# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br><br>HEARTWISE, INC.,<br><br>Debtor. | **Case No. 22-60060**<br><br>On Appeal from:<br><br>United States Bankruptcy Appellate Panel for the Ninth Circuit, Case No. CC-22-1089-LSG (Hon. Scott H. Gan, Hon. William J. Lafferty, III, and Hon. Gary A. Spraker) |
| VITAMINS ONLINE, INC.,<br><br>Appellant,<br><br>vs.<br><br>HEARTWISE, INC.; MAGLEBY, CATAXINOS & GREENWOOD, P.C.,<br><br>Appellees. | U.S. Bankruptcy Court, Central District of California, Santa Ana Division, Case No. 8:20-bk-13335-SC (Hon. Scott C. Clarkson)<br><br>**APPELLEE MAGLEBY, CATAXINOS & GREENWOOD, P.C.'S OPPOSITION TO APPELLANT VITAMINS ONLINE, INC.'S MOTION PURSUANT TO CIRCUIT RULE 3-6(a)(1) FOR AN ORDER VACATING APPEALED ORDERS ISSUED WITHOUT JURISDICTION** |

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Aaron J. Malo, Cal. Bar No. 179985
amalo@sheppardmullin.com
Anastasia K. Billy, Cal. Bar No. 210416
abilly@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626
Telephone: 714.513.5100
Facsimile: 714.513.5130

RAY QUINNEY & NEBEKER P.C.
Jeffrey W. Shields, *pro hac vice*
jshields@rqn.com
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: 801.323.3374
Facsimile: 801.532.7543

*Attorneys for Magleby, Cataxinos & Greenwood, P.C.*

## Corporate Disclosure Statement

## [Fed. R. App. Proc. 26.1(a)]

Appellee Magleby, Cataxinos & Greenwood, P.C. does not have any parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Dated: March 30, 2023

By _____ */s/ Aaron J. Malo*
AARON J. MALO
Attorneys for
MAGLEBY, CATAXINOS &
GREENWOOD, P.C.

# **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

I.      Introduction.....................................................................................5

II.     Background Facts. ...........................................................................5

III.    VOL's Motion Should Be Denied Because The Bankruptcy Court
        And The BAP Had Jurisdiction Over The Underlying Core Matters
        Arising In The Heartwise Bankruptcy Case.....................................8

IV.     VOL's Motion Should Be Denied Because The Underlying Claim
        Objections Satisfy The Criteria For "Related To" Jurisdiction.....................10

V.      VOL's Motion Should Be Denied Because Jurisdiction Is Proper
        Under The Confirmed And Substantially Consummated Plan. ....................13

VI.     Conclusion. .....................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**<u>Cases</u>**

*Christensen v. Tucson Ests., Inc. (In re Tucson Ests., Inc.)*
  912 F.2d 1162 (9th Cir. 1990) ...........................................................13

*In re Fietz*
  852 F.2d 455 (9th Cir. 1988) ...............................................10, 12, 13

*Pacor, Inc. v. Higgins*
  743 F.2d 984 (3d Cir. 1984) .............................................................10

*Trulis v. Barton*
  107 F.3d 685 (9th Cir. 1995) ......................................................14, 15

**<u>Statutes and Rules</u>**

11 U.S.C. § 1126(a) ...........................................................................12

28 U.S.C. § 157(a) ...............................................................................9

28 U.S.C. § 157(b)(1)............................................................................9

28 U.S.C. § 157(b)(2)(B) ...................................................................9, 10

28 U.S.C. § 157(c) .............................................................................10

28 U.S.C. § 158...................................................................................9

28 U.S.C. § 1334(b) ...........................................................................9, 10

Cir. R. 3-6(a)(1) ..................................................................................5

Fed. R. Bankr. Proc. 8002...................................................................14

## OPPOSITION TO MOTION

Appellee Magleby, Cataxinos & Greenwood, P.C. ("MCG") hereby opposes the Motion Pursuant To Circuit Rule 3-6(a)(1) For An Order Vacating Appealed Orders Issued Without Jurisdiction (the "Motion") filed by appellant Vitamins Online, Inc. ("VOL") in this matter.

## I. **Introduction.**

VOL seeks summary disposition based solely on its allegation that the lower courts lacked subject matter jurisdiction over the claim objections at issue. There is no good faith basis for that contention. Both the bankruptcy court and the Bankruptcy Appellate Panel had clear statutory jurisdiction over the claim objections because they are "core" matters arising in a case under title 11. Even if that were not so, the requirements for "related to" jurisdiction were satisfied, and the court's jurisdiction was conclusively established by the terms of the plan confirmation order from which VOL never took an appeal. There is no "clear error" here that could support summary disposition as requested by VOL. *See* Circuit Rule 3-6(a)(1). The Motion should be denied.

## II. **Background Facts.**

Underlying this appeal are competing claims filed by VOL (claim 3) and MCG (claim 5) in the Heartwise, Inc. ("Heartwise" or the "Debtor") bankruptcy, as

well as objections to those claims. [*See* Bk. Dkt. 645, Ex. 3[1], 4:16-5:13, 6:18-22.] Both claims are based on a judgment entered against Heartwise in the District Court for the District of Utah (the "Utah Judgment") which is currently on appeal to the Tenth Circuit Court of Appeals. [*Id*. at 2:15-24; 13:15-16.] Pursuant to the Debtor's confirmed plan of reorganization, an amount presumed to be sufficient to satisfy the Utah Judgment has been deposited with the bankruptcy court. [Bk. Dkt. 460, Ex. 1, 5:2-6; Bk. Dkt. 679, Ex. 4.] Importantly, the confirmed plan provides that both the Tenth Circuit appeal and all objections to MCG's and VOL's claims must be resolved before any portion of those funds can be released to pay either claim 3 or claim 5. [Bk. Dkt. 460, Ex. 1, 5:7-11; Bk. Dkt. 645, Ex. 3, 13:9-22.]

The bankruptcy court (Hon. Mark Wallace presiding) originally issued a Memorandum Decision and Order sustaining MCG's objection and disallowing VOL's claim (the "Disallowance Order") [Bk. Dkt. 729, Ex. E], and a separate Order overruling VOL's objection to MCG's claim (the "Objection Order") [Bk. Dkt. 747, Ex. 5]. VOL sought reconsideration of the Disallowance Order, and additional findings of fact and conclusions of law regarding the Objection Order. In response, the bankruptcy court (Hon. Scott C. Clarkson presiding) issued two orders (collectively, the "Abstention Orders") vacating the Disallowance Order and

---

[1] For the sake of clarity, exhibits included in VOL's Motion are referenced by the same letter used therein; additional exhibits included in this Opposition are referenced by number.

the Objection Order, and abstaining from rendering any decision on the merits of

the dispute between MCG and VOL, directing that the dispute should be resolved

in the Utah courts. [Bk. Dkt. 776, Ex. D; Bk. Dkt. 777, Ex. 6.]

VOL appealed the Disallowance Order, the Objection Order, and both of the

Abstention Orders. [Bk. Dkt. 788, Ex. 7.] Noting that "the primary issue in this

appeal is whether the bankruptcy court appropriately abstained from hearing the

dispute; the merits are not before us," the Bankruptcy Appellate Panel for the

Ninth Circuit (the "BAP") affirmed both Abstention Orders. [BAP Doc. 52, Ex. B,

at p. 9.] VOL then initiated this appeal.

Through the Motion, VOL now seeks a determination that the bankruptcy

court lacked jurisdiction to issue the Disallowance Order – but not the Objection

Order – and one (but not both) of the Abstention Orders. [Motion, Dkt. Entry: 15-

1, at ECF pp. 5, 25 of 26.] It also seeks vacatur of the decision and related

judgment issued by the BAP for want of jurisdiction in connection with one of the

Abstention Orders [*Id*. at ECF pp. 5, 26 of 26], though VOL does not challenge the

BAP's ability to review and affirm the second Abstention Order. [BAP Doc. 52,

Ex. B, at pp. 7, 18.] Finally, VOL includes a request for remand to the bankruptcy

court within the Motion. [Motion, Dkt. Entry: 15-1, at ECF p. 26 of 26.]

Apparently, VOL inconsistently contends that the second Abstention Order should

remain in effect, even though it would seemingly suffer from the same

jurisdictional infirmities that VOL contends justify its challenge to the first such order.

## III. **VOL's Motion Should Be Denied Because The Bankruptcy Court And The BAP Had Jurisdiction Over The Underlying Core Matters Arising In The Heartwise Bankruptcy Case.**

The Motion implicates but one issue – whether the lower courts had subject matter jurisdiction to issue the orders giving rise to this appeal.[2]  The applicable jurisdictional analysis is entirely straightforward:

---

[2] Although entirely irrelevant to the singular jurisdictional issue raised by the Motion, VOL includes a lengthy discussion of its prior proposal for immediate payment of its claim 3, partly to VOL and partly to MCG, while leaving MCG and VOL "to go and litigate in the Utah courts if they deem it necessary regarding their rights…."  [Motion, Dkt. Entry: 15-1, at ECF p. 17 of 26.]  Discussing settlement negotiations in this context is wildly inappropriate, but VOL's decision to do so necessitates a response.  MCG did decline VOL's settlement proposal for a number of reasons, including:  (a) it directly contravened the terms of Heartwise's confirmed plan of reorganization requiring resolution of the Tenth Circuit appeal of the Utah Judgment before any distribution can be made on claim 3 [Bk. Dkt. 460, Ex. 1, 5:7-11; Bk. Dkt. 645, Ex. 3, 13:9-12]; (b) it failed to account for the Debtor's objection to claim 3 which remained (and remains) unadjudicated, preventing any such payment without obtaining bankruptcy court-approved consent from the Debtor [Bk. Dkt. 711, Ex. 9]; and (c) it would have left MCG at risk of liability to a third party that provided litigation funding to VOL, to whom MCG owes a contractual duty to make certain payments in the event that MCG receives any proceeds derived from the Utah Judgment.  VOL has steadfastly refused to participate in any settlement discussions intended to arrive at a bankruptcy court-approved, global resolution among all such parties.

- 28 U.S.C. § 1334(b) provides district courts with jurisdiction covering "all civil proceedings arising under title 11, or arising in or related to cases under title 11;"

- 28 U.S.C. § 157(a) authorizes district courts to refer those cases to the bankruptcy courts;

- 28 U.S.C. § 157(b)(1) specifies that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11;" and

- The allowance or disallowance of claims is among the "core" proceedings arising in cases under title 11 that are expressly identified within 28 U.S.C. § 157(b)(2)(B).

Thus, bankruptcy courts have jurisdiction to hear and determine matters involving claims and objections thereto. In this instance, the underlying orders issued by the bankruptcy court, like the BAP decision related thereto, all address claims filed by MCG and VOL, and the objections raised in response to those claims. These are "core" proceedings arising in the Heartwise bankruptcy case. Given this, the bankruptcy court and the BAP unquestionably possessed subject matter jurisdiction over these matters,[3] and VOL's Motion should be denied.

---

[3] It appears that VOL is not challenging the appellate jurisdiction of the BAP under 28 U.S.C. § 158, and is only arguing that underlying jurisdiction pursuant to 28 U.S.C. § 1334(b) was lacking.

**IV.**   <u>**VOL's Motion Should Be Denied Because The Underlying Claim**</u>

      <u>**Objections Satisfy The Criteria For "Related To" Jurisdiction.**</u>

     VOL's Motion omits any discussion of the controlling jurisdictional determination under 28 U.S.C. § 1334(b) and 157(b)(2)(B) detailed above, and instead focuses on legal authority addressing only "related to" jurisdiction under 28 U.S.C. § 1334(b) and 157(c). Although this jurisdictional basis is neither applicable nor necessary in the context of claim objections, the bankruptcy court and the BAP would possess jurisdiction under this alternative as well.

     Under *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (an analysis adopted by the Ninth Circuit in *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988)), a proceeding falls within "related to" jurisdiction if it "could conceivably have any effect on the estate being administered in bankruptcy." Such "related to" jurisdiction is very broad, including both actions against the debtor or its property, and any proceeding in which "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Fietz*, 852 F.2d at 457. Here, "related to" jurisdiction would certainly cover the claim objections addressing whether MCG or VOL is entitled to collect millions of dollars from Heartwise, because those objections implicate both the Debtor's property and the administration of the bankruptcy estate.

Practicality also mandates this conclusion. The claims filed by MCG and VOL are both based on the Utah Judgment – a judgment entered against the Debtor. As such, the bankruptcy court necessarily must possess jurisdiction to issue rulings regarding which of those competing claims will be allowed or disallowed, and in what amounts, so that the bankruptcy estate can be properly administered. Absent such jurisdiction, Heartwise would be left in the untenable position of having to somehow address overlapping and competing claims in a bankruptcy case governed by a court that lacked the authority to issue a final order establishing which creditors (if any) are entitled to payment. That would be absurd.

The circumstances necessary to establish "related to" jurisdiction were also clear at the time MCG filed its objection to VOL's claim, contrary to VOL's assertion. No plan of reorganization had yet been confirmed in the Heartwise bankruptcy.[4] Both MCG and VOL asserted claims against the Debtor, and both MCG and VOL were active participants in the Heartwise bankruptcy case. [*See* MCG's Proof of Claim 5-2, Ex. H; VOL's Proof of Claim 3-2, Ex. 8.] As such, it was already manifest that determinations regarding the competing claims and objections stood to materially impact the plan and confirmation process, and the

---

[4] MCG's objection to VOL's claim was filed on May 29, 2021. [*See* Dkt. 277, Ex. G.] The order confirming Heartwise's plan of reorganization was not entered until December 17, 2021. [*See* Bk. Dkt. 644, Ex. 2.]

bankruptcy estate as a whole. *See*, *e.g.*, 11 U.S.C. §§ 1126(a) (holder of allowed

claim may accept or reject plan); 1129(B)(2)(b) (requirements for plan of

reorganization regarding allowed unsecured claims). There is no reasonable

argument that resolution of the claim objections, with the resulting allowance or

disallowance of all or part of the competing multi-million dollar claims, would not

affect "the debtor's rights, liabilities, options, or freedom of action." Accordingly,

the criteria for "related to" jurisdiction were satisfied. *See Fietz*, 852 F.2d at 457.

VOL agrees that this jurisdictional analysis should be performed as of the

time MCG filed its objection to VOL's claim. [*See* Motion, Dkt. Entry: 15-1, at

ECF pp. 21-22 of 26.] Yet within the Motion, VOL relies on changed

circumstances that arose later – after the Debtor's plan of reorganization was

confirmed and substantially consummated – to support its assertion that the

underlying claims and objections have no effect on the bankruptcy estate. [*See*

Motion, Dkt. Entry: 15-1, at ECF p. 23 of 26.] By that later time, Heartwise had

deposited sufficient funds with the bankruptcy court to pay the competing claims

of either MCG or VOL, in the event that the Utah Judgment survives scrutiny by

the Tenth Circuit. [Bk. Dkt. 679, Ex. 4.] It was only at *that* time that the impact

on the Debtor's estate effectively became the "same" if either MCG's claim or

VOL's claim is allowed and paid.[5] But this was not the situation when MCG's

---

[5] All of the statements from the lower courts quoted by VOL were made post-confirmation, and were based on these same later circumstances. Additionally,

objection was filed, and months later, post-confirmation is not the proper time to assess "related to" jurisdiction. *See Fietz*, 852 F.2d at 457, fn. 2.

## V.  **VOL's Motion Should Be Denied Because Jurisdiction Is Proper Under The Confirmed And Substantially Consummated Plan.**

The bankruptcy court also has jurisdiction over MCG's and VOL's claims, and the objections thereto, pursuant to the terms of the Debtor's confirmed plan of reorganization. After conducting a multi-day, in-person trial, the bankruptcy court confirmed Heartwise's plan over VOL's objections. [Bk. Dkt. 644, Ex. 2, 5:14-17, 6:18-7:2.] The confirmed plan required Heartwise to interplead sufficient funds to pay either VOL's claim 3 or MCG's claim 5 (depending upon how the competing objections are ultimately resolved). [*Id*. at 4:10-12.] The bankruptcy court's Findings of Fact and Conclusions of Law [Bk. Dkt. 645, Ex. 3], which were expressly incorporated into the plan confirmation order [Bk. Dkt. 644, Ex. 2, 6:13-15], make it clear that the funds deposited into the bankruptcy court's registry are subject to the court's eventual determination of whether MCG or VOL "will be

---

VOL takes these quotes out of context. These statements actually addressed "the substance rather than form of an asserted 'core' proceeding," one of the factors for consideration in reviewing an abstention decision. *See Christensen v. Tucson Ests., Inc. (In re Tucson Ests., Inc.)*, 912 F.2d 1162, 1167 (9th Cir. 1990) (factor seven). As the BAP noted, "the bankruptcy court implicitly, and correctly, found that, while the dispute was ostensibly a core proceeding, its substance was a two-party dispute that did not impact the estate." [BAP Doc. 52, Ex. B, p. 17.]

paid the Judgment, or any portion thereof." [Bk. Dkt. 645, Ex. 3, 13:9-15, 19-22; *see also* Bk. Dkt. 644, Ex. 2, 21:11-17.]

The confirmation order was entered on December 17, 2021. [*See* Bk. Dkt. 644, Ex. 2.] VOL never appealed that order, and cannot collaterally attack it through these proceedings. Additionally, the confirmed plan went effective as of January 3, 2022 – at that time, Heartwise paid all claims as required under the Plan, including depositing $14.5 million with the bankruptcy court in satisfaction of the Utah Judgment. [Bk. Dkt. 679, Ex. 4.]

Absent a direct appeal (which never occurred here), the provisions of a confirmed plan are enforceable and entitled to *res judicata* effect; a party cannot later collaterally attack the bankruptcy court's jurisdiction over the subject matter of the plan. *See Trulis v. Barton,* 107 F.3d 685, 691 (9th Cir. 1995) (having failed to appeal plan confirmation order, party cannot challenge bankruptcy court's jurisdiction over subject matter of plan). The plan confirmation order here was never appealed by VOL or any other party, and the time for any such appeal has long since lapsed. *See* Fed. R. Bankr. Proc. 8002. Therefore, all provisions of the plan are binding on Heartwise, VOL, and MCG – and the plan conclusively establishes that the bankruptcy court has jurisdiction to make a determination regarding MCG's and VOL's competing claims and objections. VOL's failure to appeal the confirmation order renders the bankruptcy court's jurisdiction immune

from collateral attack. *See Trulis,* 107 F.3d at 691. This provides yet another basis for denying the Motion.

**VI.    Conclusion.**

Under any analysis, the bankruptcy court and the BAP possessed the necessary subject matter jurisdiction to make determinations regarding the claims and related objections implicated by this appeal. All the challenged rulings involved the allowance or disallowance of claims in the Heartwise bankruptcy case, which means that the courts making those rulings were considering "core" proceedings arising in a case under title 11. The clear impact those rulings had on the bankruptcy estate also satisfy the requirements for "related to" jurisdiction. Additionally, jurisdiction exists pursuant to the Debtor's confirmed plan of reorganization; VOL never appealed the plan confirmation order and cannot now collaterally challenge that ruling.

For all of these reasons, and as set forth more fully above, MCG respectfully requests that VOL's Motion be denied.

Dated:  March 30, 2023

By        _/s/ Aaron J. Malo_

AARON J. MALO
Attorneys for
MAGLEBY, CATAXINOS &
GREENWOOD, P.C.

<u>**CERTIFICATE OF COMPLIANCE**</u>

I, Aaron J. Malo, am counsel for Appellee Magleby, Cataxinos & Greenwood, P.C. in this matter. This Opposition, excluding those items listed in Fed. R. App. Proc. 27(d)(1) and 32(f), contains 2633 words, and complies with the word limit of Fed. R. App. Proc. 27(d)(2)(a). The type size and typeface (Times New Roman, 14 point) used in this Response comply with Fed. R. App. Proc. 27(d)(1)(E) and 32(a)(5)(A).

Dated: March 30, 2023

By       */s/ Aaron J. Malo*
                AARON J. MALO
                Attorneys for
                MAGLEBY, CATAXINOS &
                GREENWOOD, P.C.

# EXHIBIT "1"

1  Ronald A. Clifford (State Bar No. 246542)
   E-Mail: RAC@RCliffordLaw.com
2  R. CLIFFORD & ASSOCIATES
   1100 Town and Country Rd., Suite 1250
3  Orange, California 926868
   Telephone: (949) 533-9774
4

5  *General Insolvency Counsel for*
   *Heartwise, Inc.*
6

7                  UNITED STATES BANKRUPTCY COURT

8          CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

9

| In re: | Case No.: 8:20-bk-13335-MW |
|---|---|
| HEARTWISE, INC., | Chapter 11 |
| Debtor in Possession. | **HEARTWISE, INC.'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION** |
| | **Confirmation Hearing Date, Time and Location:** |
| | Date:      November 10, 2021 |
| | Time:      2:00 p.m. |
| | Place:      411 West Fourth Street |
| | Santa Ana, CA 92701 |
| | Courtroom 6C |
| | **Objection and Voting Deadline:** |
| | Date:  October 15, 2021 |

### I.   INTRODUCTION

On December 4, 2020 (the "Petition Date"), Heartwise, Inc. (the "Debtor") filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). This document is the *Debtor's First Amended Chapter 11 Plan of Reorganization* (this "Plan").

Chapter 11 of the Bankruptcy Code allows debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization.  This Plan is a plan of reorganization that provides for certain payments to creditors of the Debtor on the Effective Date from, *inter alia*, income from the Debtor's business as more fully described below.  The effective

date of this Plan (the "Effective Date") will be the first business day that is at least fifteen (15) calendar days following the date of the entry of the Court order confirming this Plan (the "Confirmation Order") when and if all the following conditions for the effectiveness of the Plan have been satisfied or waived by the Debtor: (1) there is no stay in effect with respect to the Confirmation Order; and (2) the Confirmation Order is not subject to any appeal or rehearing.  After the Effective Date, the Debtor shall be referred to as the "Reorganized Debtor," and shall be referred to herein, when appropriate, as the Reorganized Debtor.

## II.   CLASSFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.    What Creditors And Interest Holders Will Receive Under The Plan**

As required by the Bankruptcy Code, this Plan (i) classifies claims and interests in various classes according to their right to priority, (ii) states whether each class of claims or interests is impaired or unimpaired, and provides the treatment each class will receive.

**B.    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed the following claims in a class.

**1.    Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Bankruptcy Code section 507(a)(2).  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date of this Plan, unless a particular claimant agrees to a different treatment.

The following chart lists all the Debtor's estimated §507(a)(2) administrative claims and their treatment under this Plan:

/ / /

/ / /

/ / /

---

| Name | Amount Owed | Treatment |
|---|---|---|
| Office of the U.S. Trustee | $72,000 (estimated) | Paid in full on the Effective Date |
| Clerk's Office Fees | TBD | Paid in full on the Effective Date |
| Unpaid Payroll | $360,000 | Paid in full on the Effective Date |
| DTO Law | $5,000.00 | Paid in full on the Effective Date |
| R. Clifford & Associates | $200,000 | Paid in full on the Effective Date |
| **Total** | **$637,000** | |

Court Approval of Fees Required:

The Court must rule on all fees listed in this chart before any particular fee or expense will be paid. For all professional fees and expenses, except fees owing to the Clerk of the Bankruptcy Court or U.S. Trustee, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be required to be paid under this Plan. The administrative claim amounts set forth above simply represent the Debtor's best estimate as to the amount of allowed administrative claims in this case. The actual administrative claims may be higher or lower. Much of whether the administrative claims described above for professionals are the actual amounts will be dependent on whether the Debtor is required to engage in any substantial litigation regarding the confirmation of this Plan and/or claim objections. If the Debtor is required to engage in such litigation, then the Debtor's professionals are likely to incur professional fees and expenses in excess of the figures set forth above.

Any creditors, other than professionals, wishing to file a request for the allowance of an administrative expense must file such request no later than thirty days (30) days after the Effective Date. Professionals shall have until 60 days following the Effective Date to file fee applications for all pre-confirmation amounts. By voting to accept this Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any administrative claims, and no party is waiving any of its rights to object to the allowance of any administrative claim. Similarly, professionals who have been employed in these cases shall not be deemed to agree that the figures contained herein represent

any ceiling on the amount of fees and expenses that such professionals have incurred or for which

they are entitled to seek payment.  Such fees and expenses are merely estimates provided at the time

of the preparation of the accompanying Disclosure Statement.

Administrative expenses incurred in the ordinary course of the Debtor's business shall be

paid in the ordinary course of business and, pursuant to 11 U.S.C. sections 363 and 1107, may be

paid by the Reorganized Debtor without Court approval.

### 2. Priority Tax Claims

Priority Tax Claims include certain unsecured income, employment, and other taxes

described in Section 507(a)(8) of the Bankruptcy Code.  The Debtor estimates that its asserted

priority tax claims are as follows:

| Entity | Amount | Treatment |
| --- | --- | --- |
| Franchise Tax Board | $1,966.00 | Paid in full on the Effective Date |
| Internal Revenue Service | $300,100.00 | Paid in full on the Effective Date |
| State Board of Equalization | $6,627.00 | Paid in full on the Effective Date |
| **Total** | **$308,693** | |

### C. Classified Claims And Interests

### 1. Priority Unsecured Claims

Certain priority claims that are referred to in Sections 507(a)(3), (4), (5), (6), and (7) of the

Bankruptcy Code are required to be placed in classes.  These types of claims are entitled to priority

treatment as follows:  The Bankruptcy Code requires that each holder of such a claim receive cash

on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured

priority claim holders may vote to accept deferred cash payments of a value, as of the Effective

Date, equal to the allowed amount of such claim.  The Debtor does not estimate any priority

unsecured claims.

### 2. Class 1: General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under 11 U.S.C. §

507(a).  General unsecured non-priority claims will comprise Class 1.  It is estimated that Class 1

claims will total $14,754,667.23 (after application of pre-petition deposits). Class 1 claims will be paid in full on the Effective Date. The amount asserted in Claim No. 5 of Magleby, Cataxinos & Greenwood, P.C. ("Magleby"), $14.5 million, which amount is related to the *Final Judgment* (the "Judgment") entered by the U.S. District Court for the District of Utah, Case No. 2:13-cv-00982-DAK, on November 10, 2020, shall be deposited with the Court's registry as interpleaded funds on the Effective Date, and will be released to Magleby only upon further order of this Court.

To be clear, the Debtor has filed an appeal of the Judgment, and Vitamins Online, Inc., the judgment creditor, has stated that it will be pursuing a cross-appeal of the Judgment. Nonetheless, the $14.5 million to pay the Judgment in full, which includes attorneys' fees and interest, will be fully funded on the Effective Date as set forth above, but not released to Magleby until all appeals of the Judgment, and any subsequent proceedings have been completed.

### 3. Interest Holders

Interest holders are the parties who hold an ownership interest (i.e. equity interest) in the estate. Currently, Earnesty, LLC ("Earnesty") owns a 51% interest in the Debtor, and DavidPaul Doyle ("Doyle") owns a 49% interest in the Debtor. On the Effective Date, these interests will be cancelled, and new shares in the Reorganized Debtor will be issued in exchange for the new value contribution of $9,425,854.69. Based on current equity interests, Earnesty shall have the right to purchase 51% of the newly issued shares in the Reorganized Debtor for $4,807,185.89, and Doyle shall have the right to purchase 49% of the newly issues shared in the Reorganized Debtor for $4,618,668.79. The new value contributions must be in cash, and funded fourteen (14) days prior to the Effective Date. Should Earnesty fail to fund the full $4,807,185.89 for its 51% interest in the Reorganized Debtor, Doyle shall have the opportunity to purchase the entirety of the newly issued shares in the Reorganized Debtor for $9,425,854.69. Should Doyle fail to fund the full $4,618,668.79 for his 49% interest in the Reorganized Debtor, Earnesty shall have the opportunity to purchase the entirety of the newly issued shared in the Reorganized Debtor for $9,425,854.69.

Both Earnesty and Doyle shall be required to deposit into an escrow account, their share of the new value contribution fourteen (14) days prior to the Confirmation Hearing. Neither Earnesty

nor Doyle shall be permitted to assign their interests in, prospective interests in, or right to fund the purchase of interests in, the Reorganized Debtor prior to the Effective Date.

**D. Means of Effectuating this Plan and Implementations**

    **1. Funding this Plan**

All pre-petition claims of the Debtor, including priority tax claims, and Class 1 claims shall be paid in cash, in full, on the Effective Date of this Plan, or when allowed, and will be funded from the new value contribution, the return of deposits from Robinson Pharma, Inc. ("Robinson") and Alpha Health Research ("Alpha"), the remaining retainer from Law Offices of Michael Jay Berger, and the Debtor's cash-on-hand on the Effective Date.

    **2. Composition of the Reorganized Debtor**

The Reorganized Debtor's equity will be owned by Earnesty and/or Doyle as provided herein. On the Effective Date, the equity interests in the Debtor shall be cancelled. Each of Earnesty and Doyle will have the ability to purchase newly issued shares in the Reorganized Debtor in their current equity proportional share in the Debtor. Specifically, Earnesty will have the option to purchase 51% of the shares of the Reorganized Debtor, and Doyle will have the option to purchase 49% of the shares of the Reorganized Debtor.

This equity purchase in the Reorganized Debtor shall constitute the new value contribution. The purchase must be in cash, on the Effective Date, with the cash deposited in escrow at least fourteen (14) days prior to the Confirmation Hearing. Earnesty will be entitled to purchase 51% of the newly issued shares in the Reorganized Debtor for $4,807,185.89, and Doyle will be entitled to purchase 49% of the newly issued shared in the Reorganized Debtor for $4,618,668.79. If Earnesty does not purchase its 51% in the Reorganized Debtor, Doyle will have the right to purchase his 51%. If Doyle does not purchase his 49% interest in the Reorganized Debtor, Earnesty will have the right to purchase his 49%. If either Earnesty or Doyle does not purchase their interest in the Reorganized Debtor by depositing the required amount on or before fourteen (14) days prior to the Confirmation Hearing, then the other party willing to purchase that interest will be required to deposit the increased purchase amount seven (7) days prior to the Confirmation Hearing.

1    In no event will the full $9,425,854.69 go unfunded in that Earnesty has agreed that it will in-

2    fact purchase its 51% interest in the Reorganized Debtor, as well as Doyle's 49% interest in the

3    Reorganized Debtor should Doyle choose not to purchase his 49% option. Notwithstanding any

4    other provision of this Plan to the contrary, as Earnesty's and Doyle's commitment to fund is

5    dependent on management continuity, minimized administrative expenses, and the absence of

6    disruption to the business, their funding commitment will terminate, and any funds in escrow shall

7    be released to each of them that has posted any such amounts, if a chapter 11 Trustee, examiner,

8    chief restructuring officer or other manager of the Debtor is appointed without Earnesty's and

9    Doyle's consent.

10   So long as Doyle and Earnesty purchase their proportional shares of the newly issued equity

11   in the Reorganized Debtor, the current Shareholder Agreement of the Debtor shall serve as the

12   Shareholder Agreement of the Reorganized Debtor. If only one of Doyle or Earnesty purchase the

13   full equity in the Reorganized Debtor, then a new shareholder agreement shall govern. Any

14   employment agreements with officers and/or employees of the Reorganized Debtor shall be

15   determined by officers of the Reorganized Debtor in accordance with the terms of the governing

16   shareholder agreement.

17   **3.    Disbursing Agent**

18   The Reorganized Debtor will serve as the disbursing agent for purposes of making all

19   distributions required to be made under this Plan.

20   **4.    Objections to Claims**

21   The Debtor and/or Reorganized Debtor will file objections to all claims which are

22   inconsistent with the Debtor's books and records or which lack legal and/or factual basis, unless the

23   Debtor and/or Reorganized Debtor deem the inconsistency or amount at issue to be insignificant or

24   too small to warrant litigation. As provided in §502(c) of the Bankruptcy Code, the Court may

25   estimate any contingent or unliquidated disputed claim for purposes of confirmation of this Plan.

26   Any requests for estimation of claims for any purpose shall be filed no later than 30 days after the

27   date the Court enters an order confirming this Plan or shall be deemed forever waived. The

28   Reorganized Debtor shall have the authority to file any objections to claims following Plan

confirmation (or to continue the prosecution of such objections commenced by the Debtor prior to

Plan confirmation), and the Court shall retain jurisdiction over the Reorganized Debtor and this case

to resolve such claim objections following Plan confirmation.  Nothing contained in this Plan shall

constitute a waiver or release by the Debtor or the Reorganized Debtor of any rights of setoff or

recoupment, or of any defense, the Debtor or the Reorganized Debtor may have with respect to any

claim.

      **5.**      **Disputed Claims Reserve**

The amount to be reserved on account of any Disputed Claim shall be (i) an amount that any

objecting party and the holder of the Disputed Claim shall agree should be withheld, (ii) if no such

agreement is reached, the amount that would have been distributed on the basis of the amount

claimed by the holder in its proof of claim filed or deemed filed in the Bankruptcy Case if such proof

of claim asserts a fixed, liquidated sum, (iii) if neither clause (i) or (ii) applies, the amount that

would have been distributed on the basis of the amount shown in the Schedules filed by the Debtor

pursuant to Rule 1007 if such amount is a fixed, liquidated sum and no proof of claim is filed, or (iv)

in the case of a contingent or unliquidated claim, the amount estimated by the Bankruptcy Court

upon a motion brought on not less than 14 days' notice to the affected parties and an opportunity for

a hearing under Rule 9014-1(b).  Before any distribution on account of a Class, the Reorganized

Debtor shall transfer to a disputed claims reserve account an amount equal to the appropriate reserve

for Disputed Claims in that Class.  At such time as a Disputed Claim becomes an Allowed Claim,

the previous distributions due on account of such Allowed Claim shall be released from the disputed

claims reserve account for delivery to the holder of such Allowed Claim.  Any funds reserved on

account of a Disputed Claim that becomes an Allowed Claim which exceed the amount due to the

holder of such Allowed Claim shall be returned to the Reorganized Debtor.

      **6.**      **Avoidance Actions and Litigation**

The Debtor, or the Reorganized Debtor, as the case may be, shall retain the exclusive right to

bring any and all actions under Chapter 5 of the Bankruptcy Code.  The Debtor or Reorganized

Debtor also expressly reserve the right to bring any and all actions against any parties-in-interest for

pre-petition and post-petition conduct.  The value of the retained actions at this point is unknown to

the Debtor.  Given the fact that this is a 100% plan, meaning that creditors are being paid in full for their allowed claims, the Reorganized Debtor does not intend on brining any avoidance actions as the actions would likely not resolve prior to the payments required under this Plan being made.  However, the Debtor is not waiving these claims, and should they need to be brought to ensure payment to creditors, they will be available, up through, and including any statute of limitations regarding the same.

### 7.    Employment of Officers, Employees and Professionals

On the Effective Date, the Reorganized Debtor will employ as its Chief Executive Officer, Tuong Nguyen, and as its Chief Financial Officers, Elaine Phan.  On or after the Effective Date, the Reorganized Debtor shall have the right to employ and compensate such officers, directors, employees, professionals, agents, and representatives as the Reorganized Debtor determines is necessary or appropriate to implement all of the provisions of this Plan and to enable the Reorganized Debtor to operate its business without the need for any further order of the Court.

### 8.    Distributions to be Made Pursuant to this Plan

All distributions to be made to the holders of Allowed claims pursuant to this Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's Schedules, as they may from time to time be amended in accordance with Federal Rule of Bankruptcy Procedure 1007 and 1009, or, if a different address is stated in a proof of claim duly filed with the Bankruptcy Court, to such address.  Checks issued to pay allowed claims shall be null and void if not negotiated within 180 days after the date of issuance thereof (the "Non-Negotiated Checks") and the amounts of such null and void checks shall be returned to the Reorganized Debtor.  The holder of a claim with respect to which a Non-Negotiated Check was issued shall forfeit all such holder's right to further distributions under this Plan.

If there remain disputed claims in any creditor Class on the date of a distribution under this Plan, a sum shall be withheld from the distribution to the holders of allowed claims of that Class in an amount that would have been distributed on account of the disputed claim as if all such disputed Class claims were allowed in the amounts asserted.  Once a disputed claim is resolved, the holder of

1  the formerly disputed claim will receive the distribution that the claim holder is entitled to receive

2  and any excess sums available will be distributed paid to the Reorganized Debtor.

3        **9.      Exculpations and Releases**

4        To the maximum extent permitted by law, neither the Debtor, the Reorganized Debtor, nor

5  any of their professionals employed or retained by any of them, shall have or incur liability to any

6  person or entity for any act taken or omission made in good faith in connection with or related to the

7  formulation and implementation of this Plan, or a contract, instrument, release, or other agreement or

8  document created in connection therewith, the solicitation of acceptances for or confirmation of this

9  Plan, or the consummation and implementation of this Plan and the transactions contemplated

10  thereby.

11        **10.     Injunctions**

12        **As of the Effective Date, the Confirmation Order shall enjoin the prosecution, whether**

13  **directly, indirectly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage,**

14  **demand, debt, right, cause of action, liability, or interest released, discharged, or terminated**

15  **pursuant to this Plan.  Except as provided in this Plan or the Confirmation Order, as of the**

16  **Effective Date, all entities that have held, currently hold, or may hold a claim or other debt or**

17  **liability that is discharged or an interest or other right of an equity security holder that is**

18  **extinguished pursuant to the terms of this Plan are permanently enjoined from taking any of**

19  **the following actions against the Debtor, the Reorganized Debtor, or their property on account**

20  **of any such discharged claims, debts, or liabilities or extinguished interests or rights: (a)**

21  **commencing or continuing, in any manner or in any place, any action or other proceeding; (b)**

22  **enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or**

23  **order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff,**

24  **right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to**

25  **the Debtor; and (e) commencing or continuing any action in any manner, in any place, that**

26  **does not comply with or is inconsistent with the provisions of this Plan.  By accepting**

27  **distribution pursuant to this Plan, each holder of an allowed claim receiving distributions**

28

1   pursuant to this Plan shall be deemed to have specifically and expressly consented to the

2   injunction set forth in this Section.

3        Notwithstanding this provision, on the date that the Confirmation Order is entered by

4   the Court, the automatic stay applicable to this Case through 11 U.S.C. § 362, shall terminate

5   to allow: (1) regarding the Judgment, the Debtor's appeal, and any cross-appeal by Vitamins

6   Online to be filed and litigated to conclusion; (2) Vitamins Online to file and litigate the

7   complaint attached as Exhibit A to Claim No. 7 filed by Vitamins Online in the Bankruptcy

8   Case; and (3) Doyle to file and litigate any complaint in a court of competent jurisdiction

9   against the Debtor pursuant to Oregon Statute 60.952.  The lifting of the automatic stay

10  described herein as to the Judgment is solely to allow Vitamins Online and the Debtor to

11  obtain a favorable ruling by the 10th Circuit Court of Appeals of the Judgment and/or an

12  augmented award by the District Court after the appeal of the Judgment.  The lifting of the

13  automatic stay described herein as to the complaint attached to Proof of Claim No. 7 as

14  Exhibit A is solely to allow that actual complaint to be filed in a court of competent

15  jurisdiction, and then litigated to a judgment.  The lifting of the automatic stay as to any

16  complaint to be filed by Doyle as against the Debtor under Oregon Statute 60.952 is solely to

17  allow the complaint to be filed, and litigated to judgment.  The lifting of the automatic stay

18  described herein shall not allow the enforcement of any Judgment or award against the

19  Debtor's estate, or the Reorganized Debtor.  As set forth below, the Court is retaining

20  jurisdiction as to the allowance of any such judgments or awards against the Debtor's estate.

21  The lifting of the automatic stay described herein also begins, or continues the running of any

22  statute of limitations as of the entry of the Confirmation Order by the Court related to an

23  appeal and cross-appeal rights regarding the Judgment, the filing of the complaint attached to

24  Claim No. 7 as Exhibit A, and Doyle's filing of a complaint against the Debtor pursuant to

25  Oregon Statute 60.952.

26        11.     Executory Contracts and Unexpired Leases

27       The Reorganized Debtor, as of the Effective Date, shall assume the contracts it has with

28  Robinson and Alpha.  All of the amounts required to cure the pre-petition amounts owed to

Robinson and Alpha shall be paid in full through a setoff of the pre-petition deposits each of them holds.  Any amounts owed to Robinson or Alpha for post-petition shipments of goods and services constitute ordinary course of business payables that shall be paid in the ordinary course of business post-confirmation.  All other unexpired leases and executory contracts of the Debtor not assumed in writing within 30 days of the Effective Date shall be deemed rejected as of the Effective Date.  Any proofs of claim for rejected executory contracts or unexpired leases may be filed with the Court within 45 days of the Effective Date of this Plan.

All of the Debtor's remaining executory contracts and unexpired leases which have not previously been assumed or rejected, and which are not included above shall be deemed rejected effective as of 11:59 p.m. prevailing Pacific time on the Effective Date.  THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT THAT IS REJECTED ON THE EFFECTIVE DATE WILL BE FORTY-FIVE (45) DAYS AFTER THE EFFECTIVE DATE.  Any claim based on the rejection of an unexpired lease or executory contract will be barred if a proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.

**12.    Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to governmental regulatory commission approvals.

**13.    Submission of Post-Confirmation Reports**

Until a Final Decree is obtained, each January, April, July, and September, the Debtor shall file with the Court and serve on the Office of the United States Trustee a status report (a) containing the Debtor's receipts and disbursements during the prior three months and (b) explaining the Debtor's progress toward obtaining a Final Decree.

**14.    Retention of Jurisdiction**

After confirmation of this Plan and the occurrence of the Effective Date, in addition to jurisdiction that exists in any court, the Bankruptcy Court will retain such jurisdiction as is legally permissible, including for the following purposes:

(a)    To resolve any and all disputes regarding the operation and interpretation of this Plan and/or the Confirmation Order;

1        (b)    To determine the allowability, classification, or priority of claims and interests

2 upon objection by the Debtor, the Reorganized Debtor, or by other parties in interest with standing to

3 bring such objection or proceeding and to consider any objection to claim or interest whether such

4 objection is filed before or after the Effective Date;

5        (c)    To determine the extent, validity, and priority, of any lien asserted against

6 property of the Debtor or property of the Debtor's estate;

7        (d)    To construe and take any action to enforce this Plan, the Confirmation Order,

8 and any other order of the Court, issue such orders as may be necessary for the implementation,

9 execution, performance, and consummation of this Plan and the Confirmation Order, and all matters

10 referred to in this Plan or the Confirmation Order, and to determine all matters that may be pending

11 before the Court in this case on or before the Effective Date with respect to any person or entity

12 related thereto;

13        (e)    To determine any and all applications for the allowance of compensation and

14 reimbursement of expenses of professionals for the period on or before the Effective Date;

15        (f)    To determine any request for payment of administrative expense;

16        (g)    To determine motions for the assumption, assumption and assignment, or

17 rejection of executory contracts or unexpired leases filed within 45 days of the Effective Date and

18 the allowance of any claims resulting therefrom;

19        (h)    To determine all applications, motions, adversary proceedings, contested

20 matters, and any other litigated matters instituted during the pendency of this case, whether before,

21 on, or after the Effective Date, including avoidance actions, and the Reorganized Debtor shall have

22 the right to commence any avoidance actions after the Effective Date and to continue with the

23 prosecution of any avoidance actions commenced by the Debtor before the Effective Date;

24        (i)    To determine the allowance of Claim Nos. 6, 7, and 8;

25        (j)    To determine such other matters and for such other purposes as may be

26 provided in the Confirmation Order;

27

28

1      (k)    To modify this Plan under Section 1127 of the Bankruptcy Code in order to

2  remedy any apparent defect or omission in this Plan or to reconcile any inconsistency in this Plan so

3  as to carry out its intent and purpose;

4      (l)    Except as otherwise provided in this Plan and Confirmation Order, to issue

5  injunctions, to take such actions or make such orders as may be necessary or appropriate to restrain

6  interference with this Plan or the Confirmation Order, or the execution or implementation by any

7  person or entity of this Plan and Confirmation Order;

8      (m)    To issue such orders in aid of consummation of this Plan or the Confirmation

9  Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or

10  entity, to the fullest extent authorized by the Bankruptcy Code or the Bankruptcy Rules; and

11      (n)    To enter a final decree closing this Chapter 11 case.

12              **V.    EFFECT OF CONFIRMATION OF THIS PLAN**

13  **A.    Discharge**

14      The Debtor will receive a discharge under this Plan pursuant to and in accordance with the

15  provisions of 11 U.S.C. § 1141 because there has not been a liquidation of all or substantially all of

16  the property of the Debtor's estate and because the Reorganized Debtor will be continuing with a

17  portion of the Debtor's current business operations.  Upon the Effective Date and in consideration of

18  the distributions to be made hereunder, except as otherwise expressly provided herein, each holder

19  (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest

20  and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the

21  Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and

22  all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective

23  Date, all such entities shall be forever precluded and enjoined, pursuant to section 524 of the

24  Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated

25  Interest in the Debtor against the Debtor, the Reorganized Debtor, or any of their assets or property,

26  whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases

27  therefor were known or existed prior to the Effective Date.

28

Notwithstanding the above-referenced discharge, the discharge will not apply to: (1) any judgment obtained by Vitamins Online related solely to the timely filing of the complaint it attached to Claim No. 7 as Exhibit A; (2) any increase in the amount of the Judgment obtained by Vitamins Online through a cross-appeal timely filed with the 10th Circuit or any reduction of the Judgment through the Debtor's appeal; and (3) any amounts that Doyle obtains from a court of appropriate jurisdiction related to a judgment entered against the Debtor based on Oregon Statute 60.952.

**B.     Modification Of The Plan**

The Debtor may modify this Plan at any time before confirmation.  However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on this Plan if the Debtor modifies this Plan before confirmation.  The Debtor may also seek to modify this Plan at any time after confirmation of this Plan as long as (1) this Plan has not been substantially consummated and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**C.     Post-Confirmation Conversion or Dismissal**

A creditor or other party in interest may bring a motion to convert or dismiss the case under 11 U.S.C. §1112(b) after this Plan is confirmed if there is a default in performing under this Plan.  If the Bankruptcy Court orders the Debtor's Chapter 11 case converted to Chapter 7 after this Plan is confirmed, all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to this Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Bankruptcy Court during this case.  The Confirmation Order may also be revoked under very limited circumstances.  The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Confirmation Order.

**D.     Final Decree**

Once this estate has been fully administered as referred to in Federal Rule of Bankruptcy Procedure 3022, the Reorganized Debtor will file a motion with the Court to obtain a final decree to close the Debtor's Chapter 11 case.  The Reorganized Debtor shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. §1930(a)(6).

1   Dated: September 22, 2021               By:_____

2                                    Tuong Nguyen

3                                    Chief Executive Officer of

                                   Heartwise, Inc., Debtor-in-Possession

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

1100 Town and Country Rd., Suite 1250, Orange, California 92868.

A true and correct copy of the foregoing document entitled: *Heartwise, Inc.'s Chapter 11 Plan of Reorganization* will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On September 22, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger on behalf of Attorney The Law Offices of Michael Jay Berger
michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Anthony Bisconti on behalf of Creditor Robinson Pharma, Inc.
tbisconti@bienertkatzman.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Alpha Health Research
tbisconti@bienertkatzman.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Ernesty LLC
tbisconti@bienertkatzman.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Robinson Pharma, Inc.
tbisconti@bienertkatzman.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Tuong Nguyen
tbisconti@bienertkatzman.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Jared Glicksman on behalf of Interested Party DavidPaul Doyle
jglicksman@yocca.com

Jared Glicksman on behalf of Plaintiff DavidPaul Doyle
jglicksman@yocca.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Eve H Karasik on behalf of Interested Party Levene, Neale, Bender, Yoo & Brill L.L.P.
ehk@lnbyb.com

Steven J. Katzman on behalf of Creditor Robinson Pharma, Inc.
SKatzman@bienertkatzman.com,
admin@bienertkatzman.com;chowland@bienertkatzman.com;4579179420@filings.docketbird.com

Steven J. Katzman on behalf of Defendant Robinson Pharma, Inc.
SKatzman@bienertkatzman.com,
admin@bienertkatzman.com;chowland@bienertkatzman.com;4579179420@filings.docketbird.com

Aaron J Malo on behalf of Interested Party Magleby Cataxinos & Greenwood
amalo@sheppardmullin.com, clopez@sheppardmullin.com;abilly@sheppardmullin.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

Kathleen P March on behalf of Interested Party Vitamins Online, Inc.
kmarch@bkylawfirm.com, kmarch3@sbcglobal.net

Carlos A Nevarez on behalf of Creditor Robinson Pharma, Inc.
cnevarez@bienertkatzman.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Alpha Health Research
cnevarez@bienertkatzman.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Ernesty LLC
cnevarez@bienertkatzman.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Robinson Pharma, Inc.
cnevarez@bienertkatzman.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Tuong Nguyen
cnevarez@bienertkatzman.com, carlos.aa.nevarez@gmail.com

Misty A Perry Isaacson on behalf of Interested Party Courtesy NEF
misty@ppilawyers.com, ecf@ppilawyers.com;perryisaacsonmr51779@notify.bestcase.com

Dean G Rallis, Jr on behalf of Creditor Vitamins Online, Inc
drallis@hahnlawyers.com, marias@hahnlawyers.com;mpham@hahnlawyers.com;drallis@ecf.courtdrive.com

Seth A Safier on behalf of Creditor Martha Valentine
seth@gutridesafier.com

K. Luan Tran on behalf of Creditor Robinson Pharma, Inc.
ltran@kslaw.com, tle@kslaw.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov                       ☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On September 22, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.  The Plan is being served as Exhibit A to the Disclosure Statement.

Securities and Exchange Commission
444 South Flower Street, Suite 900
Los Angeles, California 90071
                                                    ☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 22, 2021, I served the following persons and/or entities by personal delivery as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Mark S. Wallace
United States Bankruptcy Court
411 West Fourth Street, Suite 6135
Santa Ana, CA 92701-4593
                                                    ☐ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 22, 2021 | Ronald A. Clifford | /s/ Ronald A. Clifford |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Label Matrix for local noticing
0973-8
Case 8:20-bk-13335-MW
Central District of California
Santa Ana
Wed Sep 22 08:35:35 PDT 2021

A. Clifford & Associates
1100 Town and Country Rd.
Suite 1250
Orange, CA 92868-4633

2973 Harbor Blvd., #472
Costa Mesa, CA 92626-3912

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd, #1700
Los Angeles, CA 90067-6253

Santa Ana Division
411 West Fourth Street, Suite 2030,
Santa Ana, CA 92701-4500

Alpha House Research
2781 West Macarthur Blvd., Suite 34
Santa Ana, CA 92704-8300

American Express
P O Box 650448
Dallas, TX 75265-0448

Anthem Blue Cross
P O Box 51011
Los Angeles, CA 90051-5311

Brads Deals LLC
6115 Estate Smith Bay Suite 315 Box 7
St. Tomas, VI 00802-1324

California Bank and Trust
Bankcard Center
P O Box 30833
Salt Lake City, UT 84130-0833

California Dept. of Tax & Fee Administration
Collections Support Bureau MIC:55
PO BOX 942879
SACRAMENTO CA 94279-0055

Capital One
P O Box 60599
City of Industry, CA 91716-0599

Central Entertainment Group Inc
1001 6th Ave 14th Floor
New York, NY 10018-5477

Christina Entertainment Inc
2419 Santiago Drive
Newport Beach, CA 92660-3649

DavidPaul Doyle
4400 El Nido Ranch Rd
Orinda, CA 94563-1900

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

Franchise Tax Board
c/o General Counsel Section
P O Box 1720, MS: A-260
Rancho Cordova, CA 95741-1720

Internal Revenue Service (IRS)
P O Box 7346
Philadelphia, PA 19101-7346

Little Red Management
7200 Franklin Ave 222
Los Angeles, CA 90046-3083

Magleby Cataxinos & Greenwood, P.C.
ATTN:  J.Magleby
141 Pierpont Avenue
Salt Lake City, UT 84101-1902

Mark Foley
411 E. Wisconsin Ave.
Suite 1000
Milwaukee, WI 53202-4409

Martha Valenite
c/o Gutride Safier LLP
Seth A. Safier, Esq.
100 Pine Street, Ste 1250
San Francisco, CA 94111-5235

Monumental
5010 SE Foster Rd, #86352
Portland, OR 97206-3039

PHD Studios
1968 Hutchins Circle
Medford, OR 97504-4878

Premeo Financial Corp
P O Box 19367
Kalamazoo, MI 49019-0367

Retain Exchange Network, Inc.
7071 Warner Ave., Ste #345
Huntington Beach, CA 92647-5495

Rob Wilsey Creative Partners LLC
300 s. Raymond Ave., Ste 6
Pasadena, CA 91105-2638

Robinson Pharma
3330 South Harbor Blvd.
Santa Ana, CA 92704-6831

State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279-8064

Steptoe & Johnson LLP
633 West Fifth Street
Los Angeles, CA 90071-2005

- 37 -

Tatyana Shykal
10625 Parrish St, Apt 223
Matthews, NC 28105-8933

Trojan Law Offices
Red Fox Plaza
9250 Wilshire Blvd., 325
Beverly Hills, CA 90212-3376

Tuong V. Nguyen
10132 Tyler Court
Westminster, CA 92683-5760

Uline
12575 Uline Drive
Pleasant Prairie WI 53158-3686

Uline
P O Box 88741
Chicago, IL 60680-1741

United States Trustee (SA)
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4500

Vitamins Online Inc.
Edgar R. Cataxinos
MAGLEBY CATAXINOS & GREENWOOD
170 S MAIN ST STE 1100
Salt Lake City, UT 84101-1651

Vitamins Online, Inc.
c/o The Bankruptcy Law Firm, P.C.
10524 W. Pico Blvd., Ste. 212
Los Angeles, CA 90064-2346

WORKMAN NYDEGGER
60 E SOUTH TEMPLE STE 1000
Salt Lake City, UT 84111-1011

Martha Valentine
c/o Gutride Safier LLP
100 pine street
suite 1250
san francisco, CA 94111-5235

RONALD CLIFFORD
R. Clifford & Associates
1100 TOWN AND COUNTRY RD., SUITE 1250
ORANGE, CA 92868-4633

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Alpha Health Research, Inc.

(u)Blakeley LLP

(u)Courtesy NEF

(u)DTO Law

(u)Greenberg Traurig, LLP

(u)Magleby Cataxinos & Greenwood

(u)QualiNutra, Inc.

(u)Robinson Pharma, Inc.

(u)The Law Offices of Michael Jay Berger

(u)Vitamins Online, Inc

(d)Robinson Pharma, Inc.
3330 South Harbor Blvd.
Santa Ana, CA 92704-6831

(u)DavidPaul Doyle

End of Label Matrix
Mailable recipients      41
Bypassed recipients      12
Total                    53

# EXHIBIT "2"

1 | Ronald A. Clifford (State Bar No. 246542)
E-Mail: RAC@RCliffordLaw.com
2 | **R. CLIFFORD & ASSOCIATES**
3 | 1100 Town and Country Rd., Suite 1250
Orange, California 92868
4 | Telephone: (949) 533-9774

5 | *General Insolvency Counsel for*
*Heartwise, Inc.*
6

FILED & ENTERED

DEC 17 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle          DEPUTY CLERK

7 |                  UNITED STATES BANKRUPTCY COURT

CHANGES MADE BY COURT

8 |          CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

9 | In re:

10 | HEARTWISE, INC.,

11 |

12 |                                  Debtor in Possession.

Case No.: 8:20-bk-13335-MW

Chapter 11

**ORDER CONFIRMING HEARTWISE,
INC.'S FIRST AMENDED CHAPTER 11
PLAN OF REORGANIZATION AND
DENYING WITH PREJUDICE CERTAIN
CONFIRMATION ORDER-RELATED
MOTIONS**

**Hearing Date, Time and Location:**
Date:      November 10, 2021
Time:      2:00 p.m.
Place:     411 West Fourth Street
           Santa Ana, CA 92701
           Courtroom 6C

20 |                         **BACKGROUND FACTS**

21 |          Heartwise, Inc. ("Heartwise") and Vitamins Online, Inc. ("VOL") engage in the business of

22 | selling vitamins and nutritional supplements online and are business competitors.  On October 23,

23 | 2013, VOL filed a complaint against Heartwise in the United States District Court for the District of

24 | Utah (the "District Court") alleging claims for unfair competition and false advertising under federal

25 | and Utah law (the "District Court Action").  Nearly five years later, in approximately August to

26 | September 2018, VOL engaged Magleby, Cataxinos & Greenwood, P.C. ("MCG") to lead the

27 | prosecution of the District Court Action.  MCG sent VOL an engagement letter dated September 27,

28 | 2018 that memorializes the terms of the engagement (the "Engagement Agreement").  The

1  Engagement Agreement provided for reduced hourly rates plus a contingency fee.  In the event

2  MCG gained VOL a recovery in excess of $5 million (defined as the "Extraordinary Result

3  Threshold"), MCG would become entitled to an increased contingency fee.  The Engagement

4  Agreement also arguably provides that MCG had the exclusive right to collect any payment on an

5  award to VOL, to subtract its attorneys' fees and costs and to remit the balance to VOL.

6       The District Court held a three-week bench trial in the summer of 2020.  The District Court

7  made very detailed findings of fact and conclusions of law in a 53-page document and awarded VOL

8  $9,551,232 in damages against Heartwise plus prejudgment interest plus reasonable attorneys' fees

9  (the "Judgment").  The amount of attorneys' fees has not yet been determined, but parties generally

10  expect the Judgment with awarded attorneys' fees and prejudgment interest to be about $14.5

11  million.

12       Although one might reasonably expect that VOL would be thrilled with a Judgment that was

13  double (or possibly triple, depending upon how the matter is viewed) the "Extraordinary Result

14  Threshold" that VOL itself had agreed to when it signed the Engagement Agreement, that does not

15  appear to have been the case.  VOL took the position that the District Court got it wrong, and that

16  VOL was entitled to <u>an additional $34 million</u> beyond that awarded to it in the Judgment.

17       VOL's next move was to fire MCG – the law firm that had gained it a recovery double and

18  possibly triple the "Extraordinary Result Threshold" -- and to purportedly terminate the Engagement

19  Agreement.

20       Heartwise filed a notice of appeal with respect to the Judgment.  VOL intended to file a

21  cross-appeal of the Judgment, but before that could occur Heartwise filed a voluntary chapter 11

22  petition in this Court on December 4, 2020.  VOL was thus stayed from filing the cross-appeal.

23       Early in the case, Heartwise proposed a plan of reorganization that would pay all creditors

24  holding allowed claims 100 cents on the dollar.  This included the Judgment.  Generally, creditors

25  who are presented with a chapter 11 plan of reorganization that pays them 100 cents on the dollar

26  tend to approve of and support confirmation of such a plan, but that did not occur here.  VOL

27  repeatedly endeavored through various filings with the Court to prevent Heartwise's 100-cents-on-

28  the-dollar plan from getting to a plan confirmation hearing and then continued these efforts during

1    the multi-day confirmation hearing itself and again after the confirmation hearings concluded.

2    Heartwise has alleged that VOL's objective in this case is not to have the Judgment paid in full but

3    instead to destroy Heartwise as a business competitor and to prevent it from reorganizing (or else to

4    end up owning the entirety of Heartwise's capital stock).

5         VOL filed Claim 3-1 (later amended in Claim 3-2) with respect to the Judgment.  VOL also

6    filed Claim 8 for the additional $34 million that the District Court had purportedly erred in failing to

7    add to the Judgment.  Finally, VOL filed Claim 7 for an additional $20 million in damages unrelated

8    to the District Court Action.

9         Claim 3-2 and Claim 8 drew objections filed by MCG.  MCG evidently fears that if the

10   Judgment is paid by Heartwise directly to VOL, VOL will not honor the terms of the Engagement

11   Agreement and will decline to pay MCG the hourly and contingency fees it has earned by winning

12   VOL a recovery that is double or triple the "Extraordinary Result Threshold."  To protect itself

13   against the risk of non-payment, MCG filed Claim 5-2 and Claim 12, asserting that any amounts

14   paid by Heartwise in respect of the Judgment or in respect of VOL's $34 million claim in Claim 8

15   must be paid to MCG, not VOL, because of MCG's alleged rights under the Engagement Agreement

16   to collect the Judgment (and the $34 million addition thereto, should VOL be successful in its

17   contention that the District Court erred in failing to award VOL an extra $34 million in the District

18   Court Action).  MCG does not dispute that if moneys are paid to MCG under Claim 5-2 and Claim

19   12, MCG would have an obligation to pay the excess amount over to VOL after MCG has deducted

20   the fees and costs to which it is allegedly entitled under the Engagement Agreement (and possibly

21   amounts owing to a third party who provided litigation financing to VOL).  MCG supports

22   confirmation of the Plan (as that term is defined below) and generally has argued in opposition to

23   VOL throughout most or all of this case.

24        Upon motion by Heartwise and a hearing, the Court estimated Claim 7, Claim 8 and Claim

25   12 at <u>zero</u> for purposes of distribution under a plan of reorganization and for voting (but not for

26   allowance).

27        VOL was initially represented in this bankruptcy case by Levene, Neale, Bender, Yoo &

28   Golubcik ("Levene Neale").  VOL then replaced Levene Neale with The Bankruptcy Law Firm, P.C.

("BLF") whose principal attorney is Kathleen March, Esq.  Finally, Hahn & Hahn LLP has substituted in for BLF as VOL's third set of attorneys in this chapter 11 case within less than one year.

Prior to a transaction described below, Heartwise's capital stock was owned 51 percent by Earnesty, LLC ("Earnesty") and 49 percent by DavidPaul Doyle ("Mr. Doyle").  Like VOL, Mr. Doyle objected to confirmation of Heartwise's chapter 11 plan of reorganization (although on grounds generally different from those asserted by VOL).

Heartwise's First Amended Chapter 11 Plan of Reorganization (the "Plan") provides for payment of all creditors holding allowed claims 100 cents on the dollar plus postpetition interest. Because MCG disputes VOL's Claim 3-2, the Plan provides for Heartwise to interplead approximately $14.5 million in moneys ear-marked to pay the Claim 3-2 or Claim 5-2 (depending upon how the interpleader is ultimately resolved).  Payment in full with interest occurs on the effective date of the Plan, which is the first business day that is 14 days after entry of an order confirming the Plan.  However, if an appeal of the Confirmation Order is taken, the Plan does not become effective (unless Heartwise waives that condition).

The Plan does not provide for any distribution to Claim 7, Claim 8 or Claim 12 because each of those claims has been estimated by this Court at zero for purposes of distribution and Plan confirmation.  The Plan provides that litigation involving these claims can go forward after the Plan becomes effective, and in the event these Claims are allowed in any amount, such Claims will be paid in cash in full.

The Plan is partially funded by cash contributions by Heartwise's shareholders, with the balance of the funding to come from cash already on hand plus the release of multi-million dollar deposits held by parties with whom Heartwise transacts business.  The shareholder cash contribution in the aggregate is about $9.5 million, with 51 percent thereof to be paid by Earnesty and 49 percent to be paid by Mr. Doyle.  If either shareholder declines to fund the Plan in the required amount, the other shareholder has the right to make the contribution of the shareholder who declined to fund. This has actually occurred, with Mr. Doyle declining to advance his 49 percent share of the approximate $9.5 million aggregate contribution.  Earnesty will be paying the entirety of the $9.5

1   million contribution and as a result will own 100 percent of Heartwise's capital stock.

2          At the outset of the hearing on Plan confirmation on November 10, 2021, VOL's chief

3   financial officer, Osman Khan ("Mr. Khan"), announced that he had purchased the entirety of Mr.

4   Doyle's interest in Heartwise, including but not limited to all Heartwise capital stock owned by Mr.

5   Doyle, all claims Mr. Doyle had against Heartwise, and Mr. Doyle's interest as plaintiff in an

6   adversary proceeding he commenced in this main bankruptcy case.  Upon hearing this, the Court

7   ruled that Mr. Doyle was no longer a "party in interest" and therefore was not entitled to call

8   witnesses, introduce evidence, make objections or otherwise be heard at the confirmation hearing.

9   An emergency motion for reconsideration of this ruling was filed and denied.  Mr. Doyle has

10  appealed this ruling to the United States District Court for the Central District of California and, in

11  this Court, has filed a motion seeking a stay pending appeal (the "Stay Motion").  The Court heard

12  oral argument on the Stay Motion on December 15, 2021.  This Court's determination of the Stay

13  Motion is set forth below.

14         Following a multi-day confirmation hearing trial (the "Confirmation Hearing"), the Court on

15  November 23, 2021 entered its Memorandum Decision and Order, Docket No. 561 (the

16  "Memorandum Decision"), overruling all objections to Plan confirmation and directing Heartwise to

17  lodge a confirmation order and findings of fact and conclusions of law.  On December 8, 2021, VOL

18  filed a Motion for Reconsideration of Memorandum Decision and Order (Docket No. 596) (the

19  "Reconsideration Motion").  The Court heard oral argument on the Reconsideration Motion on

20  December 15, 2021.  The Court's determination of the Reconsideration Motion is set forth below.

21         On December 13, 2021, the Court was notified after regular business hours that VOL had

22  prepared a draft emergency motion arguing that the Court should accept VOL's bid to buy Heartwise

23  because VOL's bid was a higher and better bid than the $9.5 million in capital contributions being

24  made by Earnesty under the Plan.  During the morning of December 14, 2021, the Court entered an

25  order permitting VOL to orally make the emergency motion at the Court hearing of the

26  Reconsideration Motion at 2 pm on December 15, 2021 (the "Oral Emergency Motion").  The

27  Court's determination of the Oral Emergency Motion is set forth below.

28

1

2

3

4

5      NOW, THEREFORE, the Court having reviewed and considered the disclosure statement,

6  the Plan, the objections and briefs in support of confirmation, and the Court having heard statements

7  of counsel in support of and in opposition to confirmation of the Plan at the Confirmation Hearing,

8  considered the testimony presented and evidence admitted at the Confirmation Hearing, and it

9  appearing to the Court that (i) notice of the Confirmation Hearing was adequate and appropriate as to

10 all parties to be affected by the Plan and the transactions contemplated thereby, and (ii) the legal and

11 factual bases set forth in the briefs and declarations submitted in support of confirmation of the Plan

12 and the evidence as presented at the Confirmation Hearing establish just cause for the relief granted

13 herein; and after due deliberation thereon and good cause appearing therefor, the Court adopts the

14 *Findings of Fact and Conclusions of Law* entered on the Court's docket by the Court concurrently

15 herewith, and incorporates them as if fully set forth herein.

16      **NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**

17 **THAT:**

18      1.      <u>Confirmation of the Plan</u>.  The Plan and each of its provisions (whether or not

19 specifically approved herein) are approved and confirmed under Section 1129 of the Bankruptcy

20 Code, provided, however, that if there is any direct conflict between the terms of the Plan and the

21 terms of this Confirmation Order, the terms of this Confirmation Order shall control.  Each of the

22 terms and conditions of the Plan and the exhibits and schedules thereto are an integral part of the

23 Plan and are incorporated by reference into this Confirmation Order.  The Plan complies with all

24 applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and this Court's Local

25 Bankruptcy Rules.

26      2.      <u>Objections</u>.  Excepting only the Stay Motion, the Reconsideration Motion and the

27 Oral Emergency Motion (all of which are ruled on below), all objections to confirmation of the Plan

28 that have not been withdrawn, waived or settled, and all reservations of rights included therein, are

1    overruled on the merits and for the reasons set forth on the record at the Confirmation Hearing, and

2    as set forth in the *Findings of Fact and Conclusions of Law*.

3         3.    Modifications to the Plan.  In accordance with Section V.B. of the Plan, the Plan may

4    be modified as set forth, and in accordance with the procedures therein.

5         4.    Non-severability, Indivisibility and Mutual Dependency.  The provisions of the Plan

6    and this Confirmation Order and each and every part of this Confirmation Order from page 1

7    through and including page 25, including the *Findings of Fact and Conclusions of Law* incorporated

8    herein by reference, are integrated, non-severable, indivisible and mutually dependent and inter-

9    dependent.  A challenge to any portion of the Plan, this Confirmation Order and/or the *Findings of*

10   *Fact and Conclusions of Law* is a challenge to the entirety of all of them.

11        5.    Binding Effect.  Pursuant to Section 1141 of the Bankruptcy Code, effective as of the

12   Effective Date, the provisions of the Plan, including the exhibits and schedules to, and all documents

13   and agreements executed pursuant to or in connection with, the Plan, and this Confirmation Order

14   shall be binding on (i) Heartwise, (ii) all holders of claims against and equity interests in Heartwise,

15   whether or not impaired under the Plan and whether or not such holders have accepted or rejected

16   the Plan, (iii) each person or entity receiving, retaining or otherwise acquiring property under the

17   Plan, (iv) any non-Heartwise party to an executory contract or unexpired lease with Heartwise, (v)

18   any person or entity making an appearance in the Chapter 11 Case or any other party-in-interest in

19   the Chapter 11 Case, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees,

20   executors, administrators, affiliates, officers, directors, agents, representatives, attorneys,

21   beneficiaries or guardians.

22        6.    Revesting of Assets.  Except as otherwise provided in the Plan or this Confirmation

23   Order, on and after the Effective Date, all property and assets of Heartwise's estate shall vest in the

24   Reorganized Heartwise free and clear of all claims, liens, encumbrances, charges and other interests,

25   without supervision or approval of the Court and free of any restrictions of the Bankruptcy Code or

26   Bankruptcy Rules other than those restrictions expressly imposed by the Plan and this Confirmation

27   Order.  On and after the Effective Date, the Reorganized Heartwise may operate its businesses and

28   may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code and

Bankruptcy Rules and in all respects as if there were no pending case under any chapter or

provisions of the Bankruptcy Code, except as provided therein.

7. <u>Releases, Exculpation and Limitations of Liability</u>.  Except as otherwise provided in

the Plan, this Confirmation Order or a separate order of the Court, the release, exculpation and

limitation of liability provisions set forth in the Plan, including, but not limited to, those contained in

section II.D(9) of the Plan are approved in all respects, are incorporated herein in their entirety, are

so ordered and shall be immediately effective on the Effective Date of the Plan without further order

or action on the part of the Court, any of the parties to such releases or any other party. The releases,

exculpation and limitation of liability provisions contained in the Plan, including, but not limited to,

those provided in section II.D(9) of the Plan, are fair and equitable and given for valuable

consideration and are in the best interest of Heartwise and all parties-in-interest, and, accordingly,

are hereby authorized, approved and binding in all respects on all persons and entities described

therein. To the extent that a release or other provision in the Plan constitutes a compromise of a

controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019

approving such compromise.

8. <u>Injunctions</u>.  The injunctions contained in the Plan, including, but not limited to, those

provided in section II.D(10) of the Plan, are hereby authorized, approved and binding on all persons

and entities described therein.  Except as otherwise provided in the Plan, as of the Effective Date this

Confirmation Order shall enjoin the prosecution, whether directly, indirectly, derivatively or

otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action,

liability, or interest released, discharged, or terminated pursuant to the Plan. Except as provided in

the Plan or this Confirmation Order, as of the Effective Date, all entities that have held, currently

hold, or may hold a claim or other debt or liability that is discharged or an interest or other right of

an equity security holder that is extinguished pursuant to the terms of the Plan are permanently

enjoined from taking any of the following actions against Heartwise, the Reorganized Heartwise, or

their property on account of any such discharged claims, debts, or liabilities or extinguished interests

or rights: (a) commencing or continuing, in any manner or in any place, any action or other

proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award,

1   decree, or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff,

2   right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to

3   Heartwise; and (e) commencing or continuing any action in any manner, in any place, that does not

4   comply with or is inconsistent with the provisions of the Plan. By accepting distribution pursuant to

5   the Plan, each holder of an allowed claim receiving distributions pursuant to this Plan shall be

6   deemed to have specifically and expressly consented to the injunction set forth in the Plan,

7   including, but not limited to section II.D(10) of the Plan.

8          Notwithstanding section II.D(10) of the Plan, on the date that this Confirmation Order is

9   entered by the Court, the automatic stay applicable to this Case through Section 362 of the

10  Bankruptcy Code, shall terminate to allow: (1) regarding the Judgment, Heartwise's appeal, and any

11  timely cross-appeal by VOL to be filed and litigated to conclusion; (2) VOL to file and litigate the

12  complaint attached as Exhibit A to Claim No. 7 filed by VOL in Heartwise's Chapter 11 Case; and

13  (3) Mr. Doyle, as his interest may appear, to file and litigate any complaint in a court of competent

14  jurisdiction against Heartwise pursuant to Oregon Statute 60.952. The lifting of the automatic stay

15  described herein as to the Judgment is solely to allow VOL and Heartwise to obtain a favorable

16  ruling by the 10th Circuit Court of Appeals of the Judgment and/or an augmented award by the

17  District Court after the appeal of the Judgment. The lifting of the automatic stay described herein as

18  to the complaint attached to Proof of Claim No. 7 as Exhibit A is solely to allow that actual

19  complaint to be filed in a court of competent jurisdiction, and then litigated to a judgment. The

20  lifting of the automatic stay as to any complaint to be filed by Mr. Doyle, as his interest may appear,

21  as against Heartwise under Oregon Statute 60.952 is solely to allow the complaint to be filed, and

22  litigated to judgment. The lifting of the automatic stay described herein shall not allow the

23  enforcement of any judgment or award against Heartwise's estate, or the Reorganized Heartwise. As

24  set forth below, the Court is retaining jurisdiction as to the allowance of any such judgments or

25  awards against Heartwise's estate. The lifting of the automatic stay described herein also begins, or

26  continues the running of any statute of limitations as of the entry of the Confirmation Order by the

27  Court related to an appeal and cross-appeal rights regarding the Judgment, the filing of the complaint

28  attached to Claim No. 7 as Exhibit A, and Mr. Doyle's filing of a complaint (as his interest may

appear) against Heartwise pursuant to Oregon Statute 60.952.

9.    <u>Assumed Executory Contracts and Unexpired Leases</u>.  As of the Effective Date, the Reorganized Heartwise shall assume the executory contracts it has with Robinson Pharma, Inc. and Alpha Health Research.  The amounts to cure the executory contracts with Robinson Pharma, Inc. and Alpha Health Research shall be offset from the pre-petition deposits Heartwise placed with each Robinson Pharma, Inc. and Alpha Health Research.  All other executory contracts and leases of Heartwise that the Reorganized Heartwise does not assume in writing within 30 days of the Effective Date shall be deemed rejected as of the Effective Date.  Any proof of claim for rejected contracts or unexpired leases must be filed with the Court within 45 days of the Effective Date.

10.    <u>General Authorizations</u>.  Pursuant to Section 1142(b) of the Bankruptcy Code and in each case without further notice to, hearing before or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person, Heartwise, the Reorganized Heartwise and their respective officers and directors and all other necessary parties are authorized and empowered to: (i) take any and all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements, documents and transactions contemplated by or described in the Plan or in this Confirmation Order; and (ii) perform any and all other acts that are necessary, appropriate or required to comply with or carry out the terms and conditions of the Plan or this Confirmation Order.

11.    <u>Authority to Act</u>.  Heartwise through the Effective Date, and the Reorganized Heartwise thereafter, and their respective authorized representatives, officers and directors are authorized and empowered pursuant to any applicable corporation laws of the jurisdiction in which Heartwise and Reorganized Heartwise are incorporated, organized or formed, to take any and all actions necessary or desirable to implement the transactions contemplated by the Plan and this Confirmation Order, in each case without any requirement of further vote, consent, approval, authorization or other action by the stockholder, security holders, officers, directors, partners, managers, members or other owners of Heartwise or the Reorganized Heartwise or notice to, order of, or hearing before the Court. Each federal, state and local governmental agency or department is

1   hereby authorized and directed to accept any and all documents and instruments necessary and

2   appropriate to consummate the Plan and the transactions contemplated thereby.

3         12.   <u>Government Approvals</u>.  This Confirmation Order shall constitute all approvals and

4   consents required, if any, by the laws, rules or regulations of any State or any governmental

5   authority with respect to the implementation or consummation of the Plan and any documents

6   instruments or agreements, and any amendments or modifications thereto, and any other acts

7   referred to in or contemplated by the Plan, the disclosure statement, and any documents, instruments

8   or agreements contained therein, and any amendments or modifications of any of the foregoing.

9         13.   <u>Professional Fee Claims</u>.  Professionals employed by the Court during the Chapter 11

10   Case shall have until 90 days following the Effective Date to file fee applications for all pre-

11   confirmation amounts for services rendered and expenses incurred in this matter.

12         14.   <u>Disputed Claims</u>.  Any disputed claims shall be determined as provided for in the

13   Plan, disclosure statement and this Confirmation Order.

14         15.   <u>Title 28 Fees</u>.  All fees payable pursuant to Section 1930 of title 28, United States

15   Code shall be paid on or before the Effective Date.

16         16.   <u>Discharge</u>.  As of the Effective Date, to the fullest extent provided under Section

17   1141 of the Bankruptcy Code and all other applicable provisions of the Bankruptcy Code, each

18   holder (as well as any representatives, trustees, or agents on behalf of each holder) of a claim or

19   interest and any affiliate of such holder shall be deemed to have forever waived, released, and

20   discharged Heartwise, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and

21   from any and all claims, interests, rights, and liabilities that arose prior to the Effective Date. Upon

22   the Effective Date, all such entities shall be forever precluded and enjoined, pursuant to section 524

23   of the Bankruptcy Code, from prosecuting or asserting any such discharged claim against Heartwise,

24   the Reorganized Heartwise, or any of their assets or property, whether or not such holder has filed a

25   proof of claim and whether or not the facts or legal bases therefor were known or existed prior to the

26   Effective Date.

27         Notwithstanding the above-referenced discharge, the discharge will not apply to: (1) any

28   judgment obtained by VOL  related solely to the timely filing of the complaint it attached to Claim

No. 7 as Exhibit A; (2) any increase in the amount of the Judgment obtained by VOL through a cross-appeal timely filed with the 10th Circuit or any reduction of the Judgment through the Debtor's appeal; and (3) any amounts that Mr. Doyle (as his interest may appear) obtains from a court of appropriate jurisdiction related to a judgment entered against Heartwise based on Oregon Statute 60.952. Any such judgments or awards may be enforced against Heartwise by requesting the allowance of a claim for that judgment(s) or award(s) with this Court against Heartwise (and then paid by Reorganized Heartwise pursuant to the Plan's terms).

17.    Release of Liens. The release and discharge of all mortgages, deeds of trust, liens or other security interests against property of Heartwise's estate is approved in all respects and so ordered and shall be immediately effective on the Effective Date without further order or action on the part of the Court. All entities holding claims against or interests in Heartwise that are treated under the Plan are hereby directed to execute, deliver, file or record any document, and to take any action, necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan. Upon entry of this Order, all entities holding claims against or interests in Heartwise that are treated under the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking actions to interfere with the implementation and consummation of the Plan.

18.    Termination of Equity Interests. On the Effective Date, except as provided in the Plan or this Confirmation Order, the equity interest in Heartwise shall be terminated, cancelled and extinguished.

19.    Notice of Confirmation. In accordance with Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), as soon as reasonably practicable after this Confirmation Order has been entered by the Court, Heartwise shall mail notice of the entry of this Confirmation Order to all creditors and parties-in-interest in the Chapter 11 Case.

20.    Substantial Consummation. "Substantial Consummation" of the Plan, as defined in Section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

21.    Other Rights. Any and all rights of Heartwise and Reorganized Heartwise under

Section 502(e) of the Bankruptcy Code are reserved.

22.    <u>Reversal or Modification of this Confirmation Order</u>.  Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated or stayed by subsequent order of the Court, or any other court of competent jurisdiction, such reversal, stay, modification or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority or lien incurred or undertaken by Heartwise or the Reorganized Heartwise, as applicable, prior to the date that Heartwise received actual written notice of the effective date of such reversal, stay, modification or vacatur. Notwithstanding any such reversal, stay, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the date that Heartwise received actual written notice of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan, or any amendments or modifications thereto, in effect prior to the date that Heartwise received such actual written notice.

23.    <u>Retention of Jurisdiction</u>.  Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, and section II.D(14) of the Plan, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Case and all matters arising under, arising in, or related to the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, those matters in section II.D(14) of the Plan. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Confirmation Order.

24.    <u>New Value Contribution</u>.  Earnesty, LLC has provided timely proof of the full amount of the New Value Contribution, and so it is awarded all of the equity interests in the Reorganized Heartwise upon the Effective Date, so long as the New Value Contribution is actually made.

25.    <u>Interest on Class 1 Claims</u>.  All allowed Class 1 claims shall be paid interest at the rate of .11% from the Petition Date through the date of payment under the Plan.

26.    <u>Headings</u>.  The headings contained within this Confirmation Order are used for the

1    convenience of the parties and shall not alter or affect the meaning of the text of this Confirmation

2    Order.

3

4                              **THE STAY MOTION**

5              As stated earlier, the Court orally ruled from the bench that Mr. Doyle would not be

6    permitted to make argument, call witnesses or present evidence at the Plan confirmation hearing

7    because he was no longer a party in interest, having sold the entirety of his interest in Heartwise to

8    Mr. Khan during the evening of November 9, 2021.  The Court also overruled his objections to Plan

9    confirmation on the same grounds.  The Court has an independent obligation to determine whether

10   plan confirmation requirements are met (irrespective of whether any party objects to plan

11   confirmation), and in performing the necessary review the Court determined that, even taking into

12   account Mr. Doyle's objections, such requirements have been met.

13             Mr. Doyle moved for reconsideration of the Court's oral ruling, and the Court denied such

14   motion by Order Denying DavidPaul Doyle's Participation in the Confirmation Hearing,Docket No.

15   551, filed and entered November 17, 2021 (the "Participation Denial Order").  Mr. Doyle has taken

16   an appeal of the Participation Denial Order to the United States District Court for the Central District

17   of California.  What is before this Court now is Mr. Doyle's motion for a stay pending appeal of the

18   Participation Denial Order.  Lacking any cognizable interest in Heartwise that would qualify him as

19   a "party in interest" within the meaning of Bankruptcy Code section 1109 (entitled, appropriately

20   enough, "Who May Be Heard") or Bankruptcy Code section 1128(b), Mr. Doyle seeks to bring to a

21   screeching halt the entire Plan confirmation process which importantly affects parties who <u>do </u>have

22   an interest in this case.  Such *bona fide* parties in interest – unlike Mr. Doyle -- have claims against

23   Heartwise that are to be paid 100 cents on the dollar (plus postpetition interest) when the Plan goes

24   effective.  Intuitively, it would seem that a <u>person who has absolutely no interest of any kind in a</u>

25   <u>chapter 11 debtor</u> should not be permitted to derail a plan of reorganization proposing to pay all

26   creditors holding allowed claims 100 cents on the dollar plus postpetition interest on the plan's

27   effective date.  Intuition does not always translate into a correct legal conclusion, but in this instance

28   it does, as will be shown below.

---

1

2                          **Standards for a Stay Pending Appeal**

3          Mr. Doyle correctly states the standards for granting a stay pending appeal.  A bankruptcy

4   court must consider four factors:  (1) whether the applicant has made a strong showing that he is

5   likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

6   (3) whether an issuance of the stay will substantially injure other parties interested in the proceeding;

7   and (4) where the public interest lies.  *In re Gardens Regional Hospital and Medical Center, Inc.,*

8   567 B.R. 820, 830 (Bankr. C.D. Cal. 2017).  The moving party must make a "minimum permissible

9   showing" with respect to each of the four factors, with the first two factors being the most critical.

10  For the reasons stated below, it is clear each of the four factors swings heavily against Mr. Doyle

11  with the result that he has not made a "minimum permissible showing" under any of them.

12

13              **Mr. Doyle's Prospects for Success on the Merits – The First Factor**

14         Mr. Doyle's prospects for success on the merits are nil for the following reason:  the

15  Participation Denial Order is an <u>interlocutory order</u>, not a <u>final order</u>, and therefore is not subject to

16  appeal.  One of the purposes of the final order rule is to prevent piecemeal appeals that burden

17  appellate courts where there is a possibility that the entire matter may become moot because of

18  subsequent developments in the case.  *Bullard v. Blue Hills Bank,* 575 U.S. ___, 135 S. Ct. 1686

19  (2015) (" . . . [p]ermitting piecemeal, prejudgment appeals . . . undermines 'efficient judicial

20  administration . . .").  For example, appellate litigation concerning a defendant's objection to a

21  protective order precluding a deposition becomes useless and pointless if the trial court subsequently

22  awards judgment in favor of the defendant.

23         Similar circumstances are present here.  Mr. Doyle objected to confirmation of the Plan.  The

24  Court then entered the Participation Denial Order.  The Court followed this up with a hearing on

25  Plan confirmation.  Had the Court decided that the Plan should <u>not</u> be confirmed, Mr. Doyle would

26  not be prosecuting this particular appeal.  This shows that the "final order" in question here is this

27  Confirmation Order, not the Participation Denial Order.

28

---

1    *Bullard* confirms this analysis.  In *Bullard,* the Supreme Court of the United States held that

2    denial of confirmation of a chapter 13 plan was not an appealable final order "because only plan

3    confirmation – or case dismissal—alters the status quo and fixes the rights and obligations of the

4    parties."  Mr. Doyle's ultimate rights are not altered until the Court confirms the Plan – and thus the

5    "final order" is this Confirmation Order, not the earlier Participation Denial Order.

6    But even if the foregoing analysis is incorrect, there are additional, independent reasons why

7    Mr. Doyle's likelihood of success are approaching zero.  These reasons are discussed below.

8    The Participation Denial Order cited several independent grounds for the decision announced

9    therein (1) Federal Rule of Bankruptcy Procedure 7025 did not apply because the plan confirmation

10   hearing was not an adversary proceeding governed by Rule 7025; (2) Bankruptcy Code section

11   1109, which <u>did</u> apply, compelled the conclusion that Mr. Doyle was not entitled to be heard by the

12   Court because – having sold the entirety of his interests in Heartwise – he was no longer a "party in

13   interest" within the meaning of section 1109; and (3) even if Mr. Doyle qualified as a party in

14   interest, he had waived any entitlement to be heard because he had failed to raise or argue section

15   1109.

16   Mr. Doyle argues in this Stay Motion that the Court erred by concluding that Bankruptcy

17   Rule 7025 does not apply.  Mr. Doyle is correct in this regard, and he is correct for the reasons he

18   states.  The plan confirmation hearing, although not an adversary proceeding, was a contested matter

19   within the meaning of Bankruptcy Rule 9014.  Per Rule 9014, Rule 7025 applies in contested

20   matters.  Fed. R. Bankr. Pro. 9014(c).

21   However, this does not change the Court's ultimate conclusion in the Participation Denial

22   Order that Mr. Doyle was not entitled to be heard at the plan confirmation hearing.

23   Bankruptcy Code section 1109 – applicable in chapter 11 proceedings such as this one – is

24   entitled "Right to Be Heard."  It provides as follows:  "(b)  A party in interest, including the debtor,

25   the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity

26   security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a

27   case under this chapter."  The definition of "party in interest" is broad but is not without limit.  Even

28   a person who has a financial stake in the outcome of a proceeding is not necessarily a "party in

1    interest." For example, a person who is not a direct creditor of the debtor in bankruptcy but who is

2    an indirect creditor by reason of being a shareholder in the creditor is not a "party in interest" under

3    Bankruptcy Code section 1109. *Krys v. Official Comm. Of Unsecured Creditors of Refco, Inc. (In re*

4    *Refco, Inc.),* 505 F.3d 109, 117-18 (2d Cir. 2007).

5            Similarly, and even more to the point, Bankruptcy Code section 1128(b) provides that "[a]

6    party in interest may object to confirmation of a plan." There is no reason to believe "party in

7    interest" in section 1128(b) has any broader meaning than "party in interest" in section 1109(b).

8    Section 1128(b)'s omission of the statutory language "including the debtor, the trustee, a creditors'

9    committee, an equity security holders' committee, a creditor, an equity security holder, or any

10   indenture trustee" that is found in section 1109(b) may signal that, if anything, "party in interest"

11   under section 1128(b) has a somewhat narrower meaning than "party in interest" under section

12   1109(b).

13           Mr. Doyle, having sold the entirety of his interests in Heartwise, does not fall into any of the

14   enumerated categories of Bankruptcy Code section 1109(b). He is not the debtor, the trustee, the

15   creditors' committee, the equity holders' committee, a creditor, an equity security holder or an

16   indenture trustee. If an indirect creditor, such as a shareholder of a creditor, does not qualify as a

17   "party in interest" under *Krys*, it follows *a fortiori* that Mr. Doyle, who does not possess even the

18   limited financial stake held by a shareholder of a creditor, is not a "party in interest."

19           The foregoing analysis gains additional strength from reasoning based upon Federal Rule of

20   Bankruptcy Procedure 3001(e )(2). This Rule provides that if a claim is transferred after a proof of

21   claim has been filed in the bankruptcy court, "evidence of the transfer shall be filed by the

22   transferee." The purpose of this Rule is to put parties on notice that the original holder of the claim

23   is no longer a party in interest. *In re Kreisler,* 331 B.R. 364, 376 (Bankr. N.D. Ill. 2005) "(Pursuant

24   to Bankruptcy Rule 3001(e )(2), a transferee of a proof of claim that has already been filed must file

25   evidence of the transfer [citation omitted] Such evidence puts the trustee on notice that <u>the original</u>

26   <u>holder of the claim against the estate is no longer an interested party with respect to that claim</u>.")

27   (underscoring added by this Court)

28

---

**ORDER CONFIRMING HEARTWISE, INC.'S FIRST AMENDED CHAPTER 11 PLAN OF
REORGANIZATION**
**- 56 -**    17

1    But what of the provisions of Federal Rule of Bankruptcy Procedure 7025 and Federal Rule

2  of Civil Procedure 25, which seem on their face to give Mr. Doyle the right to continue with his

3  objections to plan confirmation until Mr. Khan is substituted as a party in interest?  The United

4  States Court of Appeals for the Ninth Circuit has supplied an answer to this question.  The answer is

5  that where there is a conflict between the Bankruptcy Code and the Bankruptcy Rules, the conflict

6  must be settled in favor of the Bankruptcy Code.  *American Law Center P.C. v. Stanley (In re*

7  *Jastrem)*, 253 F.3d 438, 441-42 (9th Cir. 2001) ("We have interpreted [28 U.S.C.] § 2075 to mean

8  that 'any conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of

9  the Code.'")  (Note in this regard that 28 U.S.C. § 2075 is the statute pursuant to whose authority the

10  Supreme Court of the United States is authorized to promulgate rules of bankruptcy procedure).

11  Here, there are not one but two Bankruptcy Code provisions in conflict with the interpretation of

12  Rule 7025 argued by Mr. Doyle:  Bankruptcy Code section 1109(b) and Bankruptcy Code section

13  1128(b).

14    Based upon this reasoning, it follows that Mr. Doyle ceased to be a "party in interest" within

15  the meaning of section 1109(b) and section 1128(b) and surrendered his right to be heard in

16  connection with the plan confirmation from and after the time he sold all his interests in Heartwise to

17  Mr. Khan.  The Participation Denial Order's alternative and independent ground of decision – that

18  Mr. Doyle waived his rights under Bankruptcy Code section 1109 because he failed to raise them –

19  is equally applicable here.

20    Mr. Doyle's prospects for success on the merits are slim to none.  This factor weighs heavily

21  against him.

22

23    **Irreparable Injury to Mr. Doyle – The Second Factor**

24    Analysis of this factor, even more than the analysis of the first factor, strongly supports the

25  conclusion that no stay pending appeal should be granted.  If the Plan is confirmed, there is no injury

26  at all to Mr. Doyle, let alone an irreparable injury.  Yes, the Plan cancels all existing capital stock in

27  Heartwise, but Mr. Doyle no longer owns any capital stock in Heartwise, having sold the entirety of

28  his 49 percent interest in capital stock to Mr. Khan.  Yes, the Plan provides for treatment of Mr.

---

**ORDER CONFIRMING HEARTWISE, INC.'S FIRST AMENDED CHAPTER 11 PLAN OF
REORGANIZATION**

1   Doyle's claims against Heartwise, <u>but Mr. Doyle no longer owns any claims against Heartwise by</u>

2   <u>reason of having sold them to Mr. Khan</u>.  Without belaboring the point further, it is evident that there

3   is no injury to Mr. Doyle that would occur by reason of Plan confirmation let alone an irreparable

4   injury.

5

6   **Whether Issuance of the Stay Will Substantially Injure Other Parties Interested in the**

7   **Proceeding – The Third Factor**

8         If, as Mr. Doyle requests, a stay is granted that prevents this Court from confirming the Plan,

9   the Plan, not being confirmed, will not become effective.  The Plan provides for all creditors holding

10  undisputed allowed claims to be paid 100 cents on the dollar together with postpetition interest on

11  the Plan effective date.  Accordingly, the stay that Mr. Doyle seeks will substantially injure all

12  creditors holding undisputed allowed claims by postponing for an indefinite period of time (and

13  perhaps even forever, because no one has a "crystal ball") the payment of their claims in full with

14  interest. If the Plan is not confirmed and Heartwise's business collapses (or the case is converted to

15  chapter 7), these creditors might <u>never</u> get paid.  Payment of their claims is being funded by

16  contribution of about $9.4 million in cash by Earnesty, LLC, and such payment is expressly

17  conditioned on the Plan being confirmed.  This is real injury, and the injury is substantial.  Indeed,

18  MCG makes this very point:  "The Stay Motion implicates MCG's rights and, if granted . . . stands

19  to irreparably harm MCG because, absent the issuance of the required stay, MCG stands to be paid

20  in full, with interest, on the effective date of the Debtor's confirmed Chapter 11 plan of

21  reorganization."  Opposition and Notice of Joinder in Opposition to DavidPaul Doyle's Motion for

22  Stay, Docket No. 630, filed December 14, 2021 at page 2 of 4, lines 13-16.

23        It is true, as Mr. Doyle points out, that the Plan's effective date may be stayed anyway by

24  operation of Plan terms if an appeal is taken from an order confirming the Plan.  However,

25  Heartwise has authority under the Plan to waive this condition to Plan effectiveness, so it is by no

26  means a foregone conclusion that the Plan will not become effective because of a stay triggered by

27  VOL's appeal of the confirmation order.  There would seem to be a powerful incentive for VOL <u>not</u>

28  to appeal an order confirming the Plan because by declining to appeal (and assuming VOL can

**ORDER CONFIRMING HEARTWISE, INC.'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

1   overcome an objection to its one of its claims by its former attorneys), VOL would stand to get paid

2   approximately $14.5 million in cash in relatively short order and  to continue to litigate its claimed

3   entitlement to an additional $54 million.  (It is the attractiveness of this disposition that Heartwise

4   cites in support of its argument that VOL's objective in this bankruptcy proceeding is not to get paid

5   but rather to destroy (or end up owning) a business competitor).

6        Because granting a stay pending appeal would severely and adversely impact innocent third-

7   party creditors of Heartwise as well as Heartwise itself, this factor weighs heavily against Mr. Doyle.

8

9                               **The Public Interest**

10        In enacting Chapter 11 of the Bankruptcy Code and its predecessors under the Bankruptcy

11   Act, Congress created an avenue for financially-troubled entities to reorganize their affairs, to

12   remain in business and to survive.  Heartwise's efforts to reorganize were fought by VOL nearly

13   every step of the way.  (VOL is now on its third set of attorneys in this bankruptcy case).  Mr. Doyle

14   then joined the fray and also raised arguments against Plan confirmation.  Heartwise expended a

15   great deal of time and money in its quest to get to Plan confirmation.  Wherever the public interest

16   lies, surely it does not lie in permitting a person who sold the entirety of his interest in a chapter 11

17   debtor to derail the confirmation of that debtor's plan of reorganization, all to the material detriment

18   of parties who are "parties in interest" and do have a financial stake in the proceedings.  Mr. Doyle

19   has no more interest in this case than a member of the general public.  The public interest strongly

20   lies in not granting a stay pending appeal.

21

22                               **Conclusion**

23   The Stay Motion is denied with prejudice.

24

25

26                         **THE RECONSIDERATION MOTION**

27        The Court denies the Reconsideration Motion with prejudice for all the reasons argued by (1)

28   Heartwise in Heartwise, Inc.'s Opposition to Vitamins Online, Inc.'s Motion for Reconsideration of

---

**ORDER CONFIRMING HEARTWISE, INC.'S FIRST AMENDED CHAPTER 11 PLAN OF
REORGANIZATION**
**- 59 -**   20

1   Memorandum Decision and Order, Docket No. 625, filed December 14, 2021, and (2) creditor

2   Robinson Pharma, Inc. in its Opposition to Vitamins Online, Inc.'s Motion for Reconsideration of

3   Memorandum Decision and Order, Docket No. 627, filed December 14, 2021, and <u>for the following

4   additional and independent reasons</u>:

5           VOL complains that the Court erred in finding that the Plan does not unfairly discriminate

6   against VOL's various claims.  It's true that the Plan treats VOL's Claims 3-2, 7 and 8 differently

7   than other Class 1 Claims, but the different treatment is compelled and justified by different

8   circumstances.  MCG has objected to Claim 3-2.  This prevents Claim 3-2 from being allowed, at

9   least until the time that the objection is resolved.  11 U.S.C. § 502(a) ("A claim or interest, proof of

10  which is filed under section 501 of this title is deemed allowed, unless a party in interest . . .

11  objects").  VOL's attempt to split hairs about precisely what MCG is arguing in its objection to

12  Claim 3-2 fails because MCG's objection goes right to the very heart of the matter:  is VOL entitled

13  to be paid Claim 3-2 <u>by</u> Heartwise (as opposed to by MCG, after MCG has been paid by Heartwise

14  pursuant to MCG's Claim 5)?  If VOL has no right to payment <u>from</u> Heartwise in respect of Claim

15  3-2, the absence of a "right to payment" as against Heartwise means that Claim 3-2 should be

16  disallowed in its entirety by this Court (without prejudice, of course, to VOL's right to get paid by

17  MCG pursuant to the terms of the Engagement Agreement).  These matters remain to be determined,

18  but as of the present time there are powerful reasons why Claim 3-2 should not be treated in the

19  same fashion as undisputed allowed Class 1 Claims.

20          Claims 7 and 8 are estimated at zero for purposes of distribution.  That is exactly the amount

21  distributed being distributed by Heartwise at the present time to VOL in respect of such claims –

22  zero.  VOL is given the right under the Plan to litigate its entitlement to be paid Claims 7 and 8.  If

23  VOL is successful, Reorganized Heartwise is required by the Plan's terms to pay them in cash in full

24  in their allowed amounts.  VOL's contention that Heartwise will be unable to pay these claims if

25  they are allowed in full is completely speculative and without evidence or other support.  In

26  summary, there is no unfair discrimination here regarding the treatment of any of VOL's claims

27  under the Plan.

28

1    VOL's argument that its claims are "impaired" likewise falls by the wayside.  "Impairment,"

2    as VOL concedes, is measured by a creditor's rights had the debtor not filed bankruptcy.  If

3    Heartwise had not filed bankruptcy, Heartwise in all likelihood would have been put on notice by

4    MCG that, when Heartwise went to pay the Judgment, Heartwise should send the money to MCG,

5    not VOL.  (There is no reason to believe MCG would have been less diligent if Heartwise had not

6    filed bankruptcy than it has been in this bankruptcy case).  Faced with competing demands for

7    payment of the Judgment, Heartwise would have interpleaded the moneys it intended to use to pay

8    the Judgment.  That is precisely what happens under the Plan.

9    As for Claims 7 and 8, there is no impairment in part because the Plan provides for their

10   payment in the estimated amount – zero.  A claim that is estimated at zero for purposes of

11   distribution is not impaired when the Plan provides for zero distributions in respect of that claim.

12   The other reason supporting the conclusion that Claims 7 and 8 are unimpaired is that VOL

13   has, in substance, exactly the same rights with respect to these Claims under the Plan that VOL

14   would have had if Heartwise had never filed for bankruptcy.  The Plan gives VOL the right to

15   litigate these claims in the forum of its choosing.  If VOL is successful, VOL will return to this

16   Court, and this Court will allow the claim in the full amount determined by the forum of VOL's

17   choosing.  VOL then can collect the allowed claim from Reorganized Heartwise because the Plan

18   expressly provides there is no discharge with respect to these claims.

19   VOL's contention that the Plan cuts off its rights and leaves it with an unenforceable

20   judgment against the Heartwise bankruptcy estate if it prevails in litigation against Heartwise on

21   Claims 7 and 8 is based upon a twisted and incorrect reading of the Plan.  The Plan provides in

22   Section V(A) that Claims 7 and 8 are not discharged (although the Plan does not use the terms

23   "Claims 7 and 8," what the Plan refers to as carved out of the discharge are in fact those claims).

24   Because there is no discharge, VOL, should it prevail, would be able to enforce any judgment it

25   obtains in this regard against the reorganized Heartwise.

26   VOL has previously complained that the Plan's effective date provisions are impermissibly

27   vague and potentially onerous.  VOL points to Heartwise's authority under the Plan to waive

28   conditions to the effective date and suggests that such waiver might not occur until an appeal of this

1  Order is fully in progress.  VOL also objects to the provision that the effective date is "at least" 15

2  days after an order is entered confirming the plan.

3       The Court interprets the waiver provision as carrying with it a requirement of reasonableness.

4  For example, Heartwise cannot wait six months after a notice of appeal of the confirmation order is

5  filed to invoke its right to waive the condition.  If a notice of appeal is filed, Heartwise has under the

6  Plan a reasonable period of time in which to elect to waive or not waive conditions to the Plan

7  becoming effective.

8       The reference to "at least" 15 days is appropriate and warranted by a legitimate business

9  purpose.  It, too, is circumscribed by a requirement of reasonableness.  For example, if this Order

10  had been entered on December 16, 2021, the 15th day thereafter would be December 31, 2021—New

11  Year's Eve.  It turns out that New Year's Eve is an administrative staff vacation day.  On that day,

12  Heartwise would undoubtedly find it difficult or impossible to pay approximately $14.5 million into

13  the Court's registry because the Court staff generally handling such a matter likely would be

14  unavailable.  Thus, the "at least" feature allows Heartwise to time the effective date in such a way

15  that it will be able to implement matters required under the Plan to occur on the Plan effective date

16  to actually occur on that date.  This is a ministerial matter well within Heartwise's discretion and is

17  subject to a requirement of reasonableness.

18       Finally, the Reconsideration Motion's contention that VOL was not allowed to bid for the

19  equity in Heartwise is addressed in the following section of this Order.

20

21  **THE ORAL EMERGENCY MOTION**

22       VOL argues that the Court erred by failing to consider (and approve) a bid by VOL to

23  acquire 100 percent of the issued and outstanding capital stock of Heartwise in exchange for a new

24  value contribution by VOL.  VOL's bid envisions that VOL would (1) reduce the debt under the

25  Judgment by $11 million (and, presumably, amend Claim 3-2 to reduce the amount claimed by $11

26  million), (2) contribute $200,000 to pay existing equity holders, (3) pay administrative, priority tax

27  and Class 1 claims on the effective date, (4) pay creditors 12 percent per annum postpetition interest,

28  and (5) waive and release Claims 7 and 8.  The Court permitted VOL to make an oral emergency

---

**ORDER CONFIRMING HEARTWISE, INC.'S FIRST AMENDED CHAPTER 11 PLAN OF
REORGANIZATION**
**- 62 -**  23

1   motion asking the Court to approve this bid and heard the oral emergency motion and oral

2   oppositions thereto on December 15, 2021.

3          The Plan contains no provision for bids for Heartwise's equity by third parties such as VOL

4   or anyone else.  This Court previously determined that the Plan was confirmable and entered a

5   Memorandum Decision and Order to that effect, Docket No. 561, filed and entered November 23,

6   2021 (the "Memorandum Decision").  The Memorandum Decision determined that an auction

7   method for determining the value of the new equity to be issued under the Plan pursuant to the rule

8   in *Bank. A. Nat. Tr. Sav. v. 203 North Lasalle,* 526 U.S. 434, 457 (1999) was inapplicable because

9   VOL's claims are not impaired under the Plan and therefore confirmation under cramdown is not

10  required by 11 U.S.C. § 1129(b).  Memorandum Decision at page 14 of 17, lines 16-18.

11         VOL's suggestion that the Court approve VOL's bid as described above, reject Earnesty's

12  bid and then confirm the Plan, taken all together, essentially amounts to a *sub rosa* plan of

13  reorganization that has not been run through the disclosure statement process and has not been voted

14  on by Class 1 creditors.  It would be a gross violation of bankruptcy law for the Court to confirm

15  such a plan.  This approach, if adopted, would also violate the exclusivity that Heartwise possesses

16  under 11 U.S.C. § 1121 to file a plan and solicit acceptances.

17         When creditors (other than VOL, of course) voted to accept the Plan, they voted to accept a

18  Plan where Earnesty contributes approximately $9.5 million and Robinson Pharma, Inc. returns to

19  Heartwise millions of dollars in deposits. The creditors did not vote to have VOL become the 100

20  percent owner of Heartwise's equity.  Robinson Pharma, Inc. has consistently supported Heartwise

21  in this chapter 11 case, and it is nearly certain that Robinson Pharma, Inc. would not have consented

22  to return millions of dollars in deposits (as the Plan requires) if it knew that VOL would end up

23  owning all of Heartwise's capital stock.  To accept VOL's bid and confirm the Plan – as VOL urges

24  the Court to do—would be to confirm a Plan that creditors never voted to accept.

25         In addition to the foregoing, VOL's bid is inferior to Earnesty's bid.  VOL's Claim 3-2,

26  whose amount would be reduced by $11 million under VOL's bid, is a disputed claim.  MCG has

27  objected to Claim 3-2 and contends that VOL is not entitled to directly collect even one penny of the

28  Judgment, that right having been passed to MCG pursuant to the terms of the Engagement

1    Agreement.  What VOL is proposing to reduce may not be VOL's to reduce.  VOL has not made a

2    sufficient showing that if MCG prevails in this dispute and becomes entitled to receive payment of

3    Claim 3-2 in its entirety, that $11 million or more would remain after MCG deducts its fees and

4    costs and makes any required payment to third parties (such as Privati) who may have financed the

5    litigation.

6          For these reasons, the Court denies the oral emergency motion that asks the Court to accept

7    VOL's bid, reject Earnesty's bid and confirm the Plan.

8

9    **OBJECTIONS TO THE FORM OF THE CONFIRMATION ORDER AND FINDINGS OF**

10                          **FACT AND CONCLUSIONS OF LAW**

11          The form of this Order and the Findings of Fact and Conclusions of Law has drawn

12   objections by "Doyle/Khan".  It is the law of the case, pursuant to the Participation Denial Motion,

13   that Mr. Doyle is not now entitled to be heard in this case because he is not a "party in interest"

14   under 11 U.S.C. § 1109(b). Mr. Khan is entitled to be heard, and the Court has sustained his

15   objections in part and denied them in part.  Where the objections are sustained (essentially, an

16   objection that "the Court didn't really find $X$"), the Court has stricken the objected-to provision of

17   the confirmation order as lodged and the findings of fact and conclusions of law as lodged.

18          IT IS SO ORDERED.

19

20

21

22

23   Date: December 17, 2021                      Mark S. Wallace
                                                   United States Bankruptcy Judge
24

25

26

27

28

# EXHIBIT "3"

Ronald A. Clifford (State Bar No. 246542)
E-Mail: RAC@RCliffordLaw.com
**R. CLIFFORD & ASSOCIATES**
1100 Town and Country Rd., Suite 1250
Orange, California 92868
Telephone: (949) 533-9774

*General Insolvency Counsel for*
*Heartwise, Inc.*

FILED & ENTERED

DEC 17 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle       DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CHANGES MADE BY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>HEARTWISE, INC.,<br><br>              Debtor in Possession. | Case No.: 8:20-bk-13335-MW<br><br>Chapter 11<br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW**<br><br>**Hearing Date, Time and Location:**<br>Date:      November 10, 2021<br>Time:     2:00 p.m.<br>Place:    411 West Fourth Street<br>             Santa Ana, CA 92701<br>             Courtroom 6C |

*Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization* (the "Plan") came

before the Court for hearing on confirmation of the Plan pursuant to 11 U.S.C. § 1129 beginning on

November 10, 2021, and concluded after severa; court days of trial on November 16, 2021.  Ronald

A. Clifford appeared on behalf of Heartwise, Inc. (the "Debtor").  Dean G. Rallis, Jr. of Hahn &

Hahn LLP and Chad E. Nydegger of Workman Nydegger appeared on behalf of Vitamins Online,

Inc. ("Vitamins Online").  Mark F. Foley and William D. Gardner of von Briesen & Roper, s.c.

appeared on behalf of DavidPaul Doyle ("Doyle") and Osman Khan ("Khan").  Aaron Malo of

Sheppard, Mullin, Richter & Hampton LLP, Jeffrey W. Shields of Jones, Waldo, Holbrook &

McDonough, P.C., and James E. Magleby of Magleby, Cataxinos & Greenwood ("Magleby")

appeared on behalf of Magleby.  Tony Bisconti of Bienert Katzman Littrell Williams LLP appeared

on behalf of Earnesty, LLC ("Earnesty").  Nancy Goldenberg appeared on behalf of the Office of the United States Trustee.

Having reviewed the evidence provided in support and in opposition to confirmation of the Plan, and after considering the testimony offered and arguments made during the confirmation trial, the Court makes the following findings of fact and conclusions of law overruling the objections to confirmation of the Plan, and confirming the Plan as modified on the record.

## PRE-PETITION BACKGROUND

The Debtor was formed by Doyle as an Oregon corporation on May 10, 2012, and is a retailer and wholesaler of nutritional supplements.  Earnesty is the controlling interest holder of the Debtor, owing to a 51% interest in the Debtor's issued shares and outstanding stock.  Tuong Nguyen ("Nguyen") is the Debtor's chief executive officer, Elaine Phan ("Phan") is the Debtor's chief financial officer.

On October 28, 2013, Vitamins Online filed a complaint against the Debtor in the U.S. District Court for the District of Utah (the "Utah Court") alleging unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Utah common law for false advertising.  *See* Case No. 2:13-cv-00982-DAK.  On November 10, 2020, the Utah Court entered its *Final Judgment*, whereby judgment was entered in favor of Vitamins Online, and against the Debtor, in the principal amount of $9,551,232, with pre-judgment interest at the rate of 2.13% per annum beginning on January 1, 2014, and reasonable attorney fees and costs (the "Judgment").  *Id.* at Docket No. 586. The Debtor timely filed its *Notice of Appeal* of the Judgment on December 3, 2020.  *Id.* at Docket No. 588.

## POST-PETITION BACKGROUND

### A.  The Petition

Unable to pay the Judgment, and under pressure from its trade vendors for deposits and the

withdrawal of trade terms, on December 4, 2020 (the "Petition Date"), the Debtor filed with this Court its voluntary petition for relief pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code").

**B. The Disclosure Statement and Plan**

**(1) The Initial Plan**

On March 20, 2021, the Debtor filed *Heartwise, Inc.'s Plan of Reorganization* (the "Initial Plan") and *Disclosure Statement Describing Heartwise, Inc.'s Chapter 11 Plan of Reorganization*. *See* Docket Nos. 135 and 134 respectively[1].

The Initial Plan provided for payment in full, in cash, on its effective date, of all allowed claims.  *See* Docket No. 135, pp. 4-5.

The Initial Plan also provided interest holders of the Debtor with the non-assignable opportunity to fund a portion of a new value contribution totaling $9,425,854.69 in proportion to their percentage of equity in the Debtor in exchange for that same percentage of equity in the Reorganized Debtor, and, should one of the interest holders not fund their portion of the new value contribution, the other interest holder could fund the entirety of the new value contribution in exchange for 100% of the equity interests in the Reorganized Debtor.  *Id.* at p. 5.

**(2) The First Amended Plan**

On May 5, 2021, the Debtor filed *Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization* (the "First Amended Plan") and *First Amended Disclosure Statement Describing Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization*.  *See* Docket Nos. 201 and 202 respectively.  The First Amended Plan addressed the interpleading of the amounts to pay Claims Nos. 3 and 5 as discussed below, removed Doyle as the chief branding officer of the Reorganized Debtor, extended the deadline for creditors to negotiate distributions under the plan to 120 days,

made clear that payments to creditors were to be accomplished on the effective date, and narrowed the definition of the effective date. *Id.*

### (3) Disclosure Statement Approval

On September 9, 2021, the Court entered its *Order on Approval of First Amended Disclosure Statement Describing Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization* (the "Order Approving Disclosure Statement"). *See* Docket No. 439. The Order Approving Disclosure Statement set the hearing on confirmation of the Plan for November 10, 2021. On September 22, 2021, the Debtor filed and served on all parties-in-interest that *Notice of: (1) Hearing on Confirmation of Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization; and (2) Related Confirmation Procedures and Deadlines*, as well as the Plan (which was further revised after the Disclosure Statement hearing) and the Disclosure Statement. *See* Docket Nos. 460-462. The Plan is the third iteration of the same.

### C.  Claims Filed Against the Debtor's Bankruptcy Estate and Objections Thereto

On February 11, 2021, Vitamins Online filed Claim No. 3-1 asserting a general unsecured non-priority claim against the Debtor's bankruptcy estate in the "anticipated total [of] $14,427,000.00" related to the Judgment. The breakdown of Claim No. 3-1 is as follows:  (1) $9,551,232 for the principal amount of the Judgment; (2) $1,395,740.32 in prejudgment interest at 2.13% from January 1, 2014 through November 10, 2020; (3) attorneys' fees of approximately $3,480,000; and (4) $934.74 of post-judgment, pre-petition interest at the rate of .13%.

On April 26, 2021, Magleby filed its *Limited Objection to Claim of Vitamins Online, Inc. [Claim No. 3-1]* (the "Objection to Claim No. 3"). *See* Docket No. 173. Magleby represented Vitamins Online regarding the Judgment until its withdrawal from the case on January 14, 2021. *Id.* at p. 1. The Objection to Claim No. 3 argues as follows:  (1) Magleby is owed $3,375,000 of the

---

[1] All remaining references to Docket Numbers refer to the Chapter 11 Case docket.

amounts to be paid on the Judgment as a contingency fee; (2) Magleby is owed $144,748.61 from Vitamins Online related to accrued but unpaid hourly fees in obtaining the Judgment; and (3) based on an assignment provision in the fee agreement between Vitamins Online and Magleby, any amounts to be paid by the Debtor on the Judgment, must be paid to Magleby in the first instance, and after deducting the fees owed to Magleby, Magleby will then in turn pay Vitamins Online. *Id.* at pp. 2-4.

On April 26, 2021, Magleby filed Claim No. 5 asserting a general unsecured non-priority claim against the Debtor's bankruptcy estate in the amount of $14.5 million related to the Judgment.

On April 28, 2021, Vitamins Online filed its amended Claim No. 3-2 in the amount of $14,426,972, again, related to the Judgment, which amended claim leaves out the post-judgment, pre-petition interest of $934.74 that was claimed in the original Claim No. 3-1.

On April 29, 2021, Doyle filed Claim No. 6 asserting a general unsecured non-priority claim against the Debtor's bankruptcy estate in the amount of $10,245,410 based on what he asserted to be the Debtor's statutory obligation under Oregon Statute 60.952 for the value of Doyle's 49% interest in the Debtor, and the Debtor's requirement to repurchase those shares for their fair value on account of oppressive conduct and breach of fiduciary duties by Earnesty.

On May 25, 2021, Vitamins Online filed Claim No. 7 asserting a general unsecured non-priority claim against the Debtor's bankruptcy estate in the amount of $20 million for purported "willful false advertising of products NOT sued on before."

On May 25, 2021, Vitamins Online filed Claim No. 8 asserting a general unsecured non-priority claim against the Debtor's bankruptcy estate in the amount of $34 million for purported additional amounts that should have been awarded by the Utah Court regarding the Judgment.

On May 29, 2021, Magleby filed that *Limited Objection to Claim of Vitamins Online, Inc. [Claim No. 8-1]* (the "Objection to Claim No. 8").  The Objection to Claim No. 8 argues that based

on an assignment provision in the fee agreement between Vitamins Online and Magleby, any amounts to be paid by the Debtor on Claim No. 8, must be paid to Magleby in the first instance, and after deducting the contingency fee owed to Magleby, Magleby will then in turn pay Vitamins Online.

On May 29, 2021, Magleby filed Claim No. 12 asserting a general unsecured non-priority claim against the Debtor's bankruptcy estate in the amount of $34 million related to purported additional amounts that should have been awarded by the Utah Court regarding the Judgment.

On October 19, 2021, Doyle filed Amended Claim No. 6 asserting a general unsecured non-priority claim against the Debtor's bankruptcy estate in the amount of $10,703,560 based on what he asserted to be the Debtor's statutory obligation under Oregon Statute 60.952 for the value of Doyle's 49% interest in the Debtor, and the Debtor's requirement to repurchase those shares for their fair value on account of oppressive conduct and breach of fiduciary duties by Earnesty.

On October 30, 2021, Vitamins Online filed that *Notice of Hearing on Magleby Cataxinos & Greenwood, PC's Limited Objection to Amended Claim of Vitamins Online, Inc.  See* Docket No. 499.

On November 8, 2021, Vitamins Online filed *Creditor Vitamins Online, Inc.'s Omnibus Objection to Magleby Cataxinos & Greenwood, P.C.'s Claim Nos. 5-2 and 12 on Grounds that Alleged Claimant is Not a Creditor and the Claims are Unenforceable against the Estate.  See* Docket No. 525.

### D.  Motions to Estimate Claims

#### (1) Claim No. 7

On August 5, 2021, the Debtor filed *Heartwise, Inc.'s Motion to Estimate Claim No. 7 for All Purposes, Including for Purposes of Allowance, Distribution, and Voting on Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization* (the "Claim No. 7 Estimation Motion"), wherein the

Debtor requested that the Court estimate Claim No. 7 at zero for all purposes, including for the purposes of allowance, distribution, and voting on the Plan. *See* Docket No. 373. On September 13, 2021, the Court entered its *Order Approving in Part, and Denying in Part, Heartwise, Inc.'s Motion to Estimate Claim No. 7 for All Purposes, Including for Purposes of Allowance, Distribution, and Voting on Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization*, whereby the Court estimated Claim No. 7 at $0.00 for the purposes of voting on any plan of reorganization in this case, plan confirmation, and distribution on Claim No. 7, but denied the Claim No. 7 Estimation Motion's request to allow Claim No. 7 at $0.00. Instead of allowing Claim No. 7 at $0.00 as requested in the Claim No. 7 Estimation Motion, the Order provided that the Plan was to be revised to carve-out from the discharge any amounts that may be awarded Vitamins Online related to any judgment that Vitamins Online might obtain on part of the complaint that it attached to Claim No. 7 as Exhibit "A" by a court of appropriate jurisdiction.

### (2) Claim Nos. 8 and 12

On August 5, 2021, the Debtor filed *Heartwise, Inc.'s Motion to Estimate Claim Nos. 8 and 12 for All Purposes, Including for Purposes of Allowance, Distribution, and Voting on Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization* (the "Claim No. 8 Estimation Motion"), wherein the Debtor requested that the Court estimate Claim Nos. 8 and 12 at zero for all purposes, including for the purposes of allowance, distribution, and voting on the Plan. *See* Docket No. 369. On September 13, 2021, the Court entered its *Order Approving in Part, and Denying in Part, Heartwise, Inc.'s Motion to Estimate Claim Nos. 8 and 12 for All Purposes, Including for Purposes of Allowance, Distribution, and Voting on Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization*. *See* Docket No. 446. The Order approved the Claim No. 8 Estimation Motion as to Claim No. 12, estimating Claim No. 12 at $0.00 for all purposes, including for the purposes of voting on the Plan, and any distribution under the Debtor's Plan. However, the Order preserved

Magleby's rights to any amounts it asserts it is entitled to related to any engagement agreement

between it and Vitamins Online, including, but not limited to, Magleby's asserted rights to "direct

distribution of any monies to [Vitamins Online] from [the Debtor] through the plan…"  The Order

estimated Claim No. 8 at $0.00 for purposes of voting on any plan of reorganization in this case,

plan confirmation in this case, and distribution, but the Claim No. 8 Estimation Motion was denied

as to its request to estimate Claim No. 8 at $0.00 for allowance.  Instead, the Order required that the

Debtor's Plan be amended to provide the lifting of the stay upon entry of the confirmation order for

the limited purpose of allowing the Debtor to advance its appeal of the Judgment, and for Vitamins

Online to timely file and litigate any cross-appeal of the Judgment.  The Order also required that the

Plan be amended to carve-out from its discharge, any amounts that Vitamins Online may obtain

related to its cross-appeal of the Judgment, and that the Court shall retain jurisdiction as to the

allowance of any amounts that Vitamins Online is awarded against the Debtor on its cross-appeal.

### (3) Claim No. 6

On September 17, 2021, the Debtor filed *Heartwise, Inc.'s Motion to Estimate Claim No. 6*

*for the Purposes of Distribution, and Voting on Heartwise, Inc.'s First Amended Chapter 11 Plan of*

*Reorganization* (the "Claim No. 6 Estimation Motion"), wherein the Debtor requested that the Court

estimate Claim No. 6 at zero for purposes of voting on the Plan, confirmation of the Plan, and

distribution.  *See* Docket No. 454.  The Claim No. 6 Estimation Motion made clear that the Debtor

would be amending the Plan to provide that the stay shall be lifted upon entry of the confirmation

order of the Plan for the purpose of allowing Doyle to file and litigate any claims he has against the

Debtor and/or the Debtor's only other equity holder, Earnesty, in an appropriate forum, and *vice*

*versa*.  *Id.* at p. 4, lines 5-8.  The Claim No. 6 Estimation Motion also made clear that as to

allowance of Claim No. 6, should Doyle obtain a money judgment against the Debtor based on the

claims asserted in Claim No. 6 from a court of appropriate jurisdiction, Doyle may return to this

1   Court to seek allowance of Claim No. 6 in that amount.  *Id.* at lines 8-11.

2          On October 4, 2021, the Debtor and Doyle entered into that *Stipulation Approving*

3   *Heartwise, Inc.'s Motion to Estimate Claim No. 6 for the Purposes of Distribution, and Voting on*

4   *Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization* (the "Claim No. 6 Stipulation"),

5   whereby the Debtor and Doyle stipulated that:  (1) Claim No. 6 should be estimated at zero for the

6   purposes of voting on the Plan, confirmation of the Plan, and distribution under the Plan; (2) Claim

7   No. 6 shall not be estimated for the purposes of allowance; (3) the basis of liability for Claim No. 6

8   as set out in the Appendix to Claim No. 6 shall be carved out from the discharge under the Plan; (4)

9   the Plan shall be amended so that the automatic stay terminates upon entry of an order confirming

10  the Plan for the limited purpose of allowing Doyle, the Debtor, and/or Earnesty to litigate in a court

11  of competent jurisdiction, the basis of Claim No. 6 as set forth in the Appendix attached to Claim

12  No. 6; and (5) the Plan shall be amended to provide that the Court will retain jurisdiction regarding

13  allowance of Claim No. 6.  *See* Docket No. 467.

14         On October 12, 2021, the Court entered its *Order Approving Stipulation Approving*

15  *Heartwise, Inc.'s Motion to Estimate Claim No. 6 for the Purposes of Distribution, and Voting on*

16  *Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization*, whereby the Court approved

17  the Claim No. 6 Stipulation.  *See* Docket No. 477.

18                                    **THE PLAN**

19  **A.  Objections to, and Participation in the Plan Confirmation Hearing**

20         On October 15, 2021, Doyle and Vitamins Online filed objections to confirmation of the

21  Plan.  *See* Docket Nos. 482 and 483 respectively.  Both objections are overruled as more fully set

22  forth herein, and that *Order Denying DavidPaul Doyle's Participation in the Confirmation Hearing*

23  (*See* Docket No. 551).

24         On November 3, 2021, the Court ordered that any party-in-interest wishing to call witnesses

at the confirmation hearing on the Plan was to submit a declaration with a list of those witnesses on or before 12:00 p.m. (PST), November 4, 2021. On November 4, 2021, Doyle filed *DavidPaul Doyle's Declaration Regarding Live Witnesses for Confirmation Hearing* indicating his intention to testify himself, to call an expert valuation witness (Mary O'Connor) and to reserve the right to call witnesses called by other parties in the case. *See* Docket No. 505.

On November 10, 2021, twenty-three minutes before the hearing on confirmation of the Plan, Vitamins Online filed that *Notice of Submission of Declaration of Osman Khan in Regarding Purchase of DavidPaul Doyle's Rights and Interests in Debtor* (the "Notice of Purchase"). *See* Docket No. 532. Khan, the chief financial officer of Vitamins Online, attested through the Notice of Purchase that in his personal capacity, he purchased on November 9, 2021, "all of Doyle's interests in Debtor, including all of his rights and interests in the pending adversary proceeding in this Case []." *Id.* at ¶ 10.

Upon hearing this information for the first time without any prior notice, the Court determined that Doyle, no longer having any interest of any kind in the Debtor as represented in open Court by Khan (Doyle and his counsel did not dispute Khan's assertions), would not be permitted to call any witnesses. The Court overruled Doyle's objections to confirmation of the Plan because he did not have any cognizable interest in the Debtor or in the confirmation proceedings regarding the Plan and therefore was not a "party in interest" within the meaning of 11 U.S.C. § 1109(b).

On the Veterans Day federal holiday, November 11, 2021, at 9:56 p.m., Doyle filed that *Emergency Motion Pursuant to LBR 9075 for Reconsideration of the Court's Order Denying DavidPaul Doyle's Participation in the Confirmation Hearing* (the "Motion for Reconsideration"), arguing that the Court violated Federal Rule of Bankruptcy Procedure 7025 because Khan has not filed a motion to substitute for Doyle, thereby leaving Doyle as a party in interest. *See* Docket No.

534. The Court denied the Motion for Reconsideration on the grounds that: (1) Federal Rule of Bankruptcy Procedure 7025 applies in adversary proceedings, and the hearing on confirmation of the Plan is not a hearing in an adversary proceeding; and (2) Section 1109(b) of the Bankruptcy Code controlled the issue, and Doyle waived any arguments under Section 1109(b) of the Bankruptcy Code by not raising the argument in the Motion for Reconsideration. *See Order Denying DavidPaul Doyle's Participation in the Confirmation Hearing*, Docket No. 551; *see also In re Public Service Co. of New Hampshire*, 88 B.R. 546, 550-551 (Bankr. D.N.H. 1988); *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985). The Court held, even if it were to consider Section 1109(b) of the Bankruptcy Code to the Motion to Reconsider, it would rule against Doyle in that having transferred the entirety of his interest in the Debtor and his claims against the Debtor to a third party, Doyle is no longer a party in interest or stakeholder in this case, and lacks standing to appear and be heard or participate in the hearing on confirmation of the Plan. *See* Docket No. 551, p. 3.

In denying the Motion to Reconsider the Court ruled that: (1) the Motion is denied on the merits; (2) The Motion is denied for lack of standing; (3) Doyle's participation in chapter 11 plan confirmation hearing after he sold his interest in this case, is denied; (4) The outstanding objections to plan confirmation by Doyle are denied for lack of standing; and (5) Doyle is precluded from calling any witnesses, introducing any evidence or otherwise participating in any manner in the Debtor's plan confirmation hearing.

Having denied the Motion to Reconsider, the sole remaining objection to confirmation of the Plan the Court would consider was that of Vitamins Online. As set forth more fully below, the Court overrules all objections to confirmation of the Plan by Vitamins Online.

**B. Confirmation of the Plan Pursuant to Section 1129 of the Bankruptcy Code**

"The court shall confirm a chapter 11 plan only if the plan meets the requirements of § 1129(a)." *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 498 (9th Cir. BAP 2003). The Court

concludes that the Plan meets the confirmation requirements under Section 1129 of the Bankruptcy

Code.

### (1) Section 1129(a)(1) of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code provides that the Plan shall "comply with the

applicable provisions of this title."  Section 1129(a)(1) of the Bankruptcy Code seeks to ensure

compliance of the Plan with Sections 1122 and 1123 of the Bankruptcy Code.  *See* S. Rep. No. 95-

989, 95th Cong., 2d Sess. 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No.

95-595, 95th Cong., 1st Sess. 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5936, 6368.

### a.   Section 1122(a) of the Bankruptcy Code

Section 1122(a) of the Bankruptcy Code provides in relevant part that "a plan may place a

claim or an interest in a particular class only if such claim or interest is substantially similar to the

other claims or interest of such class."

The Plan contains one class of claims, which is Class 1, and which encompasses all general

unsecured, non-priority claims of the Debtor's estate.

The Plan lists both Doyle and Earnesty as interest holders.

Vitamins Online did not challenge, and the Court finds that the Plan meets the requirements

of Section 1122(a) of the Bankruptcy Code.

### b.   Section 1123 of the Bankruptcy Code

Section 1123 of the Bankruptcy Code has seven (7) different subparts that apply to corporate

debtors.

Sections 1123(a)(1)-(3) of the Bankruptcy Code relate to specification of classes, whether

those classes are impaired, and what those classes and interests will receive under the Plan.  There is

only one (1) class of claims under the Plan, which is Class 1, and all "allowed" claims in that class

are being paid in full, with post-petition interest, in cash on the Effective Date.

Section 1123(a)(3) of the Bankruptcy Code provides that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Differences within a single class do not violate Section 1123(a)(3) of the Bankruptcy Code where the claims that are the subject of different treatment have not yet been allowed and are disputed. *See In re First Magnus Financial Corp.*, 2008 WL 11339943 (D. AZ Dec. 11, 2008) (holdback of distributions for disputed claims until such claims are allowed does not violate section 1123(a)(3) of the Bankruptcy Code).

As to the Judgment, the Plan provides that the full amount of the Judgment, plus pre-judgment interest, post-judgment interest, post-petition interest and $57,478.16 in attorneys' fees are being deposited into the Court's registry pending an outcome of the objections to Claim Nos. 3 and 5, and the appeal and cross-appeal of the Judgment. *See* Plan, Section II(C)(2). The Court has yet to determine which party, Magleby or Vitamins Online, will be paid the Judgment, or any portion thereof. Further, the Judgment has been appealed by the Debtor to the 10th Circuit, and Vitamins Online has asserted that it will file a cross-appeal of the Judgment. In view of the objection to Claim No. 3 by Magleby, the objection to Claim No. 5 by Vitamins Online, and the appeal of the Judgment by the Debtor, any claim comprising the Judgment is not an "allowed" claim. *See* 11 U.S.C. § 502; *see also* Fed. R. Bankr. P. 3007. Once/if allowed, the claim that survives as the claim for the Judgment will be paid in full, as provided for in the Plan, from the monies that will be on deposit with the Court's registry.

Section 1123(a)(4) of the Bankruptcy Code provides in relevant part that "a plan shall provide the same treatment for each claim or interest of a particular class…" The equity interests under the Plan are being treated the same. The equity interests in the Debtor are being cancelled on the Effective Date, but equity holders were each offered an opportunity to purchase the equity interests in the Reorganized Debtor in the exact same proportion as their ownership interests in the

Debtor.  All allowed claims of Class 1, the only class of claims under the Plan, are being paid in full, in cash, with interest, on the Effective Date. The only disputed claims, those related to the Judgment, will be paid exactly as all other Class 1 claims upon further order of the Court allowing whatever claim(s) related to the Judgment survives.

Section 1123(a)(5) of the Bankruptcy Code relates to proof of adequate means to implement the Plan.  The total monies that must be available to meet the Effective Date payments under the Plan are estimated to total $16,284,386.85.  The Debtor estimates it will have no less than $4 million in cash-on-hand on the Effective Date, a new value contribution of $9,425,854.69, pre-petition deposit returns of Alpha Health Research and Robinson Pharma, Inc. totaling $3,376,608.22, and the pre-petition deposit of the Law Offices of Michal Jay Berger of $6,557.  The Debtor estimated it will have $16,809,019.91 to make Effective Date payments of $16,284,386.85.  Vitamins Online has offered unsupported speculation that Robinson Pharma, Inc. and Alpha Health Research will not return the pre-petition deposits, but there is no evidence at all that Robinson Pharma, Inc. and Alpha Health Research will do anything other than comply with this Court's order confirming the Plan, and thus requiring the return of those deposits.

Section 1123(a)(6) of the Bankruptcy Code relates to the prohibition of the issuance of non-voting stock in the reorganized debtor's corporate charter.  Any order confirming the Plan will prohibit the Reorganized Debtor from issuing non-voting stock to the extent required under Section 1123(a)(6) of the Bankruptcy Code.

Section 1123(a)(7) of the Bankruptcy Code provides that a "plan shall contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner and selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  The Plan provides that "[o]n the Effective Date, the Reorganized Debtor will employ as its Chief Executive Officer, Tuong Nguyen,

and as its Chief Financial Officer, Elaine Phan."  Plan, Section D.7.  Nguyen and Phan have been the Debtor's CEO and CFO since 2018.  The Plan also provides that "a new shareholder agreement shall govern."  *Id.* at Section D.2.

The Plan meets the requirements of Section 1123(a) of the Bankruptcy Code.

### (2) Section 1129(a)(2) of the Bankruptcy Code

Section 1129(a)(2) of the Bankruptcy Code provides that to confirm a plan, it must be shown that "[t]he proponent of the plan complies with the applicable provisions of this title."  Section 1129(a)(2) of the Bankruptcy Code's primary purpose is to assure that the plan proponent has complied with the disclosure and solicitation requirements of Sections 1125 and 1126 of the Bankruptcy Code.  *See In re MacGibbon*, 2006 WL 6810935 *9 (9th Cir. BAP 2006).

### a.  Section 1125 of the Bankruptcy Code

Section 1125(b) of the Bankruptcy Code provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  Section 1125(c) of the Bankruptcy Code provides in relevant part that "[t]he same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class…"

Section 1125(b) of the Bankruptcy Code is satisfied here.  The identical Plan and its corresponding Disclosure Statement were mailed to creditors and interest holders in preparation for confirmation only after the Court entered its Order Approving Disclosure Statement.  *See* Docket No. 462, *Notice of: (1) Hearing on Confirmation of Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization; and (2) Related Confirmation Procedures and Deadlines*; *see also* Docket Nos. 460 and 461 (including the proofs of service).

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1

### b. Section 1126 of the Bankruptcy Code

Section 1126(a) of the Bankruptcy Code provides that only "the holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." Section 1126(f) of the Bankruptcy Code provides that "a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interest of such class is not required." Section 1126(g) of the Bankruptcy Code provides that "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."

The Plan complies with Section 1126 of the Bankruptcy Code. As previously discussed, Class 1 is unimpaired, and so deemed to have accepted the Plan. Also, as previously discussed, Claims 3 and 5 are not allowed, and so not entitled to vote on the Plan pursuant to Section 1126 of the Bankruptcy Code. The Plan provides that the equity interests of the Debtor "will be cancelled and new shares in the Reorganized Debtor will be issued in exchange for the new value contribution of $9,425,854.69." Plan, Section II.C.3. The interest holders retain none of the current equity under the Plan, and so they are deemed to have rejected the Plan. The Debtor sent no ballots with the Plan, because the voting on the Plan is already provided for under the Bankruptcy Code. Class 1 has accepted the Plan, and the interest holders have rejected it.

The Plan meets the requirements of Section 1129(a)(2) of the Bankruptcy Code.

### (3) Section 1129(a)(3) of the Bankruptcy Code

Section 1129(a)(3) of the Bankruptcy Code provides that the Court shall only confirm the Plan if "the plan has been proposed in good faith and not by any means forbidden by law." "The test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a

speedy, efficient reorganization on a feasible basis." *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994).

The Debtor filed the Initial Plan within four (4) months of the Petition Date, and that Initial Plan, and every other iteration of the Initial Plan have called for the payment in full of allowed claims against the Debtor's estate. The delays in getting from the point that the Initial Plan was filed to confirmation are almost wholly attributable to actions taken by Vitamins Online and Doyle.

Vitamins Online argued that bad faith may be shown where a bankruptcy case is filed where the debtor has the cash reserves to pay a pre-petition judgment, but instead files the bankruptcy case for the purpose of gaining leverage over the judgment creditor. Here, however, the Debtor never had the cash reserves to the pay the Judgment, much less the $54 million in additional claims filed by Vitamins Online post-petition. Vitamins Online's own actions in this Case demonstrate that the Debtor needs to be in bankruptcy and needs to reorganize. The Plan meets the requirements of Section 1129(a)(3) of the Bankruptcy Code in that the Plan was proposed in good faith, and not by any means forbidden by law.

### (4) Section 1129(a)(4) of the Bankruptcy Code

Section 1129(a)(4) of the Bankruptcy Code provides that for Plan to be confirmed it must be shown that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services of costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."

As to administrative expenses of professionals of the Debtor pre-confirmation, the Plan provides that "[t]he Court must rule on all fees [] before any particular fee or expense will be paid." Plan, Section II.B.1. Courts have held that post-confirmation, "a reorganized debtor may employ professionals as it deems necessary based on the fact that a reorganized debtor is no longer subject to the bankruptcy court's jurisdiction except to the extent mandated by the confirmed plan." *In re*

*Simplot*, No. 06-00002-TLM (Bankr. D. Id. 2007).  The Plan provides that "after the Effective Date, the Reorganized Debtor shall have the right to employ and compensate … professionals, agents, and representatives as the Reorganized Debtor determines is necessary or appropriate to implement all of the provisions of this Plan and to enable the Reorganized Debtor to operate its business without the need for any further order of the Court."  Plan, Section II.D.7.

All other payments to be made under the Plan are only to be made upon confirmation of the Plan, and pursuant to any claims allowance procedures as set forth in the Plan.

The Plan meets Section 1129(a)(4) of the Bankruptcy Code.

### (5) Section 1129(a)(5) of the Bankruptcy Code

Section 1129(a)(5) of the Bankruptcy Code requires that the Plan disclose the identity of officers of the Reorganized Debtor, and any insiders to be employed by the Reorganized Debtor. The Plan complies with Section 1129(a)(5) of the Bankruptcy Code.  The Plan provides that "[o]n the Effective Date, the Reorganized Debtor will employ as its Chief Executive Officer, Tuong Nguyen, and as its Chief Financial Officer, Elaine Phan."  Plan, Section II.D.7.  The Plan complies with Section 1129(a)(5) of the Bankruptcy Code

### (6) Section 1129(a)(6) of the Bankruptcy Code

Section 1129(a)(6) of the Bankruptcy Code deals with governmental regulatory commissions, and is inapplicable to the Debtor

/ / /

### (7) Section 1129(a)(7) of the Bankruptcy Code

Section 1129(a)(7) of the Bankruptcy Code provides that "[w]ith respect to each impaired class of claims or interests each holder of a claim or interests of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or

1   retain if the debtor were liquidated under chapter 7 of this title on such date."

2   Class 1 is unimpaired. Impairment is broadly defined in bankruptcy law. Any alteration of

3   the rights of a creditor constitutes impairment. Alteration is synonymous with impairment. *See In re*

4   *L&J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993). To avoid impairment of a claim, the plan

5   of reorganization must "'leave[] unaltered the legal, equitable and contractual rights to which such

6   claim or interest entitles the holder of such claim or interest.'" *Id.* (citing 11 U.S.C. § 1124(1)).

7   

8   One means by which impairment may be analyzed is to consider what a creditor's legal,

9   equitable and contractual rights would be if the debtor had not commenced a bankruptcy proceeding,

10  and then to determine whether the creditor possesses all such legal, equitable and contractual rights

11  under the terms of the proposed plan.

12  If this Case had never been filed by the Debtor, the Debtor would have been able to stay the

13  execution of the Judgment by posting a bond pursuant to Federal Rule of Civil Procedure 62(b). In

14  the Tenth Circuit, where jurisdiction exists over the Debtor's appeal of the Judgment, the amount of

15  the bond is typically the full amount of the Judgment. *See Olcott v. Delaware Flood Co.*, 76 F.3d

16  1538, 1539 (10th Cir. 1996). The Plan provides that the full amount of the Judgment, plus pre- and

17  post-judgment interest, is to be paid into the Court's registry. Vitamins Online argues that the

18  deposit into the Court's registry should be 150% of the Judgment in order to leave Vitamins Online's

19  rights unaltered, but Vitamins Online fails to offer any statutory, rule or case law authority for this

20  proposition.

21  

22  What is more, had the Debtor not filed for bankruptcy, Vitamins Online and Magleby would

23  still be locked in a dispute over who should initially be paid the Judgment, and what amounts are

24  owed to Magleby from the Judgment, and the Plan contemplates that the dispute will go forward,

25  and therefore also leaves Vitamins Online's rights unaltered in that regard.

26  Regarding Claim Nos. 7 and 8, the Plan provides that the automatic stay will lift upon entry

27  

28  

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 84 -**   19

1   of the confirmation order to allow those matters to move forward, and any recovery on those claims

2   is carved-out of the Debtor's discharge to allow Vitamins Online to return to this Court to have those

3   claims allowed against the Debtor.  As with Claim No. 3, the legal, equitable and contractual rights

4   of Vitamins Online as to Claim Nos. 7 and 8 are left unaltered by the Plan.

5          The Plan calls for payment in full, with post-petition interest of all allowed Class 1 claims.

6   The liquidating analysis set forth in Exhibit C to the Plan shows that the fees and expenses

7   commonly incurred during a chapter 7 liquidation would drive the ultimate return to Class 1 claims

8   well below the return they will receive under the Plan.

9

10         Regarding interest holders, they receive nothing under the Plan, and they would receive

11  nothing in a chapter 7 liquidation as set forth in Exhibit C to the Plan.  What is more, the liquidation

12  analysis attached to the Plan as Exhibit C does not include Claim Nos. 6, 7 and 8, which are all

13  contingent claims that those claimants have asserted will be litigated post-confirmation.  Claim Nos.

14  6, 7 and 8 exceed $64.2 million.

15

16         Doyle argued in his opposition to the Plan that the Debtor is an extremely valuable company

17  and that there is plenty of value left over for shareholders even after all creditors are paid in full.

18  Although the Court overruled all of Doyle's objections for lack of standing after he sold the entirety

19  of his claims and interest in the Debtor to Mr. Khan, this Court nonetheless has an affirmative duty

20  to ensure that all requirements of plan confirmation are met.

21

22         The Court received lengthy testimony from Josh Edwards of Eureka Valuation Advisors, the

23  Debtor's valuation expert, who the Court qualified as an expert in the field of valuing companies

24  such as the Debtor.  Mr. Edwards was intensively cross-examined by counsel to Vitamins Online,

25  and counsel to Khan, who were also counsel to Doyle, at least up to just moments before the Court's

26  ruling on Doyle's participation in the confirmation hearing.  Mr. Edwards' conclusion was that the

27  Debtor's equity value was near zero:  "In summary, based on our investigation … it is our opinion

28

that as of September 30, 2021, the aggregate fair market value of [the Debtor] is approaching zero."
Heartwise, Trial Exhibit 3, Docket No. 514 at p. 51 of 90. The Court found Mr. Edwards' testimony
entirely credible and authoritative. Mr. Edwards demonstrated to the Court's satisfaction that the
Debtor's revenues and income were fluctuating significantly even before the pandemic struck and
that Amazon's business practices put the Debtor's financial future significantly in jeopardy. On the
liability side of the financial statement, the Judgment substantially eroded the value of the Debtor's
equity interests.

The "approaching zero" value of the Debtor's capital stock explains why the Plan provides
for the cancellation of such stock. But why then is Earnesty willing to pay nearly $10 million for the
equity interests in the Reorganized Debtor? Mr. Edwards' testimony touched upon this issue when
he explained that his valuation did not address strategic acquirers. In this context, Earnesty may be
viewed as a potential strategic acquirer willing to pay more than non-strategic buyers are willing to
pay. Robinson Pharma, Inc. under common control with the Debtor, sells product to the Debtor and
would appear to have a strategic interest in preserving a major source of buyer for its manufactures.
It is therefore unsurprising that Earnesty has made a formal offer for the Debtor's capital stock
through the Plan, paying above-market value for the Debtor's capital stock.

The Court at the confirmation hearing on the Plan ruled that certain of Mr. Edwards'
testimony on valuation "opened the door" to the admission of rebuttal testimony on valuation by
Doyle's valuation expert, Mary O'Connor of Sikich LLP. The Court qualified Ms. O'Connor as an
expert on the valuation of companies such as the Debtor, and heard testimony from Ms. O'Connor.

The Court concludes that Vitamins Online's claims are unimpaired under the Plan, as well as
the balance of claims in Class 1. As to Class 1, the Plan provides for payment in full, with interest
on all allowed claims. Class 1 is unimpaired, and therefore, pursuant to Section 1126(f) of the
Bankruptcy Code has accepted the Plan. The lack of impairment also means that there is no

requirement that the Debtor market its equity under *Bankr A. Nat. Tr. Sav. v. 203 N. Lasalle*, 526

U.S. 434 (1999). However, even if Vitamins Online and/or other Class 1 claimants were impaired,

they are receiving more under the Plan than they would receive under a liquidation of the Debtor in

Chapter 7 based on the evidence presented to the Court through the Plan and Mr. Edwards, even

considering the testimony of Ms. O'Connor. Similarly, as to the Debtor's interest holders, they

receive nothing under the Plan, however, they would also receive nothing under a Chapter 7

liquidation of the Debtor. According to the expert opinion of Mr. Edwards, in a liquidation scenario

under Chapter 7, and even in an arms-length market sale of the Debtor, the return to interest holders

would be zero.

### (8) Section 1129(a)(8) of the Bankruptcy Code

Section 1129(a)(8) of the Bankruptcy Code provides that in order for the Plan to be

confirmed it is to be shown "[w]ith respect to each class of claims or interests (A) such class has

accepted the plan; or (B) such class is not impaired under the plan." Class 1 is unimpaired, and so

pursuant to Section 1126(f) of the Bankruptcy Code, Class 1 has accepted the Plan. However,

interest holders are receiving nothing under the Plan, and so they have not accepted the Plan

pursuant to Section 1126(g) of the Bankruptcy Code. As interest holders have not accepted the Plan,

Section 1129(a)(8) of the Bankruptcy Code has not been met, however, the Plan is nonetheless

confirmable because the Plan satisfies Section 1129(a)(10) and 1129(b) of the Bankruptcy Code as

discussed *infra*.

### (9) Section 1129(a)(9) of the Bankruptcy Code

Section 1129(a)(9) of the Bankruptcy Code requires that all administrative expense priority

claims be paid in full on the Plan's Effective Date, and, regarding priority taxes that those payments

be made in accordance with the payment schedule found in Section 1129(a)(9)(C) of the Bankruptcy

Code. The Plan complies with Section 1129(a)(9).

Section II.B.1 of the Plan provides that all administrative expense priority claims will be "[p]aid in full on the Effective Date." The only caveat is that all of the administrative expense priority claims listed in the chart of Section II.B.1 of the Plan that relate to professionals employed by the Debtor must first be approved by the Court in conformance with Section 1129(a)(4) of the Bankruptcy Code. As to ordinary course operational expenses incurred by the Debtor in its business operations, those expenses "shall be paid in the ordinary course of business…"

The Debtor has no claims that are subject to Sections 507(a)(1), (4), (5), (6), or (7) of the Bankruptcy Code.

As to priority tax claims, the Plan provides that all priority tax claims shall be "[p]aid in full on the Effective Date." Plan, Section II.B.2.

### (10)   Section 1129(a)(10) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code provides that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." Class 1 is the only class of claims, and it is unimpaired under the Plan. Ergo, Section 1129(a)(10) of the Bankruptcy Code has been met.

### (11)   Section 1129(a)(11) of the Bankruptcy Code

Section 1129(a)(11) of the Bankruptcy Code allows confirmation of the Plan so long as the Plan "is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." A relatively low threshold of proof will satisfy Section 1129(a)(11) of the Bankruptcy Code so long as adequate evidence supports a finding of feasibility. *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *see also In re Loop 76, LLC*, 465 B.R. 525, 544 (9th Cir. BAP 2012). "[I]n [the 9th Circuit], all the debtor need demonstrate is that the plan 'has a

reasonable probability of success.'" *In re Loop 76, LLC*, 465 B.R. at 544. It is hornbook bankruptcy law that success of the plan need not be guaranteed. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d. Cir. 1988). The Plan satisfies Section 1129(a)(11) of the Bankruptcy Code's feasibility requirement.

Allowed Class 1 claims, all administrative expense priority claims, and all priority tax claims will be paid in full, in cash, on the Effective Date. The amount of Claim Nos. 3 and 5 will be deposited into the Court's registry pending allowance of a claim related to the Judgment. The Debtor has estimated that the administrative expense priority claims of the Debtor will total $637,000. *See* Plan, Section II.B.1. The Debtor has estimated that priority tax claims will total $308,693. *Id.* at Section II.B.2. The Debtor has estimated that unsecured claims, including the amounts to be deposited into the Court's registry related to the Judgment, will total $15,338,693.85. *Id.* at Exhibit B. So, there is a total of $16,284,386.85 that will be required to make the estimated Effective Date payments according to the Debtor's estimates.

The Debtor as of September 2021, had cash of $5,551,830. *See* Docket No. 480, p. 2. While it is possible that the Debtor's cash-on-hand will fall by the time of the Effective Date, the Debtor projects that its cash-on-hand will not fall below $4 million prior to the Effective Date. So, the Debtor expects to have no less than $4 million in cash on the Effective Date. The pre-petition deposits of Robinson and Alpha will be returned to the Debtor on the Effective Date, which total $3,376,608.22. There is a remaining amount on the pre-petition retainer of Law Offices of Michael J. Berger of $6,557. *See* Plan, Section III. Lastly, there is to be a new value contribution of $9,425,854.69. The waterfall of the claims and amounts to pay is as follows:

Total claims to pay          - $16,284,386.85

Total cash to pay claims     - $16,809,019.91

Post-confirmation, operationally, the Debtor believes that global supply chain issues,

increased raw material costs, research and development costs, increased marketing and advertising costs, will have an impact on its profits on a go-forward basis. However, in accounting for these increased costs and potentially reduced revenue, at least through 2025, the Debtor believes it will operate profitably. The Debtor believes that post-confirmation, Robinson Pharma, Inc. will continue to support the Debtor with the current level of trade credit it extends the Debtor. The Debtor also expects that the Debtor's other trade vendors will continue to support the Debtor post-confirmation.

Vitamins Online has argued that the Plan does not take into account Claim Nos. 7 and 8. Vitamins Online speculates that it will prevail on the litigation that underlies Claim Nos. 7 and 8, resulting in $54 million in allowed claims that will scuttle the Plan. The Court believes this to be mere speculation and does not come to grips with the fact that the Court had estimated Claim Nos. 7 and 8 at zero for purposes of confirmation of the Plan, voting on the Plan, and distribution under the Plan. The Court would not have estimated these claims at zero if it believed Vitamins Online had a realistic probability of success in litigating these claims.

The Plan complies with the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.

### (12)     Section 1129(a)(12) of the Bankruptcy Code

Section 1129(a)(12) of the Bankruptcy Code provides that the Plan shall only be confirmed if "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." The Debtor has remained current on filing fees and fees to the Office of the United States Trustee. The Plan calls for the Debtor to pay any and all amounts that will be due and owing pursuant to section 1930 of title 28, and so Section 1129(a)(12) of the Bankruptcy Code has been met. *See* Plan, Section II.B.1.

### (13)     Section 1129(a)(13) of the Bankruptcy Code

Section 1129(a)(13) of the Bankruptcy Code provides for the continuation of payment of retiree benefits post-confirmation pursuant to Section 1114 of the Bankruptcy Code. The Debtor states that it had no such payments to make prior to the Petition Date, has no such payments to make currently, and so no such payments are required to be made post-confirmation. Section 1129(a)(13) of the Bankruptcy Code is inapplicable.

**(14)    Section 1129(a)(14) through Section 1129(a)(16) of the Bankruptcy Code**

Section 1129(a)(14) through Section 1129(a)(16) of the Bankruptcy Code are not applicable. Section 1129(a)(14) of the Bankruptcy Code relates to domestic support obligations, which is inapplicable to the Debtor. Section 1129(a)(15) of the Bankruptcy Code relates to "individual" debtors, and the Debtor is not an individual. Section 1129(a)(16) of the Bankruptcy Code relates to property transfers by a corporation that is not a moneyed, business, or commercial corporation, which is also inapplicable to the Debtor, because the Plan does not provide for any property transfers by a corporation that is not a moneyed, business, or commercial corporation trust.

**(15)    Section 1129(b) of the Bankruptcy Code**

Section 1129(b)(1) of the Bankruptcy Code relates to what is termed "cram down." That is, "if all application requirements of [Section 1129(a) of the Bankruptcy Code] other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The Plan satisfies Section 1129(b). Only interest holders are deemed to have not accepted the Plan.

Section 1129(b)(2)(C)(i) of the Bankruptcy Code provides that "the condition that a plan be fair and equitable [w]ith respect to a class of interests-the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the

effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation

preference to which such holder is entitled, any fixed redemption price to which such holder is

entitled, or the value of such interest."

Here, the Debtor's equity is out of the money.  As set forth more fully above, lengthy expert

testimony by Mr. Edwards, including through lengthy cross-examination by counsel for Vitamins

Online, Khan and Doyle, proved to the Court's satisfaction that any liquidation of the Debtor would

result in nothing to interest holders of the Debtor, exactly as they are receiving under the Plan.

### (16)   Section 1129(c) through Section 1129(e) of the Bankruptcy Code

Section 1129(c) of the Bankruptcy Code is inapplicable because there is no competing plan.

Section 1129(d) of the Bankruptcy Code is inapplicable because the Debtor is paying all taxes, pre-

and post-petition.  Section 1129(e) of the Bankruptcy Code is inapplicable because the Debtor is not

a small business.

### C.  Miscellaneous Objections to Confirmation

Vitamins Online objected to the Plan, arguing that the Effective Date is illusory, unclear and

ambiguous.  The Effective Date of the Plan "will be the first business day that is at least fifteen (15)

calendar days following the date of the entry of the Court order confirming this Plan (the

'Confirmation Order') when and if all the following conditions for the effectiveness of the Plan

have been satisfied or waived by the Debtor: (1) there is no stay in effect with respect to the

Confirmation Order; and (2) the Confirmation Order is not subject to any appeal or rehearing."  Plan,

Section I.  This is a matter of simple mathematics and the use of a calculator; there is no ambiguity

or vagueness regarding the matter.

The Court interprets Debtor's waiver right to mean that such waiver, if it is to be effective,

must be made within a reasonable period of time after (1) the Debtor is first notified in writing that

either a stay of the Confirmation Order is in effect,  or (2) the Confirmation Order is not subject to

1  any appeal or rehearing.

2      Vitamins Online objected to the Plan's failure to pay Class 1 claims post-petition interest at

3  the Federal judgment rate.  The Debtor has agreed to pay all allowed Class 1 claims post-petition

4  interest at the highest Federal judgment interest rate that has existed post-petition, .11%, so this

5  argument is moot.

6

7      **WHEREFORE**, for the foregoing reasons, the Court overrules all objections to confirmation

8  of the Plan, finds that the Plan with the modifications discussed herein comports with Section 1129

9  of the Bankruptcy Code, and that the Plan should be confirmed.

10                        ###

11

12

13

14

15

16

17

18

19

20

21

22

23  Date: December 17, 2021          Mark S. Wallace
24                                   United States Bankruptcy Judge
25

26

27

28

# EXHIBIT "4"

1  Ronald A. Clifford (State Bar No. 246542)
   E-Mail: RAC@RCliffordLaw.com
2  **R. CLIFFORD & ASSOCIATES**
3  1100 Town and Country Rd., Suite 1250
   Orange, California 92868
4  Telephone: (949) 533-9774

5  *General Insolvency Counsel for*
   *Heartwise, Inc.*
6

7                    UNITED STATES BANKRUPTCY COURT

8          CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

9  In re:                                    Case No.: 8:20-bk-13335-MW

10 HEARTWISE, INC.,                          Chapter 11

11
                        Debtor in Possession.   **NOTICE OF EFFECTIVE DATE OF**
12                                              **HEARTWISE, INC.'S FIRST AMENDED**
                                                **CHAPTER 11 PLAN OF**
13                                              **REORGANIZATION**

14

15

16        **TO THE DEBTOR, OFFICE OF THE UNITED STATES TRUSTEE, PARTIES-IN-**

17 **INTEREST, AND THEIR ATTORNEYS OF RECORD:**

18        **PLEASE TAKE NOTICE** that on December 17, 2021, the U.S. Bankruptcy Court for the

19 Central District of California (the "Court") entered in the above-referenced Chapter 11 case its (1)

20 *Order Confirming Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization and Denying*

21 *with Prejudice Certain Confirmation Order-Related Motions* (the "Confirmation Order"); (2)

22 *Findings of Fact and Conclusions of Law*; and (3) *Notice of Order Confirming Chapter 11 Plan*.

23        **PLEASE TAKE FURTHER NOTICE** that pursuant to *Heartwise, Inc.'s First Amended*

24 *Chapter 11 Plan of Reorganization* (the "Plan"), as confirmed by the Court through the

25 Confirmation Order, all conditions precedent to the Effective Date of the Plan have been satisfied or

26 waived by Heartwise, Inc. (the "Debtor").  The Effective Date occurred at 12:01 a.m., on January 3,

27 2022.

28        **PLEASE TAKE FURTHER NOTICE** that pursuant to the Plan, checks have been made to

---

1   all Class 1 creditors and mailed via U.S. Mail on the Effective Date of the Plan, or deposited into the

2   Court's registry pursuant to that *Order to Deposit Funds into the Court's Registry*, which pays all

3   Class 1 claimants' claims in full, with interest. A copy of the registry deposit receipt is attached

4   hereto as Exhibit "1."

5        **PLEASE TAKE FURTHER NOTICE** that pursuant to the Plan, checks have been made to

6   all priority tax claimants and mailed via U.S. Mail on the Effective Date of the Plan, which pays all

7   priority tax claims in full, with interest.

8        **PLEASE TAKE FURTHER NOTICE** that pursuant to Section IV(D)(8) of the Plan, all

9   issued checks issued to pay allowed claims shall be null and void if not negotiated within 180 days

10  after the date of issuance, which, here, is **July 2, 2022.**  Any monies related to checks deemed null

11  and void due to the failure of a creditor to negotiate said check by the aforementioned deadline shall

12  be returned to the Reorganized Debtor.  The holder of a claim with respect to which any such non-

13  negotiated check was issued shall forfeit all such holder's right to further distributions under the

14  Plan.

15  Dated:  January 3, 2022                **R. CLIFFORD & ASSOCIATES**

16                                          By: */s/ Ronald A. Clifford*
17                                               Ronald A. Clifford

18                                          *General Insolvency Counsel for*
19                                          *Heartwise, Inc.*

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

DATE: 01/03/22   Case 8:20-bk-13335-MW  Doc 679  Filed 01/04/22   Entered 01/04/22 13:07:21   Desc
TIME: 14:05:12           CENTRAL DISTRICT Main Document   Page 4 of 9
                         DAILY TRANSACTION LOG BY SOURCE

PROCESSED ON:   01/03/22

| Trx | Case No | Rec No | OpId | Amt Recd | Check No | Debtor | STATUS |
|---|---|---|---|---|---|---|---|
| IN PERSON | | | | | | | |
| 107 | 22-10001-TA | 80075839 | 12 | 338.00 | 27588319536 | PEDRO A HERNANDEZ | |
| REG | 20-13335-MW | 80075840 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075841 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075842 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075843 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075844 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075845 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075846 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075847 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075848 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075849 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075850 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075851 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075852 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075853 | 12 | 980,000.00 | 1480 | HEARTWISE, INC. | |
| REG | 20-13335-MW | 80075855 | 12 | 780,000.00 | 1480 | HEARTWISE, INC. | |
| | IN PERSON | : | | $14,500,338.00 | | | |
| | TOTAL RECEIVED: | | | $14,500,338.00 | | | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

1100 Town & Country Road, Suite 1250, Orange, California 92868.

A true and correct copy of the foregoing document entitled:  *Notice of Effective Date of Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization*; and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On January 4, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Michael Jay Berger on behalf of Attorney The Law Offices of Michael Jay Berger
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
Anthony Bisconti on behalf of Creditor Robinson Pharma, Inc.
tbisconti@bienertkatzman.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com
Jared Glicksman on behalf of Interested Party DavidPaul Doyle
jglicksman@yocca.com
Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov
Eve H Karasik on behalf of Interested Party Levene, Neale, Bender, Yoo & Brill L.L.P.
ehk@lnbyb.com
Steven J. Katzman on behalf of Creditor Robinson Pharma, Inc.
SKatzman@bienertkatzman.com,
admin@bienertkatzman.com;chowland@bienertkatzman.com;4579179420@filings.docketbird.com
Monica Y Kim on behalf of Interested Party Levene, Neale, Bender, Yoo & Brill L.L.P.
myk@lnbrb.com, myk@ecf.inforuptcy.com
Aaron J Malo on behalf of Interested Party Magleby Cataxinos & Greenwood
amalo@sheppardmullin.com, jsummers@sheppardmullin.com
Kathleen P March on behalf of Creditor Vitamins Online, Inc
kmarch@bkylawfirm.com, kmarch3@sbcglobal.net
Carlos A Nevarez on behalf of Creditor Robinson Pharma, Inc.
cnevarez@bienertkatzman.com, carlos.aa.nevarez@gmail.com
K. Luan Tran on behalf of Creditor Robinson Pharma, Inc.
ltran@kslaw.com, tle@kslaw.com
United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov
Misty A Perry Isaacson on behalf of Interested Party Courtesy NEF
misty@ppilawyers.com, ecf@ppilawyers.com;perryisaacsonmr51779@notify.bestcase.com
Dean G Rallis, Jr on behalf of Creditor Vitamins Online, Inc
drallis@hahnlawyers.com, marias@hahnlawyers.com;mpham@hahnlawyers.com;drallis@ecf.courtdrive.com
Seth A Safier on behalf of Creditor Martha Valentine
seth@gutridesafier.com

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**2.  SERVED BY UNITED STATES MAIL**:
On January 4, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Mark S. Wallace
United States Bankruptcy Court
411 West Fourth Street, Suite 6135
Santa Ana, CA 92701-4593

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on [], I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 4, 2022 | Ronald A. Clifford | /s/ Ronald A. Clifford |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

Label Matrix for local noticing
0973-8
Case 8:20-bk-13335-MW
Central District of California
Santa Ana
Tue Jan  4 10:48:48 PST 2022

Heartwise, Inc.
2973 Harbor Blvd., #472
Costa Mesa, CA 92626-3912

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd, #1700
Los Angeles, CA 90067-6253

R. Clifford & Associates
1100 Town and Country Rd.
Suite 1250
Orange, CA 92868-4633

Santa Ana Division
411 West Fourth Street, Suite 2030,
Santa Ana, CA 92701-4500

Alpha House Research
2781 West Macarthur Blvd., Suite 34
Santa Ana, CA 92704-8300

American Express
P O Box 650448
Dallas, TX 75265-0448

Anthem Blue Cross
P O Box 51011
Los Angeles, CA 90051-5311

Brads Deals LLC
6115 Estate Smith Bay Suite 315 Box 7
St. Tomas, VI 00802-1324

California Bank and Trust
Bankcard Center
P O Box 30833
Salt Lake City, UT 84130-0833

California Dept. of Tax & Fee Administration
Collections Support Bureau MIC:55
PO BOX 942879
SACRAMENTO CA 94279-0055

Capital One
P O Box 60599
City of Industry, CA 91716-0599

Central Entertainment Group Inc
1001 6th Ave 14th Floor
New York, NY 10018-5477

Christina Entertainment Inc
2419 Santiago Drive
Newport Beach, CA 92660-3649

DavidPaul Doyle
4400 El Nido Ranch Rd
Orinda, CA 94563-1900

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

Franchise Tax Board
c/o General Counsel Section
P O Box 1720, MS: A-260
Rancho Cordova, CA 95741-1720

Internal Revenue Service (IRS)
P O Box 7346
Philadelphia, PA 19101-7346

Little Red Management
7200 Franklin Ave 222
Los Angeles, CA 90046-3083

Magleby Cataxinos & Greenwood, P.C.
ATTN:  J.Magleby
141 Pierpont Avenue
Salt Lake City, UT 84101-1902

Mark F. Foley
411 E. Wisconsin Ave., Ste. 1000
Milwaukee, WI 53202-4409

Mark Foley
411 E. Wisconsin Ave.
Suite 1000
Milwaukee, WI 53202-4409

Martha Valenite
c/o Gutride Safier LLP
Seth A. Safier, Esq.
100 Pine Street, Ste 1250
San Francisco, CA 94111-5235

Monumental
5010 SE Foster Rd, #86352
Portland, OR 97206-3039

PHD Studios
1968 Hutchins Circle
Medford, OR 97504-4878

Premeo Financial Corp
P O Box 19367
Kalamazoo, MI 49019-0367

Retain Exchange Network, Inc.
7071 Warner Ave., Ste #345
Huntington Beach, CA 92647-5495

Rob Wilsey Creative Partners LLC
300 s. Raymond Ave., Ste 6
Pasadena, CA 91105-2638

Robinson Pharma
3330 South Harbor Blvd.
Santa Ana, CA 92704-6831

State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279-8064

```
Steptoe & Johnson LLP                Tatyana Shykal                  Teikametrics, LLC
633 West Fifth Street                10625 Parrish St, Apt 223        280 Summer Street
Los Angeles, CA 90071-2005           Matthews, NC 28105-8933          Boston, MA 02210-1131



Trojan Law Offices                   Tuong V. Nguyen                  Uline
Red Fox Plaza                        10132 Tyler Court                12575 Uline Drive
9250 Wilshire Blvd., 325             Westminster, CA 92683-5760       Pleasant Prairie WI 53158-3686
Beverly Hills, CA 90212-3376



Uline                                United States Trustee (SA)       Vitamins Online Inc.
P O Box 88741                        411 W Fourth St., Suite 7160     Edgar R. Cataxinos
Chicago, IL 60680-1741               Santa Ana, CA 92701-4500         MAGLEBY CATAXINOS & GREENWOOD
                                                                      170 S MAIN ST STE 1100
                                                                      Salt Lake City, UT 84101-1651



Vitamins Online, Inc.                WORKMAN NYDEGGER                 Martha Valentine
c/o The Bankruptcy Law Firm, P.C.    60 E SOUTH TEMPLE STE 1000       c/o Gutride Safier LLP
10524 W. Pico Blvd., Ste. 212        Salt Lake City, UT 84111-1011    100 pine street
Los Angeles, CA 90064-2346                                            suite 1250
                                                                      san francisco, CA 94111-5235



RONALD CLIFFORD
R. Clifford & Associates
1100 TOWN AND COUNTRY RD., SUITE 1250
ORANGE, CA 92868-4633
```

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(u)Alpha Health Research, Inc.       (u)Blakeley LLP                  (u)Courtesy NEF



(u)DTO Law                           (u)Earnesty LLC                  (u)Greenberg Traurig, LLP



(u)Magleby Cataxinos & Greenwood     (u)QualiNutra, Inc.              (u)Robinson Pharma, Inc.



(u)The Law Offices of Michael Jay Berger  (u)Vitamins Online, Inc     (d)Robinson Pharma, Inc.
                                                                      3330 South Harbor Blvd.
                                                                      Santa Ana, CA 92704-6831
```

(u)DavidPaul Doyle

End of Label Matrix
| | |
|---|---|
| Mailable recipients | 42 |
| Bypassed recipients | 13 |
| Total | 55 |

# EXHIBIT "5"

1    AARON J. MALO, Cal. Bar No. 179985
     amalo@sheppardmullin.com
2    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     650 Town Center Drive, 10th Floor
3    Costa Mesa, California 92626-1993
     Telephone:    714.513.5100
4    Facsimile:    714.513.5130

5    JEFFREY W. SHIELDS, admitted *pro hac vice*
     jshields@joneswaldo.com
6    JONES, WALDO, HOLBROOK & McDONOUGH, PC
     170 South Main Street, Suite 1500
7    Salt Lake City, Utah  84101
     Telephone:    801.521.3200
8    Facsimile:    801.328.0537

9    Attorneys for Creditor
     Magleby Cataxinos & Greenwood, PC
10

**FILED & ENTERED**

**FEB 11 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle        DEPUTY CLERK

11              UNITED STATES BANKRUPTCY COURT

12         CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

13

14   In re:                              Case No. 8:20-bk-13335-MW
                                         Chapter 11
15   HEARTWISE, INC.,                    The Hon.  Mark S. Wallace

16              Debtor.

17                                       **ORDER OVERRULING CREDITOR
                                         VITAMINS ONLINE, INC.'S OMNIBUS
18                                       OBJECTION TO MAGLEBY
                                         CATAXINOS & GREENWOOD, P.C.'S
19                                       CLAIM NOS. 5-2 AND 12**

20                                       Hearing:
                                         Date:    January 24, 2022
21                                       Time:    2:00 p.m. (PST)
                                         Crtrm.:  6C
22

23

24

25

26

27

28

Case No. 8:20-BK-13335-MW

SMRH:4855-5164-6732.4
                              **- 105 -**        ORDER OVERRULING OMNIBUS OBJECTION
                                                 TO CLAIMS 5-2 AND 12

1    The Omnibus Objection ("Objection") filed by Vitamins Online, Inc. ("VOL") to Claim

2    Nos. 5-2 and 12 filed by Magleby Cataxinos & Greenwood, PC ("MCG") [Dk. 525] came on for

3    hearing on January 24, 2022, at approximately 2:00 p.m. in Department 6C of the above-captioned

4    Court, the Honorable Mark S. Wallace presiding.  Appearances were as stated in the record.

5    Having considered all papers submitted in support of and in opposition to VOL's

6    Objection, and based upon such oral argument as was advanced at the hearing,

7    **IT IS HEREBY ORDERED** that:

8    1.    For the reasons set forth more fully in the Court's *Amended Memorandum*

9    *Decision and Order Re: Magleby Cataxinos Limited Objection to Claim 3-2 of Vitamins Online*

10    *Inc.* [Dk. 729], VOL's Objection to Claim No. 5-2 filed by MCG is OVERRULED AND

11    DENIED in its entirety.

12    2.    For the reasons set forth more fully in the Court's *Amended Memorandum*

13    *Decision and Order Re: Magleby Cataxinos Limited Objection to Claim 3-2 of Vitamins Online*

14    *Inc.* [Dk. 729], VOL's Objection to Claim No. 12 filed by MCG is OVERRULED AND DENIED

15    in its entirety.

16    **IT IS SO ORDERED.**

17    ###

18

19

20

21

22

23    Date: February 11, 2022                    Mark S. Wallace
24                                              United States Bankruptcy Judge

25

26

27

28

# EXHIBIT "6"

FILED & ENTERED

APR 26 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

In re:

Heartwise, Inc.

Debtor(s).

Case No.: 8:20-bk-13335-SC

CHAPTER 11

**ORDER (1) DENYING MOTION FOR ADDITIONAL FINDINGS ("MOTION") [DK. 757]; (2) VACATING ORDER ENTERED FEBRUARY 11, 2022 [DK. 747]; AND (3) VACATING HEARING ON MOTION**

Hearing to be Vacated:
Date:       May 17, 2022
Time:       1:30 PM
Courtroom:  5C – virtual

The Court has considered the Motion for Additional Findings[1] filed February 25, 2022 [Dk. 757] (the "Motion") by Vitamins Online, Inc. ("VOL"), in which VOL requests that the Court supplement the order overruling VOL's Objection to Claim No. 5-2 entered February 11, 2022 [Dk. 747] ("Objection Order"), the opposition filed by

---

[1] A motion to make additional findings in a Bankruptcy Proceeding is governed by Rule 7052 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 52 of the Federal Rules of Civil Procedure (FRCP). FRCP 52 permits a party to request amendment of a court's findings, or the issuance of additional findings. Fed. R. Civ. Pro. 52(b). One purpose of Rule 52(a) is to aid appellate court by affording it clear understanding of ground or basis of decision of lower court. *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975).

1   Magleby, Cataxinos, & Greenwood, P.C. ("MCG") on March 30, 2022 [Dk. 766] ("MCG
2   Opposition"), the limited opposition filed by  Heartwise, Inc. ("Heartwise" or "Debtor") on
3   March 20, 2022 [Dk. 768] ("Debtor Opposition"), and the replies filed by VOL on April 6,
4   2022, [Dks. 769 and 770], as well as the docket as a whole, and has determined that
5   this matter is appropriate for disposition without a hearing, and finds good cause to
6   DENY the Motion, VACATE the Objection Order, and VACATE the hearing on the
7   Motion.
8          The Objection Order is directly related to a dispute between VOL and MCG
9   regarding which of the two entities are entitled to assert a claim against the Debtor
10  based on the same underlying judgment.[2] As noted by MCG in its Opposition, "VOL's
11  objections to MCG's claims involved the same underlying issues as MCG's objections to
12  VOL's claims, and both sets of objections were decided together as part of a single,
13  unified ruling from this Court. Although there were separate Orders entered for MCG's
14  objection to VOL's claims (Dkt. 729) and VOL's objection to MCG's claims (Dkt. 747),
15  the latter order relies on and expressly incorporates the former." [MCG Opposition, Dk.
16  766, Pg. 4:16-20].
17         This Court has issued an order VACATING the order entered by the predecessor
18  Court disallowing MCG's claim ("Disallowance Order") [Dk. 729] and ABSTAINING from
19  the resolution of that dispute. *See* Order entered April 26, 2022 [Dk. 776]
20  ("Reconsideration Order"). As the Objection Order is directly related, and, in fact, relies
21  on the now-vacated Disallowance Order, and for the reasons more fully explained in the
22  Reconsideration Order, which is incorporated herein, this Court finds it appropriate to
23  VACATE the Objection Order.
24  //
25  //
26  //
27
28

---

[2] A more fulsome factual summary is contained in the Reconsideration Order, which is incorporated by
reference herein.

1      In light of the foregoing, the relief requested in the Motion is unnecessary, and

2 the Motion is DENIED as moot.

3      IT IS SO ORDERED.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25 Date: April 26, 2022

Scott C. Clarkson
United States Bankruptcy Judge

26

27

28

# EXHIBIT "7"

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| WORKMAN NYDEGGER PC<br>CHAD E. NYDEGGER pro hac vice<br>E-mail: cnydegger@wnlaw.com<br>60 East South Temple Suite 1000<br>Salt Lake City, UT 84111<br>Telephone: (801) 533-9800<br>Facsimile: (801) 328-1707<br><br>HAHN & HAHN LLP<br>DEAN G. RALLIS JR., State Bar No. 94266<br>E-Mail: drallis@hahnlawyers.com<br>301 E. COLORADO BLVD., NINTH FLOOR<br>PASADENA, CALIFORNIA 91101-1977<br>Telephone: (626) 796-9123<br>Facsimile: (626) 449-7357<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Vitamins Online, Onc. | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -** SANTA ANA DIVISION

</div>

| In re:<br><br>HEARTWISE, INC.<br><br><br><br><br><br>Debtor(s). | CASE NO.: 8:20-bk-13335-SC<br><br>ADVERSARY NO.:<br>(*if applicable*)<br><br>CHAPTER: 11 |
|---|---|
| <br><br><br>Plaintiff(s) (*if applicable*).<br>vs.<br><br><br><br><br>Defendant(s) (*if applicable*). | **NOTICE OF APPEAL**<br>**AND STATEMENT OF ELECTION** |

**Part 1:  Identify the appellant(s)**

1.  Name(s) of appellant(s): Vitamins Online, Inc.

2.  Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (*describe*):

For appeals in a bankruptcy case and not in an  adversary proceeding.
☐ Debtor
☒ Creditor
☐ Trustee
☐ Other (*describe*):

## Part 2:  Identify the subject of this appeal

1.   Describe the judgment, order, or decree appealed from:

Orders at Docket Nos. 728, 729, 747, 754, 776, and 777, pertaining to the allowance and/or disallowance of Claim 3-2, Claim 5-2, and Claim 12.

2.   The date the judgment, order, or decree was entered:   Jan 31, 2022 (##728, 729), Feb 11, 2022 (#747),  Feb 23, 2022 (#754), April 26, 2022 (##776, 777)

## Part 3:  Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (*attach additional pages if necessary*):

1.   Party: See list of parties at Attachment 1

Attorney:

2.   Party:

Attorney:

## Part 4:  Optional election to have appeal heard by District Court (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court.  If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below.  Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐    Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

## Part 5:  Sign below

Date: 5/10/2022

Signature of attorney for appellant(s) (or appellant(s)
if not represented by an attorney)

Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.

**[Note to inmate filers:** If you are an inmate filer in an institution and you seek the timing benefit of Fed. R. Bankr. P. 8002(c)(1), complete Director's Form 4170 (Declaration of Inmate Filing) and file that declaration along with the Notice of Appeal.]

# Attachment 1

## Part 3: Identify the other parties to the appeal

**Attorney for Debtor and Debtor-in-Possession**

Matthew Grimshaw, Esq.
Marshack Hays LLP
870 Roosevelt Avenue
Irvine, CA 92620
Telephone:  (949) 333-7777

**Attorney for Creditor Magleby Cataxinos & Greenwood, P.C.**

Aaron J. Malo, Esq.
Sheppard Mullin Richter & Hampton
650 Town Center Drive, 4th Floor
Costa Mesa, CA 92626
Telephone:  (714) 513-5100

**United States Trustee**

Nancy S Goldenberg
411 W Fourth St Ste 7160
Santa Ana, CA 92701-8000
Telephone:  (714) 338-3416

**Attorneys for Creditor Vitamins Online, Inc.**

Dean G. Rallis Jr., Esq.
Hahn & Hahn LLP
301 E. Colorado Blvd., Ninth Floor
Pasadena, CA 91101-1977
Telephone:  (626) 796-9123

Chad E. Nydegger, Esq. (*Admitted pro hac vice*)
Workman Nydegger PC
60 East South Temple Suite 1000
Salt Lake City, UT 84111
Telephone:  (801) 533-9800

# Order

# [ECF Docket no. 728]

1

2

3

4

5

6

7

FILED & ENTERED

JAN 31 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle          DEPUTY CLERK

8

9

10

11

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

12

13

14

15

16

17

18

19

20

In re:

Heartwise, Inc.

Debtor(s).

Case No.: 8:20-bk-13335-MW

CHAPTER 11

**MEMORANDUM DECISION AND ORDER RE: MAGLEBY CATAXINOS LIMITED OBJECTION TO CLAIM 3-2 OF VITAMINS ONLINE INC.**

[Related to Docket No. 277]

Date:        January 24, 2021
Time:        2:00 PM
Courtroom:   6C

21

22

23

24

This matter comes before the Court on the limited objection of creditor Magleby, Cataxinos & Greenwood, P.C. ("MCG") to Claim No. 3-2 filed by Vitamins Online, Inc. ("VOL").

25

26

27

28

**Background Facts**

On October 28, 2013, VOL filed a complaint against competitor Heartwise, Inc. ("Heartwise") in the United States District Court for the District of Utah (the "District Court") alleging claims for unfair competition and false advertising under federal and

1  Utah law (the "District Court Action").  Nearly five years later, in approximately August to

2  September 2018, VOL replaced its existing counsel in the District Court Action with

3  MCG.  MCG sent VOL an engagement letter dated September 27, 2018 that

4  memorializes the terms of the engagement (the "Engagement Agreement").  VOL

5  accepted the terms of the Engagement Agreement by email confirmation transmitted

6  October 17, 2018.

7       The Engagement Agreement generally provides for a combination of reduced

8  hourly fees and a contingency fee.  The Engagement Agreement states "Client agrees

9  to pay the Firm the contingency fee at the time of recovery.  That is, it is the intent of the

10  parties that both Client and the Firm shall be paid at the same time, as any recovery is

11  obtained . . . *All payments from or collected against HeartWise or associated persons or*

12  *entities shall be directed to the Firm, which will deduct the contingency fee and any*

13  *outstanding fees and costs, and then pay the balance to Client.* . . . If Client is

14  successful in recovering more than five million dollars ($5,000,000.00) (the

15  "Extraordinary Result Threshold"), then the Firm's contingency fee shall increase by

16  an additional 5% for all compensatory or other damages recovered above the

17  Extraordinary Result Threshold.  So, for example, if the Firm collects $10 million from

18  Heartwise with no appeal, the Firm will be entitled to a 17.5% contingency fee on the

19  first $5 million, and a 22.5% contingency fee on the next $5 million . . . "  Engagement

20  Agreement at 9 (italics added by the Court).

21       The District Court Action went to trial during the summer of 2020.  The District

22  Court held a three-week bench trial and issued very comprehensive and detailed

23  findings of fact and conclusions of law in a 53- page document.  On November 10,

24  2020, the District Court awarded VOL $9,551,232 in damages against Heartwise along

25  with prejudgment interest at 2.13 percent per annum plus reasonable attorneys' fees (to

26  be determined at a later time) and entered judgment (the "Judgment").  After attorneys'

27  fees are awarded, it is generally expected that the total amount of the Judgment will be

28  approximately $14.5 million.

By reference to Engagement Agreement standards – standards expressly agreed to by VOL -- MCG "hit the ball out of the park" as the saying goes, obtaining a Judgment that was nearly <u>twice</u> the benchmark for the Extraordinary Result Threshold. One would think that VOL would be thrilled with a recovery nearly <u>double</u> the amount that VOL, in the Engagement Agreement, had agreed would be the "Extraordinary Result Threshold." However, that apparently did not happen. VOL has announced its intentions to file an appeal (technically, a cross-appeal, because Heartwise has appealed the Judgment) of the Judgment. According to VOL, the District Court got it wrong and should have awarded VOL an additional $34 million above and beyond the $9,551,232 already awarded. (This position is stated in a proof of claim filed by VOL, namely Claim 8).

VOL's next move, having in hand a Judgment that was expected to rise to about $14.5 million, was to terminate the law firm that had gained it that double (or triple, depending upon how one views the matter) "Extraordinary Result" recovery. Mr. Khan's declaration in this matter states he terminated MCG on December 3, 2020. Mr. Khan's email to MCG states: "Please consider this email as the official notice of termination for the MCG law firm representing Vitamins Online Inc. . . effective immediately." The notice fails to state any cause for termination.

Heartwise filed a voluntary bankruptcy petition seeking relief under Chapter 11 of the Bankruptcy Code on December 4, 2020. Subsequently, Heartwise filed an amended plan of reorganization proposing to pay all creditors 100 cents on the dollar plus postpetition interest on the plan's effective date. Throughout this bankruptcy case, VOL has consistently fought against confirmation of a plan of reorganization that would pay VOL in full with interest if the Heartwise appeal of the Judgment is unsuccessful. Heartwise alleges that VOL's goal in this chapter 11 case is not to get paid in full but instead to destroy a business competitor.

VOL filed proof of claim 3-2 on April 28, 2021, seeking approximately $14.5 million in respect of the Judgment. MCG filed Claim 5-2 on May 29, 2021, asserting a

1   claim to the same $14.5 million, basing its claim on the Engagement Agreement and the

2   Judgment.  MCG contends that the provisions of the Engagement Agreement quoted

3   above entitle it to receive payment of the Judgment, to subtract its fees and costs (and

4   possibly other amounts owing to a third party who helped finance the Judgment-related

5   litigation), and then to pay the remaining amount to VOL.  Similarly, MCG filed Claim

6   No. 12 in response to VOL's Claim No. 8, asserting a right to receive an additional $34

7   million in the District Court Action.

8

9                       **MCG's Status as a Creditor Holding a Claim**

10          Pursuant to 11 U.S.C. § 101(10)(a), the term "creditor" means "an entity that has

11  a claim against the debtor that arose at the time of or before the order for relief

12  concerning the debtor."  11 U.S.C. § 101 broadly defines "claim" to mean a "right to

13  payment, whether or not such right is reduced to judgment, liquidated, unliquidated,

14  fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

15          What occurred here is that, through the Engagement Agreement, VOL granted

16  MCG a power coupled with an interest.  A power is the authority to do any act which the

17  grantor himself might lawfully perform.  Black's Law Dictionary (Revised Fourth Edition).

18  The power granted to MCG through the Engagement Agreement is the exclusive right to

19  collect the Judgment.  The interest coupled with this power is MCG's attorney's lien that

20  arises by operation of Utah statutory law and, possibly, Utah common law.  Utah Code

21  Annotated § 38-2-7(2) ("An attorney shall have a lien for the balance of compensation

22  due from a client on any money or property owned by the client that is the subject of or

23  connected with work performed for the client . . .")  *See also* Utah Code Annotated § 38-

24  2-7(10) ("This section does not alter or diminish in any way an attorney's common law

25  retaining lien rights.")  Alternatively, the interest coupled with MCG's power may be

26  viewed as MCG's rights to payment of all its fees and costs under the Engagement

27  Agreement.  Under Utah law, a power coupled with an interest cannot be revoked by

28  the grantor of the power.  *Montague v. McCarroll,* 15 Utah 318 (1897).  Additionally, a

1  power cannot be revoked if it is given for consideration.  That rule applies here as well,

2  because the exclusive power to collect the Judgment was given by VOL to MCG

3  through the Engagement Agreement in consideration for MCG's undertaking to litigate

4  the District Court Action against Heartwise.

5      Thus, MCG holds a power that gives MCG the exclusive right to collect the

6  Judgment.   The consequence of this for bankruptcy purposes is that MCG holds a

7  "claim" – namely, a right to payment.  The right to payment in question is MCG's

8  exclusive right to collect the Judgment.  VOL has no right to collect the Judgment

9  because it granted MCG the exclusive right to collect the Judgment.

10      VOL has no right of payment <u>as against Heartwise</u> to payment of the Judgment

11  because VOL granted MCG the exclusive right to collect the Judgment from Heartwise.

12  Because VOL lacks any right to payment of the Judgment by Heartwise, VOL does not

13  have a valid claim in this case as to the Judgment.  Undoubtedly, VOL has a right to

14  payment <u>as against MCG</u>, but the absence of any right to payment from Heartwise

15  means that Claim 3-2 must be disallowed by this Court in the entirety.  The *sine qua*

16  *non* of a "claim" is a right to payment (with certain exceptions not pertinent here), and

17  VOL simply does not have such a right as far as the Judgment is concerned.

18      The Court sustains MCG's objection and disallows Claim 3-2 in its entirety with

19  prejudice.  This ruling is without prejudice to VOL's rights under the Engagement

20  Agreement to payment from MCG in accordance with the terms of the Engagement

21  Agreement.

22      IT IS SO ORDERED.

23

24

25  Date: January 31, 2022

Mark S. Wallace
United States Bankruptcy Judge

26

27

28

# Order

# [ECF Docket no. 729]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED & ENTERED

JAN 31 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle        DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:20-bk-13335-MW |
| Heartwise, Inc. | CHAPTER 11 |
| | **AMENDED MEMORANDUM DECISION AND ORDER RE: MAGLEBY CATAXINOS LIMITED OBJECTION TO CLAIM 3-2 OF VITAMINS ONLINE INC.** |
| | [Related to Docket No. 277] |
| Debtor(s). | Date: January 24, 2022<br>Time: 2:00 PM<br>Courtroom: 6C |

This matter comes before the Court on the limited objection of creditor Magleby, Cataxinos & Greenwood, P.C. ("MCG") to Claim No. 3-2 filed by Vitamins Online, Inc. ("VOL").

## Background Facts

On October 28, 2013, VOL filed a complaint against competitor Heartwise, Inc. ("Heartwise") in the United States District Court for the District of Utah (the "District Court") alleging claims for unfair competition and false advertising under federal and

Utah law  (the "District Court Action").  Nearly five years later, in approximately August to September 2018, VOL replaced its existing counsel in the District Court Action with MCG .  MCG sent VOL an engagement letter dated September 27, 2018 that memorializes the terms of the engagement (the "Engagement Agreement").  VOL accepted the terms of the Engagement Agreement by email confirmation transmitted October 17, 2018.

The Engagement Agreement generally provides for a combination of reduced hourly fees and a contingency fee.  The Engagement Agreement states "Client agrees to pay the Firm the contingency fee at the time of recovery.  That is, it is the intent of the parties that both Client and the Firm shall be paid at the same time, as any recovery is obtained . . . *All payments from or collected against HeartWise or associated persons or entities shall be directed to the Firm, which will deduct the contingency fee and any outstanding fees and costs, and then pay the balance to Client.* . . . If Client is successful in recovering more than five million dollars ($5,000,000.00) (the "Extraordinary Result Threshold"), then the Firm's contingency fee shall increase by an additional 5% for all compensatory or other damages recovered above the Extraordinary Result Threshold. So, for example, if the Firm collects $10 million from Heartwise with no appeal, the Firm will be entitled to a 17.5% contingency fee on the first $5 million, and a 22.5% contingency fee on the next $5 million . . . "  Engagement Agreement at 9 (italics added by the Court).

The District Court Action went to trial during the summer of 2020.  The District Court held a three-week bench trial and issued very comprehensive and detailed findings of fact and conclusions of law in a 53- page document.  On November 10, 2020, the District Court awarded VOL $9,551,232 in damages against Heartwise along with prejudgment interest at 2.13 percent per annum plus reasonable attorneys' fees (to be determined at a later time) and entered judgment (the "Judgment").  After attorneys' fees are awarded, it is generally expected that the total amount of the Judgment will be approximately $14.5 million.

By reference to Engagement Agreement standards – standards expressly agreed to by VOL -- MCG "hit the ball out of the park" as the saying goes, obtaining a Judgment that was nearly <u>twice</u> the benchmark for the Extraordinary Result Threshold.  One would think that VOL would be thrilled with a recovery nearly <u>double</u> the amount that VOL, in the Engagement Agreement, had agreed would be the "Extraordinary Result Threshold." However, that apparently did not happen.  VOL has announced its intentions to file an appeal (technically, a cross-appeal, because Heartwise has appealed the Judgment) of the Judgment.  According to VOL, the District Court got it wrong and should have awarded VOL an additional $34 million above and beyond the $9,551,232 already awarded.  (This position is stated in a proof of claim filed by VOL, namely Claim 8).

VOL's next move, having in hand a Judgment that was expected to rise to about $14.5 million, was to terminate the law firm that had gained it that double (or triple, depending upon how one views the matter) "Extraordinary Result" recovery.  Mr. Khan's declaration in this matter states he terminated MCG on December 3, 2020.  Mr. Khan's email to MCG states: "Please consider this email as the official notice of termination for the MCG law firm representing Vitamins Online Inc. . . effective immediately."  The notice fails to state any cause for termination.

Heartwise filed a voluntary bankruptcy petition seeking relief under Chapter 11 of the Bankruptcy Code on December 4, 2020. Subsequently, Heartwise filed an amended plan of reorganization proposing to pay all creditors 100 cents on the dollar plus postpetition interest on the plan's effective date.  Throughout this bankruptcy case, VOL has consistently fought against confirmation of a plan of reorganization that would pay VOL in full with interest if the Heartwise appeal of the Judgment is unsuccessful. Heartwise alleges that VOL's goal in this chapter 11 case is not to get paid in full but instead to destroy a business competitor.

VOL filed proof of claim 3-2 on April 28, 2021, seeking approximately $14.5 million in respect of the Judgment.  MCG filed Claim 5-2 on May 29, 2021, asserting a claim to the same $14.5 million, basing its claim on the Engagement Agreement and the

1    Judgment.  MCG contends that the provisions of the Engagement Agreement quoted

2    above entitle it to receive payment of the Judgment, to subtract its fees and costs (and

3    possibly other amounts owing to a third party who helped finance the Judgment-related

4    litigation), and then to pay the remaining amount to VOL.  Similarly, MCG filed Claim

5    No. 12 in response to VOL's Claim No. 8, asserting a right to receive an additional $34

6    million in the District Court Action.

7

8                    **MCG's Status as a Creditor Holding a Claim**

9            Pursuant to 11 U.S.C. § 101(10)(a), the term "creditor" means "an entity that has a

10   claim against the debtor that arose at the time of or before the order for relief concerning

11   the debtor."  11 U.S.C. § 101 broadly defines "claim" to mean a "right to payment,

12   whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

13   contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

14           What occurred here is that, through the Engagement Agreement, VOL granted

15   MCG a <u>power coupled with an interest</u>.  A power is the authority to do any act which the

16   grantor himself might lawfully perform.  Black's Law Dictionary (Revised Fourth Edition).

17   The power granted to MCG through the Engagement Agreement is the exclusive right to

18   collect the Judgment.  The interest coupled with this power is MCG's attorney's lien that

19   arises by operation of Utah statutory law and, possibly, Utah common law.  Utah Code

20   Annotated § 38-2-7(2) ("An attorney shall have a lien for the balance of compensation

21   due from a client on any money or property owned by the client that is the subject of or

22   connected with work performed for the client . . .")  *See also* Utah Code Annotated § 38-

23   2-7(10) ("This section does not alter or diminish in any way an attorney's common law

24   retaining lien rights.")  Alternatively, the interest coupled with MCG's power may be

25   viewed as MCG's rights to payment of all its fees and costs under the Engagement

26   Agreement.  Under Utah law, a power coupled with an interest cannot be revoked by the

27   grantor of the power.  *Montague v. McCarroll,* 15 Utah 318 (1897).  Additionally, a power

28   cannot be revoked if it is given for consideration.  That rule applies here as well, because

the exclusive power to collect the Judgment was given by VOL to MCG through the
Engagement Agreement in consideration for MCG's undertaking to litigate the District
Court Action against Heartwise.

Thus, MCG holds a power that gives MCG the exclusive right to collect the
Judgment.  The consequence of this for bankruptcy purposes is that MCG holds a "claim"
– namely, a right to payment.  The right to payment in question is MCG's exclusive right
to collect the Judgment.  VOL has no right to collect the Judgment because it granted
MCG the exclusive right to collect the Judgment.

VOL has no right of payment <u>as against Heartwise</u> to payment of the Judgment
because VOL granted MCG the exclusive right to collect the Judgment from Heartwise.
Because VOL lacks any right to payment of the Judgment by Heartwise, VOL does not
have a valid claim in this case as to the Judgment.  Undoubtedly, VOL has a right to
payment <u>as against MCG</u>, but the absence of any right to payment from Heartwise
means that Claim 3-2 must be disallowed by this Court in the entirety.  The *sine qua non*
of a "claim" is a right to payment (with certain exceptions not pertinent here), and VOL
simply does not have such a right as far as the Judgment is concerned.

The Court sustains MCG's objection and disallows Claim 3-2 in its entirety with
prejudice.  This ruling is without prejudice to VOL's rights under the Engagement
Agreement to payment from MCG in accordance with the terms of the Engagement
Agreement.

IT IS SO ORDERED.

Date: January 31, 2022

Mark S. Wallace
United States Bankruptcy Judge

# Order

# [ECF Docket no. 747]

1   AARON J. MALO, Cal. Bar No. 179985
    amalo@sheppardmullin.com
2   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    650 Town Center Drive, 10th Floor
3   Costa Mesa, California 92626-1993
    Telephone:    714.513.5100
4   Facsimile:    714.513.5130

5   JEFFREY W. SHIELDS, admitted *pro hac vice*
    jshields@joneswaldo.com
6   JONES, WALDO, HOLBROOK & McDONOUGH, PC
    170 South Main Street, Suite 1500
7   Salt Lake City, Utah 84101
    Telephone:    801.521.3200
8   Facsimile:    801.328.0537

9   Attorneys for Creditor
    Magleby Cataxinos & Greenwood, PC
10

<div style="text-align:center; border:1px solid blue;">

**FILED & ENTERED**

**FEB 11 2022**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle          DEPUTY CLERK

</div>

11              UNITED STATES BANKRUPTCY COURT

12      CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

13

14  In re:                          Case No. 8:20-bk-13335-MW
                                    Chapter 11
15  HEARTWISE, INC.,                The Hon. Mark S. Wallace

16              Debtor.

17                                  **ORDER OVERRULING CREDITOR
                                    VITAMINS ONLINE, INC.'S OMNIBUS
18                                  OBJECTION TO MAGLEBY
                                    CATAXINOS & GREENWOOD, P.C.'S
19                                  CLAIM NOS. 5-2 AND 12**

20                                  Hearing:
                                    Date:     January 24, 2022
21                                  Time:     2:00 p.m. (PST)
                                    Crtrm.:   6C
22

23

24

25

26

27

28

Case No. 8:20-BK-13335-MW

SMRH:4855-5164-6732.4

**- 128 -**

ORDER OVERRULING OMNIBUS OBJECTION
TO CLAIMS 5-2 AND 12

1    The Omnibus Objection ("Objection") filed by Vitamins Online, Inc. ("VOL") to Claim

2   Nos. 5-2 and 12 filed by Magleby Cataxinos & Greenwood, PC ("MCG") [Dk. 525] came on for

3   hearing on January 24, 2022, at approximately 2:00 p.m. in Department 6C of the above-captioned

4   Court, the Honorable Mark S. Wallace presiding.  Appearances were as stated in the record.

5    Having considered all papers submitted in support of and in opposition to VOL's

6   Objection, and based upon such oral argument as was advanced at the hearing,

7    **IT IS HEREBY ORDERED** that:

8    1.    For the reasons set forth more fully in the Court's *Amended Memorandum*

9   *Decision and Order Re: Magleby Cataxinos Limited Objection to Claim 3-2 of Vitamins Online*

10  *Inc.* [Dk. 729], VOL's Objection to Claim No. 5-2 filed by MCG is OVERRULED AND

11  DENIED in its entirety.

12   2.    For the reasons set forth more fully in the Court's *Amended Memorandum*

13  *Decision and Order Re: Magleby Cataxinos Limited Objection to Claim 3-2 of Vitamins Online*

14  *Inc.* [Dk. 729], VOL's Objection to Claim No. 12 filed by MCG is OVERRULED AND DENIED

15  in its entirety.

16   **IT IS SO ORDERED.**

17                        ###

18

19

20

21

22

23                        *Mark S. Wallace*
     Date: February 11, 2022           Mark S. Wallace
24                        United States Bankruptcy Judge

25

26

27

28

Case No. 8:20-BK-13335-MW

SMRH:4855-5164-6732.4

ORDER OVERRULING OMNIBUS OBJECTION
TO CLAIMS 5-2 AND 12

# Order

# [ECF Docket no. 754]

1

2

3

4

5

6

7



FILED & ENTERED

FEB 23 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle        DEPUTY CLERK

8

9

10

11

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## ANTA ANA DIVISION

12

13

14

15

16

17

18

19

20

| In re: | Case No.: 8:20-bk-13335-MW |
|---|---|
| Heartwise, Inc. | CHAPTER 11 |
| | **ORDER DENYING VITAMINS ONLINE, INC.'S MOTION FOR ADDITIONAL FINDINGS PURSUANT TO RULE 7052** |
| | Date:        TBD<br>Time:        TBD<br>Courtroom:  6C<br>411 W Fourth Street<br>Santa Ana, CA 92701 |
| Debtor(s). | |

21

22

23

24

25

26

27

28

On January 31, 2022, this Court entered its Amended Memorandum Decision and Order re: Magleby Cataxinos Limited Objection to Claim 3-2 of Vitamins Online (the "Order"). Vitamins Online, Inc. ("VOL") now moves the Court to supplement (or further amend) the Order to make additional findings (the "Motion"). The Motion is made pursuant to Federal Rule of Bankruptcy Procedure 7052. Rule 7052 provides that Federal Rule of Civil Procedure 52 (with certain modifications) applies in adversary proceedings. Although the Order relates to a determination in a contested matter, Rule 7052 applies by reason of Federal Rule of Bankruptcy Procedure 9014(c).

The Motion is essentially an effort by VOL to re-argue the objection to Claim 3-2.  This Court determines that the findings of fact and conclusions of law that it made in the Order are sufficient to pass muster under Rule 7052.

Accordingly, the Motion is denied with prejudice.

IT IS SO ORDERED.

### 

Date: February 23, 2022

Mark S. Wallace
United States Bankruptcy Judge

# Order

# [ECF Docket no. 776]



FILED & ENTERED

APR 26 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

In re:

Heartwise, Inc.

Debtor(s).

Case No.: 8:20-bk-13335-SC

CHAPTER 11

**ORDER (1) GRANTING MOTION FOR RECONSIDERATION ("MOTION") [DK. 761]; (2) VACATING DISALLOWANCE ORDER ENTERED JANUARY 31, 2022 [DK. 729]; (3) ABSTAINING FROM DISPUTE BETWEEN VITAMINS ONLINE, INC. AND MAGLEBY, CATAXINOS, & GREENWOOD, P.C.; AND (4) VACATING HEARING ON MOTION**

Hearing to be Vacated:
Date:        May 17, 2022
Time:        1:30 PM
Courtroom: 5C – virtual

The Court has considered the Motion for Reconsideration filed March 9, 2022 [Dk. 761] (the "Motion") by Vitamins Online, Inc. ("VOL"), in which VOL seeks reconsideration of the Court's Order Disallowing Claim 3-2 entered January 31, 2022 [Dk. 729] ("Disallowance Order"), the opposition filed by Magleby, Cataxinos, & Greenwood, P.C. ("MCG") on March 30, 2022 [Dk. 767] ("MCG Opposition"), the limited

opposition filed by Heartwise, Inc. ("Heartwise" or "Debtor") on March 20, 2022 [Dk. 768] ("Debtor Opposition"), and the replies filed by VOL on April 6, 2022, [Dks. 769 and 770], as well as the docket as a whole, and has determined that this matter is appropriate for disposition without a hearing, and finds good cause to GRANT the Motion, VACATE the Disallowance Order, ABSTAIN from resolution of the two-party dispute between VOL and MCG, and VACATE the hearing on the Motion.

## I.    Background

Heartwise and VOL are competitors, both engaged in the business of selling vitamins and nutritional supplements online. [Confirmation Order entered December 17, 2021, Dk. 644, Pg. 1:21-22]. On October 23, 2013, pre-petition, VOL filed a complaint against Heartwise in the United States District Court for the District of Utah (the "Utah District Court") alleging claims for unfair competition and false advertising under federal and Utah law (the "District Court Action"). [*Id.*, Pg. 1:22-25]. VOL hired Magleby, Cataxinos & Greenwood, P.C. ("MCG") to represent it in the prosecution of the District Court Action. [*Id.*, Pg. 1:26-28].

After a three-week bench trial, the Utah District Court ruled against Heartwise, awarding damages to VOL in the amount of $9,551,232, plus prejudgment interest and reasonable attorneys' fees (the "Judgment"). [*Id.*, Pg. 2:6-9]. The amount of attorneys' fees has not yet been determined, but the parties generally expect the Judgment with awarded attorneys' fees and prejudgment interest to be about $14.5 million. [*Id.*, Pg. 2:9-11]. Heartwise appealed the Judgment, which appeal remains pending. [*Id.*, Pg. 2:20].

Thereafter, Heartwise filed a Chapter 11 petition. [Petition filed December 4, 2020, Dk. 1]. Both VOL and MCG (VOL's former attorneys) filed proofs of claim[1], both asserting the right to collect on the same Judgment. MCG asserted that although VOL was the named Judgment holder, MCG has a right to collect payment on the Judgment

---

[1] VOL filed its Amended Claim No. 3 on April 28, 2021. MCG filed its Amended Claim Nos. 5 and 12 on May 29, 2021.

1   pursuant to the engagement letter executed between MCG and VOL in connection with

2   MCG's representation of VOL in the District Court Action ("Engagement Letter"). *See*

3   Amended Claim No. 5-2, filed May 29, 2021. Both the VOL and MCG proofs of claim

4   drew objections by MCG and VOL, respectively [Dks. 277 & 525].[2]

5       Heartwise filed a plan of reorganization, which was confirmed by Order entered

6   December 17, 2021 [Dk. 644]. The approved plan, which Heartwise asserts has been

7   substantially consummated [Debtor Opposition, Dk. 768, Pg. 3:2-3], provides for

8   payment of all claims in full. However, at the time of confirmation, the cross objections

9   to the VOL and MCG claims filed by MCG and VOL [Dk. 277 & 525] were then-pending.

10  Accordingly, Heartwise deposited $14.5 million dollars into the Court's registry,

11  earmarked to pay either the VOL or MCG claims in satisfaction of the Judgment upon

12  resolution of the pending appeal.[3]

13      After a hearing on the objections to the VOL and MCG claims, on January 31,

14  2022, the Court entered the Disallowance Order [Dk. 729], sustaining MCG's objection

15  and disallowing VOL's Claim No. 3-2 in its entirety.[4]

16      On February 14, 2022, VOL filed a Motion for Additional Findings Pursuant to

17  Rule 7052 ("Motion for Additional Findings") [Dk. 750], which was denied by the Court

18  via order entered February 23, 2022 [Dk. 754].

19      On March 9, 2022, VOL filed the present Motion [Dk. 761] seeking

20  reconsideration of the Disallowance Order pursuant to, *inter alia*, FRCP 59(e), FRCP

21  60(b)(1), 60(b)(4), and 60(b)(6), asserting that "[t]he [predecessor][5] Court committed

22

23  [2] Heartwise also filed objections to the VOL and MCG claims [Dk. 711 & 712] after the Court's
    confirmation of Heartwise's plan. The objections were consistent with Heartwise's position that the
24  Judgment should be overturned in its entirety (i.e., the issue of Heartwise's pending appeal). Further,
    Heartwise asserted that it filed the objections to ensure that no monies would be released from the
25  Court's registry until Heartwise's pending appeal, any cross-appeal, and any subsequent proceedings
    were concluded.
26  [3] The order confirming Debtor's plan [Dk. 644] terminated the automatic stay to allow Debtor's appeal of
    the Judgment, and any cross-appeals to be filed by VOL against Debtor, to be litigated to conclusion.
27  [4] The Court also entered a companion order overruling VOL's objection to MCG's Claim Nos. 5-2 and 12;
    however, that order was entered later on February 11, 2022 [Dk. 747].
28  [5] This case was randomly transferred to this Court on February 24, 2022, based on the retirement of
    Judge Wallace [See Dk. 755], whose order is the subject of this instant proceeding. Judge Wallace is
    hereinafter referred to as the prior or predecessor court herein.

1 several clear errors of law and fact that were manifestly unjust and warrant

2 reconsideration…" [Motion, Dk. 761, Pg. 15:16-17]. For the reasons more fully

3 explained herein, this Court agrees.

4     **II.    The Motion can be considered pursuant to Civil Rule 59(e) and/or**

5           **Civil Rule 60.**

6     "A claim that has been allowed or disallowed may be reconsidered for cause." 11

7 U.S.C. § 502(j). Generally, reconsideration of a Court's order may be achieved under

8 either Federal Civil Rule 59(e) (motion to alter or amend a judgment), which is made

9 applicable to bankruptcy proceedings by Bankruptcy Rule 9023, or Civil Rule 60(b)

10 (relief from judgment), which is made applicable to bankruptcy proceedings by

11 Bankruptcy Rule 9024. Fed. R. Civ. Proc. 59(e). Fed. R. Bankr. Proc. 9023. Fed. R. Civ.

12 Proc. 60(b). Fed. R. Bankr. Proc. 9024. See also *Sch. Dist. No. 1J v. ACandS, Inc.,* 5

13 F.3d 1255, 1262 (9th Cir. 1993).

14     Typically, when a party files a motion for reconsideration within 14 days after the

15 entry of judgment, the motion is treated as a motion to alter or amend judgment under

16 Civil Rule 59(e). *Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp*., 248 F.3d 892,

17 898–99 (9th Cir. 2001) (citation omitted). Conversely, a motion for reconsideration filed

18 more than 14 days following the entry of a judgment is treated as a motion for relief from

19 a judgment or order under Rule 60(b). *Id.* However, notwithstanding the foregoing, Rule

20 60(b)(1) motions arising from the court's error[6] must be made prior to the expiration of

21 time to file an appeal (i.e., within 14 days after the entry of judgment). *Gila River Ranch,*

22 *Inc. v. United States*, 368 F.2d 354, 357 (9th Cir.1966).

23     The 14-day period to file an appeal may be tolled or otherwise extended if certain

24 conditions are met. Bankruptcy Rule 8002(b) provides that if a party timely files a motion

25 for additional findings, the time to file an appeal runs from the entry of the order

26

27 _____

28 [6] Rule 60(b)(1) affords relief occasioned by mistake. Such mistake may include the Court's substantive
errors of law or fact. *Fid. Fed. Bank, FSB v. Durga Ma Corp*., 387 F.3d 1021, 1024 (9th Cir. 2004) ("The
district court has discretion to correct a judgment for mistake or inadvertence, either on the part of
counsel or the court itself.").

1   disposing of the motion for additional findings rather than the entry of the original order

2   sought to be appealed. Fed. R. Bankr. Proc. 8002(b)(1)(A).

3       VOL timely filed a Motion for Additional Findings [Dk. 750] on February 14, 2022.

4   The Court denied the Motion for Additional Findings on February 23, 2022 [Dk. 754].

5   Thus, pursuant to Bankruptcy Rule 8002(b), the time to appeal the Disallowance Order

6   began on February 23, 2022, the date the order denying the motion for additional

7   findings was entered. On March 9, 2022, within the requisite 14-day period, VOL filed

8   the present Motion [Dk. 761] seeking reconsideration of the Disallowance Order.

9       Accordingly, the Motion is timely and can be analyzed under both Civil Rule 59(e)

10  and 60(b).

11      **III.    Reconsideration is warranted pursuant to Civil Rule 59(e) and Civil**

12              **Rule 60.**

13      Civil Rules "59(e) and 60(b) are distinct, serve different purposes, and have

14  different standards that can yield different results…" *Demos v. Brown (In re Graves)*,

15  279 B.R. 266, 275 (B.A.P. 9th Cir. 2002). Civil Rule 59(e) allows for reconsideration if

16  the bankruptcy court "(1) is presented with newly discovered evidence, (2) committed

17  clear error or the initial decision was manifestly unjust, or (3) if there is an intervening

18  change in controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th

19  Cir. 1993) (internal citation omitted). Civil Rule 60(b) allows for reconsideration "only

20  upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered

21  evidence; … (4) the judgment is void; … or (6) extraordinary circumstances which would

22  justify relief." Fed. R. Civ. Proc. 60(b).

23      VOL asserts that "[t]he [predecessor] Court committed several clear errors of law

24  and fact that were manifestly unjust and warrant reconsideration…" [Motion, Dk. 761,

25  Pg. 15:16-17]. With all due respect, this Court agrees.[7]

26

27  ─────────────
    [7] The Court acknowledges the arguments raised in the Oppositions implicating the law of the case
28  doctrine, as well as the allegations that the Motion represents improper "judge-shopping," but respectfully
    disagrees. "Since a lower court cannot by its law of the case bind a higher court having appellate
    jurisdiction over it, the only sensible thing for a lower federal court… to do is set itself right instead of
    inviting reversal above, when convinced that its law of the case is substantially erroneous." 1B Moore's

It is common practice for a firm representing a client on a contingency fee basis to include a term in its engagement letter with the client that requires that payment of any potential judgment obtained in client's favor to be made through the firm, such that the firm can collect its contingency fee from the judgment proceeds and pay the remainder to the client. However, such a term is not an assignment but rather creates a contractual right between the firm and client; the client is, for all intents and purposes, the sole holder of the judgment, and the judgment debtor remains liable only to the holder of the judgment. If the judgment debtor does not pay the judgment through the firm or otherwise, the existence of the term in the engagement letter does not provide the firm with recourse against the judgment debtor directly, except that the firm may seek to collect the judgment on their client's behalf. Likewise, the firm has no recourse against the judgment debtor if the judgment debtor, contrary to the terms of the engagement letter[8], pays the client directly. In that circumstance, the firm's only recourse is to seek collection of the judgment proceeds directly from the client.

The term "creditor" means "an entity that has a claim **against the debtor** that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C.

---

Federal Practice P0.404[1], at 407 (1982) (footnotes omitted). In the instance of successor judges involved in the same case, the Seventh Circuit has explained: "We think Professor Moore's analysis is applicable to the situation in which one federal district judge believes the ruling of another district judge to be erroneous, as Judge Perry did in this case. We do not think that Judge Perry was foreclosed by the law of the case from holding that Diaz II was barred by res judicata." *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 562-63 (7th Cir. 1982). This Court adopts the Seventh Circuit's analysis. Indeed, the Ninth Circuit has also addressed such a doctrine:

> "Under the "law of the case" doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." Thomas v. Bible, 983 F.2d 152, 154 (9th Cir.) (cert. denied 508 U.S. 951, 124 L. Ed. 2d 661, 113 S. Ct. 2443 (1993). The doctrine is not a limitation on a tribunal's power, but rather a guide to discretion. Arizona v. California, 460 U.S. 605, 618, 75 L. Ed. 2d 318, 103 S. Ct. 1382 (1983). A court may have discretion to depart from the law of the case where: 1) *the first decision was clearly erroneous*; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) *a manifest injustice would otherwise result*. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion. Thomas v. Bible, 983 F.2d at 155.

*United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (emphasis added).

[8] The Court notes that the judgment debtor has no privity of contract with the firm via the engagement letter or otherwise.

§101(10)(a) (emphasis added). A "claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured." 11 U.S.C. §101.

VOL holds a Judgment against Debtor. MCG is not the judgment holder, and does not purport to be. MCG merely holds a contractual right to collect and receive payment from the judgment proceeds; however, under the plain terms of the Engagement Letter, and privity of contract principles, MCG's right to collect may not necessarily translate into a "right to payment" enforceable against the Debtor itself, who is not a party to the Engagement Letter. That MCG and VOL executed the Engagement Letter may create rights as between MCG and VOL, but it is unclear from the caselaw and briefings before this Court that the terms of the Engagement Letter vested an interest in MCG such that MCG can pursue a right to payment against Debtor on its own behalf. Further, it is unclear from the predecessor court's order how the terms of the Engagement Letter created an irrevocable power coupled with interest, as was the case in *Montague v. McCarroll*, 15 Utah 318 (1897) (which was cited by the predecessor court but relates to a "power of attorney" rather than an engagement agreement).

The U.S. Supreme Court has made it clear that attorney-client relationships are different than other types of agency relationships:

> In fact, that relationship is a quintessential principal-agent relationship, for the client retains ultimate dominion and control over the underlying claim … [b]ut the client still must determine whether to settle or proceed to judgment and make, as well, other critical decisions. The attorney is an agent who is duty bound to act in the principal's interests…. This rule applies regardless of whether the attorney-client contract or state law confers any special rights or protections on the attorney, so long as such protections do not alter the relationship's fundamental principal-agent character.

*Commissioner v. Banks,* 543 U.S. 426, 427 (2005). The Disallowance Order does not address the foregoing distinction, nor does it cite a single case which holds that an engagement letter which creates an attorney-client relationship may also create an irrevocable "power coupled with an interest." This is an error, which makes it unclear that MCG is a creditor for the purposes of the foregoing statute; accordingly, this Court

1 VACATES the Disallowance Order.[9]

2     **IV.**    **This Court shall abstain from adjudicating the dispute between VOL**

3             **and MCG with regard to who has a right to payment against the**

4             **Estate.**

5     A dispute remains between VOL and MCG regarding which entity has a claim

6 and right to payment from Debtor. It is this Court's view that this dispute should be

7 adjudicated in an alternate venue (i.e., the Utah District Court), where Debtor's appeal

8 on the Judgment remains pending, and which court will ultimately decide the amount of

9 attorneys' fees and interest to be added to the Judgment, if any.[10] Accordingly, this

10 Court permissibly ABSTAINS from adjudicating the issue.

11     This Court recognizes that abstention is the exception, not the norm. *See County*

12 *of Allegheny v. Frank Mashuda Co*., 360 U.S. 185, 188-89 (1959); *Eastern Airlines, Inc.*

13 *v. Int'l Assoc. of Machinists & Aerospace Works (In re Ionosphere Clubs, Inc.)*, 108 B.R.

14 951, 954 (Bankr. S.D.N.Y. 1989). However, permissive abstention is appropriate in

15 certain circumstances, as contemplated by 28 U.S.C. § 1334(c)(1):

16
17     Except with respect to a case under chapter 15 of title 11, nothing in this section
    prevents a district court *in the interest of justice, or in the interest of comity with*
18     *State courts or respect for State law*, from abstaining from hearing a particular
    proceeding arising under title 11 or arising in or related to a case under title 11.

19
20
21
22
23

---

24 [9] "The Ninth Circuit has implemented a pragmatic approach to finality in bankruptcy cases. Under the
approach, a bankruptcy order is final if it 1) resolves and seriously affects substantive rights and 2) finally
25 determines the discrete issue to which it is addressed. If further proceedings will affect the scope of the
order, the order is not subject to review. This approach ensures that a case does not make two complete
26 trips through the appellate process." *Shoemaker v. Segal (In re Shoemaker),* No. CC-19-1248-TLS, 2020
Bankr. LEXIS 3280, at *9 (B.A.P. 9th Cir. Nov. 20, 2020) (*citing Elliott v. Four Seasons Props. (In re*
27 *Frontier Props., Inc.),* 979 F.2d 1358, 1363 (9th Cir. 1992)) (internal quotations omitted). See also *Zucker
v. Maxicare Health Plans Inc*., 14 F.3d 477, 481-82 (9th Cir. 1994) (concluding that a judgment was not
28 final based on its contingent nature).
[10] As noted below, the Court has already granted relief from stay to allow Debtor's appeal to be heard in
the Utah District Court. See Order Confirming Plan entered December 17, 2021, Dk. 644, Pg. 9:8-10:1.

1    28 U.S.C. § 1334(c)(1) (emphasis added).[11] [12]

2        In considering whether permissive abstention is appropriate, courts have

3    considered one or more (not necessarily all) of twelve factors. As one court notes,

4    "[a]lthough the bankruptcy court should consider all twelve factors, one should not be

5    beguiled into a false sense that a head count will yield the answer with mathematical

6    certainty." *Fidelity Nat'l Title Ins. Co. v. Franklin (In re Franklin),* 179 B.R. 913, 928

7    (Bankr. E.D. Cal. 1995). These factors are:

8            (1) the effect or lack thereof on the efficient administration of the estate if a court
9            recommends abstention, (2) the extent to which state law issues predominate
             over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable
10           state law, (4) the presence of a related proceeding commenced in state court or
             other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28
11           U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to
             the main bankruptcy case, (7) the substance rather than the form of an asserted
12           'core' proceeding, (8) the feasibility of severing state law claims from core
             bankruptcy matters to allow judgments to be entered in state court with
13           enforcement left to the bankruptcy court, (9) the burden of [the court's] docket,
14           (10) the likelihood that the commencement of the proceeding in a bankruptcy
             court involves forum shopping by one of the parties, (11) the existence of a right
15           to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

16

17   *Eastport Assocs. v. City of Los Angeles*, 935 F.2d 1071, 1075 (9th Cir. 1991);

18   *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1167

19   (9th Cir. 1990).

20       The Court has considered the relevant factors and determined that the factors

21   weigh heavily in favor of abstention.

22       First, the administration of the Estate is effectively completed. Debtor has

23

24   _____
     [11] "Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to
25   abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the
     court of appeals under section 158(d), 1291, or 1292 of this title [28 USCS § 158(d), 1291, or 1292] or by
26   the Supreme Court of the United States under section 1254 of this title [28 USCS § 1254]. Subsection (c)
     and this subsection shall not be construed to limit the applicability of the stay provided for by section 362
27   of title 11, United States Code, as such section applies to an action affecting the property of the estate in
     bankruptcy." 28 U.S.C.S. § 1334.
28   [12] Within a bankruptcy context, permissive abstention is available in both core or non-core proceedings.
     *Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehouseman & Helpers*, 124 F.3d 999, 1009 (9th Cir.
     1997). That is, Congress contemplated that a bankruptcy court may abstain even from deciding a case
     which states a claim that arises under the Bankruptcy Code. *Id.*

confirmed a plan and substantially consummated that plan, setting aside funds in the Court's registry to cover payment of its claim related to the Judgment. Whether such payment is determined to be made to VOL or MCG is irrelevant to the effective administration of the Estate; Debtor is entirely unaffected by the outcome of the dispute between VOL and MCG. Secondly, the two-party dispute between VOL and MCG revolves entirely around state law issues that have no bearing on bankruptcy law.

Additionally, the presence of a non-bankruptcy court proceeding is not required for permissive abstention, but it may weigh in favor of abstention. *See In re Hatfield*, No. 08-30154 TEC, 2009 WL 2849538, at *2 (Bankr. N.D. Cal. 2009). Here, Debtor has appealed the Judgment entered in the District Court Action and been afforded relief from stay to pursue such an appeal; at this time, the appeal remains pending. Moreover, the Utah District Court is the best court to determine what amount of attorneys' fees and interest should be added to the Judgment, if VOL prevails on appeal. It is this Court's view that the Utah District Court where the Judgment was entered is the most appropriate venue for resolution of the tangential and related issue of whether VOL or MCG have the right to payment of the Judgment under the laws of the State of Utah.[13] Allowing the state court to adjudicate this dispute to full resolution is not only feasible, but also advantageous to the efficient administration of the Estate. Moreover, allowing the Utah District Court to resolve this dispute alleviates burden on this Court's docket to resolve non-bankruptcy matters.[14]

For all of the reasons above, this Court ABSTAINS from adjudicating the issue of whether VOL or MCG have a right to payment from the Estate.[15]

_____

[13] In fact, the Engagement Letter itself indicates that the parties previously agreed to litigate issues related to MCG's representation in such a forum: "In the unlikely event of a dispute, the state and federal courts in Salt Lake County, Utah, shall be the exclusive venue for resolution of any and all claims between Client and the Firm." See MCG Opposition, Dk. 767, Engagement Letter, Pg. 45.
[14] While unfortunate, the fact that the parties engaged in litigation of this dispute before the predecessor court does not sway this Court into retaining the matter. The extent of the parties' prior litigation efforts is but one of the many factors that have been considered by the Court, and is insufficient to change the balance of the factors which weigh squarely in favor of this Court's abstention of the dispute.
[15] To be clear, once the state court has resolved the issue of the appeal and the right to payment, the prevailing party (either MCG or VOL) may file whatever they deem appropriate in this Court to facilitate payment from the funds set aside by Debtor in the Court's registry.

**V.    Conclusion**

In light of the foregoing, after having reviewed the Motion and related pleadings, and the docket as a whole, the Court finds that this matter is appropriate for disposition without a hearing, and finds good cause to GRANT the Motion, VACATE the Disallowance Order, ABSTAIN from resolution of the dispute between VOL and MCG, and VACATE the hearing on the Motion.

IT IS SO ORDERED.

Date: April 26, 2022

Scott C. Clarkson
United States Bankruptcy Judge

# Order

# [ECF Docket no. 777]

FILED & ENTERED

APR 26 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

In re:

Heartwise, Inc.

Debtor(s).

Case No.: 8:20-bk-13335-SC

CHAPTER 11

**ORDER (1) DENYING MOTION FOR ADDITIONAL FINDINGS ("MOTION") [DK. 757]; (2) VACATING ORDER ENTERED FEBRUARY 11, 2022 [DK. 747]; AND (3) VACATING HEARING ON MOTION**

Hearing to be Vacated:
Date:        May 17, 2022
Time:        1:30 PM
Courtroom:  5C – virtual

The Court has considered the Motion for Additional Findings[1] filed February 25, 2022 [Dk. 757] (the "Motion") by Vitamins Online, Inc. ("VOL"), in which VOL requests that the Court supplement the order overruling VOL's Objection to Claim No. 5-2 entered February 11, 2022 [Dk. 747] ("Objection Order"), the opposition filed by

---

[1] A motion to make additional findings in a Bankruptcy Proceeding is governed by Rule 7052 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 52 of the Federal Rules of Civil Procedure (FRCP). FRCP 52 permits a party to request amendment of a court's findings, or the issuance of additional findings. Fed. R. Civ. Pro. 52(b). One purpose of Rule 52(a) is to aid appellate court by affording it clear understanding of ground or basis of decision of lower court. *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975).

1   Magleby, Cataxinos, & Greenwood, P.C. ("MCG") on March 30, 2022 [Dk. 766] ("MCG

2   Opposition"), the limited opposition filed by Heartwise, Inc. ("Heartwise" or "Debtor") on

3   March 20, 2022 [Dk. 768] ("Debtor Opposition"), and the replies filed by VOL on April 6,

4   2022, [Dks. 769 and 770], as well as the docket as a whole, and has determined that

5   this matter is appropriate for disposition without a hearing, and finds good cause to

6   DENY the Motion, VACATE the Objection Order, and VACATE the hearing on the

7   Motion.

8   　　　The Objection Order is directly related to a dispute between VOL and MCG

9   regarding which of the two entities are entitled to assert a claim against the Debtor

10  based on the same underlying judgment.[2] As noted by MCG in its Opposition, "VOL's

11  objections to MCG's claims involved the same underlying issues as MCG's objections to

12  VOL's claims, and both sets of objections were decided together as part of a single,

13  unified ruling from this Court. Although there were separate Orders entered for MCG's

14  objection to VOL's claims (Dkt. 729) and VOL's objection to MCG's claims (Dkt. 747),

15  the latter order relies on and expressly incorporates the former." [MCG Opposition, Dk.

16  766, Pg. 4:16-20].

17  　　　This Court has issued an order VACATING the order entered by the predecessor

18  Court disallowing MCG's claim ("Disallowance Order") [Dk. 729] and ABSTAINING from

19  the resolution of that dispute. *See* Order entered April 26, 2022 [Dk. 776]

20  ("Reconsideration Order"). As the Objection Order is directly related, and, in fact, relies

21  on the now-vacated Disallowance Order, and for the reasons more fully explained in the

22  Reconsideration Order, which is incorporated herein, this Court finds it appropriate to

23  VACATE the Objection Order.

24  //

25  //

26  //

27

28
_____

[2] A more fulsome factual summary is contained in the Reconsideration Order, which is incorporated by
reference herein.

1    In light of the foregoing, the relief requested in the Motion is unnecessary, and

2    the Motion is DENIED as moot.

3    IT IS SO ORDERED.

25   Date: April 26, 2022

Scott C. Clarkson
United States Bankruptcy Judge

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
 301 E. Colorado Blvd., 9th Floor Pasadena, CA 91101-1977

A true and correct copy of the foregoing document entitled: **NOTICE OF APPEAL AND STATEMENT OF ELECTION**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
 5/10/2022        , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 5/10/2022     , I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 5/10/2022 | Jessica L. Evans | /s/ Jessica L. Evans |
| *Date* | *Printed Name* | *Signature* |

**SERVICE LIST**

**SERVED BY NEF**

- **Michael Jay Berger**    michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Anthony Bisconti**    tbisconti@bklwlaw.com, 4579179420@filings.docketbird.com;docket@bklwlaw.com
- **Jared Glicksman**    jglicksman@yocca.com
- **Nancy S Goldenberg**    nancy.goldenberg@usdoj.gov
- **Matthew Grimshaw**    mgrimshaw@marshackhays.com, mgrimshaw@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **Eve H. Karasik**    ehk@lnbyb.com
- **Steven J. Katzman**    SKatzman@bienertkatzman.com, 4579179420@filings.docketbird.com;docket@bklwlaw.com
- **Aaron J Malo**    amalo@sheppardmullin.com, clopez@sheppardmullin.com;abilly@sheppardmullin.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Carlos A Nevarez**    cnevarez@bklwlaw.com, 4579179420@filings.docketbird.com;docket@bklwlaw.com
- **Aram Ordubegian**    ordubegian.aram@arentfox.com
- **Misty A Perry Isaacson**    misty@ppilawyers.com, ecf@ppilawyers.com;pagterandperryisaacson@jubileebk.net
- **Dean G Rallis**    drallis@hahnlawyers.com, jevans@hahnlawyers.com;drallis@ecf.courtdrive.com
- **Seth A Safier**    seth@gutridesafier.com
- **Annie Y Stoops**    annie.stoops@afslaw.com, yvonne.li@arentfox.com
- **K. Luan Tran**    ltran@kslaw.com, tle@kslaw.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **David Wood**    dwood@marshackhays.com, dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

**SERVED BY PERSONAL DELIVERY**

Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

**SERVED BY EMAIL**

**Attorney for Debtor and Debtor-in-Possession**

Matthew Grimshaw, Esq.
Marshack Hays LLP
870 Roosevelt Avenue
Irvine, CA 92620
E-mail: mgrimshaw@marshackhays.com

**Attorney for Creditor Magleby Cataxinos & Greenwood, P.C.**

Aaron J. Malo, Esq.
Sheppard Mullin Richter & Hampton
650 Town Center Drive, 4th Floor
Costa Mesa, CA 92626
E-mail: amalo@sheppardmullin.com

**United States Trustee**

Nancy S Goldenberg
411 W Fourth St Ste 7160
Santa Ana, CA 92701-8000
E-mail: nancy.goldenberg@usdoj.gov

**Attorneys for Creditor Vitamins Online, Inc.**

Dean G. Rallis Jr., Esq.
Hahn & Hahn LLP
301 E. Colorado Blvd., Ninth Floor
Pasadena, CA 91101-1977
E-mail: drallis@hahnlawyers.com

Chad E. Nydegger, Esq. (*Admitted pro hac vice*)
Workman Nydegger PC
60 East South Temple Suite 1000
Salt Lake City, UT 84111
E-mail: cnydegger@wnlaw.com

# EXHIBIT "8"

Case 8:20-bk-13335-MW    Claim 3-3    Filed 04/28/21    Desc Main Document    Page 1 of 62

**Fill in this information to identify the case:**

Debtor 1    Heartwise, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Central District of California

Case number    8:20-bk-13335-MW

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | | |
| --- | --- | --- | --- |
| 1. | Who is the current creditor? | Vitamins Online, Inc. | |
| | | Name of the current creditor (the person or entity to be paid for this claim) | |
| | | Other names the creditor used with the debtor | |
| 2. | Has this claim been acquired from someone else? | ☑ No ☐ Yes.  From whom? | |

| 3. | Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- | --- | --- |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | The Bankruptcy Law Firm, P.C. | Vitamins Online, Inc., Attn: Rebecca Webb, |
| | | Name | Name |
| | | 10524 W. Pico Blvd., Ste. 212 | Office Manager, 1467 West 105 North |
| | | Number      Street | Number      Street |
| | | Los Angeles        CA        90064 | Orem              UT        84057 |
| | | City              State        ZIP Code | City              State        ZIP Code |
| | | Contact phone   310-559-9224 | Contact phone   800-476-3542 |
| | | Contact email   kmarch@bkylawfirm.com | Contact email   osman@nutrigold.com |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | | __ __ __ __ __ — __ __ — __ __ __ __ — __ __ __ __ | |

| 4. | Does this claim amend one already filed? | ☐ No ☑ Yes.  Claim number on court claims registry (if known) 3-1 | Filed on 02/11/2021 MM / DD / YYYY |
| --- | --- | --- | --- |
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No ☐ Yes.  Who made the earlier filing? | |

Official Form 410

Proof of Claim

page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $_____over 14,426,972.00_____*

*$14,426,972 consists of: $9,551,232 judgment, plus $1,395,740 in prejudgment interest, 2.13% per year, plus estimated $3,480,000 in attorneys' fees and costs, which were awarded by judgment but amount not yet set.

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Judgment entered 11/10/20 for Lanham Act Section 43(a) violations, etc. See Exhibits 1 and 2, attached.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

> Vitamins Online, Inc. has filed a Motion for Relief from Stay, set for hearing on 5/10/21, to proceed in the District Court, District of Utah, to set the dollar amount of attorneys' fees and costs, which were awarded but not yet set. Vitamins Online, Inc. will also seek its attorneys' fees spent in this bankruptcy case to enforce its judgment, plus will seek postjudgment interest on the $9,551,232 judgment, as allowed by law.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| Part 3: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 4/19/2021
MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Osman | | Khan |
|---|---|---|---|
|  | First name | Middle name | Last name |

| Title | President and Chief Financial Officer |
|---|---|

| Company | Vitamins Online, Inc. |
|---|---|
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 1467 West 105 North |
|---|---|
|  | Number    Street |

| | Orem | UT | 84057 |
|---|---|---|---|
| | City | State | ZIP Code |

| Contact phone | 800-476-3542 | Email | Osman@Nutrigold.com |
|---|---|---|---|

**ATTACHMENT TO PROOF OF CLAIM**

**OF**

**VITAMINS ONLINE, INC.**

**Item 1:  Total Amount of Claim on Petition Date (December 4, 2020):**

| | |
|---|---|
| Principal Amount of Judgment | $9,551,232.00 |
| Pre-Judgment Interest at 2.13% (1/1/14 to 11/10/20) | $1,395,740.32 |
| Award of Attorneys' Fees, Costs & Expenses [$3,480,000±] | [not yet determined] |
| Judgment Amount as entered Nov. 10, 2020 | $10,946,972.32 (plus) |
| | attorneys' fees & costs "awarded" |
| | but not yet formally determined [$3,480,000±] |
| | |
| Post-Judgment Interest at 0.13% (11/10/20 to 12/4/2020) | $934.74 |
| **Total Amount as of Petition Date** | **$10,947,907.06** *(plus)* |
| | *attorneys' fees & costs "awarded"* |
| | but not yet formally determined [$3,480,000±] |

*Total Amount as of Petition Date including Attorneys' Fees:*     *$14,427,907.06*

**Item 2:  Basis for Claim:**

On October 28, 2013, Vitamins Online, Inc. ("Vitamins Online" or "Creditor"), as plaintiff, filed a complaint against HeartWise, Inc. d/b/a NatureWise (the "Debtor" or "HeartWise"), as defendant, in the United States District Court for the District of Utah (the "Trial Court") alleging unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Utah common law for false advertising,[1] thereby commencing the civil action styled *Vitamins Online, Inc. v. HeartWise, Inc. d/b/a NatureWise*, Case No. 2:13-cv-00982-DAK (the "Utah Lawsuit").

The Utah Lawsuit continued for the next seven years.  The Trial Court "held a bench trial … on July 16 – August 6, 2020."[2] On November 10, 2020, the Trial Court entered its Findings, and the Judgment.  Based upon the substantial evidence introduced at trial, the Trial Court found "that [Vitamins Online] ha[d] met its burden in demonstrating that [the Debtor] violated Section 43(a) of the Lanham Act and Utah state common law."[3]

Without limitation, the Trial Court found: (a) that "NatureWise's actions were willful in that NatureWise and Doyle [as defined below] sought to intentionally deceive consumers;"[4] (b) that NatureWise and its agent "Doyle willfully made false representations with respect to the Products and artificially altered reviews in order to make NatureWise more profitable;"[5] and (c) that, "as a result of testing, NatureWise had knowledge that certain lots of the Products did not match their

---

[1]     See *Findings of Fact and Conclusions of Law* entered November 10, 2020 in the Utah Lawsuit (the "Findings"), at 1. A true and correct copy of the Findings are attached hereto as **Exhibit 2**.

[2]     Findings at 1.

[3]     Findings at 1.

[4]     Findings ¶ 39, at 43.

[5]     Findings ¶ 39, at 43.

label claims, yet, even with that knowledge, NatureWise continued selling those products and never issued any recalls."[6]

The Trial Court also specifically found that the Debtor had engaged in substantial and inexcusable "discovery improprieties" including (a) spoilating evidence, without limitation intentionally deleting relevant videos and e-mails, (b) failing to produce requested documents, and (c) misrepresenting to the Trial Court the existence of relevant information.[7]

On November 10, 2020, based upon the substantial findings, including specific and detailed finding that the Debtor's unlawful actions were "willful," the Trial Court entered the Federal Judgment (as defined in footnote below) in favor of Vitamins Online and against the Debtor in the amount of $10,946,972.32,[8] plus an "award[ of Vitamins Online's] reasonable attorney fees and costs in th[e Utah Lawsuit]" in an amount not yet determined by the Trial Court.[9]

The Debtor filed the instant Case before the Trial Court could determine and liquidate the attorneys' fees, costs and expenses that were specifically "awarded" as part of the Federal Judgment. Vitamins Online incurred, and anticipates that the Trial Court will award approximately $3,480,000.00±, including approximately (x) $3,263,221.00 in reasonable attorneys' fees, (y) $215,229.18 in necessary and reasonable expert witness costs, and (z) additional costs.

Accordingly, while the award of attorneys' fees, costs and expenses remains unliquidated, the Federal Judgment is not contingent, disputed or unliquidated. Further, the fact that the Debtor filed a notice of appeal does not render the Federal Judgment non-final, contingent or disputed.

As explained by the Bankruptcy Appellate Panel for the Ninth Circuit:

> [Vitamin Online]'s claim in the instant case is not contingent just because the [J]udgment is on appeal.... [T]he Ninth Circuit has held that a judgment is final ... even if it is on appeal. Further, the actions giving rise to the liability, the instance of fraud and the resulting [J]udgment, both occurred pre-petition .... Additionally, the amount of the claim is not unliquidated because, as of the date of the filing of the chapter 11 case, it was easily subject to ready determination— the [Trial] Court had already determined the amount of the claim to be ["$9,551,232 in disgorged profits with simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014"].

---

[6]   Findings ¶ 39, at 43.

[7]   Findings ¶¶ 89-90, at 27-28; ¶¶ 1-2, at 29; ¶ 39, at 43.

[8]   A true and copy of the *Final Judgment* is attached as **Exhibit 1** (the "Judgment" or the "Federal Judgment"). The Judgment includes a principal award of "$9,551,232 in disgorged profits [plus] simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014" and continuing through November 10, 2020, which interest totals $1,395,740.32. See Khan Decl. ¶¶ 6-8.

[9]   Judgment ("Plaintiff is further awarded its reasonable attorney fees and costs in this matter, to be determined post judgment"). The Debtor filed the instant Case before the Trial Court could determine and liquidate the attorneys' fees, costs and expenses awarded under the Judgment. *See* Khan Decl. ¶ 10.

In re Audre, Inc., 216 B.R. 19, 30 (B.A.P. 9th Cir. 1997) (citations omitted) (affirming bankruptcy court's denial of motion to disallow or estimate claim predicated on California state court judgment). Indeed, as the Court of Appeals for the Ninth Circuit has held – repeatedly:

> The federal rule on the preclusive effect of a judgment from which an appeal has been taken is that the pendency of an appeal does not suspend the operation of an otherwise final judgment for purposes of *res judicata.*

Eichman v. Fotomat Corp., 759 F.2d 1434, 1439 (9th Cir. 1985); see also United States v. Vandewater Int'l Inc., No. 2:17-CV-04393-RGK-KS, 2020 WL 5372352, at *2 (C.D. Cal. July 21, 2020) (quoting and following Eichman); Tripati v. Henman, 857 F.2d 1366, 1367 (9th Cir. 1988) ("The established rule in the federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal....") (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4433, at 308 (1981)); In re Imagine Fulfillment Servs., LLC, 489 B.R. 136, 149 (Bankr. C.D. Cal. 2013) ("A judgment establishing liability against a debtor, entered prepetition, is not a contingent debt"); In re Albano, 55 B.R. 363, 369 (N.D. Ill. 1985) ("a final order of a district court is not simply in limbo until affirmed by the court of appeals")

## Item 7:  Supporting Documents

*Final Judgment* entered November 10, 2020, attached as **Exhibit 1**

*Findings of Fact and Conclusions of Law* entered November 10, 2020, attached as **Exhibit 2**

# Exhibit 1

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| VITAMINS ONLINE, INC., a Delaware corporation,<br><br>     Plaintiff,<br><br>v.<br><br>HEARTWISE, INC. an Oregon corporation d/b/a NATUREWISE,<br><br>     Defendant. | **FINAL JUDGMENT**<br><br>Case No.:  2:13-cv-00982-DAK<br><br>Judge Dale A. Kimball |

This action came before the court for a bench trial.  Pursuant to Federal Rule of Civil Procedure 58 and the court's Findings of Fact and Conclusions of Law entered November 10, 2020 [ECF No. 585], and with there being no other issues before the court, the court enters judgment in favor of Plaintiff and against Defendant in the amount of $9,551,232 in disgorged profits with simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014.  Plaintiff is further awarded its reasonable attorney fees and costs in this matter, to be determined post judgment.  This action is now closed.

DATED this 10th day of November, 2020.

BY THE COURT:

DALE A. KIMBALL
United States District Court

# Exhibit 2

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VITAMINS ONLINE, INC.,** a Delaware corporation,<br><br>    **Plaintiff,**<br><br>v.<br><br>**HEARTWISE, INC.** an Oregon corporation d/b/a **NATUREWISE,**<br><br>    **Defendant.** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br><br>**Case No.: 2:13-cv-00982-DAK**<br><br><br>**Judge Dale A. Kimball** |

On October 28, 2013, Plaintiff filed a complaint against Defendant in this court alleging unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Utah common law for false advertising. The Complaint alleged false advertising based on two types of conduct: (1) manipulating Amazon.com's ("Amazon") customer review system ("Review Claims"); and (2) falsely advertising and misrepresenting the content and characteristics of its green coffee and garcinia cambogia products ("Ingredients Claims").

The court held a bench trial in this matter on July 16 – August 6, 2020. Plaintiff was represented by James E. Magleby, Yevgen Kovalov, Edgar R. Cataxinos, and Geoffrey Kris Biehn. Defendant was represented by R. Joseph Trojan, Francis Wong, Kevin R. Davis, and Dylan C. Dang. Throughout the trial, the court heard the testimony of witnesses and received exhibits by the parties into evidence. At the close of Plaintiff's case in chief, Defendant moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).

The court now issues the following Findings of Fact and Conclusions of Law, finding that Plaintiff has met its burden in demonstrating that Defendant violated Section 43(a) of the

Lanham Act and Utah state common law. In conjunction thereto, the court denies Defendant's

Rule 52(c) motion.

### FINDINGS OF FACTS[1]

1.      Vitamins Online, Inc. ("Vitamins Online") is a Utah-based retailer that distributes

supplements under the brand name NutriGold.  Tr. 66-67 (Khan).  Osman Khan ("Khan") and

Sripriya Rangarajan ("Rangarajan") are the co-founders of Vitamins Online and NutriGold.  Tr.

70.  Khan is the Chief Financial Officer of Vitamins Online.  Stip. Fact 3. Vitamins Online

launched its brand of supplements under the NutriGold brand in 2010. Tr. 70.  Prior to that time,

Khan and Rangarajan invested considerable time and resources to identify options to make

products without the excipients (e.g. magnesium stearate, silicon dioxide) commonly found in

dietary supplements.  Tr. 70.  It took Vitamins Online approximately one year of preparation and

an additional year to launch its first NutriGold product.  Tr. 70.  Khan testified at trial, and the

court finds that he was a credible, reliable witness.

2.      HeartWise, Inc d/b/a NatureWise ("NatureWise") is an Oregon Corporation that

sells dietary supplements on Amazon under the brand name NatureWise.  NatureWise was

---

[1] The court enters these findings of fact based on a preponderance of the evidence.  In assessing the credibility of the witnesses, the court has considered the source and basis of each witness's knowledge; the ability of each witness to observe; the strength of each witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial.

In addition, the court will provide citations to the record in the following manner: references to the uncontroverted facts submitted by the parties and adopted by the court in its July 7, 2020 Pretrial Order (ECF No. 535) are abbreviated as "Stip. Fact [X]"; references to the hearing transcript are abbreviated as "Tr. [page]"; and references to exhibits admitted at trial are abbreviated as "Ex. [X]."  In addition, although, in the Pretrial Order, Plaintiff does not set forth any uncontroverted facts and contests virtually every fact set out by Defendant, Plaintiff acknowledges that it does not contest "simple facts relating to the entities and the role by the principals of each entity."  (*Id.*)  Accordingly, the court's citation to the Pretrial Order will be limited to these "simple facts."

2

incorporated in May of 2012.  Tr. 419-420; Ex. 5144.001.  DavidPaul Doyle ("Doyle") is

NatureWise's founder and Chief Brand Officer.  Stip. Facts 4-6.  In 2018, Tom Nguyen of

Robinson Pharma became NatureWise's Chief Executive Officer following his investment in the

company.  Tr. 423-424.  Doyle currently owns 49% of NatureWise and has no active role in its

management or daily operations.  Tr. 424.  Doyle testified at trial.  The court finds that he was

not a credible witness, and his testimony was unreliable.[2]

## I.      Ingredients Claims

### A.      NutriGold's Garcinia Cambogia Gold

3.      Vitamins Online first launched its NutriGold Garcinia Cambogia Gold

supplement ("NutriGold Garcinia") in 2011.  Tr. 106.  Garcinia cambogia is a fruit that contains

hydroxycitric acid ("HCA").  Tr. 106.  NutriGold Garcinia contained the clinically proven,

multi-patented SuperCitrimax garcinia cambogia ingredient supplied by the company InterHealth

(now Lonza).  Tr. 107-108; Tr. 114-115; Ex. 3.  SuperCitrimax is a patented form of HCA from

garcinia cambogia bound to calcium and potassium.  Tr. 114-115; Ex. 3.  SuperCitrimax

provides 60% calcium/potassium salt HCA and is clinically proven to curb appetite, burn fat, and

reduce body weight.  Tr. 114-115; Ex. 3.  Generic garcinia cambogia does not have the same

clinical support as SuperCitrimax because the generic is not bound to the patented ratio of the

calcium/potassium salt.  Tr. 117.  SuperCitrimax is significantly more expensive than generic

extracts because it is proven to be effective and provides a competitive advantage in the

marketplace.  Tr. 119.

---

[2] The issues surrounding Doyle's credibility are demonstrated and detailed through the
findings below.

3

4. Prior to the middle of 2013, there were a few other competitors on Amazon that were offering garcinia cambogia products, and some contained SuperCitrimax. Tr. 123-24. However, by mid-2013, Vitamins Online was the only seller of SuperCitrimax garcinia cambogia on Amazon. Tr. 123-24. Vitamins Online advertised its NutriGold Garcinia product on Amazon as containing SuperCitrimax and 60% HCA. Tr. 110-19; Tr. 114-15; Ex. 3. Vitamins Online heavily advertised that its product contained SuperCitrimax because it was backed by clinical studies. Tr. 119.

5. The TV personality Dr. Mehmet Oz, known as "Dr. Oz," aired a television show on October 1, 2012, in which he promoted the benefits of garcinia cambogia. Ex. 55, 104. That show featured Dr. Harry Preuss, the chief researcher for the SuperCitrimax ingredient in several studies. Tr. 207-10; Exs. 104, 105, and 56. In the episode, Dr. Oz gave specific buying guidelines to help customers purchase the right product—garcinia cambogia extract with at least 50% HCA and potassium or calcium/potassium. Tr. 211; Ex. 56.1. He also emphasized that the dosage needed to be high. Tr. 211; Ex. 56.1. Dr. Oz's show on garcinia cambogia increased Vitamins Online's sales substantially. Tr. 212-13. In order to meet that demand, NutriGold had a supply agreement with InterHealth that guaranteed an uninterrupted supply of SuperCitrimax. Tr. 216-17; Ex. 607.

6. Vitamins Online spent millions advertising its NutriGold Garcinia and placed particular emphasis on the SuperCitrimax ingredient. Tr. 152-57; Ex. 611.1.

## B. NutriGold's Svetol Green Coffee Gold

7. In 2012, Vitamins Online launched a green coffee product with Svetol ("NutriGold Green Coffee") (collectively, with NutriGold Garcinia, the "NutriGold Products"), a chlorogenic acid product produced by the company Naturex. Tr. 137. Svetol is approximately four or five times more expensive than generic green coffee bean extract. Tr. 142-43, 145.

4

Despite its higher price, Vitamins Online chose to produce a green coffee product containing

Svetol because it was backed by clinical studies. Tr. 137-39. The studies relied upon by

Vitamins Online demonstrated that the amount of the active ingredient of the green coffee is

critical, as a product with less than the amount used in the study may not provide the same

benefit. Tr. 141-42; Ex. 634.3. Importantly, Svetol was the only green coffee extract that was

clinically proven to provide a weight-loss benefit. Tr. 143-44. Therefore, on its Amazon

product page, Vitamins Online advertised NutriGold Green Coffee as the only product that

contained 400 milligrams, the dosage used in the clinical studies, of Svetol Green Coffee extract

per capsule. Tr. 146; Ex. 380.2. Vitamins Online spent millions advertising its NutriGold Green

Coffee and placed particular emphasis on the Svetol ingredient. Tr. 152-57; Ex. 611.1.

   8.  Dr. Oz aired a television show on March 1, 2012 promoting the benefits of green

coffee. Tr. 157; Ex. 5. Sales of Vitamins Online's NutriGold Green Coffee spiked after the

episode. Tr. 159. In late 2012, Dr. Oz aired a second episode on green coffee, offering buying

guidelines for green coffee bean extract products. Tr. 199, 872; Exs. 41-42. In the second show,

Dr. Oz told viewers to look for Svetol or GCA; products that had at least 45% chlorogenic acid;

products dosages of 400 mg, 3x per day; and explained that a 30-day supply costs approximately

$30. Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2. He also warned consumers to not be duped by

the word "pure." Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2. In addition, Dr. Oz recommended

purchasing products with no fillers and no artificial ingredients. Tr. 996; Ex. 56.

   9.  Following the second Dr. Oz show, sales of NutriGold Green Coffee increased

significantly because the product matched Dr. Oz's requirements. Tr. 206. Eventually,

NutriGold Green Coffee obtained a #1 ranking on the Amazon Best Sellers list. Tr. 160-61.

### C. NatureWise's Products

10. When Doyle launched NatureWise, he had no experience with supplements or the supplement industry. Tr. 425. He did, however, have experience in selling spiritual books on Amazon. Tr. 418-19. To transition from book sales to supplements on Amazon, Doyle watched a few videos on the internet and looked for a supplier. Tr. 430. In addition, he conducted research and discovered green coffee bean extract was the top seller in the health and personal care category on Amazon. Tr. 425. Accordingly, NatureWise's first product was a green coffee product. Tr. 427.

11. From approximately 2012 to the end of 2013, NatureWise launched six products– Green Coffee Bean Extract 800; Svetol with GCA; Garcinia Cambogia; Krill Oil; Ubiquinol; and Vitamin D. Tr. 427-28.

12. NatureWise launched the following products on the following dates: the first green coffee product (Amazon Standard Identification Number ("ASIN") B009VUZJTM) launched in July of 2012; the second green coffee product launched in October 2012 (ASIN B009aH4OR4); the first garcinia product launched in January 2013 (ASIN B00B5H5BHA); the second garcinia product launched in August 2015 (ASIN B01HRHBNJK). Tr. 429; Ex. 701.1.

### 1. NatureWise's Green Coffee

13. NatureWise launched its first green coffee product in the summer of 2012 as a result of high consumer demand. Tr. 420, 433. That product was called NatureWise Green Coffee Bean Extract 800 (the "First Green Coffee"). Tr. 427. NatureWise used Private Label Nutraceuticals ("PLN") as its contract manufacturer. Tr. 859-61; Ex. 50.20. NatureWise's first purchase from PLN occurred in June 2012, and NatureWise continued purchasing product from PLN thereafter. Tr. 859-63; Ex. 50.20-30. At the start, NatureWise purchased generic green coffee from PLN and merely asked PLN to include higher quality ingredients without giving

6

specifications. Tr. 857. Furthermore, in its purchase orders, NatureWise did not specify any percentage of chlorogenic acid that the end product should contain. Tr. 859-863; Ex. 50.21-30. Similarly, NatureWise's label for the First Green Coffee did not specify the percentage of chlorogenic acid that it contained. Tr. 863; Exs. 5025.17-18, 5024.15.

14.     Nevertheless, NatureWise advertised the First Green Coffee as containing 50% chlorogenic acid on Amazon. Tr. 862-64; Ex. 102.1. Likewise, NatureWise advertised it as having optimum levels of chlorogenic acid. Tr. 867-68; Ex. 1021.1. But NatureWise did not test the First Green Coffee to determine the actual percentage of chlorogenic acid that it contained. Tr. 872. NatureWise did not begin performing such tests until March 2013, at the earliest. Tr. 889; 5144.1.

15.     NatureWise also referenced a 2012 study involving Green Coffee Antioxidants ("GCA") to sell the First Green Coffee even though that product did not contain GCA. Tr. 871; Ex. 1021.1. NatureWise understood that the study was conducted using a dosage of at least 350 milligrams of GCA twice a day. Tr. 893. In referencing the study, NatureWise advertised that the First Green Coffee contained "Clinically Proven GCA" on the front of the bottle. Tr. 891-92; Ex. 22.

16.     In the fall of 2012, following the second Dr. Oz episode on green coffee, NatureWise changed the title of the First Green Coffee to Green Coffee Bean Extract 800 with GCA. Tr. 875-76; Ex. 5025.1-4. NatureWise continued representing that it contained 50% chlorogenic acid on Amazon and that its ingredients corresponded with the GCA study. Tr. 882-83; Ex. 1021.1. However, the product only contained approximately 5 milligrams of GCA. Tr. 877-78; Ex. 50.2. Doyle knew that the product contained a minimal amount of GCA—an amount that failed to match the dosage used in the GCA study. Tr. 878.

7

17.     Reviewers on Amazon believed that the First Green Coffee contained the proper amounts of GCA and relied on NatureWise's representations.  Tr. 971; Exs. 572A.1, 572A.2.

18.     At some point in late 2012, Amazon removed the phrase "chlorogenic acid" from the First Green Coffee's product page because it wanted proof that the claim was accurate.  Tr. 883.  After Amazon removed the phrase, Doyle informed Amazon that it had 50% chlorogenic acid.  Tr. 884-85; Ex. 86.  Yet, in a November 2012 email to PLN, Doyle admitted that he did not know how many milligrams of green coffee were in the First Green Coffee.  Tr. 880-81; Harden Dep. 53-57; Ex. 669.51-669.55.  Because he could not verify the amount of chlorogenic acid in the First Green Coffee, Doyle asked Amazon to change the listing name to "Green Coffee Bean Extract 800 – 100% Pure All Natural Weight Loss Supplement for All Body Types.  Chlorogenic Acid.  800mg.  60 Caps."  Tr. 887; 86.1.

19.     Because NatureWise was not conducting tests on the First Green Coffee until March 2013, at the earliest, NatureWise did not know how much chlorogenic acid it contained.  Tr. 889-90; Ex. 5144.1.

20.     Around January 2013, NatureWise purportedly increased the amount of GCA in the First Green Coffee to 20 milligrams—an amount still well below the amount used in the GCA study that NatureWise referenced on Amazon.  Tr. 895; Ex. 50.13.  Yet, NatureWise advertised that the First Green Coffee contained clinically proven GCA on its labels.  Tr. 891-92; Ex. 8.1, 22.1.

21.     In March 2013, Doyle began testing his products.  Tr. 951; Ex. 124.  The test results indicated that some lots of NatureWise's First Green Coffee did not match their label claims.  Tr. 947, 951; Exs. 123.1, 124.  However, NatureWise continued selling the First Green Coffee and did not recall any lots.  Tr. 950; Ex. 123.1.

22.     Eventually, NatureWise purportedly increased the amount of GCA in the First
Green Coffee to 350 milligrams—the same dosage as used in the GCA study.  Tr. 904.
However, around that time, Doyle learned that the GCA study was seriously flawed.  Tr. 984-86,
993; Ex. 341.  But NatureWise continued advertising the First Green Coffee as being clinically
proven. Tr. 906.  The study was officially retracted in October 2014.  Tr. 990; Ex. 1001.1.

23.     Along with the First Green Coffee, in October 2012, NatureWise started
advertising a second green coffee product called Svetol Green Coffee Bean Extract UltraPure
with GCA (the "Second Green Coffee" and, collectively with the First Green Coffee, the "Green
Coffees").  Tr. 909; Ex. 701.1.  The Second Green Coffee contained 300 milligrams of a
proprietary blend of generic green coffee extract and GCA and 133 milligrams of Svetol.  Tr.
912; Ex. 57.4.  NatureWise advertised Svetol and GCA prominently on its bottle and packaging.
Tr. 913; Exs. 24.1, 25.1.

24.     In March 2013, Doyle learned from Naturex that the Second Green Coffee did not
meet its label claims.  Tr. 919, 930-31; Ex. 115.1.  Naturex explained that it had tested samples
provided by NatureWise, and those samples contained much less chlorogenic acid than was
advertised on the label.  Ex. 115.1.  Consequently, Naturex demanded that NatureWise recall all
of the non-conforming units.  Tr. 931; Ex. 115.2.  In addition, Naturex demanded that
NatureWise notify customers who had purchased non-conforming units that the product they
purchased did not meet its label claims.  Tr. 931; Ex. 115.2.  Although NatureWise had the
capability of doing so, Doyle does not remember ever contacting customers as requested by
Naturex.  Tr. 933-34.

25.     Notwithstanding Naturex's request to recall the Second Green Coffee units that
did not match their label claims, NatureWise continued selling them.  Tr. 944, 955, 961; Ex.

9

131.1.  Further, NatureWise intentionally sold as many bottles as it could before the deadline that

Naturex had imposed to recall the non-conforming product.  Tr. 944, 955, 961; Ex. 131.1.

NatureWise only ceased selling the non-conforming Second Green Coffee because Doyle was

worried about getting in trouble with Naturex for selling beyond the deadline.  Tr. 956-57; Ex.

131.2.

26.    On June 28, 2013, Naturex informed NatureWise once again that the Second

Green Coffee still did not conform to its label claim.  Tr. 964-65; Exhibit 1016.  Specifically,

NatureWise advertised the Second Green Coffee as being vegetarian, but Naturex determined

that claim was not true.  Tr. 964-65; Exhibit 1016.  As a result, Naturex terminated its licensing

agreement with NatureWise in June 2013.  Tr. 965-67, 969-70.

### 2.    NatureWise's Garcinia Cambogia

27.    NatureWise launched its first garcinia cambogia product (the "First Garcinia") in

January 2013.  Tr. 429; Ex. 701.1.  It began shipping the First Garcinia by at least June 2013.  Tr.

254-55, 1004; Ex. 108.1.  The First Garcinia used generic garcinia cambogia ingredients.  Tr.

1001.  It did not have SuperCitrimax.  Tr. 1000-01.

28.    When launching the First Garcinia, Doyle was keenly aware of NutriGold.  Tr.

1010.  Doyle relied on NutriGold Garcinia's product information on Amazon to develop the

claims for the First Garcinia.  Tr. 1010-11; Ex. 106.  Doyle wanted to sell SuperCitrimax because

NutriGold was selling it.  Tr. 1015; Ex. 95.

29.    Although the First Garcinia did not contain SuperCitrimax, NatureWise

referenced SuperCitrimax on its Amazon product page and included the SuperCitrimax logo on

the First Garcinia's label.  Tr. 1004-05; Ex. 108.  NatureWise further advertised the First

Garcinia as being clinically proven and having a patented form of 60% HCA bound to calcium

and potassium on the First Garcinia's label, box, and Amazon product page.  Tr. 1006-07, 1032,

10

1035-36; Exs. 108-108.1; 83-84, 375-76. This was a direct reference to SuperCitrimax because such claims were patented by and proprietary to SuperCitrimax. Tr. 114-15; Ex. 3. NatureWise also advertised that the First Garcinia contained "100% Pure SuperCitrimax." Tr. 1021, 1037; Ex. 83-84, 375-76. NatureWise did this, and continued doing this for a period of time, even though it was not authorized by InterHealth to sell SuperCitrimax and even though Doyle knew that NatureWise was unable to obtain a licensing agreement for SuperCitrimax. Tr. 1018, 1021; Ex. 375. NatureWise eventually stopped advertising SuperCitrimax in the First Garcinia, but it is unclear when that advertising actually ceased. Tr. 1016.

30.     The First Garcinia reached the number one spot on Amazon within two months after launch. Tr. 1031; Ex. 146. During that time, NatureWise sold 74,000 bottles of the First Garcinia and generated approximately $2 million in revenue. Tr. 1031; Ex. 146.

31.     In December 2013, NatureWise hired a consultant, AIBMR, to review NatureWise's advertising claims on the First Garcinia. Tr. 104. After conducting its review, AIBMR determined and informed NatureWise that many of the claims it was making regarding the First Garcinia were neither legitimate nor substantiated. Tr. 1046-47, 1054; Exs. 240, 356. This was especially true with respect to the claims explicitly and implicitly referring to SuperCitrimax given that the First Garcinia did not contain SuperCitrimax, and therefore lacked its patented and proprietary elements. Tr. 1046-47, 1054; Exs. 240, 356. AIBMR recommended that NatureWise stop making weight-loss and appetite suppressant claims given that the First Garcinia was generic garcinia cambogia, and NatureWise was making claims unique to SuperCitrimax. Tr. 1041; Ex. 356.

32.     Notwithstanding AIBMR's recommendation, NatureWise continued to make weight-loss and appetite suppressions claims. Tr. 1044, 1050-51; Ex. 356. AIBMR also

11

recommended that NatureWise remove references to various clinical studies because, after performing the necessary research, AIBMR was unable to locate such studies. Tr. 1878-79, 1886; Ex. 245

33. Notably, NatureWise did not sell a garcinia cambogia product with SuperCitrimax until it launched a second garcinia cambogia product in August 2015 (the "Second Garcinia," collectively with the First Garcinia, the "Garcinias"). Tr. 1093-94; Ex. 701.1.

**D. Production and Manufacturing of the Green Coffees and the First Garcinia**

34. As stated above, NatureWise used PLN as its first contract manufacturer. Tr. 859-61; Ex. 50.20. However, at some point in 2013, Doyle learned that PLN was not actually a contract manufacturer. Tr. 957-58. Instead, PLN was a mere intermediary that was purchasing products from actual contract manufacturers. Tr. 956-60. As such, for much of the time in 2012 and 2013, NatureWise did not know who was manufacturing the Green Coffees and the First Garcinia. Tr. 1766. Eventually, NatureWise learned that a contract manufacturer named Metaugus was producing its products. Tr. 114; Ex. 511. Notably, Metaugus received an FDA warning letter on May 22, 2013, for violating laws that regulate supplement production. Tr. 114; Ex. 511.

35. In October 2013, NatureWise stopped using PLN and began using DNE Nutraceuticals ("DNE") as its contract manufacturer. Tr. 859-61, 981; Exs. 50.20, 298.1. Like Metaugus, DNE received a warning letter from the FDA in August 2013 for reasons similar to Metaugus. Tr. 1770; Ex. 512.

36. Even though NatureWise was unaware for much of 2012 and 2013 as to who was actually manufacturing its products, NatureWise made the following claims regarding the Green Coffees and the First Garcinia:

12

- 172 -

(a)    That each ingredient that NatureWise used was verified for purity through in-house laboratory testing, Tr. 868-69, 2257; Exs. 386.2;1021.1;

(b)    That NatureWise had implemented a strict set of FDA compliant manufacturing procedures to ensure product integrity, including daily inspections of all storage, blending and production areas, Tr. 2258-59; Ex. 386.2; and

(c)    That NatureWise's facilities were regularly inspected by FDA officials to maintain their certifications, Tr. 2260-61; Ex. 386.2.

37.    Although NatureWise eventually figured out who was manufacturing its products, it failed to maintain necessary documentation demonstrating and detailing how the Green Coffees and the Garcinias were made (collectively, the "Products"). Tr. 1737, 1890, 1976. For example, NatureWise represented in July 2015 that, despite being in business and selling its products since 2012, it did not have Standard Operating Procedures ("SOPs") and that it was in the process of developing product specification sheets. Tr. 1131, 1774. Despite NatureWise's representation, it never produced any SOPs in this case. Tr. 1737.

38.    NatureWise also failed to track which label or labels it used for each lot/batch of the Products. Tr. 845-46; Ex. 401.6. Indeed, NatureWise did not maintain any specific data relating to specific labeling for specific lots of the Products. Tr. 1125-26; Ex. 408.3. Consequently, during discovery, NatureWise represented that it:

(a)    Could not identify the specific label or labels that it used on bottles for each lot/batch of the Products that it produced, Tr. 845-46; Ex. 401.6;

(b)    Lacked the ability to know which labels were used at which times, or which label revisions were used on final products, Tr. 847; Ex. 401.8-9.

(c)     Lacked the information as to the period during which products containing

each lot/batch were sold, Tr. 847; Ex. 401.6-7; and

(d)     Could not identify which label claims were made on specific dates, Tr.

877.

39.     Nevertheless, immediately before trial, NatureWise produced some photographs

of labels next to lot numbers.  Tr. 1127-28; Exs. 5025.1, 5024.-4; 5022.1-4.

> E.     **NatureWise Product Testing**

40.     Vitamins Online presented testimony from an expert in analytical supplement

testing, Dr. Norman Howe, Ph.D. ("Dr. Howe").  The Court finds that Dr. Howe was qualified

and credible and that his testimony was based on sufficient facts and data and the product of

reliable scientific principles and methods.  Tr. 1733-34.  Mollie Kober ("Kober") testified at trial

for the purpose of rebutting Dr. Howe's testimony.  While the court finds that Kober's testimony

was credible, she failed to rebut Dr. Howe's testimony that certain lots of the Products did not

meet their label claims.

41.     Dr. Howe compared test results against label claims because NatureWise never

produced SOPs, and label claims were the best information available in the absence of such

specifications.  Tr. 1866.

42.     A certificate of analysis ("COA") is a written document that includes finished

product specifications, test method for each specification, the results of testing to verify that each

specification has been met, and the signature of the analyst.  Tr. 1787.  Finished product

specifications are extremely important in the dietary supplement industry.  Tr. 1774.

43.     For example, if a company claims that it has a "quality" product, it must first

define what "quality" is for that product.  Tr. 1774.  The way that a company does that is through

14

a specification sheet. Tr. 1774. Specifications define product quality in clear, measurable terms. Tr. 1801.

44.     The parties used the following laboratories to perform tests and provide COAs for the Products: Eurofins, Tr. 1249; Advanced Laboratories, Tr. 2503; Covance, Tr. 2457; San Rafael, Tr. 2447; Atlas Biosciences, Tr. 2425; and Intertek, Ex. 5083.

45.     The testing results from the foregoing laboratories produced conflicting results. Tr. 1779, 1872; Exs. 144, 372, 650, 668, 5083. Some results demonstrated that the Products met their label claims while other results demonstrated that they did not. Tr. 1896; Ex. 5083.

46.     The following list details advertising claims made by NatureWise and corresponding test results demonstrating that those advertising claims were false and/or inaccurate:

(a)     Labels for the Garcinias claimed 60 milligrams of potassium, but testing demonstrated that certain lots had far less, Tr. 1059-63, 1871-72, 1859; Exs. 167.1, 181, 187, 188, 193, 372.107, 650, 668;

(b)     The Garcinias claimed 60% HCA, but testing demonstrated that certain lots had less than 60%, Tr. 1095; Ex. 159;

(c)     The Garcinias claimed 300 milligrams of HCA on their labels, but testing demonstrated that certain lots contained far less, Tr. 1856-57; Exs. 372.67, 372.69, 372.203,

(d)     The Garcinias claimed certain amounts of garcinia cambogia extract, but testing demonstrated that certain lots did not match those claims, Ex. 372;

(e)     Labels on the Garcinias advertised that they were 100% pure and had no fillers, binders, or artificial ingredients, but testing demonstrated that certain lots

15

contained excipients, binders, fillers, and/or artificial ingredients, Tr. 1857-58, 1871, 1875, 2349; Exs. 372, 372.69, 372.128, 372.177, 650, 5019.5;

(f)     Labels on the Garcinias advertised that they were vegetarian capsules, but testing demonstrated that certain lots contained protein and gelatin from animal sources, Tr. 1076-77, 1858, 1870; Exs. 161, 161.3, 168.1, 370.205, 370.206, 650, 668;

(g)     The Green Coffees claimed certain amounts of green coffee extract, but testing demonstrated that certain lots did not match those claims, Ex. 372;

(h)     NatureWise advertised the Green Coffees as being vegetarian, but various lots of the Green Coffees tested positive for gelatin from animal sources, Tr. 1077-77; Exs. 168.1, 161, 161.3;

(i)     Certain lots of the Green Coffees advertised 400 milligrams of chlorogenic acids on the labels, but testing demonstrated that some of those lots contained far less, Tr. 1853-54; Exs. 372.8, 372.10, 372.22, 372.28, 521; and

(j)     Labels on the Green Coffees advertised that they were 100% pure and had no fillers, binders, or artificial ingredients, but testing demonstrated that certain lots contained excipients, binders, fillers, and/or artificial ingredients.  Tr. 1860-62; Exs. 372. 123, 372.126, 372.130, 372.135, 372.152.

47.     The foregoing claims were material to consumers.  Tr. 850-51, 873-74, 877, 899, 909, 913-14, 922-23, 996, 999, 1007, 1034; Ex. 304A.

48.     Importantly, Doyle was aware that certain lots of the Products did not match their label claims.  Tr. 920-21, 945, 981-982, 1107-08, 1115-16, 1119-20; Exs. 111, 112, 112.1, 150, 150.2, 298.1.  Yet, even with that knowledge, NatureWise continued selling and distributing the Products without issuing any recalls.  Tr. 1783; Ex. 111.

16

49.     Moreover, even though Doyle know there were test results indicating that certain lots of the Products did not meet their label claims, NatureWise represented to a third-party auditor that none of its products had ever tested out of specification.  Tr. 2270, 2275; Exs. 124, 372.

## II.     Review Claims

### A.     Amazon

50.     An Amazon product page is comprised of product photos, a product title, product features, and a section for more detailed product features.  Tr. 85-86; Ex. 1.3.  The seller of the product controls the content of these four areas.  Tr. 87; Ex. 1.3.  Amazon provides a platform on the backend for third-party sellers to manage orders and customer communications.  Tr. 89.  Through this platform, the seller can input the product information manually, or use an excel file so Amazon can auto-populate these fields.  Tr. 89.  A seller can update the page at any time through these two methods.  Tr. 89-90.  Once updated, the information appears within one or two days.  Tr. 89-90.

51.     One component of the product page is a mini scoreboard that reflects the number of reviews and the average rating of the product indicated by stars.  The mini scoreboard is automatically updated by Amazon.  Tr. 90, 98; Ex. 1.3.  Each product on Amazon is given an ASIN.  Tr. 90-91.

52.     The "Best Seller" rank on Amazon reflects a ranking by category of the best-selling products and provides information on a product's position at a particular point in time within that product category.  This section is updated automatically by Amazon.  Tr. 92-93; Ex. 1.3.  Appearing in the top one or two results on Amazon's Best Seller list offers a competitive advantage over those products listed below.  Tr. 184-85.

17

53.     Other components on a product page include the customer reviews section, the
aggregate statistics of all reviews, the most helpful customer reviews, content of reviews, and
comments on reviews.  Tr. 94-99, Ex. 1.3.  In addition, Amazon tracks what customers view in
relation to a product page and uses this information to provide consumers with direct and side-
by-side comparisons to similar items.  Tr. 98-99; Ex. 374.2.

54.     There are two types of reviews on Amazon product pages: verified and unverified
reviews.  Tr. 93-94; Ex. 1.3.  To obtain a verified review, the reviewer must purchase the product
without a discount.  Tr. 93-94; Ex. 1.3.  The verified review badge is automated by Amazon and
determined purely based on whether the non-discounted purchase occurred.  Tr. 93-94; Ex. 1.3.
To leave an unverified review, any Amazon account holder can log in and leave a review.  Tr.
94-95; Ex. 1.3.  The name associated with the Amazon account appears on each review.  Only
one review for each product can be posted from a single Amazon account.  Tr. 96; Ex. 1.3.
Amazon account holders can vote up or down reviews to indicate a review's helpfulness, and
account holders can vote up or down multiple reviews on one product page.  Tr. 102-03.  When
leaving a review, an Amazon account holder selects the number of stars, from 1 to 5 stars, as a
ranking of the product.  Tr. 102-103; Ex. 1.3.  When a new review is posted, the input
immediately changes the product's score rating—adding to the total number of reviews, the total
number of star rankings and the average star ranking.  Tr. 97-98; Ex. 1.3.

55.     Another section on each Amazon product page is titled, "Most Helpful Customer
Reviews."  Tr. 99-100; Ex. 1.5.  In this section, the most helpful reviews are prominently
displayed.  Tr. 99-100; Ex. 1.5.  Such reviews may be positive or negative and are determined by
the number of "helpful" or "up" votes from customers.  Tr. 99-100; Ex. 1.5.  The device by
which a review is voted up or down is a button asking whether the review is helpful or not, and

only those with an Amazon account can vote up or down on a review a single time.  Tr. 102-03;
Ex. 1.3.  The reviews with the most helpfulness votes appear at the top of the first page of
reviews.  Tr. 100; Ex. 1.5.  Conversely, the reviews voted least helpful are bumped down to later
pages.  Tr. 101; Ex. 1.5.  Notably, only approximately ten reviews appear on each page, and most
consumers do not read beyond the first set of reviews.  Tr. 101-02; Ex. 1.5.

56.     Reviews are important to consumers. Tr. 483.  In particular, the number of
positive reviews is important to the buying decision of many customers.  Tr. 485; Ex. 669.259.
Customers also generally care about star ratings.  Tr. 488.

57.     Good reviews are a factor in search results, and reviews are a factor in increased
sales.  Tr. 759-760.

58.     In order to monitor reviews and ensure that reviews are legitimate, Amazon has
an anti-manipulation policy for reviews.  Tr. 639-41.  That policy provides that "[a]ny attempt to
manipulate reviews, including by directly or indirectly contributing false, misleading or authentic
content, is strictly prohibited."  Tr. 640; Ex. 416.1; Malley-Naslund Dep. 59-60, Ex. 669.378-
669.379.

### B.     Importance of Amazon Reviews to Consumers

59.     Vitamins Online presented testimony from a marketing and consumer survey
expert, Michael Belch, Ph.D. ("Dr. Belch"), regarding the importance of online reviews to
consumers.  Tr. 1268-80.  The Court finds that Dr. Belch was qualified and credible.

60.     There is very extensive and consistent literature that online reviews are an
important part of almost all online purchasing decisions.  Tr.  1270, 1310.  The literature
indicates that consumers use, rely upon, and trust online reviews in making purchasing decisions.
Tr. 1270, 1351.

19

61.     More specifically, Amazon customers use and rely upon the website's online reviews when making purchasing decisions.  Tr. 1268-80.  Reviews on Amazon are very important to customers.  Tr. 483; Ex. 235.  The number of positive reviews that any given product has on Amazon is also important to and influential for customers.  Tr. 485-87; Ex. 333.  The number of reviews has an impact on sales.  Tr. 487.  Sellers on Amazon stand to gain financially from each positive review on their product pages.  Tr. 513.

62.     Similarly, customers care about products' star ratings.  Tr. 491; Ex. 334.  Even slight differences in star ratings can lead to much higher sales for higher rated products.  Tr. 491.

### C.     NatureWise's Reviews

63.     Doyle believed that Amazon reviews were critical to NatureWise's success.  Tr. 475-76.  Doyle also believed that reviews would have a direct effect on NatureWise's sales.  Tr. 586.

64.     Prior to the launch of the First Green Coffee, in May 2012, Doyle knew that customers had the capacity to post dishonest reviews on products that they had never received.  Tr. 577-78.  NatureWise launched the First Green Coffee in mid-to-late July 2012.  Tr. 420, 433.  Nevertheless, the First Green Coffee began receiving product reviews prior to its actual launch.  Tr. 436-37, 504-05; Ex. 571.  For example, the following reviews were posted on the First Green Coffee's Amazon product page prior to its launch:

(a)     A review stating that the customer had been taking the First Green Coffee for a couple of weeks, Tr. 498-99, 501; Exs. 571, 571D.1;

(b)     A review giving the First Green Coffee five stars and claiming that the customer had been taking the product for months, Tr. 504-05; Ex. 571;

(c)     A review explaining that the customer was seeing results of losing one pound every two weeks, Tr. 503-04; Exs. 571, 571D.3;

20

(d)     A review stating that the customer had lost eighteen pounds in the prior eighteen weeks, Tr. 504; Exs. 571, 571D.3;

(e)     A review referring to the specific milligrams being advertised by NatureWise and claiming to have been taking 800 milligrams as prescribed, twice per day, Tr. 505-06; Exs. 571, 571D.4;

(f)     A review explaining that the customer had been taking the product for approximately three weeks, Tr. 509; Exs. 571, 571D.8;

(g)     A review wherein the customer claimed that his spouse had lost eleven pounds over the prior three months, Tr. 509-10; Exs. 571, 571D.1;

(h)     A review stating that the customer had been taking the product for four weeks, Tr. 510-11; Exs. 571, 571D.19; and

(i)     A review claiming that the customer had experienced solid weight loss during the prior month.  Tr. 510-11; Exs. 571, 571D.19.

65.     By July 14, 2012, the First Green Coffee had more than seventeen four- and five-star reviews.  Tr. 503-04, 510-11; Exs. 571, 571D.3.  Notably, several of these early reviews came from unverified purchasers and appeared on the First Green Coffee's page all within fourteen minutes of each other and giving it five-star ratings.  Tr. 498; Exs. 571, 571D.1. Likewise, fourteen of the five-star unverified reviews appeared on the First Green Coffee's product page within twenty-five minutes of each other and all ending with a similar pattern of including an exclamation point in the title of the review.  Tr. 511-12; Exs. 571, 571D.21.

66.     Similar to the First Green Coffee, the Second Green Coffee and the Garcinias also accumulated a substantial number of overwhelmingly positive reviews soon after their launch. Tr. 262-63.  For example, by June 2014, the First Garcinia had more than 5,000 reviews filling

21

more than 500 pages.  Tr. 287-88; Ex. 322.2.  And, notably, may of the positive reviews on the Firs Garcinia received helpfulness votes almost immediately.  Tr. 289-90; Ex. 322.4.

67.     To analyze the foregoing anomalies of NatureWise's reviews, Vitamins Online presented testimony from a statistics and computer science expert, Julian McAuley, Ph.D. ("Dr. McAuley").  Dr. McAuley was qualified as an expert, Tr. 1394-97, 1401, and his testimony was credible.  Dr. McAuley authored a joint report with Vitamins Online's other statistics and review manipulation expert, Thomas "Tommy" Noonan ("Noonan"), Tr. 1401-02.  Noonan was qualified as an expert, Tr. 1515-28, 1531-32, and his testimony was credible.  Dr. McAuley's testimony related to the Green Coffees and the First Garcinia.  Tr. 1403; Ex. 701.  He analyzed data from 2012 to 2015 but did not include an analysis of the Second Garcinia.  Tr. 1403, 1405, 1407-08, Tr. 1532.  Conversely, Noonan's testimony covered all four of the Products, and he analyzed data through 2018.  Tr. 1403, 1405, 1407-08, 1532, 1535.  Noonan's analysis corroborated Dr. McAuley's analysis.  Tr. 1627-28.

68.     Based on the credible testimony of Dr. McAuley and Noonan, the court makes the following findings regarding the Products and their corresponding reviews:

(a)     NatureWise's unverified reviews had higher ratings than its verified reviews, Tr. 1418-21, 1429;

(b)     The Products had higher ratings than other products in the Health & Personal Care category (the "Random Sample"), Tr. 1426-27, 1429-30;

(c)     NatureWise's unverified reviews were significantly higher than the Random Sample, Tr. 1428-30;

(d)     The Products had an unusually high number of new reviewers compared to the Random Sample, Tr. 1432-34;

(e)　NatureWise reviewers had written more prior reviews than the typical reviewers for the Random Sample, Tr. 1433;

(f)　New NatureWise reviewers gave significantly higher ratings than customers who had previously written reviews on Amazon, Tr. 1437;

(g)　Reviewers of the Products had significantly higher similarities compared to other reviewers from the Random Sample, Tr. 1443-44; and

(h)　There were various periods of time in which the Products had an unusually large ratio of unverified reviewers and an unusually large ratio of reviewers that were highly positive, Tr. 1448-49.

69.　This data suggests that NatureWise engaged in review manipulation.  Tr. 1627-28.

### D.　NatureWise's Manipulation of Reviews

70.　NatureWise manipulated the Products' reviews.  It did so by (1) block voting on the helpfulness of reviews and (2) offering free products in exchange for reviews.

### 1.　Helpfulness Block Voting

71.　NatureWise engaged in block voting on the helpfulness of reviews—that is, NatureWise directed its employees, and its employees obliged, to up vote good reviews and down vote bad reviews, which directly affected which reviews appeared at the top of the Products' pages and those that did not.  Tr. 521, 523, 525, 531-534, 543, 545; Exs. 37.5, 279, 283.1, 304, 669.269.

72.　While Doyle testified that the block voting was only in response to attacks on NatureWise reviews by unknown third parties, Tr. 526:16-527:4, that testimony was not credible. For example, Doyle would direct employees to down vote reviews without mentioning purported attacks or distinguishing between "attacking" reviews and legitimate reviews.  Tr. 540-541; Exs.

23

260.1; 269.1.  Doyle also acknowledged that some of the one-star reviews that NatureWise's employees down voted may have been from real customers.  Tr. 597.

73.     Doyle further testified that NatureWise employees were allowed to vote their conscience.  Tr. 522.  That testimony was not credible.  Moreover, NatureWise management knew that their block voting was interfering with Amazon reviews, and they were worried about customers finding out.  Ex. 268.1-2.  Similarly, NatureWise management was wary of Amazon finding out about its block voting.  Tr. 593-594.

74.     NatureWise's conduct in block voting was a violation of Amazon's policies.  Tr. 641-44; Ex. 416; Malley-Naslund Dep. 59-63, 71, 81, Exs. 669.378-669.382, 669.390, 669.400. Doyle was familiar with Amazon's anti-manipulation policy.  Tr. 614, 616, 639, 640-641; Ex. 70.5.

## 2.      Free Products in Exchange for Reviews

75.     NatureWise offered free products to customers in exchange for reviews.  Tr. 625-626, 691; Ex. 48.1, 397.2.  Free products were contingent on customers providing a review.  Tr. 626-627; Ex. 34.  On several occasions, NatureWise denied having offered free product in exchange for a review, even though that was not true.  Tr. 827-828, 831; Exs. 198.1, 280.1.

76.     Doyle also asked customers to review other products so that their reviews of NatureWise products would have more credibility and so Amazon would not think NatureWise reviews were fake.  Tr. 659, 663, 677-678; Exs. 210, Ex. 287.1.

77.     The practice of offering free products in exchange for a review was a violation of Amazon's policies.  Tr. 680; Ex. 43.

78.     These types of review manipulation resulted in the deception of consumers, Tr. 1317-37, because such review manipulation was material to consumers, Tr. 916, 921; Exs. 557-60.

24

79.     As a result of these types of review manipulation, NatureWise experienced
significant financial success.  Tr. 485-87, 491, 513, 586; Ex. 333.  475-76.

### III.     Effect of NatureWise's Actions on Vitamins Online

80.     The NutriGold Products and the Products were direct competitors on Amazon.
Tr. 179-80, 187, 272, 464-64, 467, 471, 967, 980; Exs. 386.3, 380.2-3, 381.3, 386.3, 638.  In
addition, from at least NatureWise's launch in 2012 through the end of 2013, Vitamins Online
and NatureWise were the major players in the Amazon marketplace for garcinia cambogia and
green coffee products.  And, at that time, the existence and impact of other competitors was
minimal.  Tr. 180, 272, 425-26; Exs. 27, 65, 70.3, 88.1, 1058.

81.     Vitamins Online's NutriGold Garcinia was a "#1 Amazon top seller" prior to
NatureWise's entry into the market.  Tr. 270, 2628-29; Exs. 61.1, 88.1.  Notwithstanding the
existence of a few other garcinia cambogia competitors in the market, sales of NutriGold
Garcinia continually increased following its launch.  Exs. 580, 580.1, 588, Ex. 589.  However,
after NatureWise's emergence on Amazon, it replaced Vitamins Online's NutriGold Garcinia as
the #1 ranked product on the Amazon Best Sellers list for garcinia cambogia products.  Tr. 270;
Ex. 88.1.

82.     Vitamins Online's NutriGold Green Coffee was also a "#1 Amazon top seller"
prior to NatureWise's entry into the market.  Tr. 180, 272; Exs. 27, 61.1.  However, when
NatureWise emerged on Amazon, the Green Coffees replaced NutriGold as the #1 green coffee
product.  Tr. 180, 272; Ex. 27.

83.     Thus, for both garcinia cambogia and green coffee products on Amazon, the
Products replaced NutriGold Products as the #1 best sellers.  Tr. 180, 272, 425-26; Exs. 27, 70.3,
88.1.  Similarly, the Products replaced the NutriGold Products as the top products in Amazon's

25

search results.  Tr. 180, 272, 425-26; Exs. 65, 70.3, 1058.  Consequently, Vitamins Online's sales of the NutriGold Products dropped once NatureWise began selling the Products on Amazon.  Tr. 238-40, 267-68, 272, 1954-59, 1977-84; Exs. 578. 579. 580.

84.     Following NatureWise's rise on Amazon, the Products consistently obtained #1 rankings on the Amazon Best Sellers list and effectively replaced the NutriGold Products.  Tr. 283-84; Ex. 322.1.

85.     However, by 2014, the markets for green coffee and garcinia cambogia on Amazon were inundated with competitors such that Vitamins Online and NatureWise were no longer the two major players in the relevant marketplace.  Tr. 256, 266; Exs. 5146, 5147.

## IV.     NatureWise's Revenue

86.     Vitamins Online presented testimony from Dr. Stan Smith ("Smith") to establish NatureWise's profits from selling the Products.  Tr. 1945-48.  Smith was a credible and well-qualified witness, Tr. 1940-41, and he used reasonable and appropriate methodologies in performing his work in this case.  Tr. 1947-50.  Smith determined that, in the years 2012 and 2013, NatureWise made $7,251,118 in revenue from selling the Green Coffees.  Exs. 588, 589.  During that same time period, NatureWise made $2,300,114 in revenue from selling the First Garcinia.  Exs. 588, 589.  Thus, from 2012 through 2013, NatureWise's revenue from selling the Green Coffees and the First Garcinia totaled $9,551,232.  Exs. 588, 589.

87.     NatureWise presented testimony from Richard Hoffman ("Hoffman") to rebut Smith's calculation of NatureWise's profits.  Tr. 2571-74.  In reaching his own calculation of NatureWise's profits, Hoffman was directed by Doyle to exclude certain profits.  Tr. 2656-62.  Hoffman also relied upon spreadsheets and information provided to him by NatureWise, but he did not conduct any independent investigation into the accuracy of those spreadsheets or

information.  Tr. 2656-62.  In addition, prior to performing his calculation, NatureWise informed Hoffman that it did not have record of its revenues by each specific product prior to 2014.  Tr. 2674-76.  Thus, Hoffman acknowledged that his calculation of NatureWise's profits for 2012 and 2013 was an estimate based on data from later years.  Tr. 2675-78.

88.     Because (1) Doyle was not a credible witness; (2) Hoffman acknowledged that his calculation for 2012 and 2013 was a mere estimate; and (3) NatureWise explained to Hoffman that it did not have record of its revenues by each specific product prior to 2014, Hoffman's calculations of NatureWise's revenue, costs, and deductions in the years 2012 and 2013 were unreliable and flawed.  Therefore, the court adopts Smith's calculation of NatureWise's profits for 2012 and 2013.

### V.     NatureWise's Discovery Improprieties

89.     Doyle understood that he had a duty to preserve information related to this lawsuit.  Tr. 733; Ex. 1023.2.  Nevertheless, Doyle failed to apprise all of the NatureWise employees of the obligation to preserve information.  Exs. 640, 1023.  Moreover, Doyle and/or NatureWise failed to preserve or produce evidence in the following manners:

(a)     Despite being aware of his duty to preserve evidence by early October 2013, on or around October 27, 2013, Doyle cleaned out his email and trash and reported that he could therefore not find a certain document. Ex. 5057.

(b)     Although Doyle contends that he sent hundreds of emails to Amazon regarding fake reviews, NatureWise did not produce them.  Tr. 649.

(c)     Doyle continued deleting emails.  Tr. 519-520.

(d)     Third parties produced multiple emails and documents in response to subpoenas that NatureWise failed to produce.  Notably, many of these emails contained

information detrimental to NatureWise's position.  Exs. 48, 50, 57, 61, 63, 67, 94, 95, 98, 99, 112, 122, 123, 124, 125, 131.

(e)     Doyle deleted videos that he had made and posted online after he was aware of his duty to preserve information.  NatureWise then failed to produce these videos in discovery.  Tr. 228, 445-46, 449-50, 461; Exs. 91, 92, 640.

(f)     In a previous declaration submitted by Doyle in this case, he informed the court that NatureWise used Office AutoPilot only as an autoresponder system, and communicated that the only relevant information that would have been in Office AutoPilot would have been emails.  Ex. 408.3, ¶ 2.  Doyle submitted that none of the remaining information in Office AutoPilot was relevant to this case.  Ex. 408.2.  But at trial, Doyle admitted that Office AutoPilot contained a significant amount of information beyond emails, and that such information and data had been transferred to another system.  Tr. 723; Ex. 408.1.  That additional information and data was essential to this case.  Tr. 455; Ex. 92.5.  Doyle admitted that he did not disclose the extent of the use of Office AutoPilot in his declaration.  Tr. 724-25; 408.2.  NatureWise never produced the Office AutoPilot database in this case.  Tr. 713-721; Exs. 92.5, 408.2.

(g)     NatureWise never produced any product SOPs or specification sheets, and claimed, prior to trial, that such documents did not exist.  Tr. 1131; Ex. 649.1.

(h)     NatureWise never produced the statistical analysis that it presented to Amazon to show that reviews posted to NatureWise's product pages were fake.  Tr. 741-743.

90.     Again, the court finds that Doyle's explanations to the foregoing discovery issues were not credible.

28

# CONCLUSIONS OF LAW

## I.  The Adverse Inference Rule

1.      "The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Wardrip v. Hart*, 949 F. Supp. 801, 804 (D. Kan. 1996) (citing *Gilbert v. Cosco Inc.*, 989 F.2d 399, 406 (10th Cir.1993)).  Because NatureWise failed to preserve and produce relevant evidence in this case, the court will apply the adverse inference rule to each element of Vitamins Online's claims and assume that the evidence NatureWise failed to preserve and produce was unfavorable to it.

2.      In addition, the court notes that it has already imposed spoliation sanctions for Category 1 Products—that is, NatureWise garcinia cambogia and green coffee products for which there were no existing samples for testing.  ECF No. 155.  More specifically, the court determined that Vitamins Online was entitled to an adverse inference instruction that the Category 1 Products bore all of the allegedly false Ingredients Claims alleged in the Complaint and that they failed to meet those label claims.  *Id.*  Because NatureWise has failed to adequately rebut the adverse inference, the court finds and concludes that NatureWise's Category 1 Products did not meet their label claims.

## II.  Lanham Act False Advertising Claim

3.      Vitamins Online's first claim is for false advertising under the Lanham Act.

4.      The Lanham Act provides that:

(1) [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

the origin, sponsorship, or approval of his or her goods, services, or commercial
activities by another person, or

    (B) in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another person's
goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is
likely to be damaged by such act.

15 U.S.C. § 1125(a) (2012).

    5.    To establish a false advertising claim under the Lanham Act, a plaintiff must

show (1) that the defendant used a device or made material false or misleading representations of

fact in connection with the commercial advertising or promotion of its product; (2) in commerce;

(3) that misrepresents or is/are likely to cause confusion or mistake as to (a) the origin,

association or approval of the product with or by another, or (b) the characteristics of the goods

or services; and (4) injure the plaintiff.[3] *See* 15 U.S.C. § 1125(a)(1); *Cottrell, Ltd. v. Biotrol*

*Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999); *Vitamins Online, Inc. v. HeartWise, Inc.*, No.

2:13-CV-00982-DAK, 2019 WL 6682313, at *8 (D. Utah Sept. 24, 2019); *Vitamins Online, Inc.*

*v. HeartWise*, Inc., 207 F. Supp. 3d 1233, 1237–44 (D. Utah 2016), *order vacated in part on*

*reconsideration*, No. 2:13-CV-982-DAK, 2017 WL 2733867 (D. Utah May 11, 2017).

    6.    In addition to the foregoing elements, some courts also list materiality as another

element of a Lanham Act claim, *see Novell, Inc. v. Network Trade Center, Inc.*, 25 F. Supp. 2d

1218, 1227-28 (D. Utah 1997), but the Tenth Circuit has not yet decided "whether the Lanham

Act imposes a materiality inquiry," *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x

682, 685 (10th Cir. 2015).

---

    [3] As the court has done in prior rulings, the court will refer to the foregoing elements as
the (1) "falsity"; (2) "commerce"; (3) "deception"; and (4) "injury" elements.

### A. Falsity and Deception

7.     A plaintiff can establish falsity by either showing that the defendant used a device, *Vitamins Online*, 207 F. Supp. 3d at 1242, or made false or misleading representations of fact in connection with the commercial advertising or promotion of its product, *Cottrell*, 191 F.3d at 1252 (10th Cir. 1999).  "To constitute commercial advertising or promotion . . . , the statements identified by [the plaintiff] 'must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.'" *Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1267 (10th Cir. 2020).

8.     If proceeding based on a false or misleading representation of fact, a plaintiff "can either show that the representations are literally false or impliedly false." *Vitamins Online*, 2016 WL 538458, at *6.

9.     A representation is literally false when it states that a product "has certain qualities that it in fact does not actually have" and is impliedly false when the "statements . . . , while literally true or ambiguous, convey a false impression or are misleading in context, as demonstrated by actual consumer confusion." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13–14 (7th Cir. 1992).

10.     For literally false statements, "the message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Interlink Products Int'l Inc. v. F & W Trading*, No. 15–1340 (MAS) (DEA), 2016 WL 1260713, at *9 (D.N.J. Mar. 31, 2016) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*,

31

290 F.3d 578, 586–87 (3d Cir. 2002)). "Only an *unambiguous* message can be literally false." *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) (emphasis in original) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)). Importantly, when a statement or advertisement "can reasonably be understood as conveying different messages, [a] literal falsity argument must fail." *Buetow*, 650 F.3d at 1185 (quoting *Scotts Co. v. United Ind. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002)).

11.     For a false statement to be actionable under the Lanham Act, it must be a false statement of fact. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir. 2000); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995). And for a statement of fact to be actionable, it "must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999)).

12.     When a statement or representation is deemed to be literally false, the deception element is presumed. *Procter & Gamble Co. v. Haugen*, 627 F. Supp. 2d 1287, 1290 (D. Utah 2008); *see Zoller Labs., LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004); *see also PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011). Conversely, when the statement at issue is impliedly false, a plaintiff must demonstrate actual consumer deception. *Vincent v. Utah Plastic Surgery Soc.*, 621 Fed. App'x. 546, 550 (10th Cir. 2015). Actual consumer deception must be shown by extrinsic evidence that demonstrates that the challenged statements "tend to mislead or confuse consumers." *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1239 (D. Utah 2018) (quoting *Zoller Labs.*, 111 F. App'x at 982).

13.     Yet, even under a theory of implied falsity, a plaintiff's failure to demonstrate that

consumers were actually deceived is not fatal to his or her claim.  Indeed, a plaintiff can still

benefit from a presumption of consumer deception for statements that are impliedly false if the

plaintiff can show that the defendant acted with the intent to deceive consumers.  *Cashmere &*

*Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 316 (1st Cir. 2002); *see also Merck*

*Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 256 (2d Cir. 2014); *William H. Morris Co. v. Grp. W,*

*Inc.*, 66 F.3d 255, 258 (9th Cir. 1995), *supplemented sub nom. William H. Morris Co. v. Grp. W.*

*Inc.*, 67 F.3d 310 (9th Cir. 1995).

### 1.    Ingredients Claims

14.    As mentioned above, the court concludes that the Category 1 Products did not

meet their label claims.  Consequently, the court finds those claims were literally false, and

Vitamins Online is therefore entitled to a presumption of deception.  NatureWise failed to rebut

that presumption.  Consequently, with respect to Category 1 Products, the court concludes that

Vitamins Online has established the falsity and deception elements.

15.    As to the Products in general, the court first concludes that NatureWise failed to

keep the necessary documentation to keep track of the Green Coffees and the Garcinias that it

was selling.  Indeed, NatureWise represented that it did not and cannot track which labels were

used on which bottles for each lot/batch of the Products that it produced.  Likewise, NatureWise

represented that it does not know which labels it used on the Products at different times or on

specific dates, and it does not know during which period it sold certain lots/batches.  Therefore,

because of NatureWise's failure to maintain the foregoing information, the court makes the

following legal conclusions with respect to the Products, but does not differentiate between

lots/batches:

(a)    As to certain lots, NatureWise's claim that the First Green Coffee contained 50% chlorogenic acid was literally false;

(b)    As to certain lots, NatureWise's claim that the First Green Coffee contained "Clinically Proven GCA" was literally false;

(c)    NatureWise's claims that the First Green Coffee contained the amount of GCA that corresponded with the GCA study were literally false by necessary implication;

(d)    NatureWise's claim that the First Green Coffee was clinically proven after having knowledge that the GCA study was flawed and retracted was literally false;

(e)    As to certain lots, NatureWise's claims that the Green Coffees were vegetarian were literally false;

(f)    As to certain lots, NatureWise's claims that the Green Coffees contained specific amounts of green coffee extract were literally false;

(g)    As to certain lots, NatureWise's claims that the Green Coffee contained 400 milligrams of chlorogenic acids were literally false;

(h)    As to certain lots, NatureWise's claim that the Green Coffees contained no fillers, binders, or artificial ingredients was literally false.

(i)    NatureWise's representations that the First Garcinia had SuperCitrimax were literally false;

(j)    NatureWise's claims that the First Garcinia contained a clinically proven and patented form of HCA bound to calcium and potassium were literally false;

(k)    As to certain lots, NatureWise's claims that the Garcinias were vegetarian were literally false;

34

(l)     As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(m)     As to certain lots, NatureWise's claim that the Garcinias contained 60% HCA was literally false;

(n)     As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(o)     As to certain lots, NatureWise's claim that the Garcinias contained 300 milligrams of HCA was literally false;

(p)     As to certain lots, NatureWise's claim regarding the specific amount of garcinia cambogia extract was literally false;

(q)     As to certain lots, NatureWise's claim that the Garcinias contained no fillers, binders, or artificial ingredients was literally false; and

(r)     For much of 2012 and 2013, NatureWise's claims, regarding the Green Coffees and the First Garcinia, that (1) each ingredient it used was verified for purity through in-house testing; (2) it had implemented a strict set of FDA compliant manufacturing procedures; and (3) its facilities were regularly inspected by FDA officials were literally false because NatureWise did not know who was making those products.

16.     The court concludes that NatureWise made the above representations and statements in connection with the commercial advertising and promotion of the Products because (1) NatureWise's representations were commercial speech; (2) NatureWise is in commercial competition with Vitamins Online; (3) the purpose behind the statements was to influence consumers to purchase the Products; and (4) NatureWise disseminated the statements sufficiently to the relevant purchasing public.

17.     Therefore, Vitamins Online has established the falsity element for its Ingredients Claims.  Moreover, because Vitamins Online has demonstrated that NatureWise's foregoing statements were literally false, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived by such statements.  NatureWise failed to rebut that presumption.  Therefore, Vitamins Online has also established the deception element for its Ingredients Claims.

18.     The court also concludes that, even if the foregoing claims were impliedly false, Vitamins Online would nevertheless be entitled to a presumption of deception because the court concludes that NatureWise and Doyle acted with the intent to deceive consumers.  Because NatureWise also failed to rebut that presumption, Vitamins Online has established falsity and deception under either theory of literal or implied falsity.

### 2.     Review Claims

19.     As to the Review Claims, the court reaches the following legal conclusions with respect to falsity and deception:

(a)     NatureWise's practice of block voting on the helpfulness of reviews constitutes the use of a device in connection with the commercial advertising or promotion of its products;

(b)     As a result of NatureWise's practice of block voting, the number of helpfulness votes on certain NatureWise reviews were artificially inflated and literally false; and

(c)     NatureWise's representations that it did not offer free products in exchange for reviews were literally false.

20.     Importantly, the court has already determined that NatureWise's conduct related to the Review Claims constitutes commercial advertising or promotion under the falsity element.

36

*Vitamins Online*, 207 F. Supp. 3d at 1242. Therefore, Vitamins Online has established the falsity element for its Review Claims. Moreover, because Vitamins Online has demonstrated literal falsity, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived. The court concludes that NatureWise failed to rebut that presumption. Therefore, Vitamins Online has established the deception element for its Review Claims.

21. The court also concludes that, even if the foregoing claims were impliedly false, Vitamins Online would nevertheless be entitled to a presumption of deception because the court concludes that NatureWise and Doyle acted with the intent to deceive consumers. Because NatureWise failed to rebut that presumption, Vitamins Online has established falsity and deception under either theory of use of a device, literal falsity, or implied falsity.

### B.     Commerce

22. NatureWise has not contested the commerce element of Vitamins Online's Lanham Act claim. *Vitamins Online*, 2019 WL 6682313, at *8. Regardless, the court concludes that NatureWise's actions and statements were made in commerce as required by the Lanham Act. *See* 15 U.S.C. § 1125(a).

### C.     Materiality

23. As noted above, the Tenth Circuit has not squarely addressed whether materiality is a necessary element of a Lanham Act claim. Nevertheless, the court will address it in this case. As explained by the Tenth Circuit: "Though not explicitly mentioned in the text of the Lanham Act, many courts require plaintiffs to prove that a false or misleading advertisement is 'likely to influence the purchasing decision' before permitting recovery based on it. Circuits that have imposed a materiality requirement are, however, split over who bears the burden of proof: some keep it with the plaintiff while others are willing to presume that at least some

misstatements—usually literally false ones—are material." *Gen. Steel*, 627 F. App'x at 685

(citations omitted). Further, the Second Circuit has articulated that "in many cases the evidence

and the findings by [a] court that a plaintiff has been injured or is likely to suffer injury will

satisfy the materiality standard—especially where the defendant and plaintiff are competitors in

the same market and the falsity of the defendant's advertising is likely to lead consumers to

prefer the defendant's product over the plaintiff's." *Church & Dwight Co. v. SPD Swiss*

*Precision Diagnostics, GmBH*, 843 F.3d 48, 70–71 (2d Cir. 2016).

24.     Based on this standard, the court concludes that Vitamins Online has established

that NatureWise's misrepresentations with respect to both the Ingredients Claims and the Review

Claims were material to consumers. Indeed, Vitamins Online has demonstrated that

NatureWise's misrepresentations were likely to influence consumers' purchasing decisions. This

is especially true when viewing NatureWise's misrepresentations in the context of Dr. Oz's

recommendations to consumers.

25.     Furthermore, given the court's conclusion that NatureWise's statements and

representations were literally false, Vitamins Online is entitled to a presumption that those

literally false statements and representations were material to consumers. *Pizza Hut*, 227 F.3d at

497. Because NatureWise has failed to rebut that presumption, the court concludes that

NatureWise's literally false statements and representations were material to consumers.

26.     Lastly, as will be explained in detail below, because Vitamins Online and

NatureWise were direct competitors in a sparsely populated market, the court presumes that

NatureWise's misrepresentations injured Vitamins Online. Thus, on that additional basis, the

court concludes that Vitamins Online has satisfied the materiality element.

### D.     Injury

27.     To establish the injury element of a Lanham Act false advertising claim, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).  Put differently, a plaintiff must provide evidence of "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 140.

28.     The standard for determining whether a plaintiff has provided sufficient evidence of injury is dependent on the relief that the plaintiff is seeking.  *See Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997) ("[C]ases involving injunctive relief and those seeking monetary damages under the Lanham Act have different standards of proof.").  When a plaintiff is seeking injunctive relief, the "plaintiff does not need to establish actual damages, and is instead held to a lesser standard of proving that it is likely that the defendant's advertising has caused or will cause plaintiff injury." *Berken v. Jude*, No. 12-CV-02555-RPM, 2013 WL 6152347, at *2 (D. Colo. Nov. 22, 2013).  In other words, when the plaintiff is seeking an injunction, "[t]he statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising" and not "proof of actual loss and specific evidence of causation." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980).

29.     In contrast, a "heightened level of . . . proof of causation and specific injury" is required when the plaintiff is seeking money damages, *Porous Media Corp.*, 110 F.3d at 1335–36, in order to "prevent the plaintiffs from receiving a windfall unrelated to their own damages,"

39

*Berken*, 2013 WL 6152347, at *2. And, as this court has previously determined, the standard of proof required when a plaintiff is seeking disgorgement is somewhere between the standards for money damages and injunctive relief. *Vitamins Online*, 2019 WL 6682313, at *15. In this case, Vitamins Online seeks disgorgement and injunctive relief.

30. There are certain circumstances that allow a plaintiff to benefit from a presumption of injury in Lanham Act false advertising cases. *Id.* at *13. For example, courts will apply a presumption of injury in cases involving (1) comparative advertising, *Munchkin, Inc. v. Playtex Prod., LLC*, 600 F. App'x 537 (9th Cir. 2015), or (2) "direct competitors in a sparsely populated market," *Church & Dwight*, 843 F.3d at 72 n.12.

31. In this case, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from 2012 through 2013.[4] However, after 2013, there was a flood of competitors into the market such that the market was no longer sparsely populated. Accordingly, for the years 2012 and 2013, Vitamins Online is entitled to a presumption of injury. That presumption, though, applies only to Vitamins Online's economic injury; it does not apply to Vitamins Online's alleged reputational injury. This is so because NatureWise adequately rebutted the presumption as to reputational injury. Indeed, the court concludes that NatureWise established that it did not cause Vitamins Online reputational injury. However, NatureWise failed to rebut the presumption of economic injury for 2012 and 2013. Therefore, for 2012 and 2013, Vitamins Online has established that NatureWise's conduct

---

[4] The court notes that, in its previous decisions on the parties' motions for summary judgment, it concluded that this case did not involve direct competitors in a sparsely populated market. *Vitamins Online*, 2019 WL 6682313, at *13. However, now that the court has been presented with all of the evidence at trial, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from the time that NatureWise launched in 2012 through the end of 2013.

40

proximately caused it economic injury such that Vitamins Online has established the injury element of its claim.

32.     As to the remaining years, Vitamins Online is not entitled to a presumption of injury.  Thus, Vitamins Online was required to demonstrate that it suffered economic or reputational injury that was proximately caused by NatureWise's misrepresentations.  The court concludes that it failed to do so.  While Vitamins Online did produce some evidence, that evidence was insufficient to establish that NatureWise's actions proximately caused injury to Vitamins Online.  Once the market was flooded with competitors.  Once there were a multitude of competitors for green coffee and garcinia cambogia products on Amazon, one sale for NatureWise was not necessarily a lost sale for Vitamins Online.  Instead, a sale for NatureWise could have meant a lost sale for any of the other Amazon competitors.

33.     Therefore, the court concludes that Vitamins Online has established each of the elements of its Lanham Act false advertising claim for the years 2012 and 2013.  Accordingly, the court finds Vitamins Online's liable for false advertising under the Lanham Act.

### III.     Utah Common Law Unfair Competition Claim

34.     Vitamins Online's second claim is for common law unfair competition.  "Pursuant to Utah common law, unfair competition includes—*but is not limited to*—passing off, palming off, imitating, and causing or *likely causing* confusion or deception."  *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added).

35.     In this case, the court concludes that Vitamins Online has established its unfair competition claim.  The foregoing Findings of Fact and Conclusions of Law demonstrate that NatureWise unfairly competed in the garcinia cambogia and green coffee markets on Amazon.  Indeed, there is ample evidence demonstrating that NatureWise's actions, as detailed above,

resulted in a high likelihood of deception in the relevant markets on Amazon.  Moreover, the

court's analysis with respect to Vitamins Online's Lanham Act claim applies with equal force to

its second claim.  Therefore, NatureWise is liable for unfair competition under Utah common

law.

## IV.     Remedies

36.     As previously mentioned, Vitamins Online seeks the recovery of NatureWise's

ill-gotten profits through disgorgement in addition to injunctive relief.

### A.     Disgorgement

37.     Section 35 of the Lanham Act provides that, when a plaintiff has established a

claim for false advertising, the plaintiff is entitled, "subject to the principles of equity, to recover

. . . defendant's profits."  15 U.S.C. § 1117.

38.     The Tenth Circuit has held that "[u]nder the Lanham Act, plaintiffs must show

either actual damages or willful action on the part of the defendant as a prerequisite to recover

disgorgement of profits."  *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir.

2013).  However, the Supreme Court recently clarified that a finding of willfulness can no longer

be a mandatory prerequisite to an award of the defendant's profits.  *See Romag Fasteners, Inc. v.

Fossil, Inc*., 140 S. Ct. 1492, 1494–95 (2020).  Nevertheless, the Supreme Court noted that

willfulness is still "a highly important consideration in determining whether an award of profits

is appropriate."  *Id.* at 1497.  As such, the court will consider willfulness as it "weigh[s] the

equities to fashion a remedy that matches the harm."  *Klein-Becker*, 711 F.3d at 1162.  In

addition to willfulness, other equitable considerations may include, among other things, "(1) the

degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and

adequacy of other remedies; (3) the role of a particular defendant in effectuating the

42

infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands." *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-CV-01398-PAB-KLM, 2013 WL 1900562, at *17 (D. Colo. May 7, 2013), *aff'd*, 627 F. App'x 682 (10th Cir. 2015).

39.     Here, the court concludes that disgorgement of NatureWise's profits from 2012 and 2013 is an appropriate remedy.  First, there is little doubt, if any, that NatureWise benefitted from its unlawful actions.  NatureWise quickly rose to the top of Amazon sales rankings and made millions of dollars in a matter of months despite having no previous experience in the industry.  Second, other remedies would be inadequate.  As will be described below, it would be against the public interest to impose a permanent injunction in this case.  And, even though Vitamins Online is not seeking actual damages, actual damages are rather difficult to accurately calculate in a false advertising case.  Third, Vitamins Online bears no unclean hands with respect to NatureWise's actions.  Fourth, Vitamins Online did not delay in seeking relief.  Fifth, NatureWise's actions were willful in that NatureWise and Doyle sought to intentionally deceive consumers.  Indeed, Doyle willfully made false representations with respect to the Products and artificially altered reviews in order to make NatureWise more profitable.  Sixth, as a result of testing, NatureWise had knowledge that certain lots of the Products did not match their label claims.  Yet, even with that knowledge, NatureWise continued selling those products and never issued any recalls.  And seventh, NatureWise's discovery improprieties, as explained above, favor disgorgement.  Therefore, the disgorgement of NatureWise's ill-gotten profits in 2012 and 2013 is a warranted and appropriate remedy.

40.     Now that the court has determined that disgorgement of NatureWise's profits is warranted, the court must determine the amount.  Section 35 of the Lanham Act provides that, after a plaintiff has established his or her claim, and the court has determined that disgorgement

is warranted, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117.

41.     Here, as explained in the Findings of Fact, Vitamins Online has demonstrated that, in 2012 and 2013, NatureWise's sales profits from the Green Coffees and the First Garcinia totaled $9,551,232.[5]

42.     Given that Vitamins Online has met its initial burden of proving NatureWise sales, the burden then shifts to NatureWise to prove all elements of cost or deduction. NatureWise, however, failed to carry that burden. As detailed in the Findings of Fact, NatureWise represented that it did not have record of its revenues by each specific product prior to 2014. Thus, Hoffman's calculations of NatureWise's 2012 and 2013 profits, and the costs and deductions associated with those profits, were a mere estimate and therefore unreliable. As such, the court concludes that NatureWise has failed to produce adequate evidence demonstrating any costs or deductions associated with its 2012 and 2013 profits.

43.     The court therefore concludes that the profits attributable to NatureWise's false advertising in violation of the Lanham Act amounts to $9,551,232. As such, the court awards Vitamins Online $9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and $2,300,114 from the First Garcinia. The court orders NatureWise to make payment thereof to Vitamins Online.

44.     In addition, there is a preference in the Tenth Circuit to award prejudgment interest in this type of case. *See, e.g.*, *United Phosphorous Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1236–37 (10th Cir. 2000) ("[T]his Court has adopted a preference, if not a

---

[5] The court notes that NatureWise did not begin selling the Second Garcinia until 2015. Thus, because the court has limited disgorgement to 2012 and 2013, it need not consider the Second Garcinia.

presumption, for prejudgment interest."); *FDIC v. UMIC, Inc.,* 136 F.3d 1375, 1388 (10th Cir. ("[P]rejudgment interest normally should be awarded on successful federal claims.");

*EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, No. 2:09CV523DAK, 2012 WL 2419953, at *2 (D. Utah June 26, 2012).  Accordingly, the court concludes that prejudgment interest in this case is warranted.

45.     In determining the appropriate interest rate, federal courts are "free to choose any interest rate which would 'fairly compensate the plaintiff for the delay in the receipt of payment.'"  *Towerridge, Inc. v. T.A.O., Inc.,* 111 F.3d 758, 764 (10th Cir. 1997); *EarthGrains*, 2012 WL 2419953, at *2.  Here, in its discretion, the court looks to Utah law for guidance, and concludes that Utah's post-judgment rate of 2.13% per annum, as of January 1, 2014, is an appropriate interest rate.  *See* https://www.utcourts.gov/resources/intrates/historic.html. Accordingly, the court awards Vitamins Online simple prejudgment interest of 2.13% per annum, with accrual beginning on January 1, 2014.[6]

46.     As to the Utah common law unfair competition claim, while it appears that Utah courts have not explicitly addressed the remedies available for unfair competition, the Restatement (Third) of Unfair Competition permits recovery for actual damages or an award of the defendant's profits.  Restatement (Third) of Unfair Competition § 37.  A district court will consider the same or similar factors when considering whether to award a defendant's profits

_____

[6] In Lanham cases, courts generally award simple prejudgment interest instead of compound prejudgment interest.  *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, No. 04-CV-2293 SMG, 2009 WL 5185808, at *10 (E.D.N.Y. Dec. 23, 2009), *aff'd*, 409 F. App'x 389 (2d Cir. 2010); *Sherwood Brands of Rhode Island, Inc. v. Smith Enterprises, Inc.*, No. CIV.A. 00-287T, 2003 WL 22061871, at *3 (D.R.I. Mar. 31, 2003). Furthermore, under Utah law, "[c]ompound interest is not favored," and "interest . . . should be calculated simply unless agreed to otherwise by the parties."  *City of Hildale v. Cooke*, 2001 UT 56, ¶ 36, 28 P.3d 697, 707 (quoting *Watkins & Faber v. Whiteley*, 592 P.2d 613, 616 (Utah 1979)).  Accordingly, the court awards simple prejudgment interest in this case.

under the Lanham Act or Utah common law. *See id.* § 36 cmt. b, § 37. The only possible distinction is that an award of lost profits under Utah law requires willfulness, whereas an award under the Lanham Act, does not, in light of the Supreme Court's decision in *Romag*. *See id.* § 37 cmts. c, e. Regardless, the court has found that NatureWise and Doyle acted willfully.

47.     The court therefore concludes that disgorgement is also warranted for Vitamins Online's Utah common law unfair competition claim. Thus, the court awards Vitamins Online $9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and $2,300,114 from the First Garcinia. This award of profits is not in addition to the award of profits for Vitamins Online's Lanham Act claim. The court is merely recognizing that Vitamins Online is entitled to the same disgorgement damages under both legal avenues. Accordingly, Vitamins Online is awarded $9,551,232 in disgorged profits from NatureWise for *either* its Lanham Act claim *or* its Utah common law unfair competition claim—Vitamins Online is not awarded an independent $9,551,232 for each claim.

48.     The court concludes that prejudgment interest is also warranted with respect to Vitamins Online's common law unfair competition claim. Whether a party is entitled to prejudgment interest under Utah law turns upon whether the damages are subject to calculation, as opposed to the types of damages that are not calculated, such as are awarded for personal injuries. The standard of recovery under Utah law is aptly explained in *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*:

> Prejudgment interest may be recovered where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures. Prejudgment interest is appropriate when the loss ha[s] been fixed as of a definite time and the amount of the loss can be calculated with mathematical accuracy in accordance with well-established rules of damages. The trial court adopted a semblance of this language, ruling that prejudgment interest was appropriate because Encon's damages were "subject to mathematical calculation.

Each of these iterations of the standard for recovering prejudgment interest is correct. None suggests or requires, as the FAK parties claim, that at the time the damages accrued, all of the damage figures must be known and remain static throughout the litigation. Rather, the standard focuses on the measurability and calculability of the damages.

The court of appeals has explained that "losses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact, such as in cases of personal injury, wrongful death, defamation of character, and false imprisonment. Thus, prejudgment interest is inappropriate in cases where the trier of fact is left to assess damages based on "a mere description of the wrongs done or injuries inflicted.

We have held that prejudgment interest is appropriate in cases where the amount due under [a] contract was ascertainable by calculation and it was only the method to be used in making the calculation that was uncertain.

Therefore, where damage figures must be determined by the trier of fact in its exercise of discretion, prejudgment interest is inappropriate. Where damage figures are subject to calculation, however, even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate. The trial court recognized this important distinction and noted that, although various elements of Encon's termination claim may have been disputed as to amount, the claim has been subject to mathematical calculation since the date it was submitted. The trial court was correct.

2009 UT 7, ¶¶ 51–55, 210 P.3d 263, 272–73 (citations and quotations omitted).

49.     Under this standard, the court concludes that Vitamins Online is entitled to simple prejudgment interest on its common law unfair competition claim in the amount of 2.13% per annum, with accrual beginning on January 1, 2014.  Again, the court notes that this is the same interest that Vitamins Online is entitled to under its Lanham Act claim, not in addition to that interest.

**B.     Enhanced Damages/Profits**

50.     Under the Lanham Act, a court is permitted to enter judgment of up to three times the actual damages or profits awarded.  15 U.S.C. 1117(a); *Earthgrains Baking Companies Inc. v. Sycamore Family Bakery, Inc.*, 573 F. App'x 676, 682 (10th Cir. 2014).  The decision to enhance damages lies within the discretion of the district court.  *See Earthgrains Baking*, 573 F.

47

App'x at 682.  Importantly, when exercising the court's discretion in deciding whether to
enhance damages, the court must keep in mind that the amount of profits awarded "should
constitute compensation and not a penalty."  *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp.
2d 1233, 1244 (D. Utah 1998)  (citing *Nintendo of Am. v. Dragon Pac. Int'l,* 40 F.3d 1007,
1009–11 (9th Cir. 1994)).

51.    When assessing the equitable considerations of this case, the court concludes that
an enhancement of profits is not warranted.  First, the court believes that the amount of awarded
profits adequately compensates Vitamins Online such that an enhanced award of profits is not
necessary.  Second, an enhancement of profits would result in a penalty against NatureWise
instead of compensation to Vitamins Online.  Third, while the balance of equities in this case
supports disgorging the profits that NatureWise earned in 2012 and 2013, that analysis is limited
to disgorgement itself; the equitable considerations above do not require the court to also
enhance the awarded profits.  Accordingly, the court declines to enhance the amount of
disgorged profits awarded.

### C.    Injunctive Relief

52.    Under the Lanham Act, a court has the power to grant an injunction "according to
the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. §
1116(a).  In order to qualify for injunctive relief, "[a] plaintiff must demonstrate: (1) that it has
suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are
inadequate to compensate for that injury; (3) that, considering the balance of hardships between
the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest
would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, LLC*, 547 U.S.
388, 391 (2006).

53. Based on the foregoing standard, the court concludes that Vitamins Online is not entitled to a permanent injunction. The court reaches this conclusion based on the second and fourth *eBay* factors.

54. In this case, a disgorgement of NatureWise's profits adequately compensates Vitamins Online for its injury. Thus, injunctive relief on top of disgorgement is unwarranted. Accordingly, the court finds that the second factor weighs against an injunction.

55. In addition, the fourth factor weighs against an injunction. For its injunctive relief, Vitamins Online requests that NatureWise be compelled to remove all of the Product reviews on Amazon. However, the court finds that such a remedy would be against the public interest. The court reaches this conclusion because, were the court to issue such an order, legitimate reviews of actual consumers would also be removed. Thus, injunctive relief, in that respect, would not only serve as a remedy for Vitamins Online, but also a remedy against actual consumers on Amazon and the Amazon marketplace itself. Such a result, the court believes, is not appropriate under the circumstances of this case, and goes strongly against the public interest. Therefore, the court rejects Vitamins Online's request for injunctive relief.

### D.     Attorney Fees and Costs

56. Under the Lanham Act, a court may award attorney fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). When considering whether to award attorney fees under the Lanham Act, a district court should consider the following nonexclusive factors: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in

49

particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554
n.6.

57.     Here, the court concludes that, considering the totality of the circumstances, this
is an exceptional case such that an award of attorney fees and costs is appropriate and warranted.
In particular, the court concludes that this case is exceptional in light of NatureWise's actions in
willfully deceiving consumers, failing to produce pertinent evidence, and abusing the discovery
process.  Furthermore, the court finds that an award of attorney fees and costs is appropriate in
order to deter NatureWise from further engaging in such willful conduct.

58.     Therefore, within thirty days of the date this court enters judgment, the court
directs Vitamins Online to file with the court all of the necessary documentation establishing the
amount of attorney fees and costs that it has incurred in this case.

## NATUREWISE'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS

Lastly, the court will address NatureWise's Rule 52(c) Motion for Judgment on Partial
Findings.  Federal Rule of Civil Procedure 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds
> against the party on that issue, the court may enter judgment against the party on a
> claim or defense that, under the controlling law, can be maintained or defeated only
> with a favorable finding on that issue. The court may, however, decline to render
> any judgment until the close of the evidence. A judgment on partial findings must
> be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).  When a defendant files a Rule 52(c) motion, "the trial court is not required
to consider the evidence in the light most favorable to the plaintiff."  *Roth v. Am. Hosp. Supply
Corp.*, 965 F.2d 862, 865 (10th Cir. 1992).  Rather, the trial court "must undertake[] the fact
finding process which involves a weighing of the evidence and an assessment of the credibility
of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal
right to relief."  *Id.* (alteration in original) (internal quotation marks omitted).

In this case, NatureWise moves for judgment on partial findings because it claims that (1) Vitamins Online lacks standing to assert the Ingredients Claims, and (2) Vitamins Online has failed to prove causation and injury as part of its Lanham Act claim. In addition, NatureWise contends that Vitamins Online failed to present any evidence to support a permanent injunction, and that judgment is warranted as to Vitamins Online's common law claim because claims for unfair competition under Utah common law are limited to passing-off/palming-off and misappropriation. The court will address each argument in turn.

First, NatureWise contends that Vitamins Online lacks standing with respect to the Ingredients Claims. In support of its argument, NatureWise avers that Vitamins Online is attempting to enforce the regulations of the Food and Drug Administration ("FDA"), which retains exclusive jurisdiction to enforce its regulations. To that end, NatureWise cites Ninth Circuit caselaw that provides:

> Because the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation.

*PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010).

The court finds NatureWise's standing argument to be without merit for several reasons. First, NatureWise bases much of its argument—if not all of it—on Dr. Howe's testimony regarding Good Manufacturing Practices ("GMP"). The FDA imposes certain GMP manufacturing and labeling requirements, among other things, on product manufacturers. Tr. 1735-36. As demonstrated by the foregoing Findings of Fact and Conclusions of Law, however, the court does not base NatureWise's Lanham Act liability on GMPs or FDA regulations. Rather, NatureWise is liable under the Lanham Act because its advertising claims were literally false—irrespective of the FDA regulations and GMPs. Thus, unlike *PhotoMedex*, there is no

51

need to consider, let alone litigate, any potential underlying FDA violations.  Accordingly, the
court rejects NatureWise's argument and finds that Vitamins Online has standing to assert its
claims.[7]

Second, NatureWise avers that Vitamins Online has failed to establish causation and
injury.  The court also finds this argument to be without merit based on the court's Findings of
Fact and Conclusions of Law.  As explained in detail above, the court has concluded that
Vitamins Online and NatureWise were direct competitors in a sparsely populated market from
2012 through 2013, and Vitamins Online is therefore entitled to a presumption of injury.
Because NatureWise failed to rebut that presumption and for the reasons stated above, the court
finds NatureWise's injury and causation arguments to be without merit.

Third, NatureWise contends that Vitamins Online failed to present evidence supporting a
permanent injunction.  As explained above, the court has concluded that a permanent injunction
is not appropriate in this case.  That conclusion, however, is based on the entirety of the evidence
presented at trial.  As such, the court does not grant NatureWise's motion with respect to
injunctive relief, but reaches that conclusion, as explained above, based on all of the evidence
that the parties presented.

Finally, NatureWise asserts that judgment is warranted on Vitamins Online's Utah
common law unfair competition claim.  But the court finds this argument to be without merit.
As explained above, unfair competition under Utah common law "includes—*but is not limited
to*—passing off, palming off, imitating, and causing or likely causing confusion or deception."

---

[7] It also bears mentioning that, notwithstanding the fact that Vitamins Online filed this
case in 2013, and the parties have gone through several rounds of motions for summary
judgment over the last seven years, this is the very first time that NatureWise argues that
Vitamins Online lacks standing to assert the Ingredients Claims.

*Overstock.com*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added). Thus, while NatureWise attempts to limit the definition of unfair competition, the Utah Supreme Court explicitly stated that unfair competition is not limited to passing off/palming off and misappropriation. And, because the court has concluded that NatureWise's conduct constitutes unfair competition, the court rejects NatureWise's request for judgment on Vitamins Online's common law unfair competition claim.

Therefore, based on the foregoing reasoning and the Findings of Fact and Conclusions of Law, the court hereby DENIES NatureWise's Motion for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c).

DATED this 10th day of November, 2020.

BY THE COURT:

DALE A. KIMBALL
United States District Court Judge

# EXHIBIT "9"

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Ronald A. Clifford (State Bar No. 246542)<br>RAC@RCliffordLaw.com<br>R. CLIFFORD & ASSOCIATES<br>1100 Town & Country Rd., Suite 1250<br>Orange, California 92868<br>Tel: (949) 533-9774<br><br>☒ *Attorney for:* Heartwise, Inc. | |

<table>
<tr><td colspan="2" align="center"><b>UNITED STATES BANKRUPTCY COURT<br>CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION</b> ▼</td></tr>
<tr><td>In re:<br><br>HEARTWISE, INC.,<br><br><br><br><br><br><br><br><br>Debtor(s).</td><td>CASE NO.: 8:20-bk-13335-MW<br>CHAPTER: 11 ▼<br><br><b>NOTICE OF OBJECTION TO CLAIM</b><br><br>DATE:   TBD<br>TIME:   TBD<br>COURTROOM: 6C (or assigned courtroom)<br>PLACE: 411 West Fourth Street<br>        Santa Ana, California 92701</td></tr>
</table>

1. TO *(specify claimant and claimant's counsel, if any)*:  Vitamins Online, Inc.

2. NOTICE IS HEREBY GIVEN that the undersigned has filed an objection to your Proof of Claim (Claim # 3      ) filed in the above referenced case.  The Objection to Claim seeks to alter your rights by disallowing, reducing or modifying the claim based upon the grounds set forth in the objection, a copy of which is attached hereto and served herewith.

3. **Deadline for Opposition Papers**: You must file and serve a response to the Objection to Claim not later than 14 days prior to the hearing date set forth above.

   **IF YOU FAIL TO TIMELY RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

Date: 01/18/2022

R. Clifford & Associates
Printed name of law firm

/s/ Ronald A. Clifford
Signature

Date Notice Mailed:  01/18/2022

Ronald A. Clifford
Printed name of attorney for objector

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*

**F 3007-1.1.NOTICE.OBJ.CLAIM**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
 1100 Town & Country Rd., Suite 1250, Orange, Califorina 92868.

A true and correct copy of the foregoing document entitled: **NOTICE OF OBJECTION TO CLAIM** will be served or was
served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated
below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
 1/18/2022    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  01/18/2022   , I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ , I served the
following persons and/or entities by personal delivery, overnight mail service, or, (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 01/18/2022 | Ronald A. Clifford | /s/ Ronald A. Clifford |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*

**F 3007-1.1.NOTICE.OBJ.CLAIM**

**Service via ECF**

Michael Jay Berger on behalf of Attorney The Law Offices of Michael Jay Berger
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Michael Jay Berger on behalf of Interested Party Courtesy NEF
michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com

Anthony Bisconti on behalf of Creditor Robinson Pharma, Inc.
tbisconti@bklwlaw.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Alpha Health Research
tbisconti@bklwlaw.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Ernesty LLC
tbisconti@bklwlaw.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Robinson Pharma, Inc.
tbisconti@bklwlaw.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Defendant Tuong Nguyen
tbisconti@bklwlaw.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Anthony Bisconti on behalf of Interested Party Earnesty LLC
tbisconti@bklwlaw.com, 4579179420@filings.docketbird.com;chowland@bienertkatzman.com

Jared Glicksman on behalf of Interested Party DavidPaul Doyle
jglicksman@yocca.com

Jared Glicksman on behalf of Plaintiff DavidPaul Doyle
jglicksman@yocca.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

Eve H. Karasik on behalf of Interested Party Levene, Neale, Bender, Yoo & Brill L.L.P.
ehk@lnbyb.com

Steven J. Katzman on behalf of Creditor Robinson Pharma, Inc.
SKatzman@bienertkatzman.com,
admin@bienertkatzman.com;chowland@bienertkatzman.com;4579179420@filings.docketbird.com

Steven J. Katzman on behalf of Defendant Robinson Pharma, Inc.
SKatzman@bienertkatzman.com,
admin@bienertkatzman.com;chowland@bienertkatzman.com;4579179420@filings.docketbird.com

Aaron J Malo on behalf of Interested Party Magleby Cataxinos & Greenwood
amalo@sheppardmullin.com, rgolder@sheppardmullin.com;abilly@sheppardmullin.com

Kathleen P March on behalf of Interested Party Vitamins Online, Inc.
kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net

Carlos A Nevarez on behalf of Creditor Robinson Pharma, Inc.
cnevarez@bklwlaw.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Alpha Health Research
cnevarez@bklwlaw.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Ernesty LLC
cnevarez@bklwlaw.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Robinson Pharma, Inc.
cnevarez@bklwlaw.com, carlos.aa.nevarez@gmail.com

Carlos A Nevarez on behalf of Defendant Tuong Nguyen
cnevarez@bklwlaw.com, carlos.aa.nevarez@gmail.com

Misty A Perry Isaacson on behalf of Interested Party Courtesy NEF
misty@ppilawyers.com, ecf@ppilawyers.com;pagterandperryisaacson@jubileebk.net

Dean G Rallis, Jr on behalf of Creditor Vitamins Online, Inc
drallis@hahnlawyers.com, jevans@hahnlawyers.com;drallis@ecf.courtdrive.com

Seth A Safier on behalf of Creditor Martha Valentine
seth@gutridesafier.com

K. Luan Tran on behalf of Creditor Robinson Pharma, Inc.
ltran@kslaw.com, tle@kslaw.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

**Service via U.S. Mail**

Honorable Mark S. Wallace
United States Bankruptcy Court
411 West Fourth Street, Suite 6135
Santa Ana, California 92701

Ronald A. Clifford (State Bar No. 246542)
E-Mail: RAC@RCliffordLaw.com
**R. CLIFFORD & ASSOCIATES**
1100 Town and Country Rd., Suite 1250
Orange, California 92868
Telephone: (949) 533-9774

*General Insolvency Counsel for*
*Heartwise, Inc.*

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

|  |  |
|---|---|
| In re:<br><br>HEARTWISE, INC.,<br><br>               Debtor in Possession. | Case No.: 8:20-bk-13335-MW<br><br>Chapter 11<br><br>**BRIEF IN SUPPORT OF HEARTWISE, INC.'S OBJECTION TO CLAIM NOS. 3 AND 5, AND ANY AMENDMENTS THERETO**<br><br>**Hearing Date, Time and Location:**<br>Date:    TBD<br>Time:    TBD<br>Place:   411 West Fourth Street<br>           Santa Ana, CA 92701<br>           Courtroom 6C |

Heartwise, Inc. ("Heartwise"), hereby respectfully submits it objection to Claim Nos. 3 and 5, and any amendments to those proofs of claim (this "Objection"). A true and correct copy of Claim No. 3 is attached hereto as Exhibit "1," and a true and correct copy of Claim No. 5 is attached hereto as Exhibit "2," with both Exhibits 1 and 2 being incorporated herein by reference. Claim Nos. 3 and 5 are each based on that *Final Judgment* (the "Judgment") entered by the United States District Court for the District of Utah on November 10, 2020 against Heartwise, and in favor of Vitamins Online, Inc. ("Vitamins Online") in the amount of $9,551,232 in disgorged profits with simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014, as well as Vitamins Online's reasonable attorneys' fees and costs based on alleged violations of the Lanham Act and Utah common law. A true and correct copy of the Judgment is attached hereto as Exhibit

1  "3," and is incorporated herein by reference.  Claim No. 3 was filed by Vitamins Online for the

2  amount of the Judgment in full.  Claim No. 5 was filed by Vitamins Online's former counsel,

3  Magleby Cataxinos & Greenwood, P.C., and asserts that under its engagement agreement with

4  Vitamins Online, the entire amount of the Judgment must be paid to it in the first instance, after

5  which it will reduce the monies by an amount it is owed, and return the balance to Vitamins Online,

6  and/or other parties, including a lender to Vitamins Online.

7  <div align="center">**BACKGROUND**</div>

8  On September 22, 2021, Heartwise filed *Heartwise, Inc.'s First Amended Chapter 11 Plan of*

9  *Reorganization* (the "Plan").  *See* Docket No. 460.  In connection with the Plan, Heartwise deposited

10  into the Court's registry $14.5 million regarding Claim Nos. 3 and 5.  *See* Docket No. 679, *Notice of*

11  *Effective Date of Heartwise, Inc.'s First Amended Chapter 11 Plan of Reorganization*, Exhibit 1.

12  The Plan provides, "[t]o be clear, [Heartwise] has filed an appeal of the Judgment, and [Vitamins

13  Online] has stated that it will be pursuing a cross-appeal of the Judgment.  Nonetheless, the $14.5

14  million to pay the Judgment in full, which includes attorneys' fees and interest, will be fully funded

15  on the Effective Date as set forth above, but not released to Magleby until all appeals of the

16  Judgment, and any subsequent proceedings have been completed."  *See* Plan, p. 5, lines 7-11.

17  The Plan further provides that "on the date that the Confirmation Order is entered by

18  the Court, the automatic stay applicable to this Case through 11 U.S.C. § 362, shall terminate

19  to allow: (1) regarding the Judgment, the Debtor's appeal, and any cross-appeal by Vitamins

20  Online to be filed and litigated to conclusion…," however, the "lifting of the automatic stay

21  described herein as to the Judgment is solely to allow Vitamins Online and [Heartwise] to

22  obtain a favorable ruling by the 10th Circuit Court of Appeals of the Judgment and/or an

23  augmented award by the District Court after the appeal of the Judgment."  *Id.* at p. 11, lines 3-12.

24  On December 17, 2021, the Court entered its *Order Confirming Heartwise, Inc.'s First*

25  *Amended Chapter 11 Plan of Reorganization and Denying with Prejudice Certain Confirmation*

26  *Order-Related Motions* (the "Confirmation Order").  *See* Docket No. 644.

27  In conformance with the terms of the Plan, and with entry of the Confirmation Order,

28  Heartwise has moved forward with its appeal of the Judgment.

<div align="center">**BRIEF IN SUPPORT OF HEARTWISE, INC.'S OBJECTION TO CLAIM NOS. 3 AND 5, AND ANY AMENDMENTS THERETO**</div>

1    Heartwise files this Objection because it has been made aware that Vitamins Online believes

2    that the Confirmation Order and/or the Plan entitle it to immediate payment of the amounts of the

3    Judgment that have been deposited into the Court's registry.  As is clear from the Plan and the

4    Confirmation Order, no monies are to be released from the Court's registry until the appeal, any

5    cross-appeal, and any subsequent proceedings have concluded.

6    Further, as to the merits of Claim Nos. 3 and 5, under the Lanham Act and Utah common

7    law, Heartwise submits that the Judgment should be overturned, and no amounts paid to Vitamins

8    Online.  Ergo, both Claim Nos. 3 and 5 should be disallowed in their entirety.

9    **JURISDICTION**

10    Section 157(b)(1) of Title 28 of the United States Code provides that "Bankruptcy judges

11    may hear and determine all cases under title 11 and all core proceedings arising under title 11, or

12    arising in a case under title 11."

13    The Ninth Circuit has stated that "the filing of a proof of claim is the prototypical situation

14    involving the 'allowance or disallowance of claims against the estate,' a core proceeding under 28

15    U.S.C. § 157(b)(2) . . . By filing the proof of claim, [the claimant] voluntarily subjected the

16    agreement to the bankruptcy's court's jurisdiction as well, because the agreement is an integral

17    component of the bankruptcy court's consideration of [the claimant's] claim."  *In re G.I. Industries,*

18    *Inc.*, 204 F.3d 1276, 1279-1280 (9th Cir. 2000).

19

20    **ARGUMENT**

21    Section 502(b)(1) of the Bankruptcy Code provides in relevant part that if an objection is

22    made to a proof of claim, "the court, after notice and a hearing, shall determine the amount of such

23    claim in lawful currency of the United States as of the date of the filing of the petition, and shall

24    allow such claim in such amount, except to the extent that such claim is unenforceable against the

25    debtor and property of the debtor, under any agreement or applicable law for a reason other than

26    because such claim is contingent or unmatured."

27    The basis for both Claim Nos. 3 and 5 is the Judgment.  Heartwise has filed an appeal of the

28

---

**BRIEF IN SUPPORT OF HEARTWISE, INC.'S OBJECTION TO CLAIM NOS. 3 AND 5, AND ANY AMENDMENTS THERETO**
**- 221 -** 3

1   Judgment, and will argue, among other things, that given the number of competitors in the market

2   for garcinia cambogia and green coffee bean extract supplements on Amazon.com, Heartwise did

3   not proximately cause any economic injury to Vitamins Online.  The failure of Heartwise's actions

4   to be a proximate cause of any of Vitamins Online's purported economic injury means that Vitamins

5   Online is not entitled to any damages from Heartwise under the Lanham Act or Utah common law.

6        Once the appeal and any subsequent proceedings have been decided, Heartwise will request

7   that the Court hear this Objection, and disallow Claim Nos. 3 and 5.

8                    **CONCLUSION**

9        For the foregoing reasons, Heartwise respectfully requests that Claim Nos. 3 and 5 be

10   disallowed in their entirety, and for any and all other relief as the Court deems just and appropriate.

11

12   Dated:  January 18, 2022             **R. CLIFFORD & ASSOCIATES**

13                            By: */s/ Ronald A. Clifford*

14                               Ronald A. Clifford

15                           *General Insolvency Counsel for*
*Heartwise, Inc.*

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor 1</td><td>Heartwise, Inc.</td></tr>
<tr><td>Debtor 2<br/>(Spouse, if filing)</td><td></td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the:  Central District of California</td></tr>
<tr><td>Case number</td><td>8:20-bk-13335-MW</td></tr>
</table>

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| **Part 1:** | **Identify the Claim** |
| --- | --- |

| 1. Who is the current creditor? | Vitamins Online, Inc. |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| 2. Has this claim been acquired from someone else? | ☑ No<br/>☐ Yes.  From whom? _____ |
|---|---|

| 3. Where should notices and payments to the creditor be sent?<br/><br/>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|
| | Vitamins Online, Inc. c/o Matthew M. Boley, Esq<br/>Name | Name |
| | 111 E. Broadway, 11th Floor<br/>Number          Street | Number          Street |
| | Salt Lake City          UT          84111<br/>City                    State          ZIP Code | City          State          ZIP Code |
| | Contact phone  801.363.4300 | Contact phone _____ |
| | Contact email  mboley@ck.law | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br/><br/>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| 4. Does this claim amend one already filed? | ☑ No<br/>☐ Yes.  Claim number on court claims registry (if known) _____          Filed on _____<br/>MM / DD / YYYY |
|---|---|

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br/>☐ Yes.  Who made the earlier filing? _____ |
|---|---|

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _____ 10,947,907.06

plus attorneys fees awarded as part of the Judgment, but not yet fixed - est. amt   3,480,000.00
anticipated total 14,427,000.00

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Judgment entered 11/10/2020, Section 43(a) of the Lanham Act, etc

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/27/2021
                   MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Osman | | Khan |
|---|---|---|---|
| | First name | Middle name | Last name |

Title   **Chief Financial Officer**

Company   **Vitamins Online, Inc.**
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   **1467 West 105 North**
Number        Street

**Orem**                    **UT**        **84057**
City                         State       ZIP Code

Contact phone   **800.476.3542**        Email   **osman@nutrigold.com**

---

# ATTACHMENT TO PROOF OF CLAIM
## OF
### VITAMINS ONLINE, INC.

**Item 1: Total Amount of Claim on Petition Date (December 4, 2020):**

| | |
|---|---|
| Principal Amount of Judgment | $9,551,232.00 |
| Pre-Judgment Interest at 2.13% (1/1/14 to 11/10/20) | $1,395,740.32 |
| Award of Attorneys' Fees, Costs & Expenses [$3,480,000±] | [not yet determined] |
| Judgment Amount as entered Nov. 10, 2020 | $10,946,972.32 (plus) |

attorneys' fees & costs "awarded"
but not yet formally determined [$3,480,000±]

| | |
|---|---|
| Post-Judgment Interest at 0.13% (11/10/20 to 12/4/2020) | $934.74 |
| **Total Amount as of Petition Date** | **$10,947,907.06** *(plus)* |

*attorneys' fees & costs "awarded"*
but not yet formally determined [$3,480,000±]

*Total Amount as of Petition Date including Attorneys' Fees:*  $14,427,907.06

**Item 2: Basis for Claim:**

On October 28, 2013, Vitamins Online, Inc. ("Vitamins Online" or "Creditor"), as plaintiff, filed a complaint against HeartWise, Inc. d/b/a NatureWise (the "Debtor" or "HeartWise"), as defendant, in the United States District Court for the District of Utah (the "Trial Court") alleging unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Utah common law for false advertising,[1] thereby commencing the civil action styled *Vitamins Online, Inc. v. HeartWise, Inc. d/b/a NatureWise*, Case No. 2:13-cv-00982-DAK (the "Utah Lawsuit").

The Utah Lawsuit continued for the next seven years. The Trial Court "held a bench trial … on July 16 – August 6, 2020."[2] On November 10, 2020, the Trial Court entered its Findings, and the Judgment. Based upon the substantial evidence introduced at trial, the Trial Court found "that [Vitamins Online] ha[d] met its burden in demonstrating that [the Debtor] violated Section 43(a) of the Lanham Act and Utah state common law."[3]

Without limitation, the Trial Court found: (a) that "NatureWise's actions were willful in that NatureWise and Doyle [as defined below] sought to intentionally deceive consumers;"[4] (b) that NatureWise and its agent "Doyle willfully made false representations with respect to the Products and artificially altered reviews in order to make NatureWise more profitable;"[5] and (c) that, "as a result of testing, NatureWise had knowledge that certain lots of the Products did not match their

---

[1] See *Findings of Fact and Conclusions of Law* entered November 10, 2020 in the Utah Lawsuit (the "Findings"), at 1. A true and correct copy of the Findings are attached hereto as **Exhibit 2**.

[2] Findings at 1.

[3] Findings at 1.

[4] Findings ¶ 39, at 43.

[5] Findings ¶ 39, at 43.

label claims, yet, even with that knowledge, NatureWise continued selling those products and never issued any recalls."[6]

The Trial Court also specifically found that the Debtor had engaged in substantial and inexcusable "discovery improprieties" including (a) spoilating evidence, without limitation intentionally deleting relevant videos and e-mails, (b) failing to produce requested documents, and (c) misrepresenting to the Trial Court the existence of relevant information.[7]

On November 10, 2020, based upon the substantial findings, including specific and detailed finding that the Debtor's unlawful actions were "willful," the Trial Court entered the Federal Judgment (as defined in footnote below) in favor of Vitamins Online and against the Debtor in the amount of $10,946,972.32,[8] plus an "award[ of Vitamins Online's] reasonable attorney fees and costs in th[e Utah Lawsuit]" in an amount not yet determined by the Trial Court.[9]

The Debtor filed the instant Case before the Trial Court could determine and liquidate the attorneys' fees, costs and expenses that were specifically "awarded" as part of the Federal Judgment.  Vitamins Online incurred, and anticipates that the Trial Court will award approximately $3,480,000.00±, including approximately (x) $3,263,221.00 in reasonable attorneys' fees, (y) $215,229.18 in necessary and reasonable expert witness costs, and (z) additional costs.

Accordingly, while the award of attorneys' fees, costs and expenses remains unliquidated, the Federal Judgment is not contingent, disputed or unliquidated.  Further, the fact that the Debtor filed a notice of appeal does not render the Federal Judgment non-final, contingent or disputed.

As explained by the Bankruptcy Appellate Panel for the Ninth Circuit:

> [Vitamin Online]'s claim in the instant case is not contingent just because the [J]udgment is on appeal…. [T]he Ninth Circuit has held that a judgment is final … even if it is on appeal.  Further, the actions giving rise to the liability, the instance of fraud and the resulting [J]udgment, both occurred pre-petition …. Additionally, the amount of the claim is not unliquidated because, as of the date of the filing of the chapter 11 case, it was easily subject to ready determination— the [Trial] Court had already determined the amount of the claim to be ["$9,551,232 in disgorged profits with simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014"].

---

[6]        Findings ¶ 39, at 43.

[7]        Findings ¶¶ 89-90, at 27-28; ¶¶ 1-2, at 29; ¶ 39, at 43.

[8]        A true and copy of the *Final Judgment* is attached as **Exhibit 1** (the "Judgment" or the "Federal Judgment").  The Judgment includes a principal award of "$9,551,232 in disgorged profits [plus] simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014" and continuing through November 10, 2020, which interest totals $1,395,740.32.  See Khan Decl. ¶¶ 6-8.

[9]        Judgment ("Plaintiff is further awarded its reasonable attorney fees and costs in this matter, to be determined post judgment").  The Debtor filed the instant Case before the Trial Court could determine and liquidate the attorneys' fees, costs and expenses awarded under the Judgment.  *See* Khan Decl. ¶ 10.

In re Audre, Inc., 216 B.R. 19, 30 (B.A.P. 9th Cir. 1997) (citations omitted) (affirming bankruptcy court's denial of motion to disallow or estimate claim predicated on California state court judgment).  Indeed, as the Court of Appeals for the Ninth Circuit has held – repeatedly:

> The federal rule on the preclusive effect of a judgment from which an appeal has been taken is that the pendency of an appeal does not suspend the operation of an otherwise final judgment for purposes of *res judicata.*

Eichman v. Fotomat Corp., 759 F.2d 1434, 1439 (9th Cir. 1985); see also United States v. Vandewater Int'l Inc., No. 2:17-CV-04393-RGK-KS, 2020 WL 5372352, at *2 (C.D. Cal. July 21, 2020) (quoting and following Eichman); Tripati v. Henman, 857 F.2d 1366, 1367 (9th Cir. 1988) ("The established rule in the federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal....") (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4433, at 308 (1981)); In re Imagine Fulfillment Servs., LLC, 489 B.R. 136, 149 (Bankr. C.D. Cal. 2013) ("A judgment establishing liability against a debtor, entered prepetition, is not a contingent debt"); In re Albano, 55 B.R. 363, 369 (N.D. Ill. 1985) ("a final order of a district court is not simply in limbo until affirmed by the court of appeals")

## Item 7:  Supporting Documents

*Final Judgment* entered November 10, 2020, attached as **Exhibit 1**

*Findings of Fact and Conclusions of Law* entered November 10, 2020, attached as **Exhibit 2**

# Exhibit 1

# THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VITAMINS ONLINE, INC.,** a Delaware corporation, | |
| **Plaintiff,** | **FINAL JUDGMENT** |
| v. | |
| **HEARTWISE, INC.** an Oregon corporation d/b/a **NATUREWISE,** | **Case No.: 2:13-cv-00982-DAK** |
| **Defendant.** | **Judge Dale A. Kimball** |

This action came before the court for a bench trial. Pursuant to Federal Rule of Civil Procedure 58 and the court's Findings of Fact and Conclusions of Law entered November 10, 2020 [ECF No. 585], and with there being no other issues before the court, the court enters judgment in favor of Plaintiff and against Defendant in the amount of $9,551,232 in disgorged profits with simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014. Plaintiff is further awarded its reasonable attorney fees and costs in this matter, to be determined post judgment. This action is now closed.

DATED this 10th day of November, 2020.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Court

# Exhibit 2

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VITAMINS ONLINE, INC., a Delaware corporation,** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **Plaintiff,** | |
| **v.** | |
| **HEARTWISE, INC. an Oregon corporation d/b/a NATUREWISE,** | **Case No.: 2:13-cv-00982-DAK** |
| **Defendant.** | **Judge Dale A. Kimball** |

On October 28, 2013, Plaintiff filed a complaint against Defendant in this court alleging unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Utah common law for false advertising. The Complaint alleged false advertising based on two types of conduct: (1) manipulating Amazon.com's ("Amazon") customer review system ("Review Claims"); and (2) falsely advertising and misrepresenting the content and characteristics of its green coffee and garcinia cambogia products ("Ingredients Claims").

The court held a bench trial in this matter on July 16 – August 6, 2020. Plaintiff was represented by James E. Magleby, Yevgen Kovalov, Edgar R. Cataxinos, and Geoffrey Kris Biehn. Defendant was represented by R. Joseph Trojan, Francis Wong, Kevin R. Davis, and Dylan C. Dang. Throughout the trial, the court heard the testimony of witnesses and received exhibits by the parties into evidence. At the close of Plaintiff's case in chief, Defendant moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).

The court now issues the following Findings of Fact and Conclusions of Law, finding that Plaintiff has met its burden in demonstrating that Defendant violated Section 43(a) of the

Lanham Act and Utah state common law. In conjunction thereto, the court denies Defendant's

Rule 52(c) motion.

## FINDINGS OF FACTS[1]

    1.    Vitamins Online, Inc. ("Vitamins Online") is a Utah-based retailer that distributes

supplements under the brand name NutriGold. Tr. 66-67 (Khan). Osman Khan ("Khan") and

Sripriya Rangarajan ("Rangarajan") are the co-founders of Vitamins Online and NutriGold. Tr.

70. Khan is the Chief Financial Officer of Vitamins Online. Stip. Fact 3. Vitamins Online

launched its brand of supplements under the NutriGold brand in 2010. Tr. 70. Prior to that time,

Khan and Rangarajan invested considerable time and resources to identify options to make

products without the excipients (e.g. magnesium stearate, silicon dioxide) commonly found in

dietary supplements. Tr. 70. It took Vitamins Online approximately one year of preparation and

an additional year to launch its first NutriGold product. Tr. 70. Khan testified at trial, and the

court finds that he was a credible, reliable witness.

    2.    HeartWise, Inc d/b/a NatureWise ("NatureWise") is an Oregon Corporation that

sells dietary supplements on Amazon under the brand name NatureWise. NatureWise was

---

[1] The court enters these findings of fact based on a preponderance of the evidence. In assessing the credibility of the witnesses, the court has considered the source and basis of each witness's knowledge; the ability of each witness to observe; the strength of each witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial.

    In addition, the court will provide citations to the record in the following manner: references to the uncontroverted facts submitted by the parties and adopted by the court in its July 7, 2020 Pretrial Order (ECF No. 535) are abbreviated as "Stip. Fact [X]"; references to the hearing transcript are abbreviated as "Tr. [page]"; and references to exhibits admitted at trial are abbreviated as "Ex. [X]." In addition, although, in the Pretrial Order, Plaintiff does not set forth any uncontroverted facts and contests virtually every fact set out by Defendant, Plaintiff acknowledges that it does not contest "simple facts relating to the entities and the role by the principals of each entity." (*Id.*) Accordingly, the court's citation to the Pretrial Order will be limited to these "simple facts."

2

incorporated in May of 2012. Tr. 419-420; Ex. 5144.001. DavidPaul Doyle ("Doyle") is

NatureWise's founder and Chief Brand Officer. Stip. Facts 4-6. In 2018, Tom Nguyen of

Robinson Pharma became NatureWise's Chief Executive Officer following his investment in the

company. Tr. 423-424. Doyle currently owns 49% of NatureWise and has no active role in its

management or daily operations. Tr. 424. Doyle testified at trial. The court finds that he was

not a credible witness, and his testimony was unreliable.[2]

### I.    Ingredients Claims

#### A.    NutriGold's Garcinia Cambogia Gold

3.       Vitamins Online first launched its NutriGold Garcinia Cambogia Gold

supplement ("NutriGold Garcinia") in 2011. Tr. 106. Garcinia cambogia is a fruit that contains

hydroxycitric acid ("HCA"). Tr. 106. NutriGold Garcinia contained the clinically proven,

multi-patented SuperCitrimax garcinia cambogia ingredient supplied by the company InterHealth

(now Lonza). Tr. 107-108; Tr. 114-115; Ex. 3. SuperCitrimax is a patented form of HCA from

garcinia cambogia bound to calcium and potassium. Tr. 114-115; Ex. 3. SuperCitrimax

provides 60% calcium/potassium salt HCA and is clinically proven to curb appetite, burn fat, and

reduce body weight. Tr. 114-115; Ex. 3. Generic garcinia cambogia does not have the same

clinical support as SuperCitrimax because the generic is not bound to the patented ratio of the

calcium/potassium salt. Tr. 117. SuperCitrimax is significantly more expensive than generic

extracts because it is proven to be effective and provides a competitive advantage in the

marketplace. Tr. 119.

---

[2] The issues surrounding Doyle's credibility are demonstrated and detailed through the
findings below.

4.      Prior to the middle of 2013, there were a few other competitors on Amazon that were offering garcinia cambogia products, and some contained SuperCitrimax.  Tr. 123-24.  However, by mid-2013, Vitamins Online was the only seller of SuperCitrimax garcinia cambogia on Amazon.  Tr. 123-24.  Vitamins Online advertised its NutriGold Garcinia product on Amazon as containing SuperCitrimax and 60% HCA.  Tr. 110-19; Tr. 114-15; Ex. 3.  Vitamins Online heavily advertised that its product contained SuperCitrimax because it was backed by clinical studies.  Tr. 119.

5.      The TV personality Dr. Mehmet Oz, known as "Dr. Oz," aired a television show on October 1, 2012, in which he promoted the benefits of garcinia cambogia.  Ex. 55, 104.  That show featured Dr. Harry Preuss, the chief researcher for the SuperCitrimax ingredient in several studies.  Tr. 207-10; Exs. 104, 105, and 56.  In the episode, Dr. Oz gave specific buying guidelines to help customers purchase the right product—garcinia cambogia extract with at least 50% HCA and potassium or calcium/potassium.  Tr. 211; Ex. 56.1.  He also emphasized that the dosage needed to be high.  Tr. 211; Ex. 56.1.  Dr. Oz's show on garcinia cambogia increased Vitamins Online's sales substantially.  Tr. 212-13.  In order to meet that demand, NutriGold had a supply agreement with InterHealth that guaranteed an uninterrupted supply of SuperCitrimax. Tr. 216-17; Ex. 607.

6.      Vitamins Online spent millions advertising its NutriGold Garcinia and placed particular emphasis on the SuperCitrimax ingredient.  Tr. 152-57; Ex. 611.1.

**B.     NutriGold's Svetol Green Coffee Gold**

7.      In 2012, Vitamins Online launched a green coffee product with Svetol ("NutriGold Green Coffee") (collectively, with NutriGold Garcinia, the "NutriGold Products"), a chlorogenic acid product produced by the company Naturex.  Tr. 137.  Svetol is approximately four or five times more expensive than generic green coffee bean extract.  Tr. 142-43, 145.

4

Despite its higher price, Vitamins Online chose to produce a green coffee product containing Svetol because it was backed by clinical studies. Tr. 137-39. The studies relied upon by Vitamins Online demonstrated that the amount of the active ingredient of the green coffee is critical, as a product with less than the amount used in the study may not provide the same benefit. Tr. 141-42; Ex. 634.3. Importantly, Svetol was the only green coffee extract that was clinically proven to provide a weight-loss benefit. Tr. 143-44. Therefore, on its Amazon product page, Vitamins Online advertised NutriGold Green Coffee as the only product that contained 400 milligrams, the dosage used in the clinical studies, of Svetol Green Coffee extract per capsule. Tr. 146; Ex. 380.2. Vitamins Online spent millions advertising its NutriGold Green Coffee and placed particular emphasis on the Svetol ingredient. Tr. 152-57; Ex. 611.1.

8.      Dr. Oz aired a television show on March 1, 2012 promoting the benefits of green coffee. Tr. 157; Ex. 5. Sales of Vitamins Online's NutriGold Green Coffee spiked after the episode. Tr. 159. In late 2012, Dr. Oz aired a second episode on green coffee, offering buying guidelines for green coffee bean extract products. Tr. 199, 872; Exs. 41-42. In the second show, Dr. Oz told viewers to look for Svetol or GCA; products that had at least 45% chlorogenic acid; products dosages of 400 mg, 3x per day; and explained that a 30-day supply costs approximately $30. Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2. He also warned consumers to not be duped by the word "pure." Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2. In addition, Dr. Oz recommended purchasing products with no fillers and no artificial ingredients. Tr. 996; Ex. 56.

9.      Following the second Dr. Oz show, sales of NutriGold Green Coffee increased significantly because the product matched Dr. Oz's requirements. Tr. 206. Eventually, NutriGold Green Coffee obtained a #1 ranking on the Amazon Best Sellers list. Tr. 160-61.

### C. NatureWise's Products

10.    When Doyle launched NatureWise, he had no experience with supplements or the

supplement industry.  Tr. 425.  He did, however, have experience in selling spiritual books on

Amazon.  Tr. 418-19.  To transition from book sales to supplements on Amazon, Doyle watched

a few videos on the internet and looked for a supplier.  Tr. 430.  In addition, he conducted

research and discovered green coffee bean extract was the top seller in the health and personal

care category on Amazon.  Tr. 425.  Accordingly, NatureWise's first product was a green coffee

product.  Tr. 427.

11.    From approximately 2012 to the end of 2013, NatureWise launched six products–

Green Coffee Bean Extract 800; Svetol with GCA; Garcinia Cambogia; Krill Oil; Ubiquinol; and

Vitamin D.  Tr. 427-28.

12.    NatureWise launched the following products on the following dates: the first

green coffee product (Amazon Standard Identification Number ("ASIN") B009VUZJTM)

launched in July of 2012; the second green coffee product launched in October 2012 (ASIN

B009aH4OR4); the first garcinia product launched in January 2013 (ASIN B00B5H5BHA); the

second garcinia product launched in August 2015 (ASIN B01HRHBNJK).  Tr. 429; Ex. 701.1.

#### 1.    NatureWise's Green Coffee

13.    NatureWise launched its first green coffee product in the summer of 2012 as a

result of high consumer demand.  Tr. 420, 433.  That product was called NatureWise Green

Coffee Bean Extract 800 (the "First Green Coffee").  Tr. 427.  NatureWise used Private Label

Nutraceuticals ("PLN") as its contract manufacturer.  Tr. 859-61; Ex. 50.20.  NatureWise's first

purchase from PLN occurred in June 2012, and NatureWise continued purchasing product from

PLN thereafter.  Tr. 859-63; Ex. 50.20-30.  At the start, NatureWise purchased generic green

coffee from PLN and merely asked PLN to include higher quality ingredients without giving

<div align="center">6</div>

specifications. Tr. 857. Furthermore, in its purchase orders, NatureWise did not specify any

percentage of chlorogenic acid that the end product should contain. Tr. 859-863; Ex. 50.21-30.

Similarly, NatureWise's label for the First Green Coffee did not specify the percentage of

chlorogenic acid that it contained. Tr. 863; Exs. 5025.17-18, 5024.15.

14.     Nevertheless, NatureWise advertised the First Green Coffee as containing 50%

chlorogenic acid on Amazon. Tr. 862-64; Ex. 102.1. Likewise, NatureWise advertised it as

having optimum levels of chlorogenic acid. Tr. 867-68; Ex. 1021.1. But NatureWise did not test

the First Green Coffee to determine the actual percentage of chlorogenic acid that it contained.

Tr. 872. NatureWise did not begin performing such tests until March 2013, at the earliest. Tr.

889; 5144.1.

15.     NatureWise also referenced a 2012 study involving Green Coffee Antioxidants

("GCA") to sell the First Green Coffee even though that product did not contain GCA. Tr. 871;

Ex. 1021.1. NatureWise understood that the study was conducted using a dosage of at least 350

milligrams of GCA twice a day. Tr. 893. In referencing the study, NatureWise advertised that

the First Green Coffee contained "Clinically Proven GCA" on the front of the bottle. Tr. 891-92;

Ex. 22.

16.     In the fall of 2012, following the second Dr. Oz episode on green coffee,

NatureWise changed the title of the First Green Coffee to Green Coffee Bean Extract 800 with

GCA. Tr. 875-76; Ex. 5025.1-4. NatureWise continued representing that it contained 50%

chlorogenic acid on Amazon and that its ingredients corresponded with the GCA study. Tr. 882-

83; Ex. 1021.1. However, the product only contained approximately 5 milligrams of GCA. Tr.

877-78; Ex. 50.2. Doyle knew that the product contained a minimal amount of GCA—an

amount that failed to match the dosage used in the GCA study. Tr. 878.

7

17.     Reviewers on Amazon believed that the First Green Coffee contained the proper amounts of GCA and relied on NatureWise's representations.  Tr. 971; Exs. 572A.1, 572A.2.

18.     At some point in late 2012, Amazon removed the phrase "chlorogenic acid" from the First Green Coffee's product page because it wanted proof that the claim was accurate.  Tr. 883.  After Amazon removed the phrase, Doyle informed Amazon that it had 50% chlorogenic acid.  Tr. 884-85; Ex. 86.  Yet, in a November 2012 email to PLN, Doyle admitted that he did not know how many milligrams of green coffee were in the First Green Coffee.  Tr. 880-81; Harden Dep. 53-57; Ex. 669.51-669.55.  Because he could not verify the amount of chlorogenic acid in the First Green Coffee, Doyle asked Amazon to change the listing name to "Green Coffee Bean Extract 800 – 100% Pure All Natural Weight Loss Supplement for All Body Types.  Chlorogenic Acid.  800mg.  60 Caps."  Tr. 887; 86.1.

19.     Because NatureWise was not conducting tests on the First Green Coffee until March 2013, at the earliest, NatureWise did not know how much chlorogenic acid it contained.  Tr. 889-90; Ex. 5144.1.

20.     Around January 2013, NatureWise purportedly increased the amount of GCA in the First Green Coffee to 20 milligrams—an amount still well below the amount used in the GCA study that NatureWise referenced on Amazon.  Tr. 895; Ex. 50.13.  Yet, NatureWise advertised that the First Green Coffee contained clinically proven GCA on its labels.  Tr. 891-92; Ex. 8.1, 22.1.

21.     In March 2013, Doyle began testing his products.  Tr. 951; Ex. 124.  The test results indicated that some lots of NatureWise's First Green Coffee did not match their label claims.  Tr. 947, 951; Exs. 123.1, 124.  However, NatureWise continued selling the First Green Coffee and did not recall any lots.  Tr. 950; Ex. 123.1.

22.     Eventually, NatureWise purportedly increased the amount of GCA in the First

Green Coffee to 350 milligrams—the same dosage as used in the GCA study.  Tr. 904.

However, around that time, Doyle learned that the GCA study was seriously flawed.  Tr. 984-86,

993; Ex. 341.  But NatureWise continued advertising the First Green Coffee as being clinically

proven. Tr. 906.  The study was officially retracted in October 2014.  Tr. 990; Ex. 1001.1.

23.     Along with the First Green Coffee, in October 2012, NatureWise started

advertising a second green coffee product called Svetol Green Coffee Bean Extract UltraPure

with GCA (the "Second Green Coffee" and, collectively with the First Green Coffee, the "Green

Coffees").  Tr. 909; Ex. 701.1.  The Second Green Coffee contained 300 milligrams of a

proprietary blend of generic green coffee extract and GCA and 133 milligrams of Svetol.  Tr.

912; Ex. 57.4.  NatureWise advertised Svetol and GCA prominently on its bottle and packaging.

Tr. 913; Exs. 24.1, 25.1.

24.     In March 2013, Doyle learned from Naturex that the Second Green Coffee did not

meet its label claims.  Tr. 919, 930-31; Ex. 115.1.  Naturex explained that it had tested samples

provided by NatureWise, and those samples contained much less chlorogenic acid than was

advertised on the label.  Ex. 115.1.  Consequently, Naturex demanded that NatureWise recall all

of the non-conforming units.  Tr. 931; Ex. 115.2.  In addition, Naturex demanded that

NatureWise notify customers who had purchased non-conforming units that the product they

purchased did not meet its label claims.  Tr. 931; Ex. 115.2.  Although NatureWise had the

capability of doing so, Doyle does not remember ever contacting customers as requested by

Naturex.  Tr. 933-34.

25.     Notwithstanding Naturex's request to recall the Second Green Coffee units that

did not match their label claims, NatureWise continued selling them.  Tr. 944, 955, 961; Ex.

9

131.1.  Further, NatureWise intentionally sold as many bottles as it could before the deadline that

Naturex had imposed to recall the non-conforming product.  Tr. 944, 955, 961; Ex. 131.1.

NatureWise only ceased selling the non-conforming Second Green Coffee because Doyle was

worried about getting in trouble with Naturex for selling beyond the deadline.  Tr. 956-57; Ex.

131.2.

26.    On June 28, 2013, Naturex informed NatureWise once again that the Second

Green Coffee still did not conform to its label claim.  Tr. 964-65; Exhibit 1016.  Specifically,

NatureWise advertised the Second Green Coffee as being vegetarian, but Naturex determined

that claim was not true.  Tr. 964-65; Exhibit 1016.  As a result, Naturex terminated its licensing

agreement with NatureWise in June 2013.  Tr. 965-67, 969-70.

### 2.    NatureWise's Garcinia Cambogia

27.    NatureWise launched its first garcinia cambogia product (the "First Garcinia") in

January 2013.  Tr. 429; Ex. 701.1.  It began shipping the First Garcinia by at least June 2013.  Tr.

254-55, 1004; Ex. 108.1.  The First Garcinia used generic garcinia cambogia ingredients.  Tr.

1001.  It did not have SuperCitrimax.  Tr. 1000-01.

28.    When launching the First Garcinia, Doyle was keenly aware of NutriGold.  Tr.

1010.  Doyle relied on NutriGold Garcinia's product information on Amazon to develop the

claims for the First Garcinia.  Tr. 1010-11; Ex. 106.  Doyle wanted to sell SuperCitrimax because

NutriGold was selling it.  Tr. 1015; Ex. 95.

29.    Although the First Garcinia did not contain SuperCitrimax, NatureWise

referenced SuperCitrimax on its Amazon product page and included the SuperCitrimax logo on

the First Garcinia's label.  Tr. 1004-05; Ex. 108.  NatureWise further advertised the First

Garcinia as being clinically proven and having a patented form of 60% HCA bound to calcium

and potassium on the First Garcinia's label, box, and Amazon product page.  Tr. 1006-07, 1032,

10

1035-36; Exs. 108-108.1; 83-84, 375-76.  This was a direct reference to SuperCitrimax because

such claims were patented by and proprietary to SuperCitrimax.  Tr. 114-15; Ex. 3.  NatureWise

also advertised that the First Garcinia contained "100% Pure SuperCitrimax."  Tr. 1021, 1037;

Ex. 83-84, 375-76.  NatureWise did this, and continued doing this for a period of time, even

though it was not authorized by InterHealth to sell SuperCitrimax and even though Doyle knew

that NatureWise was unable to obtain a licensing agreement for SuperCitrimax.  Tr. 1018, 1021;

Ex. 375.  NatureWise eventually stopped advertising SuperCitrimax in the First Garcinia, but it

is unclear when that advertising actually ceased.  Tr. 1016.

   30. The First Garcinia reached the number one spot on Amazon within two months

after launch.  Tr. 1031; Ex. 146.  During that time, NatureWise sold 74,000 bottles of the First

Garcinia and generated approximately $2 million in revenue.  Tr. 1031; Ex. 146.

   31. In December 2013, NatureWise hired a consultant, AIBMR, to review

NatureWise's advertising claims on the First Garcinia.  Tr. 104.  After conducting its review,

AIBMR determined and informed NatureWise that many of the claims it was making regarding

the First Garcinia were neither legitimate nor substantiated.  Tr. 1046-47, 1054; Exs. 240, 356.

This was especially true with respect to the claims explicitly and implicitly referring to

SuperCitrimax given that the First Garcinia did not contain SuperCitrimax, and therefore lacked

its patented and proprietary elements.  Tr. 1046-47, 1054; Exs. 240, 356.  AIBMR recommended

that NatureWise stop making weight-loss and appetite suppressant claims given that the First

Garcinia was generic garcinia cambogia, and NatureWise was making claims unique to

SuperCitrimax.  Tr. 1041; Ex. 356.

   32. Notwithstanding AIBMR's recommendation, NatureWise continued to make

weight-loss and appetite suppressions claims.  Tr. 1044, 1050-51; Ex. 356.  AIBMR also

recommended that NatureWise remove references to various clinical studies because, after
performing the necessary research, AIBMR was unable to locate such studies.  Tr. 1878-79,
1886; Ex. 245

33.    Notably, NatureWise did not sell a garcinia cambogia product with SuperCitrimax
until it launched a second garcinia cambogia product in August 2015 (the "Second Garcinia,"
collectively with the First Garcinia, the "Garcinias").  Tr. 1093-94; Ex. 701.1.

### D.    Production and Manufacturing of the Green Coffees and the First Garcinia

34.    As stated above, NatureWise used PLN as its first contract manufacturer.  Tr.
859-61; Ex. 50.20.  However, at some point in 2013, Doyle learned that PLN was not actually a
contract manufacturer.  Tr. 957-58.  Instead, PLN was a mere intermediary that was purchasing
products from actual contract manufacturers.  Tr. 956-60.  As such, for much of the time in 2012
and 2013, NatureWise did not know who was manufacturing the Green Coffees and the First
Garcinia.  Tr. 1766.  Eventually, NatureWise learned that a contract manufacturer named
Metaugus was producing its products.  Tr. 114; Ex. 511.  Notably, Metaugus received an FDA
warning letter on May 22, 2013, for violating laws that regulate supplement production.  Tr. 114;
Ex. 511.

35.    In October 2013, NatureWise stopped using PLN and began using DNE
Nutraceuticals ("DNE") as its contract manufacturer.  Tr. 859-61, 981; Exs. 50.20, 298.1.  Like
Metaugus, DNE received a warning letter from the FDA in August 2013 for reasons similar to
Metaugus.  Tr. 1770; Ex. 512.

36.    Even though NatureWise was unaware for much of 2012 and 2013 as to who was
actually manufacturing its products, NatureWise made the following claims regarding the Green
Coffees and the First Garcinia:

12

(a)    That each ingredient that NatureWise used was verified for purity through in-house laboratory testing, Tr. 868-69, 2257; Exs. 386.2;1021.1;

(b)    That NatureWise had implemented a strict set of FDA compliant manufacturing procedures to ensure product integrity, including daily inspections of all storage, blending and production areas, Tr. 2258-59; Ex. 386.2; and

(c)    That NatureWise's facilities were regularly inspected by FDA officials to maintain their certifications, Tr. 2260-61; Ex. 386.2.

37.    Although NatureWise eventually figured out who was manufacturing its products, it failed to maintain necessary documentation demonstrating and detailing how the Green Coffees and the Garcinias were made (collectively, the "Products"). Tr. 1737, 1890, 1976. For example, NatureWise represented in July 2015 that, despite being in business and selling its products since 2012, it did not have Standard Operating Procedures ("SOPs") and that it was in the process of developing product specification sheets. Tr. 1131, 1774. Despite NatureWise's representation, it never produced any SOPs in this case. Tr. 1737.

38.    NatureWise also failed to track which label or labels it used for each lot/batch of the Products. Tr. 845-46; Ex. 401.6. Indeed, NatureWise did not maintain any specific data relating to specific labeling for specific lots of the Products. Tr. 1125-26; Ex. 408.3. Consequently, during discovery, NatureWise represented that it:

(a)    Could not identify the specific label or labels that it used on bottles for each lot/batch of the Products that it produced, Tr. 845-46; Ex. 401.6;

(b)    Lacked the ability to know which labels were used at which times, or which label revisions were used on final products, Tr. 847; Ex. 401.8-9.

(c)     Lacked the information as to the period during which products containing

each lot/batch were sold, Tr. 847; Ex. 401.6-7; and

(d)     Could not identify which label claims were made on specific dates, Tr.

877.

39.     Nevertheless, immediately before trial, NatureWise produced some photographs

of labels next to lot numbers.  Tr. 1127-28; Exs. 5025.1, 5024.-4; 5022.1-4.

### E.     NatureWise Product Testing

40.     Vitamins Online presented testimony from an expert in analytical supplement

testing, Dr. Norman Howe, Ph.D. ("Dr. Howe").  The Court finds that Dr. Howe was qualified

and credible and that his testimony was based on sufficient facts and data and the product of

reliable scientific principles and methods.  Tr. 1733-34.  Mollie Kober ("Kober") testified at trial

for the purpose of rebutting Dr. Howe's testimony.  While the court finds that Kober's testimony

was credible, she failed to rebut Dr. Howe's testimony that certain lots of the Products did not

meet their label claims.

41.     Dr. Howe compared test results against label claims because NatureWise never

produced SOPs, and label claims were the best information available in the absence of such

specifications.  Tr. 1866.

42.     A certificate of analysis ("COA") is a written document that includes finished

product specifications, test method for each specification, the results of testing to verify that each

specification has been met, and the signature of the analyst.  Tr. 1787.  Finished product

specifications are extremely important in the dietary supplement industry.  Tr. 1774.

43.     For example, if a company claims that it has a "quality" product, it must first

define what "quality" is for that product.  Tr. 1774.  The way that a company does that is through

14

a specification sheet. Tr. 1774. Specifications define product quality in clear, measurable terms. Tr. 1801.

44.     The parties used the following laboratories to perform tests and provide COAs for the Products: Eurofins, Tr. 1249; Advanced Laboratories, Tr. 2503; Covance, Tr. 2457; San Rafael, Tr. 2447; Atlas Biosciences, Tr. 2425; and Intertek, Ex. 5083.

45.     The testing results from the foregoing laboratories produced conflicting results. Tr. 1779, 1872; Exs. 144, 372, 650, 668, 5083. Some results demonstrated that the Products met their label claims while other results demonstrated that they did not. Tr. 1896; Ex. 5083.

46.     The following list details advertising claims made by NatureWise and corresponding test results demonstrating that those advertising claims were false and/or inaccurate:

(a)     Labels for the Garcinias claimed 60 milligrams of potassium, but testing demonstrated that certain lots had far less, Tr. 1059-63, 1871-72, 1859; Exs. 167.1, 181, 187, 188, 193, 372.107, 650, 668;

(b)     The Garcinias claimed 60% HCA, but testing demonstrated that certain lots had less than 60%, Tr. 1095; Ex. 159;

(c)     The Garcinias claimed 300 milligrams of HCA on their labels, but testing demonstrated that certain lots contained far less, Tr. 1856-57; Exs. 372.67, 372.69, 372.203,

(d)     The Garcinias claimed certain amounts of garcinia cambogia extract, but testing demonstrated that certain lots did not match those claims, Ex. 372;

(e)     Labels on the Garcinias advertised that they were 100% pure and had no fillers, binders, or artificial ingredients, but testing demonstrated that certain lots

15

contained excipients, binders, fillers, and/or artificial ingredients, Tr. 1857-58, 1871,

1875, 2349; Exs. 372, 372.69, 372.128, 372.177, 650, 5019.5;

(f)     Labels on the Garcinias advertised that they were vegetarian capsules, but

testing demonstrated that certain lots contained protein and gelatin from animal sources,

Tr. 1076-77, 1858, 1870; Exs. 161, 161.3, 168.1, 370.205, 370.206, 650, 668;

(g)     The Green Coffees claimed certain amounts of green coffee extract, but

testing demonstrated that certain lots did not match those claims, Ex. 372;

(h)     NatureWise advertised the Green Coffees as being vegetarian, but various

lots of the Green Coffees tested positive for gelatin from animal sources, Tr. 1077-77;

Exs. 168.1, 161, 161.3;

(i)     Certain lots of the Green Coffees advertised 400 milligrams of chlorogenic

acids on the labels, but testing demonstrated that some of those lots contained far less, Tr.

1853-54; Exs. 372.8, 372.10, 372.22, 372.28, 521; and

(j)     Labels on the Green Coffees advertised that they were 100% pure and had

no fillers, binders, or artificial ingredients, but testing demonstrated that certain lots

contained excipients, binders, fillers, and/or artificial ingredients.  Tr. 1860-62; Exs. 372.

123, 372.126, 372.130, 372.135, 372.152.

47.     The foregoing claims were material to consumers.  Tr. 850-51, 873-74, 877, 899,

909, 913-14, 922-23, 996, 999, 1007, 1034; Ex. 304A.

48.     Importantly, Doyle was aware that certain lots of the Products did not match their

label claims.  Tr. 920-21, 945, 981-982, 1107-08, 1115-16, 1119-20; Exs. 111, 112, 112.1, 150,

150.2, 298.1.  Yet, even with that knowledge, NatureWise continued selling and distributing the

Products without issuing any recalls.  Tr. 1783; Ex. 111.

49.     Moreover, even though Doyle know there were test results indicating that certain lots of the Products did not meet their label claims, NatureWise represented to a third-party auditor that none of its products had ever tested out of specification.  Tr. 2270, 2275; Exs. 124, 372.

## II.     Review Claims

### A.     Amazon

50.     An Amazon product page is comprised of product photos, a product title, product features, and a section for more detailed product features.  Tr. 85-86; Ex. 1.3.  The seller of the product controls the content of these four areas.  Tr. 87; Ex. 1.3.  Amazon provides a platform on the backend for third-party sellers to manage orders and customer communications.  Tr. 89.  Through this platform, the seller can input the product information manually, or use an excel file so Amazon can auto-populate these fields.  Tr. 89.  A seller can update the page at any time through these two methods.  Tr. 89-90.  Once updated, the information appears within one or two days.  Tr. 89-90.

51.     One component of the product page is a mini scoreboard that reflects the number of reviews and the average rating of the product indicated by stars.  The mini scoreboard is automatically updated by Amazon.  Tr. 90, 98; Ex. 1.3.  Each product on Amazon is given an ASIN.  Tr. 90-91.

52.     The "Best Seller" rank on Amazon reflects a ranking by category of the best-selling products and provides information on a product's position at a particular point in time within that product category.  This section is updated automatically by Amazon.  Tr. 92-93; Ex. 1.3.  Appearing in the top one or two results on Amazon's Best Seller list offers a competitive advantage over those products listed below.  Tr. 184-85.

17

53.    Other components on a product page include the customer reviews section, the

aggregate statistics of all reviews, the most helpful customer reviews, content of reviews, and

comments on reviews.  Tr. 94-99, Ex. 1.3.  In addition, Amazon tracks what customers view in

relation to a product page and uses this information to provide consumers with direct and side-

by-side comparisons to similar items.  Tr. 98-99; Ex. 374.2.

54.    There are two types of reviews on Amazon product pages: verified and unverified

reviews.  Tr. 93-94; Ex. 1.3.  To obtain a verified review, the reviewer must purchase the product

without a discount.  Tr. 93-94; Ex. 1.3.  The verified review badge is automated by Amazon and

determined purely based on whether the non-discounted purchase occurred.  Tr. 93-94; Ex. 1.3.

To leave an unverified review, any Amazon account holder can log in and leave a review.  Tr.

94-95; Ex. 1.3.  The name associated with the Amazon account appears on each review.  Only

one review for each product can be posted from a single Amazon account.  Tr. 96; Ex. 1.3.

Amazon account holders can vote up or down reviews to indicate a review's helpfulness, and

account holders can vote up or down multiple reviews on one product page.  Tr. 102-03.  When

leaving a review, an Amazon account holder selects the number of stars, from 1 to 5 stars, as a

ranking of the product.  Tr. 102-103; Ex. 1.3.  When a new review is posted, the input

immediately changes the product's score rating—adding to the total number of reviews, the total

number of star rankings and the average star ranking.  Tr. 97-98; Ex. 1.3.

55.    Another section on each Amazon product page is titled, "Most Helpful Customer

Reviews."  Tr. 99-100; Ex. 1.5.  In this section, the most helpful reviews are prominently

displayed.  Tr. 99-100; Ex. 1.5.  Such reviews may be positive or negative and are determined by

the number of "helpful" or "up" votes from customers.  Tr. 99-100; Ex. 1.5.  The device by

which a review is voted up or down is a button asking whether the review is helpful or not, and

only those with an Amazon account can vote up or down on a review a single time.  Tr. 102-03;

Ex. 1.3.  The reviews with the most helpfulness votes appear at the top of the first page of

reviews.  Tr. 100; Ex. 1.5.  Conversely, the reviews voted least helpful are bumped down to later

pages.  Tr. 101; Ex. 1.5.  Notably, only approximately ten reviews appear on each page, and most

consumers do not read beyond the first set of reviews.  Tr. 101-02; Ex. 1.5.

56.     Reviews are important to consumers. Tr. 483.  In particular, the number of

positive reviews is important to the buying decision of many customers.  Tr. 485; Ex. 669.259.

Customers also generally care about star ratings.  Tr. 488.

57.     Good reviews are a factor in search results, and reviews are a factor in increased

sales.  Tr. 759-760.

58.     In order to monitor reviews and ensure that reviews are legitimate, Amazon has

an anti-manipulation policy for reviews.  Tr. 639-41.  That policy provides that "[a]ny attempt to

manipulate reviews, including by directly or indirectly contributing false, misleading or authentic

content, is strictly prohibited."  Tr. 640; Ex. 416.1; Malley-Naslund Dep. 59-60, Ex. 669.378-

669.379.

### B.     Importance of Amazon Reviews to Consumers

59.     Vitamins Online presented testimony from a marketing and consumer survey

expert, Michael Belch, Ph.D. ("Dr. Belch"), regarding the importance of online reviews to

consumers.  Tr. 1268-80.  The Court finds that Dr. Belch was qualified and credible.

60.     There is very extensive and consistent literature that online reviews are an

important part of almost all online purchasing decisions.  Tr.  1270, 1310.  The literature

indicates that consumers use, rely upon, and trust online reviews in making purchasing decisions.

Tr. 1270, 1351.

61.     More specifically, Amazon customers use and rely upon the website's online reviews when making purchasing decisions.  Tr. 1268-80.  Reviews on Amazon are very important to customers.  Tr. 483; Ex. 235.  The number of positive reviews that any given product has on Amazon is also important to and influential for customers.  Tr. 485-87; Ex. 333. The number of reviews has an impact on sales.  Tr. 487.  Sellers on Amazon stand to gain financially from each positive review on their product pages.  Tr. 513.

62.     Similarly, customers care about products' star ratings.  Tr. 491; Ex. 334.  Even slight differences in star ratings can lead to much higher sales for higher rated products.  Tr. 491.

### C.     NatureWise's Reviews

63.     Doyle believed that Amazon reviews were critical to NatureWise's success.  Tr. 475-76.  Doyle also believed that reviews would have a direct effect on NatureWise's sales.  Tr. 586.

64.     Prior to the launch of the First Green Coffee, in May 2012, Doyle knew that customers had the capacity to post dishonest reviews on products that they had never received. Tr. 577-78.  NatureWise launched the First Green Coffee in mid-to-late July 2012.  Tr. 420, 433. Nevertheless, the First Green Coffee began receiving product reviews prior to its actual launch. Tr. 436-37, 504-05; Ex. 571.  For example, the following reviews were posted on the First Green Coffee's Amazon product page prior to its launch:

(a)     A review stating that the customer had been taking the First Green Coffee for a couple of weeks, Tr. 498-99, 501; Exs. 571, 571D.1;

(b)     A review giving the First Green Coffee five stars and claiming that the customer had been taking the product for months, Tr. 504-05; Ex. 571;

(c)     A review explaining that the customer was seeing results of losing one pound every two weeks, Tr. 503-04; Exs. 571, 571D.3;

20

(d)     A review stating that the customer had lost eighteen pounds in the prior

eighteen weeks, Tr. 504; Exs. 571, 571D.3;

(e)     A review referring to the specific milligrams being advertised by

NatureWise and claiming to have been taking 800 milligrams as prescribed, twice per

day, Tr. 505-06; Exs. 571, 571D.4;

(f)     A review explaining that the customer had been taking the product for

approximately three weeks, Tr. 509; Exs. 571, 571D.8;

(g)     A review wherein the customer claimed that his spouse had lost eleven

pounds over the prior three months, Tr. 509-10; Exs. 571, 571D.1;

(h)     A review stating that the customer had been taking the product for four

weeks, Tr. 510-11; Exs. 571, 571D.19; and

(i)     A review claiming that the customer had experienced solid weight loss

during the prior month.  Tr. 510-11; Exs. 571, 571D.19.

65.     By July 14, 2012, the First Green Coffee had more than seventeen four- and five-

star reviews.  Tr. 503-04, 510-11; Exs. 571, 571D.3.  Notably, several of these early reviews

came from unverified purchasers and appeared on the First Green Coffee's page all within

fourteen minutes of each other and giving it five-star ratings.  Tr. 498; Exs. 571, 571D.1.

Likewise, fourteen of the five-star unverified reviews appeared on the First Green Coffee's

product page within twenty-five minutes of each other and all ending with a similar pattern of

including an exclamation point in the title of the review.  Tr. 511-12; Exs. 571, 571D.21.

66.     Similar to the First Green Coffee, the Second Green Coffee and the Garcinias also

accumulated a substantial number of overwhelmingly positive reviews soon after their launch.

Tr. 262-63.  For example, by June 2014, the First Garcinia had more than 5,000 reviews filling

more than 500 pages. Tr. 287-88; Ex. 322.2. And, notably, may of the positive reviews on the

Firs Garcinia received helpfulness votes almost immediately. Tr. 289-90; Ex. 322.4.

      67.    To analyze the foregoing anomalies of NatureWise's reviews, Vitamins Online

presented testimony from a statistics and computer science expert, Julian McAuley, Ph.D. ("Dr.

McAuley"). Dr. McAuley was qualified as an expert, Tr. 1394-97, 1401, and his testimony was

credible. Dr. McAuley authored a joint report with Vitamins Online's other statistics and review

manipulation expert, Thomas "Tommy" Noonan ("Noonan"), Tr. 1401-02. Noonan was

qualified as an expert, Tr. 1515-28, 1531-32, and his testimony was credible. Dr. McAuley's

testimony related to the Green Coffees and the First Garcinia. Tr. 1403; Ex. 701. He analyzed

data from 2012 to 2015 but did not include an analysis of the Second Garcinia. Tr. 1403, 1405,

1407-08, Tr. 1532. Conversely, Noonan's testimony covered all four of the Products, and he

analyzed data through 2018. Tr. 1403, 1405, 1407-08, 1532, 1535. Noonan's analysis

corroborated Dr. McAuley's analysis. Tr. 1627-28.

      68.    Based on the credible testimony of Dr. McAuley and Noonan, the court makes the

following findings regarding the Products and their corresponding reviews:

      (a)    NatureWise's unverified reviews had higher ratings than its verified

reviews, Tr. 1418-21, 1429;

      (b)    The Products had higher ratings than other products in the Health &

Personal Care category (the "Random Sample"), Tr. 1426-27, 1429-30;

      (c)    NatureWise's unverified reviews were significantly higher than the

Random Sample, Tr. 1428-30;

      (d)    The Products had an unusually high number of new reviewers compared

to the Random Sample, Tr. 1432-34;

(e)     NatureWise reviewers had written more prior reviews than the typical reviewers for the Random Sample, Tr. 1433;

(f)     New NatureWise reviewers gave significantly higher ratings than customers who had previously written reviews on Amazon, Tr. 1437;

(g)     Reviewers of the Products had significantly higher similarities compared to other reviewers from the Random Sample, Tr. 1443-44; and

(h)     There were various periods of time in which the Products had an unusually large ratio of unverified reviewers and an unusually large ratio of reviewers that were highly positive, Tr. 1448-49.

69.     This data suggests that NatureWise engaged in review manipulation.  Tr. 1627-28.

### D.     NatureWise's Manipulation of Reviews

70.     NatureWise manipulated the Products' reviews.  It did so by (1) block voting on the helpfulness of reviews and (2) offering free products in exchange for reviews.

#### 1.     Helpfulness Block Voting

71.     NatureWise engaged in block voting on the helpfulness of reviews—that is, NatureWise directed its employees, and its employees obliged, to up vote good reviews and down vote bad reviews, which directly affected which reviews appeared at the top of the Products' pages and those that did not.  Tr. 521, 523, 525, 531-534, 543, 545; Exs. 37.5, 279, 283.1, 304, 669.269.

72.     While Doyle testified that the block voting was only in response to attacks on NatureWise reviews by unknown third parties, Tr. 526:16-527:4, that testimony was not credible. For example, Doyle would direct employees to down vote reviews without mentioning purported attacks or distinguishing between "attacking" reviews and legitimate reviews.  Tr. 540-541; Exs.

23

260.1; 269.1.  Doyle also acknowledged that some of the one-star reviews that NatureWise's

employees down voted may have been from real customers.  Tr. 597.

      73.     Doyle further testified that NatureWise employees were allowed to vote their

conscience.  Tr. 522.  That testimony was not credible.  Moreover, NatureWise management

knew that their block voting was interfering with Amazon reviews, and they were worried about

customers finding out.  Ex. 268.1-2.  Similarly, NatureWise management was wary of Amazon

finding out about its block voting.  Tr. 593-594.

      74.     NatureWise's conduct in block voting was a violation of Amazon's policies.  Tr.

641-44; Ex. 416; Malley-Naslund Dep. 59-63, 71, 81, Exs. 669.378-669.382, 669.390, 669.400.

Doyle was familiar with Amazon's anti-manipulation policy.  Tr. 614, 616, 639, 640-641; Ex.

70.5.

## 2.     Free Products in Exchange for Reviews

      75.     NatureWise offered free products to customers in exchange for reviews.  Tr. 625-

626, 691; Ex. 48.1, 397.2.  Free products were contingent on customers providing a review.  Tr.

626-627; Ex. 34.  On several occasions, NatureWise denied having offered free product in

exchange for a review, even though that was not true.  Tr. 827-828, 831; Exs. 198.1, 280.1.

      76.     Doyle also asked customers to review other products so that their reviews of

NatureWise products would have more credibility and so Amazon would not think NatureWise

reviews were fake.  Tr. 659, 663, 677-678; Exs. 210, Ex. 287.1.

      77.     The practice of offering free products in exchange for a review was a violation of

Amazon's policies.  Tr. 680; Ex. 43.

      78.     These types of review manipulation resulted in the deception of consumers, Tr.

1317-37, because such review manipulation was material to consumers, Tr. 916, 921; Exs. 557-

60.

79.     As a result of these types of review manipulation, NatureWise experienced

significant financial success.  Tr. 485-87, 491, 513, 586; Ex. 333.  475-76.

### III.     Effect of NatureWise's Actions on Vitamins Online

80.     The NutriGold Products and the Products were direct competitors on Amazon.

Tr. 179-80, 187, 272, 464-64, 467, 471, 967, 980; Exs. 386.3, 380.2-3, 381.3, 386.3, 638.  In

addition, from at least NatureWise's launch in 2012 through the end of 2013, Vitamins Online

and NatureWise were the major players in the Amazon marketplace for garcinia cambogia and

green coffee products.  And, at that time, the existence and impact of other competitors was

minimal.  Tr. 180, 272, 425-26; Exs. 27, 65, 70.3, 88.1, 1058.

81.     Vitamins Online's NutriGold Garcinia was a "#1 Amazon top seller" prior to

NatureWise's entry into the market.  Tr. 270, 2628-29; Exs. 61.1, 88.1.  Notwithstanding the

existence of a few other garcinia cambogia competitors in the market, sales of NutriGold

Garcinia continually increased following its launch.  Exs. 580, 580.1, 588, Ex. 589.  However,

after NatureWise's emergence on Amazon, it replaced Vitamins Online's NutriGold Garcinia as

the #1 ranked product on the Amazon Best Sellers list for garcinia cambogia products.  Tr. 270;

Ex. 88.1.

82.     Vitamins Online's NutriGold Green Coffee was also a "#1 Amazon top seller"

prior to NatureWise's entry into the market.  Tr. 180, 272; Exs. 27, 61.1.  However, when

NatureWise emerged on Amazon, the Green Coffees replaced NutriGold as the #1 green coffee

product.  Tr. 180, 272; Ex. 27.

83.     Thus, for both garcinia cambogia and green coffee products on Amazon, the

Products replaced NutriGold Products as the #1 best sellers.  Tr. 180, 272, 425-26; Exs. 27, 70.3,

88.1.  Similarly, the Products replaced the NutriGold Products as the top products in Amazon's

search results.  Tr. 180, 272, 425-26; Exs. 65, 70.3, 1058.  Consequently, Vitamins Online's

sales of the NutriGold Products dropped once NatureWise began selling the Products on

Amazon.  Tr. 238-40, 267-68, 272, 1954-59, 1977-84; Exs. 578. 579. 580.

84.     Following NatureWise's rise on Amazon, the Products consistently obtained #1

rankings on the Amazon Best Sellers list and effectively replaced the NutriGold Products.  Tr.

283-84; Ex. 322.1.

85.     However, by 2014, the markets for green coffee and garcinia cambogia on

Amazon were inundated with competitors such that Vitamins Online and NatureWise were no

longer the two major players in the relevant marketplace.  Tr. 256, 266; Exs. 5146, 5147.

**IV.     NatureWise's Revenue**

86.     Vitamins Online presented testimony from Dr. Stan Smith ("Smith") to establish

NatureWise's profits from selling the Products.  Tr. 1945-48.  Smith was a credible and well-

qualified witness, Tr. 1940-41, and he used reasonable and appropriate methodologies in

performing his work in this case.  Tr. 1947-50.  Smith determined that, in the years 2012 and

2013, NatureWise made $7,251,118 in revenue from selling the Green Coffees.  Exs. 588, 589.

During that same time period, NatureWise made $2,300,114 in revenue from selling the First

Garcinia.  Exs. 588, 589.  Thus, from 2012 through 2013, NatureWise's revenue from selling the

Green Coffees and the First Garcinia totaled $9,551,232.  Exs. 588, 589.

87.     NatureWise presented testimony from Richard Hoffman ("Hoffman") to rebut

Smith's calculation of NatureWise's profits.  Tr. 2571-74.  In reaching his own calculation of

NatureWise's profits, Hoffman was directed by Doyle to exclude certain profits.  Tr. 2656-62.

Hoffman also relied upon spreadsheets and information provided to him by NatureWise, but he

did not conduct any independent investigation into the accuracy of those spreadsheets or

26

information. Tr. 2656-62. In addition, prior to performing his calculation, NatureWise informed Hoffman that it did not have record of its revenues by each specific product prior to 2014. Tr. 2674-76. Thus, Hoffman acknowledged that his calculation of NatureWise's profits for 2012 and 2013 was an estimate based on data from later years. Tr. 2675-78.

88.     Because (1) Doyle was not a credible witness; (2) Hoffman acknowledged that his calculation for 2012 and 2013 was a mere estimate; and (3) NatureWise explained to Hoffman that it did not have record of its revenues by each specific product prior to 2014, Hoffman's calculations of NatureWise's revenue, costs, and deductions in the years 2012 and 2013 were unreliable and flawed. Therefore, the court adopts Smith's calculation of NatureWise's profits for 2012 and 2013.

### V.     NatureWise's Discovery Improprieties

89.     Doyle understood that he had a duty to preserve information related to this lawsuit. Tr. 733; Ex. 1023.2. Nevertheless, Doyle failed to apprise all of the NatureWise employees of the obligation to preserve information. Exs. 640, 1023. Moreover, Doyle and/or NatureWise failed to preserve or produce evidence in the following manners:

(a)     Despite being aware of his duty to preserve evidence by early October 2013, on or around October 27, 2013, Doyle cleaned out his email and trash and reported that he could therefore not find a certain document. Ex. 5057.

(b)     Although Doyle contends that he sent hundreds of emails to Amazon regarding fake reviews, NatureWise did not produce them. Tr. 649.

(c)     Doyle continued deleting emails. Tr. 519-520.

(d)     Third parties produced multiple emails and documents in response to subpoenas that NatureWise failed to produce. Notably, many of these emails contained

27

information detrimental to NatureWise's position.  Exs. 48, 50, 57, 61, 63, 67, 94, 95, 98, 99, 112, 122, 123, 124, 125, 131.

(e)    Doyle deleted videos that he had made and posted online after he was aware of his duty to preserve information.  NatureWise then failed to produce these videos in discovery.  Tr. 228, 445-46, 449-50, 461; Exs. 91, 92, 640.

(f)    In a previous declaration submitted by Doyle in this case, he informed the court that NatureWise used Office AutoPilot only as an autoresponder system, and communicated that the only relevant information that would have been in Office AutoPilot would have been emails.  Ex. 408.3, ¶ 2.  Doyle submitted that none of the remaining information in Office AutoPilot was relevant to this case.  Ex. 408.2.  But at trial, Doyle admitted that Office AutoPilot contained a significant amount of information beyond emails, and that such information and data had been transferred to another system.  Tr. 723; Ex. 408.1.  That additional information and data was essential to this case.  Tr. 455; Ex. 92.5.  Doyle admitted that he did not disclose the extent of the use of Office AutoPilot in his declaration.  Tr. 724-25; 408.2.  NatureWise never produced the Office AutoPilot database in this case.  Tr. 713-721; Exs. 92.5, 408.2.

(g)    NatureWise never produced any product SOPs or specification sheets, and claimed, prior to trial, that such documents did not exist.  Tr. 1131; Ex. 649.1.

(h)    NatureWise never produced the statistical analysis that it presented to Amazon to show that reviews posted to NatureWise's product pages were fake.  Tr. 741-743.

90.    Again, the court finds that Doyle's explanations to the foregoing discovery issues were not credible.

## CONCLUSIONS OF LAW

### I.     The Adverse Inference Rule

1.      "The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Wardrip v. Hart*, 949 F. Supp. 801, 804 (D. Kan. 1996) (citing *Gilbert v. Cosco Inc.*, 989 F.2d 399, 406 (10th Cir.1993)).  Because NatureWise failed to preserve and produce relevant evidence in this case, the court will apply the adverse inference rule to each element of Vitamins Online's claims and assume that the evidence NatureWise failed to preserve and produce was unfavorable to it.

2.      In addition, the court notes that it has already imposed spoliation sanctions for Category 1 Products—that is, NatureWise garcinia cambogia and green coffee products for which there were no existing samples for testing.  ECF No. 155.  More specifically, the court determined that Vitamins Online was entitled to an adverse inference instruction that the Category 1 Products bore all of the allegedly false Ingredients Claims alleged in the Complaint and that they failed to meet those label claims.  *Id.*  Because NatureWise has failed to adequately rebut the adverse inference, the court finds and concludes that NatureWise's Category 1 Products did not meet their label claims.

### II.    Lanham Act False Advertising Claim

3.      Vitamins Online's first claim is for false advertising under the Lanham Act.

4.      The Lanham Act provides that:

(1) [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

29

the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

      (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2012).

      5.      To establish a false advertising claim under the Lanham Act, a plaintiff must show (1) that the defendant used a device or made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that misrepresents or is/are likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.[3] *See* 15 U.S.C. § 1125(a)(1); *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999); *Vitamins Online, Inc. v. HeartWise, Inc.*, No. 2:13-CV-00982-DAK, 2019 WL 6682313, at *8 (D. Utah Sept. 24, 2019); *Vitamins Online, Inc. v. HeartWise*, Inc., 207 F. Supp. 3d 1233, 1237–44 (D. Utah 2016), *order vacated in part on reconsideration*, No. 2:13-CV-982-DAK, 2017 WL 2733867 (D. Utah May 11, 2017).

      6.      In addition to the foregoing elements, some courts also list materiality as another element of a Lanham Act claim, *see Novell, Inc. v. Network Trade Center, Inc.*, 25 F. Supp. 2d 1218, 1227-28 (D. Utah 1997), but the Tenth Circuit has not yet decided "whether the Lanham Act imposes a materiality inquiry," *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 685 (10th Cir. 2015).

---

[3] As the court has done in prior rulings, the court will refer to the foregoing elements as the (1) "falsity"; (2) "commerce"; (3) "deception"; and (4) "injury" elements.

A. **Falsity and Deception**

7.      A plaintiff can establish falsity by either showing that the defendant used a

device, *Vitamins Online*, 207 F. Supp. 3d at 1242, or made false or misleading representations of

fact in connection with the commercial advertising or promotion of its product, *Cottrell*, 191

F.3d at 1252 (10th Cir. 1999). "To constitute commercial advertising or promotion . . . , the

statements identified by [the plaintiff] 'must be: (1) commercial speech; (2) by a defendant who

is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy

defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant

purchasing public to constitute 'advertising' or 'promotion' within that industry.'" *Strauss v.

Angie's List, Inc.*, 951 F.3d 1263, 1267 (10th Cir. 2020).

8.      If proceeding based on a false or misleading representation of fact, a plaintiff "can

either show that the representations are literally false or impliedly false." *Vitamins Online*, 2016

WL 538458, at *6.

9.      A representation is literally false when it states that a product "has certain

qualities that it in fact does not actually have" and is impliedly false when the "statements . . . ,

while literally true or ambiguous, convey a false impression or are misleading in context, as

demonstrated by actual consumer confusion." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6,

13–14 (7th Cir. 1992).

10.     For literally false statements, "the message may be either explicit or conveyed by

necessary implication when, considering the advertisement in its entirety, the audience would

recognize the claim as readily as if it had been explicitly stated." *Interlink Products Int'l Inc. v.

F & W Trading*, No. 15–1340 (MAS) (DEA), 2016 WL 1260713, at *9 (D.N.J. Mar. 31, 2016)

(quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*,

31

290 F.3d 578, 586–87 (3d Cir. 2002)). "Only an *unambiguous* message can be literally false." *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) (emphasis in original) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)). Importantly, when a statement or advertisement "can reasonably be understood as conveying different messages, [a] literal falsity argument must fail." *Buetow*, 650 F.3d at 1185 (quoting *Scotts Co. v. United Ind. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002)).

11.     For a false statement to be actionable under the Lanham Act, it must be a false statement of fact. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir. 2000); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995). And for a statement of fact to be actionable, it "must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999)).

12.     When a statement or representation is deemed to be literally false, the deception element is presumed. *Procter & Gamble Co. v. Haugen*, 627 F. Supp. 2d 1287, 1290 (D. Utah 2008); *see Zoller Labs., LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004); *see also PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011). Conversely, when the statement at issue is impliedly false, a plaintiff must demonstrate actual consumer deception. *Vincent v. Utah Plastic Surgery Soc.*, 621 Fed. App'x. 546, 550 (10th Cir. 2015). Actual consumer deception must be shown by extrinsic evidence that demonstrates that the challenged statements "tend to mislead or confuse consumers." *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1239 (D. Utah 2018) (quoting *Zoller Labs.*, 111 F. App'x at 982).

13.     Yet, even under a theory of implied falsity, a plaintiff's failure to demonstrate that

32

consumers were actually deceived is not fatal to his or her claim. Indeed, a plaintiff can still

benefit from a presumption of consumer deception for statements that are impliedly false if the

plaintiff can show that the defendant acted with the intent to deceive consumers. *Cashmere &*

*Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 316 (1st Cir. 2002); *see also Merck*

*Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 256 (2d Cir. 2014); *William H. Morris Co. v. Grp. W,*

*Inc.*, 66 F.3d 255, 258 (9th Cir. 1995), *supplemented sub nom. William H. Morris Co. v. Grp. W.*

*Inc.*, 67 F.3d 310 (9th Cir. 1995).

### 1.    Ingredients Claims

14.    As mentioned above, the court concludes that the Category 1 Products did not

meet their label claims. Consequently, the court finds those claims were literally false, and

Vitamins Online is therefore entitled to a presumption of deception. NatureWise failed to rebut

that presumption. Consequently, with respect to Category 1 Products, the court concludes that

Vitamins Online has established the falsity and deception elements.

15.    As to the Products in general, the court first concludes that NatureWise failed to

keep the necessary documentation to keep track of the Green Coffees and the Garcinias that it

was selling. Indeed, NatureWise represented that it did not and cannot track which labels were

used on which bottles for each lot/batch of the Products that it produced. Likewise, NatureWise

represented that it does not know which labels it used on the Products at different times or on

specific dates, and it does not know during which period it sold certain lots/batches. Therefore,

because of NatureWise's failure to maintain the foregoing information, the court makes the

following legal conclusions with respect to the Products, but does not differentiate between

lots/batches:

33

(a)    As to certain lots, NatureWise's claim that the First Green Coffee contained 50% chlorogenic acid was literally false;

(b)    As to certain lots, NatureWise's claim that the First Green Coffee contained "Clinically Proven GCA" was literally false;

(c)    NatureWise's claims that the First Green Coffee contained the amount of GCA that corresponded with the GCA study were literally false by necessary implication;

(d)    NatureWise's claim that the First Green Coffee was clinically proven after having knowledge that the GCA study was flawed and retracted was literally false;

(e)    As to certain lots, NatureWise's claims that the Green Coffees were vegetarian were literally false;

(f)    As to certain lots, NatureWise's claims that the Green Coffees contained specific amounts of green coffee extract were literally false;

(g)    As to certain lots, NatureWise's claims that the Green Coffee contained 400 milligrams of chlorogenic acids were literally false;

(h)    As to certain lots, NatureWise's claim that the Green Coffees contained no fillers, binders, or artificial ingredients was literally false.

(i)    NatureWise's representations that the First Garcinia had SuperCitrimax were literally false;

(j)    NatureWise's claims that the First Garcinia contained a clinically proven and patented form of HCA bound to calcium and potassium were literally false;

(k)    As to certain lots, NatureWise's claims that the Garcinias were vegetarian were literally false;

(l)     As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(m)     As to certain lots, NatureWise's claim that the Garcinias contained 60% HCA was literally false;

(n)     As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(o)     As to certain lots, NatureWise's claim that the Garcinias contained 300 milligrams of HCA was literally false;

(p)     As to certain lots, NatureWise's claim regarding the specific amount of garcinia cambogia extract was literally false;

(q)     As to certain lots, NatureWise's claim that the Garcinias contained no fillers, binders, or artificial ingredients was literally false; and

(r)     For much of 2012 and 2013, NatureWise's claims, regarding the Green Coffees and the First Garcinia, that (1) each ingredient it used was verified for purity through in-house testing; (2) it had implemented a strict set of FDA compliant manufacturing procedures; and (3) its facilities were regularly inspected by FDA officials were literally false because NatureWise did not know who was making those products.

16.     The court concludes that NatureWise made the above representations and statements in connection with the commercial advertising and promotion of the Products because (1) NatureWise's representations were commercial speech; (2) NatureWise is in commercial competition with Vitamins Online; (3) the purpose behind the statements was to influence consumers to purchase the Products; and (4) NatureWise disseminated the statements sufficiently to the relevant purchasing public.

17.     Therefore, Vitamins Online has established the falsity element for its Ingredients Claims.  Moreover, because Vitamins Online has demonstrated that NatureWise's foregoing statements were literally false, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived by such statements.  NatureWise failed to rebut that presumption.  Therefore, Vitamins Online has also established the deception element for its Ingredients Claims.

18.     The court also concludes that, even if the foregoing claims were impliedly false, Vitamins Online would nevertheless be entitled to a presumption of deception because the court concludes that NatureWise and Doyle acted with the intent to deceive consumers.  Because NatureWise also failed to rebut that presumption, Vitamins Online has established falsity and deception under either theory of literal or implied falsity.

### 2.     Review Claims

19.     As to the Review Claims, the court reaches the following legal conclusions with respect to falsity and deception:

(a)     NatureWise's practice of block voting on the helpfulness of reviews constitutes the use of a device in connection with the commercial advertising or promotion of its products;

(b)     As a result of NatureWise's practice of block voting, the number of helpfulness votes on certain NatureWise reviews were artificially inflated and literally false; and

(c)     NatureWise's representations that it did not offer free products in exchange for reviews were literally false.

20.     Importantly, the court has already determined that NatureWise's conduct related to the Review Claims constitutes commercial advertising or promotion under the falsity element.

36

*Vitamins Online*, 207 F. Supp. 3d at 1242. Therefore, Vitamins Online has established the falsity

element for its Review Claims. Moreover, because Vitamins Online has demonstrated literal

falsity, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived. The

court concludes that NatureWise failed to rebut that presumption. Therefore, Vitamins Online

has established the deception element for its Review Claims.

21.     The court also concludes that, even if the foregoing claims were impliedly false,

Vitamins Online would nevertheless be entitled to a presumption of deception because the court

concludes that NatureWise and Doyle acted with the intent to deceive consumers. Because

NatureWise failed to rebut that presumption, Vitamins Online has established falsity and

deception under either theory of use of a device, literal falsity, or implied falsity.

### B.     Commerce

22.     NatureWise has not contested the commerce element of Vitamins Online's

Lanham Act claim. *Vitamins Online*, 2019 WL 6682313, at *8. Regardless, the court concludes

that NatureWise's actions and statements were made in commerce as required by the Lanham

Act. *See* 15 U.S.C. § 1125(a).

### C.     Materiality

23.     As noted above, the Tenth Circuit has not squarely addressed whether materiality

is a necessary element of a Lanham Act claim. Nevertheless, the court will address it in this

case. As explained by the Tenth Circuit: "Though not explicitly mentioned in the text of the

Lanham Act, many courts require plaintiffs to prove that a false or misleading advertisement is

'likely to influence the purchasing decision' before permitting recovery based on it. Circuits that

have imposed a materiality requirement are, however, split over who bears the burden of proof:

some keep it with the plaintiff while others are willing to presume that at least some

misstatements—usually literally false ones—are material." *Gen. Steel*, 627 F. App'x at 685

(citations omitted). Further, the Second Circuit has articulated that "in many cases the evidence

and the findings by [a] court that a plaintiff has been injured or is likely to suffer injury will

satisfy the materiality standard—especially where the defendant and plaintiff are competitors in

the same market and the falsity of the defendant's advertising is likely to lead consumers to

prefer the defendant's product over the plaintiff's." *Church & Dwight Co. v. SPD Swiss*

*Precision Diagnostics, GmBH*, 843 F.3d 48, 70–71 (2d Cir. 2016).

24.     Based on this standard, the court concludes that Vitamins Online has established

that NatureWise's misrepresentations with respect to both the Ingredients Claims and the Review

Claims were material to consumers. Indeed, Vitamins Online has demonstrated that

NatureWise's misrepresentations were likely to influence consumers' purchasing decisions. This

is especially true when viewing NatureWise's misrepresentations in the context of Dr. Oz's

recommendations to consumers.

25.     Furthermore, given the court's conclusion that NatureWise's statements and

representations were literally false, Vitamins Online is entitled to a presumption that those

literally false statements and representations were material to consumers. *Pizza Hut*, 227 F.3d at

497. Because NatureWise has failed to rebut that presumption, the court concludes that

NatureWise's literally false statements and representations were material to consumers.

26.     Lastly, as will be explained in detail below, because Vitamins Online and

NatureWise were direct competitors in a sparsely populated market, the court presumes that

NatureWise's misrepresentations injured Vitamins Online. Thus, on that additional basis, the

court concludes that Vitamins Online has satisfied the materiality element.

D.     Injury

27.     To establish the injury element of a Lanham Act false advertising claim, a
plaintiff "must show economic or reputational injury flowing directly from the deception
wrought by the defendant's advertising; and that that occurs when deception of consumers causes
them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components,
Inc.*, 572 U.S. 118, 133 (2014).  Put differently, a plaintiff must provide evidence of "an injury to
a commercial interest in sales or business reputation proximately caused by the defendant's
misrepresentations." *Id.* at 140.

28.     The standard for determining whether a plaintiff has provided sufficient evidence
of injury is dependent on the relief that the plaintiff is seeking.  *See Porous Media Corp. v. Pall
Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997) ("[C]ases involving injunctive relief and those
seeking monetary damages under the Lanham Act have different standards of proof.").  When a
plaintiff is seeking injunctive relief, the "plaintiff does not need to establish actual damages, and
is instead held to a lesser standard of proving that it is likely that the defendant's advertising has
caused or will cause plaintiff injury."  *Berken v. Jude*, No. 12-CV-02555-RPM, 2013 WL
6152347, at *2 (D. Colo. Nov. 22, 2013).  In other words, when the plaintiff is seeking an
injunction, "[t]he statute demands only proof providing a reasonable basis for the belief that the
plaintiff is likely to be damaged as a result of the false advertising" and not "proof of actual loss
and specific evidence of causation." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186,
190 (2d Cir. 1980).

29.     In contrast, a "heightened level of . . . proof of causation and specific injury" is
required when the plaintiff is seeking money damages, *Porous Media Corp.*, 110 F.3d at 1335–
36, in order to "prevent the plaintiffs from receiving a windfall unrelated to their own damages,"

<div align="center">39</div>

*Berken*, 2013 WL 6152347, at *2.  And, as this court has previously determined, the standard of proof required when a plaintiff is seeking disgorgement is somewhere between the standards for money damages and injunctive relief.  *Vitamins Online*, 2019 WL 6682313, at *15.  In this case, Vitamins Online seeks disgorgement and injunctive relief.

30.     There are certain circumstances that allow a plaintiff to benefit from a presumption of injury in Lanham Act false advertising cases.  *Id.* at *13.  For example, courts will apply a presumption of injury in cases involving (1) comparative advertising, *Munchkin, Inc. v. Playtex Prod., LLC*, 600 F. App'x 537 (9th Cir. 2015), or (2) "direct competitors in a sparsely populated market," *Church & Dwight*, 843 F.3d at 72 n.12.

31.     In this case, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from 2012 through 2013.[4]  However, after 2013, there was a flood of competitors into the market such that the market was no longer sparsely populated.  Accordingly, for the years 2012 and 2013, Vitamins Online is entitled to a presumption of injury.  That presumption, though, applies only to Vitamins Online's economic injury; it does not apply to Vitamins Online's alleged reputational injury.  This is so because NatureWise adequately rebutted the presumption as to reputational injury.  Indeed, the court concludes that NatureWise established that it did not cause Vitamins Online reputational injury.  However, NatureWise failed to rebut the presumption of economic injury for 2012 and 2013.  Therefore, for 2012 and 2013, Vitamins Online has established that NatureWise's conduct

---

[4] The court notes that, in its previous decisions on the parties' motions for summary judgment, it concluded that this case did not involve direct competitors in a sparsely populated market.  *Vitamins Online*, 2019 WL 6682313, at *13.  However, now that the court has been presented with all of the evidence at trial, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from the time that NatureWise launched in 2012 through the end of 2013.

40

proximately caused it economic injury such that Vitamins Online has established the injury
element of its claim.

32.     As to the remaining years, Vitamins Online is not entitled to a presumption of
injury.  Thus, Vitamins Online was required to demonstrate that it suffered economic or
reputational injury that was proximately caused by NatureWise's misrepresentations.  The court
concludes that it failed to do so.  While Vitamins Online did produce some evidence, that
evidence was insufficient to establish that NatureWise's actions proximately caused injury to
Vitamins Online.  Once the market was flooded with competitors.  Once there were a multitude
of competitors for green coffee and garcinia cambogia products on Amazon, one sale for
NatureWise was not necessarily a lost sale for Vitamins Online.  Instead, a sale for NatureWise
could have meant a lost sale for any of the other Amazon competitors.

33.     Therefore, the court concludes that Vitamins Online has established each of the
elements of its Lanham Act false advertising claim for the years 2012 and 2013.  Accordingly,
the court finds Vitamins Online's liable for false advertising under the Lanham Act.

### III.     Utah Common Law Unfair Competition Claim

34.     Vitamins Online's second claim is for common law unfair competition.  "Pursuant
to Utah common law, unfair competition includes—*but is not limited to*—passing off, palming
off, imitating, and causing or *likely causing* confusion or deception."  *Overstock.com, Inc. v.
SmartBargains, Inc.*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added).

35.     In this case, the court concludes that Vitamins Online has established its unfair
competition claim.  The foregoing Findings of Fact and Conclusions of Law demonstrate that
NatureWise unfairly competed in the garcinia cambogia and green coffee markets on Amazon.
Indeed, there is ample evidence demonstrating that NatureWise's actions, as detailed above,

41

resulted in a high likelihood of deception in the relevant markets on Amazon. Moreover, the

court's analysis with respect to Vitamins Online's Lanham Act claim applies with equal force to

its second claim. Therefore, NatureWise is liable for unfair competition under Utah common

law.

## IV.    Remedies

36.    As previously mentioned, Vitamins Online seeks the recovery of NatureWise's

ill-gotten profits through disgorgement in addition to injunctive relief.

### A.    Disgorgement

37.    Section 35 of the Lanham Act provides that, when a plaintiff has established a

claim for false advertising, the plaintiff is entitled, "subject to the principles of equity, to recover

. . . defendant's profits." 15 U.S.C. § 1117.

38.    The Tenth Circuit has held that "[u]nder the Lanham Act, plaintiffs must show

either actual damages or willful action on the part of the defendant as a prerequisite to recover

disgorgement of profits." *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir.

2013). However, the Supreme Court recently clarified that a finding of willfulness can no longer

be a mandatory prerequisite to an award of the defendant's profits. *See Romag Fasteners, Inc. v.*

*Fossil, Inc.*, 140 S. Ct. 1492, 1494–95 (2020). Nevertheless, the Supreme Court noted that

willfulness is still "a highly important consideration in determining whether an award of profits

is appropriate." *Id.* at 1497. As such, the court will consider willfulness as it "weigh[s] the

equities to fashion a remedy that matches the harm." *Klein-Becker*, 711 F.3d at 1162. In

addition to willfulness, other equitable considerations may include, among other things, "(1) the

degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and

adequacy of other remedies; (3) the role of a particular defendant in effectuating the

42

infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands." *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-CV-01398-PAB-KLM, 2013 WL 1900562, at \*17 (D. Colo. May 7, 2013), *aff'd*, 627 F. App'x 682 (10th Cir. 2015).

39.     Here, the court concludes that disgorgement of NatureWise's profits from 2012 and 2013 is an appropriate remedy.  First, there is little doubt, if any, that NatureWise benefitted from its unlawful actions.  NatureWise quickly rose to the top of Amazon sales rankings and made millions of dollars in a matter of months despite having no previous experience in the industry.  Second, other remedies would be inadequate.  As will be described below, it would be against the public interest to impose a permanent injunction in this case.  And, even though Vitamins Online is not seeking actual damages, actual damages are rather difficult to accurately calculate in a false advertising case.  Third, Vitamins Online bears no unclean hands with respect to NatureWise's actions.  Fourth, Vitamins Online did not delay in seeking relief.  Fifth, NatureWise's actions were willful in that NatureWise and Doyle sought to intentionally deceive consumers.  Indeed, Doyle willfully made false representations with respect to the Products and artificially altered reviews in order to make NatureWise more profitable.  Sixth, as a result of testing, NatureWise had knowledge that certain lots of the Products did not match their label claims.  Yet, even with that knowledge, NatureWise continued selling those products and never issued any recalls.  And seventh, NatureWise's discovery improprieties, as explained above, favor disgorgement.  Therefore, the disgorgement of NatureWise's ill-gotten profits in 2012 and 2013 is a warranted and appropriate remedy.

40.     Now that the court has determined that disgorgement of NatureWise's profits is warranted, the court must determine the amount.  Section 35 of the Lanham Act provides that, after a plaintiff has established his or her claim, and the court has determined that disgorgement

is warranted, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117.

41.     Here, as explained in the Findings of Fact, Vitamins Online has demonstrated that, in 2012 and 2013, NatureWise's sales profits from the Green Coffees and the First Garcinia totaled $9,551,232.[5]

42.     Given that Vitamins Online has met its initial burden of proving NatureWise sales, the burden then shifts to NatureWise to prove all elements of cost or deduction. NatureWise, however, failed to carry that burden. As detailed in the Findings of Fact, NatureWise represented that it did not have record of its revenues by each specific product prior to 2014. Thus, Hoffman's calculations of NatureWise's 2012 and 2013 profits, and the costs and deductions associated with those profits, were a mere estimate and therefore unreliable. As such, the court concludes that NatureWise has failed to produce adequate evidence demonstrating any costs or deductions associated with its 2012 and 2013 profits.

43.     The court therefore concludes that the profits attributable to NatureWise's false advertising in violation of the Lanham Act amounts to $9,551,232. As such, the court awards Vitamins Online $9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and $2,300,114 from the First Garcinia. The court orders NatureWise to make payment thereof to Vitamins Online.

44.     In addition, there is a preference in the Tenth Circuit to award prejudgment interest in this type of case. *See*, *e.g.*, *United Phosphorous Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1236–37 (10th Cir. 2000) ("[T]his Court has adopted a preference, if not a

---

[5] The court notes that NatureWise did not begin selling the Second Garcinia until 2015. Thus, because the court has limited disgorgement to 2012 and 2013, it need not consider the Second Garcinia.

44

presumption, for prejudgment interest."); *FDIC v. UMIC, Inc.,* 136 F.3d 1375, 1388 (10th Cir.

("[P]rejudgment interest normally should be awarded on successful federal claims.");

*EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, No. 2:09CV523DAK,

2012 WL 2419953, at *2 (D. Utah June 26, 2012). Accordingly, the court concludes that

prejudgment interest in this case is warranted.

45. In determining the appropriate interest rate, federal courts are "free to choose any

interest rate which would 'fairly compensate the plaintiff for the delay in the receipt of

payment.'" *Towerridge, Inc. v. T.A.O., Inc.,* 111 F.3d 758, 764 (10th Cir. 1997); *EarthGrains*,

2012 WL 2419953, at *2. Here, in its discretion, the court looks to Utah law for guidance, and

concludes that Utah's post-judgment rate of 2.13% per annum, as of January 1, 2014, is an

appropriate interest rate. *See* https://www.utcourts.gov/resources/intrates/historic.html.

Accordingly, the court awards Vitamins Online simple prejudgment interest of 2.13% per

annum, with accrual beginning on January 1, 2014.[6]

46. As to the Utah common law unfair competition claim, while it appears that Utah

courts have not explicitly addressed the remedies available for unfair competition, the

Restatement (Third) of Unfair Competition permits recovery for actual damages or an award of

the defendant's profits. Restatement (Third) of Unfair Competition § 37. A district court will

consider the same or similar factors when considering whether to award a defendant's profits

---

[6] In Lanham cases, courts generally award simple prejudgment interest instead of compound prejudgment interest. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, No. 04-CV-2293 SMG, 2009 WL 5185808, at *10 (E.D.N.Y. Dec. 23, 2009), *aff'd*, 409 F. App'x 389 (2d Cir. 2010); *Sherwood Brands of Rhode Island, Inc. v. Smith Enterprises, Inc.*, No. CIV.A. 00-287T, 2003 WL 22061871, at *3 (D.R.I. Mar. 31, 2003). Furthermore, under Utah law, "[c]ompound interest is not favored," and "interest . . . should be calculated simply unless agreed to otherwise by the parties." *City of Hildale v. Cooke*, 2001 UT 56, ¶ 36, 28 P.3d 697, 707 (quoting *Watkins & Faber v. Whiteley*, 592 P.2d 613, 616 (Utah 1979)). Accordingly, the court awards simple prejudgment interest in this case.

45

under the Lanham Act or Utah common law. *See id.* § 36 cmt. b, § 37. The only possible

distinction is that an award of lost profits under Utah law requires willfulness, whereas an award

under the Lanham Act, does not, in light of the Supreme Court's decision in *Romag. See id.* § 37

cmts. c, e. Regardless, the court has found that NatureWise and Doyle acted willfully.

47. The court therefore concludes that disgorgement is also warranted for Vitamins

Online's Utah common law unfair competition claim. Thus, the court awards Vitamins Online

$9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and

$2,300,114 from the First Garcinia. This award of profits is not in addition to the award of

profits for Vitamins Online's Lanham Act claim. The court is merely recognizing that Vitamins

Online is entitled to the same disgorgement damages under both legal avenues. Accordingly,

Vitamins Online is awarded $9,551,232 in disgorged profits from NatureWise for *either* its

Lanham Act claim *or* its Utah common law unfair competition claim—Vitamins Online is not

awarded an independent $9,551,232 for each claim.

48. The court concludes that prejudgment interest is also warranted with respect to

Vitamins Online's common law unfair competition claim. Whether a party is entitled to

prejudgment interest under Utah law turns upon whether the damages are subject to calculation,

as opposed to the types of damages that are not calculated, such as are awarded for personal

injuries. The standard of recovery under Utah law is aptly explained in *Encon Utah, LLC v.*

*Fluor Ames Kraemer, LLC*:

> Prejudgment interest may be recovered where the damage is complete, the
> amount of the loss is fixed as of a particular time, and the loss is measurable by
> facts and figures. Prejudgment interest is appropriate when the loss ha[s] been fixed
> as of a definite time and the amount of the loss can be calculated with mathematical
> accuracy in accordance with well-established rules of damages. The trial court
> adopted a semblance of this language, ruling that prejudgment interest was
> appropriate because Encon's damages were "subject to mathematical calculation.

Each of these iterations of the standard for recovering prejudgment interest is correct. None suggests or requires, as the FAK parties claim, that at the time the damages accrued, all of the damage figures must be known and remain static throughout the litigation. Rather, the standard focuses on the measurability and calculability of the damages.

The court of appeals has explained that "losses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact, such as in cases of personal injury, wrongful death, defamation of character, and false imprisonment. Thus, prejudgment interest is inappropriate in cases where the trier of fact is left to assess damages based on "a mere description of the wrongs done or injuries inflicted.

We have held that prejudgment interest is appropriate in cases where the amount due under [a] contract was ascertainable by calculation and it was only the method to be used in making the calculation that was uncertain.

Therefore, where damage figures must be determined by the trier of fact in its exercise of discretion, prejudgment interest is inappropriate. Where damage figures are subject to calculation, however, even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate. The trial court recognized this important distinction and noted that, although various elements of Encon's termination claim may have been disputed as to amount, the claim has been subject to mathematical calculation since the date it was submitted. The trial court was correct.

2009 UT 7, ¶¶ 51–55, 210 P.3d 263, 272–73 (citations and quotations omitted).

49.    Under this standard, the court concludes that Vitamins Online is entitled to simple prejudgment interest on its common law unfair competition claim in the amount of 2.13% per annum, with accrual beginning on January 1, 2014.  Again, the court notes that this is the same interest that Vitamins Online is entitled to under its Lanham Act claim, not in addition to that interest.

B.    **Enhanced Damages/Profits**

50.    Under the Lanham Act, a court is permitted to enter judgment of up to three times the actual damages or profits awarded.  15 U.S.C. 1117(a); *Earthgrains Baking Companies Inc. v. Sycamore Family Bakery, Inc.*, 573 F. App'x 676, 682 (10th Cir. 2014).  The decision to enhance damages lies within the discretion of the district court.  *See Earthgrains Baking*, 573 F.

47

App'x at 682.  Importantly, when exercising the court's discretion in deciding whether to enhance damages, the court must keep in mind that the amount of profits awarded "should constitute compensation and not a penalty."  *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1233, 1244 (D. Utah 1998)  (citing *Nintendo of Am. v. Dragon Pac. Int'l,* 40 F.3d 1007, 1009–11 (9th Cir. 1994)).

51.     When assessing the equitable considerations of this case, the court concludes that an enhancement of profits is not warranted.  First, the court believes that the amount of awarded profits adequately compensates Vitamins Online such that an enhanced award of profits is not necessary.  Second, an enhancement of profits would result in a penalty against NatureWise instead of compensation to Vitamins Online.  Third, while the balance of equities in this case supports disgorging the profits that NatureWise earned in 2012 and 2013, that analysis is limited to disgorgement itself; the equitable considerations above do not require the court to also enhance the awarded profits.  Accordingly, the court declines to enhance the amount of disgorged profits awarded.

## C.     Injunctive Relief

52.     Under the Lanham Act, a court has the power to grant an injunction "according to the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116(a).  In order to qualify for injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

48

53.     Based on the foregoing standard, the court concludes that Vitamins Online is not
entitled to a permanent injunction.  The court reaches this conclusion based on the second and
fourth *eBay* factors.

54.     In this case, a disgorgement of NatureWise's profits adequately compensates
Vitamins Online for its injury.  Thus, injunctive relief on top of disgorgement is unwarranted.
Accordingly, the court finds that the second factor weighs against an injunction.

55.     In addition, the fourth factor weighs against an injunction.  For its injunctive
relief, Vitamins Online requests that NatureWise be compelled to remove all of the Product
reviews on Amazon.  However, the court finds that such a remedy would be against the public
interest.  The court reaches this conclusion because, were the court to issue such an order,
legitimate reviews of actual consumers would also be removed.  Thus, injunctive relief, in that
respect, would not only serve as a remedy for Vitamins Online, but also a remedy against actual
consumers on Amazon and the Amazon marketplace itself.  Such a result, the court believes, is
not appropriate under the circumstances of this case, and goes strongly against the public
interest.  Therefore, the court rejects Vitamins Online's request for injunctive relief.

### D.     Attorney Fees and Costs

56.     Under the Lanham Act, a court may award attorney fees to the prevailing party in
"exceptional cases."  15 U.S.C. § 1117(a).  "District courts may determine whether a case is
'exceptional' in the case-by-case exercise of their discretion, considering the totality of the
circumstances."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).
When considering whether to award attorney fees under the Lanham Act, a district court should
consider the following nonexclusive factors: "frivolousness, motivation, objective
unreasonableness (both in the factual and legal components of the case) and the need in

49

particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554
n.6.

57.     Here, the court concludes that, considering the totality of the circumstances, this
is an exceptional case such that an award of attorney fees and costs is appropriate and warranted.
In particular, the court concludes that this case is exceptional in light of NatureWise's actions in
willfully deceiving consumers, failing to produce pertinent evidence, and abusing the discovery
process.  Furthermore, the court finds that an award of attorney fees and costs is appropriate in
order to deter NatureWise from further engaging in such willful conduct.

58.     Therefore, within thirty days of the date this court enters judgment, the court
directs Vitamins Online to file with the court all of the necessary documentation establishing the
amount of attorney fees and costs that it has incurred in this case.

## NATUREWISE'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS

Lastly, the court will address NatureWise's Rule 52(c) Motion for Judgment on Partial
Findings.  Federal Rule of Civil Procedure 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds
> against the party on that issue, the court may enter judgment against the party on a
> claim or defense that, under the controlling law, can be maintained or defeated only
> with a favorable finding on that issue. The court may, however, decline to render
> any judgment until the close of the evidence. A judgment on partial findings must
> be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).  When a defendant files a Rule 52(c) motion, "the trial court is not required
to consider the evidence in the light most favorable to the plaintiff."  *Roth v. Am. Hosp. Supply
Corp.*, 965 F.2d 862, 865 (10th Cir. 1992).  Rather, the trial court "must undertake[] the fact
finding process which involves a weighing of the evidence and an assessment of the credibility
of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal
right to relief."  *Id.* (alteration in original) (internal quotation marks omitted).

50

In this case, NatureWise moves for judgment on partial findings because it claims that (1) Vitamins Online lacks standing to assert the Ingredients Claims, and (2) Vitamins Online has failed to prove causation and injury as part of its Lanham Act claim. In addition, NatureWise contends that Vitamins Online failed to present any evidence to support a permanent injunction, and that judgment is warranted as to Vitamins Online's common law claim because claims for unfair competition under Utah common law are limited to passing-off/palming-off and misappropriation. The court will address each argument in turn.

First, NatureWise contends that Vitamins Online lacks standing with respect to the Ingredients Claims. In support of its argument, NatureWise avers that Vitamins Online is attempting to enforce the regulations of the Food and Drug Administration ("FDA"), which retains exclusive jurisdiction to enforce its regulations. To that end, NatureWise cites Ninth Circuit caselaw that provides:

> Because the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation.

*PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010).

The court finds NatureWise's standing argument to be without merit for several reasons. First, NatureWise bases much of its argument—if not all of it—on Dr. Howe's testimony regarding Good Manufacturing Practices ("GMP"). The FDA imposes certain GMP manufacturing and labeling requirements, among other things, on product manufacturers. Tr. 1735-36. As demonstrated by the foregoing Findings of Fact and Conclusions of Law, however, the court does not base NatureWise's Lanham Act liability on GMPs or FDA regulations. Rather, NatureWise is liable under the Lanham Act because its advertising claims were literally false—irrespective of the FDA regulations and GMPs. Thus, unlike *PhotoMedex*, there is no

51

need to consider, let alone litigate, any potential underlying FDA violations.  Accordingly, the court rejects NatureWise's argument and finds that Vitamins Online has standing to assert its claims.[7]

Second, NatureWise avers that Vitamins Online has failed to establish causation and injury.  The court also finds this argument to be without merit based on the court's Findings of Fact and Conclusions of Law.  As explained in detail above, the court has concluded that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from 2012 through 2013, and Vitamins Online is therefore entitled to a presumption of injury.  Because NatureWise failed to rebut that presumption and for the reasons stated above, the court finds NatureWise's injury and causation arguments to be without merit.

Third, NatureWise contends that Vitamins Online failed to present evidence supporting a permanent injunction.  As explained above, the court has concluded that a permanent injunction is not appropriate in this case.  That conclusion, however, is based on the entirety of the evidence presented at trial.  As such, the court does not grant NatureWise's motion with respect to injunctive relief, but reaches that conclusion, as explained above, based on all of the evidence that the parties presented.

Finally, NatureWise asserts that judgment is warranted on Vitamins Online's Utah common law unfair competition claim.  But the court finds this argument to be without merit.  As explained above, unfair competition under Utah common law "includes—*but is not limited to*—passing off, palming off, imitating, and causing or likely causing confusion or deception."

---

[7] It also bears mentioning that, notwithstanding the fact that Vitamins Online filed this case in 2013, and the parties have gone through several rounds of motions for summary judgment over the last seven years, this is the very first time that NatureWise argues that Vitamins Online lacks standing to assert the Ingredients Claims.

*Overstock.com*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added). Thus, while

NatureWise attempts to limit the definition of unfair competition, the Utah Supreme Court

explicitly stated that unfair competition is not limited to passing off/palming off and

misappropriation. And, because the court has concluded that NatureWise's conduct constitutes

unfair competition, the court rejects NatureWise's request for judgment on Vitamins Online's

common law unfair competition claim.

      Therefore, based on the foregoing reasoning and the Findings of Fact and Conclusions of

Law, the court hereby DENIES NatureWise's Motion for Judgment on Partial Findings pursuant

to Federal Rule of Civil Procedure 52(c).

      DATED this 10th day of November, 2020.

                             BY THE COURT:

                             DALE A. KIMBALL
                             United States District Court Judge

<div align="center">53</div>

# EXHIBIT 2

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | HEARTWISE, INC. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 8:20-bk-13335-MW |

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

MAGLEBY CATAXINOS & GREENWOOD, P.C.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor   NONE

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Jeffrey W. Shields, JONES WALDO, PC<br>Name | MAGLEBY CATAXINOS & GREENWOOD, P.C.<br>Name |
| 170 South Main, Suite 1500<br>Number   Street | Attn: J. Magleby, 141 Pierpont Ave.<br>Number   Street |
| Salt Lake City      UT      84101<br>City          State          ZIP Code | Salt Lake City      UT      84101<br>City          State          ZIP Code |
| Contact phone  801-534-7278 | Contact phone  801-359-9000 |
| Contact email  JSHIELDS@JONESWALDO.COM | Contact email  magleby@mcg.law |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____
                                                                                                         MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $_____14,500,000.00___ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached paperwork, which is incorporated by this reference

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured:    $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| Part 3: | Sign Below |
|---|---|

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/16/2021
                    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | James E. Magleby |
|---|---|
|  | First name        Middle name         Last name |
| Title | President |
| Company | Magleby Cataxinos & Greenwood, P.C. |
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 141 Pierpont Ave. |
|  | Number        Street |
|  | Salt Lake City              UT        84101 |
|  | City                        State     ZIP Code |
| Contact phone | 801-359-9000 |  | Email magleby@mcg.law |

---

Official Form 410                    **Proof of Claim**                    page 3

## EXHIBIT A TO PROOF OF CLAIM

The claimant, the Utah law firm of Magleby Cataxinos & Greenwood, PC ("**MCG**"),
represented Vitamins Online, Inc. ("**Vitamins**") in a lawsuit filed in the United States District
Court for the District of Utah, *Vitamins Online, Inc. v. HeartWise, Inc.*, Case No. 2:13-cv-00982-
DAK. Following a bench trial conducted from July 16 - August 6, 2020, the Court entered a
Final Judgment against HeartWise, the Debtor in this case, in the amount of $9,551,232, plus
simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014 (the
"**Judgment**"). A copy of the Judgment is attached as **Exhibit A**. The Judgment also provides:
"Plaintiff is further awarded its reasonable attorney fees and costs in this matter, to be
determined postjudgment." On December 3, 2020, HeartWise filed a notice of appeal.

On February 11, 2021, Vitamins filed a Proof of Claim in this case in the total amount of
$14,427,000.00 consisting of of $10,947,907.06, which is the amount owed under the Judgment
(including interest accrued through the petition date), plus a second component of attorney's
fees, costs, and expert witness costs, which have been awarded but not yet liquidated by the Utah
Court, but which Vitamins identified in its proof of claim to be in the amount of $3,480,000.[1]
*See*, **Claim No. 3-1**. Notably, the plan currently proposed by Debtor accepts and proposes to
pay the Vitamins claim in full, which it lists as unimpaired in the amount of at $14,500,000.00.
*See,* proposed Disclosure Statement, Dkt. No. 134, pp. 43-45. (MCG does not object to

---

[1] As described below, MCG's representation was on a blended hourly/contingency fee basis, under which Vitamins paid reduced hourly fees at one-half of the firm's rates and a contingency fee based on the recovery at a reduced percentage. The Vitamins' proof of claim seeks the full hourly rates, not the reduced rates, but also does not seek recovery from HeartWise of the contingency fee that will be paid to MCG. Because of the size of the award in Vitamins' favor, the amount sought by Vitamins in its proof of claim is substantially less than the actual attorney fees incurred by Vitamins. Because Vitamins terminated MCG's engagement before the fee application was filed with the Utah court, MCG did not provide any assistance or input on Vitamins' proof of claim. MCG files this Proof of Claim in the amount of Vitamins' Proof of Claim but MCG will amend its claim accordingly should the Vitamins Proof of Claim be modified.

1

**- 290 -**

Vitamins' calculation of $3,480,000.  Nor does MCG object to the Debtor's plan to pay Vitamins' claim in full).

Vitamins entered into a fee agreement with MCG dated September 27, 2018 (the "**Fee Agreement**"), a redacted copy of which is attached as **Exhibit B**.  Under the Fee Agreement, Vitamins agreed to pay MCG a fee that was partly based on the number of hours worked, and partly a contingency fee.  For the hourly portion of the fees, the billing professionals' hourly rates to be paid by Vitamins were set at half their regular rates.  The contingency fee was 17.5% for work through trial, which increases to 20% upon the filing of a notice of appeal.  Under the Fee Agreement the percentage also increased by 5% for any amounts recovered in excess of $5 million (the "**Extraordinary Result Threshold**").

MCG has notified Vitamins Online that the unpaid hourly portion of its fee is in the amount of $144,748.61.  A copy of the invoice summary page is attached as **Exhibit C.** Additional invoice detail is available on request subject to appropriate protections for privileged and confidential information contained therein.  In addition, as described above, HeartWise has proposed in its plan to pay Vitamins the amount of $14,500,000 in response to the Vitamins claim.  MCG employs the claim amount for Vitamins' claim provided in the proposed Disclosure Statement for this Proof of Claim.  Under the contingency fee portion of the fee agreement, the amount owed to MCG will be $3,375,000, as reflected in the following calculation:

**MCG Fee Calculation - Post Appeal**

| | | | |
|---|---|---|---|
| First $5MM | $ | 5,000,000.00 | |
| Fee %: | 20.00% | $ | 1,000,000.00 |

2

| | | | |
|---|---|---|---|
| Extraordinary Result: | $ | 9,500,000.00 | |
| | | | |
| Fee %: | 25.00% | $ | 2,375,000.00 |
| | | $ | 3,375,000.00 |

MCG has also notified Vitamins Online that it has calculated the amount of its contingency fee to be $3,375,000.

The Fee Agreement includes the following provisions that are pertinent to Vitamins' payment of fees to MCG, and requires that all of the recovery be delivered to MCG in the first instance:

> All payments from or collected against HeartWise or associated persons or entities shall be directed to the Firm (MCG), which will deduct the contingency fee and any outstanding fees and costs, and then pay the balance to Client (Vitamins).

Fee Agreement, p. 9.

> The Client agrees that in the event there is an outstanding amount due to the Firm at the time of settlement, or collection or recovery of monies on the Client's behalf, the Firm is authorized to direct that all such monies be payable and delivered to, and in the name of the Firm. The Client agrees that in the event the Firm receives any settlement proceeds or funds otherwise due to be paid to the Client resulting from the Firm's representation of the clients in the Matter, that prior to delivery to Client, the Firm shall be entitled to first apply such proceeds or funds to any amount due and owing to the firm, as well as an amount sufficient to cover any fees and costs for work in progress that have not, at that time, been billed. In addition, the Client is advised and agrees that the Firm will not and, pursuant to ethical rules cannot disburse such proceeds or funds if they are received in the form of a check, until such time as the check has cleared the bank on which it is drawn and the check is no longer subject to the possibility of dishonor.

*Id.*, p. 12.

The foregoing provisions are vital, material parts of the Fee Agreement, which are essential (among other reasons) to protect MCG's ability to collect the attorney's fees owed to it

3

by Vitamins, for its services in the Utah lawsuit – which made Vitamins' claims possible in the first place.

Based upon the foregoing, all payments that would otherwise be paid to Vitamins on account of its Proof of Claim should be paid to MCG. If Vitamins disputes MCG's calculations of distributions, then – as contemplated in their Fee Agreement – that issue shall be resolved between the parties prior to any distribution of monies received from HeartWise (i.e., the bankruptcy estate) on account of the Proof of Claim. MCG is simultaneously filing an Objection to the Vitamins Proof of Claim, in which it asserts, based on the Fee Agreement between MCG and Vitamins, that "[a]ll payments from or collected against HeartWise . . . shall be directed to [MCG], which will deduct the contingency fee and any outstanding fees and costs, and then pay the balance to [Vitamins]."

### General Reservation of Rights

MCG reserves the right to amend or supplement this Proof of Claim and any other proof of claim it has filed or will file, to the extent allowable under 11 U.S.C. § 502(b), including, without limitation, attorney's fees and other costs incurred by it of any kind that accrue or continue to accrue. MCG further reserves the right to apply for as well as to pursue claims for administrative expenses that may arise to the extent established under 11 U.S.C. § 503. MCG further reserves the right to supplement this proof of claim for indemnified damages and for unpaid post-petition obligations which become known to MCG after filing this Proof of Claim.

MCG reserves his right to (a) amend, update and/or supplement this claim at any time and in any respect, and/or (b) file additional proofs of claim for additional claims which may be based on the same or additional documents and/or agreements.

4

This Proof of Claim is filed without prejudice to the filing by MCG of additional proofs of claim with respect to any other liability, indebtedness or obligation of the Vitamins, Debtors or any of their parents, subsidiaries or affiliates.

MCG specifically reserves his rights to file actions and claims within this case or in an appropriate non-bankruptcy forum against Vitamins, Debtor, Debtor's and Vitamins' present and former officers, directors, employees, lenders, shareholders or others for damages to its interests.

The filing of this Proof of Claim is not: (a) a waiver or release of MCG's rights against any person, entity or property, (b) a consent by MCG to the jurisdiction of this Court with respect to the subject matter of this Proof of Claim, any objection hereto, or any other proceeding commenced in these cases against or otherwise involving MCG, (c) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of this Court, with respect to the subject matter of this Proof of Claim, any objection thereto, or any other proceeding commenced in these cases against or otherwise involving MCG, or to assert that the reference has already been withdrawn with respect to the subject matter of this Proof of Claim, any objection thereto, or any other proceeding commenced in these cases against or otherwise involving MCG, (d) an election of a remedy, or (e) a waiver of any past, present or future defaults or events of default.

MCG specifically preserves all of its procedural and substantive defenses and rights with respect to any claim (if any) that may be asserted against MCG by the Debtor or by Vitamins, or any non-debtor affiliate or other entity related thereto, any trustee for the Debtor' estate, any other party in interest in this bankruptcy case, or any other person or entity whatsoever.

5

1733680.5

MCG fully reserves all rights to pursue joint and several or separate liability for the obligations and documents supporting this Proof of Claim against Vitamins or any one or more of the jointly administered Debtors in its discretion.

To the best of the MCG's knowledge, this Proof of Claim is not subject to any setoff or counterclaim in favor of the Debtor.

While MCG has made every effort to i) identify all services, use of property and other benefits provided to Vitamins prior to the Petition Date; ii) identify the correct debtor entity against with which it obtained a judgment for Vitamins or which is the proper debtor with reference to the subject matter of this Proof of Claim; iii) provide accurate information in the supporting exhibits; and, iv) include all available or refer to all supporting documentation, MCG reserves all rights to amend, modify, or supplement this Proof of Claim at any time.   In addition, MCG is investigating whether it has claims against Vitamins any of the other jointly administered debtors on other bases not identified herein.   MCG reserves all rights to file proofs of such other claims.

To the extent that MCG has valid rights to set-off pursuant to 11 U.S.C. § 553, rights of recoupment, or otherwise, such rights are expressly preserved and MCG reserves all rights related to such setoff or recoupment.   Further, MCG specifically objects to any provision of a plan of reorganization that attempts to discharge or otherwise alter any of its setoff or recoupment rights.

DATED this 16th day of April, 2021.

MAGLEBY CATAXINOS & GREENWOOD, PC

By:_____
James E. Magleby
Its: President

6

1733680.5

**In re: HeartWise, Inc., Debtor**
**United States Bankruptcy Court**
**Central District of California**
**Case No. 8:20-bk-13335-MW**
**Proof of Claim of Magleby Cataxinos & Greenwood, P.C.**

# Exhibit A

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VITAMINS ONLINE, INC.**, a Delaware corporation, | |
| **Plaintiff,** | **FINAL JUDGMENT** |
| v. | |
| **HEARTWISE, INC.** an Oregon corporation d/b/a **NATUREWISE**, | **Case No.: 2:13-cv-00982-DAK** |
| **Defendant.** | **Judge Dale A. Kimball** |

This action came before the court for a bench trial. Pursuant to Federal Rule of Civil Procedure 58 and the court's Findings of Fact and Conclusions of Law entered November 10, 2020 [ECF No. 585], and with there being no other issues before the court, the court enters judgment in favor of Plaintiff and against Defendant in the amount of $9,551,232 in disgorged profits with simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014. Plaintiff is further awarded its reasonable attorney fees and costs in this matter, to be determined post judgment. This action is now closed.

DATED this 10th day of November, 2020.

BY THE COURT:

DALE A. KIMBALL
United States District Court

Case 8:20-lk-12887-MW 03 0 6731   Filed 07/26/22 Dec Main Doc 8863887 26374 e 1 of
Case 2:13-cv-00982-DAK   Document 585   Filed 11/10/20   PageID.62030   Page 1 of 50
Main Document 87 Page 84 of 161

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VITAMINS ONLINE, INC., a Delaware corporation,**<br><br>**Plaintiff,**<br><br>v.<br><br>**HEARTWISE, INC. an Oregon corporation d/b/a NATUREWISE,**<br><br>**Defendant.** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br><br>**Case No.: 2:13-cv-00982-DAK**<br><br><br>**Judge Dale A. Kimball** |

On October 28, 2013, Plaintiff filed a complaint against Defendant in this court alleging unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and Utah common law for false advertising. The Complaint alleged false advertising based on two types of conduct: (1) manipulating Amazon.com's ("Amazon") customer review system ("Review Claims"); and (2) falsely advertising and misrepresenting the content and characteristics of its green coffee and garcinia cambogia products ("Ingredients Claims").

The court held a bench trial in this matter on July 16 – August 6, 2020. Plaintiff was represented by James E. Magleby, Yevgen Kovalov, Edgar R. Cataxinos, and Geoffrey Kris Biehn. Defendant was represented by R. Joseph Trojan, Francis Wong, Kevin R. Davis, and Dylan C. Dang. Throughout the trial, the court heard the testimony of witnesses and received exhibits by the parties into evidence. At the close of Plaintiff's case in chief, Defendant moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).

The court now issues the following Findings of Fact and Conclusions of Law, finding that Plaintiff has met its burden in demonstrating that Defendant violated Section 43(a) of the

Lanham Act and Utah state common law.  In conjunction thereto, the court denies Defendant's

Rule 52(c) motion.

## FINDINGS OF FACTS[1]

1.      Vitamins Online, Inc. ("Vitamins Online") is a Utah-based retailer that distributes

supplements under the brand name NutriGold.  Tr. 66-67 (Khan).  Osman Khan ("Khan") and

Sripriya Rangarajan ("Rangarajan") are the co-founders of Vitamins Online and NutriGold.  Tr.

70.  Khan is the Chief Financial Officer of Vitamins Online.  Stip. Fact 3. Vitamins Online

launched its brand of supplements under the NutriGold brand in 2010.  Tr. 70.  Prior to that time,

Khan and Rangarajan invested considerable time and resources to identify options to make

products without the excipients (e.g. magnesium stearate, silicon dioxide) commonly found in

dietary supplements.  Tr. 70.  It took Vitamins Online approximately one year of preparation and

an additional year to launch its first NutriGold product.  Tr. 70.  Khan testified at trial, and the

court finds that he was a credible, reliable witness.

2.      HeartWise, Inc d/b/a NatureWise ("NatureWise") is an Oregon Corporation that

sells dietary supplements on Amazon under the brand name NatureWise.  NatureWise was

---

[1] The court enters these findings of fact based on a preponderance of the evidence.  In assessing the credibility of the witnesses, the court has considered the source and basis of each witness's knowledge; the ability of each witness to observe; the strength of each witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial.

In addition, the court will provide citations to the record in the following manner: references to the uncontroverted facts submitted by the parties and adopted by the court in its July 7, 2020 Pretrial Order (ECF No. 535) are abbreviated as "Stip. Fact [X]"; references to the hearing transcript are abbreviated as "Tr. [page]"; and references to exhibits admitted at trial are abbreviated as "Ex. [X]."  In addition, although, in the Pretrial Order, Plaintiff does not set forth any uncontroverted facts and contests virtually every fact set out by Defendant, Plaintiff acknowledges that it does not contest "simple facts relating to the entities and the role by the principals of each entity."  (*Id.*)  Accordingly, the court's citation to the Pretrial Order will be limited to these "simple facts."

2

incorporated in May of 2012. Tr. 419-420; Ex. 5144.001. DavidPaul Doyle ("Doyle") is NatureWise's founder and Chief Brand Officer. Stip. Facts 4-6. In 2018, Tom Nguyen of Robinson Pharma became NatureWise's Chief Executive Officer following his investment in the company. Tr. 423-424. Doyle currently owns 49% of NatureWise and has no active role in its management or daily operations. Tr. 424. Doyle testified at trial. The court finds that he was not a credible witness, and his testimony was unreliable.[2]

## I.    Ingredients Claims

### A.    NutriGold's Garcinia Cambogia Gold

3.    Vitamins Online first launched its NutriGold Garcinia Cambogia Gold supplement ("NutriGold Garcinia") in 2011. Tr. 106. Garcinia cambogia is a fruit that contains hydroxycitric acid ("HCA"). Tr. 106. NutriGold Garcinia contained the clinically proven, multi-patented SuperCitrimax garcinia cambogia ingredient supplied by the company InterHealth (now Lonza). Tr. 107-108; Tr. 114-115; Ex. 3. SuperCitrimax is a patented form of HCA from garcinia cambogia bound to calcium and potassium. Tr. 114-115; Ex. 3. SuperCitrimax provides 60% calcium/potassium salt HCA and is clinically proven to curb appetite, burn fat, and reduce body weight. Tr. 114-115; Ex. 3. Generic garcinia cambogia does not have the same clinical support as SuperCitrimax because the generic is not bound to the patented ratio of the calcium/potassium salt. Tr. 117. SuperCitrimax is significantly more expensive than generic extracts because it is proven to be effective and provides a competitive advantage in the marketplace. Tr. 119.

---

[2] The issues surrounding Doyle's credibility are demonstrated and detailed through the findings below.

3

- 300 -

4.      Prior to the middle of 2013, there were a few other competitors on Amazon that were offering garcinia cambogia products, and some contained SuperCitrimax. Tr. 123-24. However, by mid-2013, Vitamins Online was the only seller of SuperCitrimax garcinia cambogia on Amazon. Tr. 123-24. Vitamins Online advertised its NutriGold Garcinia product on Amazon as containing SuperCitrimax and 60% HCA. Tr. 110-19; Tr. 114-15; Ex. 3. Vitamins Online heavily advertised that its product contained SuperCitrimax because it was backed by clinical studies. Tr. 119.

5.      The TV personality Dr. Mehmet Oz, known as "Dr. Oz," aired a television show on October 1, 2012, in which he promoted the benefits of garcinia cambogia. Ex. 55, 104. That show featured Dr. Harry Preuss, the chief researcher for the SuperCitrimax ingredient in several studies. Tr. 207-10; Exs. 104, 105, and 56. In the episode, Dr. Oz gave specific buying guidelines to help customers purchase the right product—garcinia cambogia extract with at least 50% HCA and potassium or calcium/potassium. Tr. 211; Ex. 56.1. He also emphasized that the dosage needed to be high. Tr. 211; Ex. 56.1. Dr. Oz's show on garcinia cambogia increased Vitamins Online's sales substantially. Tr. 212-13. In order to meet that demand, NutriGold had a supply agreement with InterHealth that guaranteed an uninterrupted supply of SuperCitrimax. Tr. 216-17; Ex. 607.

6.      Vitamins Online spent millions advertising its NutriGold Garcinia and placed particular emphasis on the SuperCitrimax ingredient. Tr. 152-57; Ex. 611.1.

**B.      NutriGold's Svetol Green Coffee Gold**

7.      In 2012, Vitamins Online launched a green coffee product with Svetol ("NutriGold Green Coffee") (collectively, with NutriGold Garcinia, the "NutriGold Products"), a chlorogenic acid product produced by the company Naturex. Tr. 137. Svetol is approximately four or five times more expensive than generic green coffee bean extract. Tr. 142-43, 145.

4

Despite its higher price, Vitamins Online chose to produce a green coffee product containing

Svetol because it was backed by clinical studies.  Tr. 137-39.  The studies relied upon by

Vitamins Online demonstrated that the amount of the active ingredient of the green coffee is

critical, as a product with less than the amount used in the study may not provide the same

benefit.  Tr. 141-42; Ex. 634.3.  Importantly, Svetol was the only green coffee extract that was

clinically proven to provide a weight-loss benefit.  Tr. 143-44.  Therefore, on its Amazon

product page, Vitamins Online advertised NutriGold Green Coffee as the only product that

contained 400 milligrams, the dosage used in the clinical studies, of Svetol Green Coffee extract

per capsule.  Tr. 146; Ex. 380.2.  Vitamins Online spent millions advertising its NutriGold Green

Coffee and placed particular emphasis on the Svetol ingredient.  Tr. 152-57; Ex. 611.1.

8.      Dr. Oz aired a television show on March 1, 2012 promoting the benefits of green

coffee.  Tr. 157; Ex. 5.  Sales of Vitamins Online's NutriGold Green Coffee spiked after the

episode.  Tr. 159.  In late 2012, Dr. Oz aired a second episode on green coffee, offering buying

guidelines for green coffee bean extract products.  Tr. 199, 872; Exs. 41-42.  In the second show,

Dr. Oz told viewers to look for Svetol or GCA; products that had at least 45% chlorogenic acid;

products dosages of 400 mg, 3x per day; and explained that a 30-day supply costs approximately

$30.  Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2.  He also warned consumers to not be duped by

the word "pure."  Tr. 201-03, 206-07, 873; Exs. 42.1, 42.2.  In addition, Dr. Oz recommended

purchasing products with no fillers and no artificial ingredients.  Tr. 996; Ex. 56.

9.      Following the second Dr. Oz show, sales of NutriGold Green Coffee increased

significantly because the product matched Dr. Oz's requirements.  Tr. 206.  Eventually,

NutriGold Green Coffee obtained a #1 ranking on the Amazon Best Sellers list.  Tr. 160-61.

Case 2:20-cv-13000-MWF-DMF Document 585 Filed 11/16/20 Page 6 of 58
Case 2:13-cv-00982-DAK Document 585 Filed 11/16/20 PageID:32033 Page 17 of
Main Document 87 Page 89 of 161

## C.     NatureWise's Products

10.     When Doyle launched NatureWise, he had no experience with supplements or the supplement industry. Tr. 425. He did, however, have experience in selling spiritual books on Amazon. Tr. 418-19. To transition from book sales to supplements on Amazon, Doyle watched a few videos on the internet and looked for a supplier. Tr. 430. In addition, he conducted research and discovered green coffee bean extract was the top seller in the health and personal care category on Amazon. Tr. 425. Accordingly, NatureWise's first product was a green coffee product. Tr. 427.

11.     From approximately 2012 to the end of 2013, NatureWise launched six products–Green Coffee Bean Extract 800; Svetol with GCA; Garcinia Cambogia; Krill Oil; Ubiquinol; and Vitamin D. Tr. 427-28.

12.     NatureWise launched the following products on the following dates: the first green coffee product (Amazon Standard Identification Number ("ASIN") B009VUZJTM) launched in July of 2012; the second green coffee product launched in October 2012 (ASIN B009aH4OR4); the first garcinia product launched in January 2013 (ASIN B00B5H5BHA); the second garcinia product launched in August 2015 (ASIN B01HRHBNJK). Tr. 429; Ex. 701.1.

### 1.     NatureWise's Green Coffee

13.     NatureWise launched its first green coffee product in the summer of 2012 as a result of high consumer demand. Tr. 420, 433. That product was called NatureWise Green Coffee Bean Extract 800 (the "First Green Coffee"). Tr. 427. NatureWise used Private Label Nutraceuticals ("PLN") as its contract manufacturer. Tr. 859-61; Ex. 50.20. NatureWise's first purchase from PLN occurred in June 2012, and NatureWise continued purchasing product from PLN thereafter. Tr. 859-63; Ex. 50.20-30. At the start, NatureWise purchased generic green coffee from PLN and merely asked PLN to include higher quality ingredients without giving

6

specifications. Tr. 857. Furthermore, in its purchase orders, NatureWise did not specify any

percentage of chlorogenic acid that the end product should contain. Tr. 859-863; Ex. 50.21-30.

Similarly, NatureWise's label for the First Green Coffee did not specify the percentage of

chlorogenic acid that it contained. Tr. 863; Exs. 5025.17-18, 5024.15.

14.     Nevertheless, NatureWise advertised the First Green Coffee as containing 50%

chlorogenic acid on Amazon. Tr. 862-64; Ex. 102.1. Likewise, NatureWise advertised it as

having optimum levels of chlorogenic acid. Tr. 867-68; Ex. 1021.1. But NatureWise did not test

the First Green Coffee to determine the actual percentage of chlorogenic acid that it contained.

Tr. 872. NatureWise did not begin performing such tests until March 2013, at the earliest. Tr.

889; 5144.1.

15.     NatureWise also referenced a 2012 study involving Green Coffee Antioxidants

("GCA") to sell the First Green Coffee even though that product did not contain GCA. Tr. 871;

Ex. 1021.1. NatureWise understood that the study was conducted using a dosage of at least 350

milligrams of GCA twice a day. Tr. 893. In referencing the study, NatureWise advertised that

the First Green Coffee contained "Clinically Proven GCA" on the front of the bottle. Tr. 891-92;

Ex. 22.

16.     In the fall of 2012, following the second Dr. Oz episode on green coffee,

NatureWise changed the title of the First Green Coffee to Green Coffee Bean Extract 800 with

GCA. Tr. 875-76; Ex. 5025.1-4. NatureWise continued representing that it contained 50%

chlorogenic acid on Amazon and that its ingredients corresponded with the GCA study. Tr. 882-

83; Ex. 1021.1. However, the product only contained approximately 5 milligrams of GCA. Tr.

877-78; Ex. 50.2. Doyle knew that the product contained a minimal amount of GCA—an

amount that failed to match the dosage used in the GCA study. Tr. 878.

17.      Reviewers on Amazon believed that the First Green Coffee contained the proper
amounts of GCA and relied on NatureWise's representations.  Tr. 971; Exs. 572A.1, 572A.2.

18.      At some point in late 2012, Amazon removed the phrase "chlorogenic acid" from
the First Green Coffee's product page because it wanted proof that the claim was accurate.  Tr.
883.  After Amazon removed the phrase, Doyle informed Amazon that it had 50% chlorogenic
acid.  Tr. 884-85; Ex. 86.  Yet, in a November 2012 email to PLN, Doyle admitted that he did
not know how many milligrams of green coffee were in the First Green Coffee.  Tr. 880-81;
Harden Dep. 53-57; Ex. 669.51-669.55.  Because he could not verify the amount of chlorogenic
acid in the First Green Coffee, Doyle asked Amazon to change the listing name to "Green Coffee
Bean Extract 800 – 100% Pure All Natural Weight Loss Supplement for All Body Types.
Chlorogenic Acid.  800mg.  60 Caps."  Tr. 887; 86.1.

19.      Because NatureWise was not conducting tests on the First Green Coffee until
March 2013, at the earliest, NatureWise did not know how much chlorogenic acid it contained.
Tr. 889-90; Ex. 5144.1.

20.      Around January 2013, NatureWise purportedly increased the amount of GCA in
the First Green Coffee to 20 milligrams—an amount still well below the amount used in the
GCA study that NatureWise referenced on Amazon.  Tr. 895; Ex. 50.13.  Yet, NatureWise
advertised that the First Green Coffee contained clinically proven GCA on its labels.  Tr. 891-92;
Ex. 8.1, 22.1.

21.      In March 2013, Doyle began testing his products.  Tr. 951; Ex. 124.  The test
results indicated that some lots of NatureWise's First Green Coffee did not match their label
claims.  Tr. 947, 951; Exs. 123.1, 124.  However, NatureWise continued selling the First Green
Coffee and did not recall any lots.  Tr. 950; Ex. 123.1.

8

22.	Eventually, NatureWise purportedly increased the amount of GCA in the First Green Coffee to 350 milligrams—the same dosage as used in the GCA study.  Tr. 904.  However, around that time, Doyle learned that the GCA study was seriously flawed.  Tr. 984-86, 993; Ex. 341.  But NatureWise continued advertising the First Green Coffee as being clinically proven.  Tr. 906.  The study was officially retracted in October 2014.  Tr. 990; Ex. 1001.1.

23.	Along with the First Green Coffee, in October 2012, NatureWise started advertising a second green coffee product called Svetol Green Coffee Bean Extract UltraPure with GCA (the "Second Green Coffee" and, collectively with the First Green Coffee, the "Green Coffees").  Tr. 909; Ex. 701.1.  The Second Green Coffee contained 300 milligrams of a proprietary blend of generic green coffee extract and GCA and 133 milligrams of Svetol.  Tr. 912; Ex. 57.4.  NatureWise advertised Svetol and GCA prominently on its bottle and packaging.  Tr. 913; Exs. 24.1, 25.1.

24.	In March 2013, Doyle learned from Naturex that the Second Green Coffee did not meet its label claims.  Tr. 919, 930-31; Ex. 115.1.  Naturex explained that it had tested samples provided by NatureWise, and those samples contained much less chlorogenic acid than was advertised on the label.  Ex. 115.1.  Consequently, Naturex demanded that NatureWise recall all of the non-conforming units.  Tr. 931; Ex. 115.2.  In addition, Naturex demanded that NatureWise notify customers who had purchased non-conforming units that the product they purchased did not meet its label claims.  Tr. 931; Ex. 115.2.  Although NatureWise had the capability of doing so, Doyle does not remember ever contacting customers as requested by Naturex.  Tr. 933-34.

25.	Notwithstanding Naturex's request to recall the Second Green Coffee units that did not match their label claims, NatureWise continued selling them.  Tr. 944, 955, 961; Ex.

131.1. Further, NatureWise intentionally sold as many bottles as it could before the deadline that Naturex had imposed to recall the non-conforming product. Tr. 944, 955, 961; Ex. 131.1. NatureWise only ceased selling the non-conforming Second Green Coffee because Doyle was worried about getting in trouble with Naturex for selling beyond the deadline. Tr. 956-57; Ex. 131.2.

26.     On June 28, 2013, Naturex informed NatureWise once again that the Second Green Coffee still did not conform to its label claim. Tr. 964-65; Exhibit 1016. Specifically, NatureWise advertised the Second Green Coffee as being vegetarian, but Naturex determined that claim was not true. Tr. 964-65; Exhibit 1016. As a result, Naturex terminated its licensing agreement with NatureWise in June 2013. Tr. 965-67, 969-70.

### 2.     NatureWise's Garcinia Cambogia

27.     NatureWise launched its first garcinia cambogia product (the "First Garcinia") in January 2013. Tr. 429; Ex. 701.1. It began shipping the First Garcinia by at least June 2013. Tr. 254-55, 1004; Ex. 108.1. The First Garcinia used generic garcinia cambogia ingredients. Tr. 1001. It did not have SuperCitrimax. Tr. 1000-01.

28.     When launching the First Garcinia, Doyle was keenly aware of NutriGold. Tr. 1010. Doyle relied on NutriGold Garcinia's product information on Amazon to develop the claims for the First Garcinia. Tr. 1010-11; Ex. 106. Doyle wanted to sell SuperCitrimax because NutriGold was selling it. Tr. 1015; Ex. 95.

29.     Although the First Garcinia did not contain SuperCitrimax, NatureWise referenced SuperCitrimax on its Amazon product page and included the SuperCitrimax logo on the First Garcinia's label. Tr. 1004-05; Ex. 108. NatureWise further advertised the First Garcinia as being clinically proven and having a patented form of 60% HCA bound to calcium and potassium on the First Garcinia's label, box, and Amazon product page. Tr. 1006-07, 1032,

10

1035-36; Exs. 108-108.1; 83-84, 375-76.  This was a direct reference to SuperCitrimax because such claims were patented by and proprietary to SuperCitrimax.  Tr. 114-15; Ex. 3.  NatureWise also advertised that the First Garcinia contained "100% Pure SuperCitrimax."  Tr. 1021, 1037; Ex. 83-84, 375-76.  NatureWise did this, and continued doing this for a period of time, even though it was not authorized by InterHealth to sell SuperCitrimax and even though Doyle knew that NatureWise was unable to obtain a licensing agreement for SuperCitrimax.  Tr. 1018, 1021; Ex. 375.  NatureWise eventually stopped advertising SuperCitrimax in the First Garcinia, but it is unclear when that advertising actually ceased.  Tr. 1016.

  30. The First Garcinia reached the number one spot on Amazon within two months after launch.  Tr. 1031; Ex. 146.  During that time, NatureWise sold 74,000 bottles of the First Garcinia and generated approximately $2 million in revenue.  Tr. 1031; Ex. 146.

  31. In December 2013, NatureWise hired a consultant, AIBMR, to review NatureWise's advertising claims on the First Garcinia.  Tr. 104.  After conducting its review, AIBMR determined and informed NatureWise that many of the claims it was making regarding the First Garcinia were neither legitimate nor substantiated.  Tr. 1046-47, 1054; Exs. 240, 356. This was especially true with respect to the claims explicitly and implicitly referring to SuperCitrimax given that the First Garcinia did not contain SuperCitrimax, and therefore lacked its patented and proprietary elements.  Tr. 1046-47, 1054; Exs. 240, 356.  AIBMR recommended that NatureWise stop making weight-loss and appetite suppressant claims given that the First Garcinia was generic garcinia cambogia, and NatureWise was making claims unique to SuperCitrimax.  Tr. 1041; Ex. 356.

  32. Notwithstanding AIBMR's recommendation, NatureWise continued to make weight-loss and appetite suppressions claims.  Tr. 1044, 1050-51; Ex. 356.  AIBMR also

recommended that NatureWise remove references to various clinical studies because, after performing the necessary research, AIBMR was unable to locate such studies.  Tr. 1878-79, 1886; Ex. 245

33.     Notably, NatureWise did not sell a garcinia cambogia product with SuperCitrimax until it launched a second garcinia cambogia product in August 2015 (the "Second Garcinia," collectively with the First Garcinia, the "Garcinias").  Tr. 1093-94; Ex. 701.1.

> **D.     Production and Manufacturing of the Green Coffees and the First Garcinia**

34.     As stated above, NatureWise used PLN as its first contract manufacturer.  Tr. 859-61; Ex. 50.20.  However, at some point in 2013, Doyle learned that PLN was not actually a contract manufacturer.  Tr. 957-58.  Instead, PLN was a mere intermediary that was purchasing products from actual contract manufacturers.  Tr. 956-60.  As such, for much of the time in 2012 and 2013, NatureWise did not know who was manufacturing the Green Coffees and the First Garcinia.  Tr. 1766.  Eventually, NatureWise learned that a contract manufacturer named Metaugus was producing its products.  Tr. 114; Ex. 511.  Notably, Metaugus received an FDA warning letter on May 22, 2013, for violating laws that regulate supplement production.  Tr. 114; Ex. 511.

35.     In October 2013, NatureWise stopped using PLN and began using DNE Nutraceuticals ("DNE") as its contract manufacturer.  Tr. 859-61, 981; Exs. 50.20, 298.1.  Like Metaugus, DNE received a warning letter from the FDA in August 2013 for reasons similar to Metaugus.  Tr. 1770; Ex. 512.

36.     Even though NatureWise was unaware for much of 2012 and 2013 as to who was actually manufacturing its products, NatureWise made the following claims regarding the Green Coffees and the First Garcinia:

12

     (a)     That each ingredient that NatureWise used was verified for purity through in-house laboratory testing, Tr. 868-69, 2257; Exs. 386.2;1021.1;

     (b)     That NatureWise had implemented a strict set of FDA compliant manufacturing procedures to ensure product integrity, including daily inspections of all storage, blending and production areas, Tr. 2258-59; Ex. 386.2; and

     (c)     That NatureWise's facilities were regularly inspected by FDA officials to maintain their certifications, Tr. 2260-61; Ex. 386.2.

37.     Although NatureWise eventually figured out who was manufacturing its products, it failed to maintain necessary documentation demonstrating and detailing how the Green Coffees and the Garcinias were made (collectively, the "Products"). Tr. 1737, 1890, 1976. For example, NatureWise represented in July 2015 that, despite being in business and selling its products since 2012, it did not have Standard Operating Procedures ("SOPs") and that it was in the process of developing product specification sheets. Tr. 1131, 1774. Despite NatureWise's representation, it never produced any SOPs in this case. Tr. 1737.

38.     NatureWise also failed to track which label or labels it used for each lot/batch of the Products. Tr. 845-46; Ex. 401.6. Indeed, NatureWise did not maintain any specific data relating to specific labeling for specific lots of the Products. Tr. 1125-26; Ex. 408.3. Consequently, during discovery, NatureWise represented that it:

     (a)     Could not identify the specific label or labels that it used on bottles for each lot/batch of the Products that it produced, Tr. 845-46; Ex. 401.6;

     (b)     Lacked the ability to know which labels were used at which times, or which label revisions were used on final products, Tr. 847; Ex. 401.8-9.

13

(c)    Lacked the information as to the period during which products containing each lot/batch were sold, Tr. 847; Ex. 401.6-7; and

(d)    Could not identify which label claims were made on specific dates, Tr. 877.

39.    Nevertheless, immediately before trial, NatureWise produced some photographs of labels next to lot numbers.  Tr. 1127-28; Exs. 5025.1, 5024.-4; 5022.1-4.

**E.    NatureWise Product Testing**

40.    Vitamins Online presented testimony from an expert in analytical supplement testing, Dr. Norman Howe, Ph.D. ("Dr. Howe").  The Court finds that Dr. Howe was qualified and credible and that his testimony was based on sufficient facts and data and the product of reliable scientific principles and methods.  Tr. 1733-34.  Mollie Kober ("Kober") testified at trial for the purpose of rebutting Dr. Howe's testimony.  While the court finds that Kober's testimony was credible, she failed to rebut Dr. Howe's testimony that certain lots of the Products did not meet their label claims.

41.    Dr. Howe compared test results against label claims because NatureWise never produced SOPs, and label claims were the best information available in the absence of such specifications.  Tr. 1866.

42.    A certificate of analysis ("COA") is a written document that includes finished product specifications, test method for each specification, the results of testing to verify that each specification has been met, and the signature of the analyst.  Tr. 1787.  Finished product specifications are extremely important in the dietary supplement industry.  Tr. 1774.

43.    For example, if a company claims that it has a "quality" product, it must first define what "quality" is for that product.  Tr. 1774.  The way that a company does that is through

14

a specification sheet. Tr. 1774. Specifications define product quality in clear, measurable terms. Tr. 1801.

44.     The parties used the following laboratories to perform tests and provide COAs for the Products: Eurofins, Tr. 1249; Advanced Laboratories, Tr. 2503; Covance, Tr. 2457; San Rafael, Tr. 2447; Atlas Biosciences, Tr. 2425; and Intertek, Ex. 5083.

45.     The testing results from the foregoing laboratories produced conflicting results. Tr. 1779, 1872; Exs. 144, 372, 650, 668, 5083. Some results demonstrated that the Products met their label claims while other results demonstrated that they did not. Tr. 1896; Ex. 5083.

46.     The following list details advertising claims made by NatureWise and corresponding test results demonstrating that those advertising claims were false and/or inaccurate:

(a)     Labels for the Garcinias claimed 60 milligrams of potassium, but testing demonstrated that certain lots had far less, Tr. 1059-63, 1871-72, 1859; Exs. 167.1, 181, 187, 188, 193, 372.107, 650, 668;

(b)     The Garcinias claimed 60% HCA, but testing demonstrated that certain lots had less than 60%, Tr. 1095; Ex. 159;

(c)     The Garcinias claimed 300 milligrams of HCA on their labels, but testing demonstrated that certain lots contained far less, Tr. 1856-57; Exs. 372.67, 372.69, 372.203,

(d)     The Garcinias claimed certain amounts of garcinia cambogia extract, but testing demonstrated that certain lots did not match those claims, Ex. 372;

(e)     Labels on the Garcinias advertised that they were 100% pure and had no fillers, binders, or artificial ingredients, but testing demonstrated that certain lots

contained excipients, binders, fillers, and/or artificial ingredients, Tr. 1857-58, 1871, 1875, 2349; Exs. 372, 372.69, 372.128, 372.177, 650, 5019.5;

(f)     Labels on the Garcinias advertised that they were vegetarian capsules, but testing demonstrated that certain lots contained protein and gelatin from animal sources, Tr. 1076-77, 1858, 1870; Exs. 161, 161.3, 168.1, 370.205, 370.206, 650, 668;

(g)     The Green Coffees claimed certain amounts of green coffee extract, but testing demonstrated that certain lots did not match those claims, Ex. 372;

(h)     NatureWise advertised the Green Coffees as being vegetarian, but various lots of the Green Coffees tested positive for gelatin from animal sources, Tr. 1077-77; Exs. 168.1, 161, 161.3;

(i)     Certain lots of the Green Coffees advertised 400 milligrams of chlorogenic acids on the labels, but testing demonstrated that some of those lots contained far less, Tr. 1853-54; Exs. 372.8, 372.10, 372.22, 372.28, 521; and

(j)     Labels on the Green Coffees advertised that they were 100% pure and had no fillers, binders, or artificial ingredients, but testing demonstrated that certain lots contained excipients, binders, fillers, and/or artificial ingredients.  Tr. 1860-62; Exs. 372. 123, 372.126, 372.130, 372.135, 372.152.

47.     The foregoing claims were material to consumers.  Tr. 850-51, 873-74, 877, 899, 909, 913-14, 922-23, 996, 999, 1007, 1034; Ex. 304A.

48.     Importantly, Doyle was aware that certain lots of the Products did not match their label claims.  Tr. 920-21, 945, 981-982, 1107-08, 1115-16, 1119-20; Exs. 111, 112, 112.1, 150, 150.2, 298.1.  Yet, even with that knowledge, NatureWise continued selling and distributing the Products without issuing any recalls.  Tr. 1783; Ex. 111.

16

49.     Moreover, even though Doyle know there were test results indicating that certain

lots of the Products did not meet their label claims, NatureWise represented to a third-party

auditor that none of its products had ever tested out of specification.  Tr. 2270, 2275; Exs. 124,

372.

## II.     Review Claims

### A.     Amazon

50.     An Amazon product page is comprised of product photos, a product title, product

features, and a section for more detailed product features.  Tr. 85-86; Ex. 1.3.  The seller of the

product controls the content of these four areas.  Tr. 87; Ex. 1.3.  Amazon provides a platform on

the backend for third-party sellers to manage orders and customer communications.  Tr. 89.

Through this platform, the seller can input the product information manually, or use an excel file

so Amazon can auto-populate these fields.  Tr. 89.  A seller can update the page at any time

through these two methods.  Tr. 89-90.  Once updated, the information appears within one or two

days.  Tr. 89-90.

51.     One component of the product page is a mini scoreboard that reflects the number

of reviews and the average rating of the product indicated by stars.  The mini scoreboard is

automatically updated by Amazon.  Tr. 90, 98; Ex. 1.3.  Each product on Amazon is given an

ASIN.  Tr. 90-91.

52.     The "Best Seller" rank on Amazon reflects a ranking by category of the best-

selling products and provides information on a product's position at a particular point in time

within that product category.  This section is updated automatically by Amazon.  Tr. 92-93; Ex.

1.3.  Appearing in the top one or two results on Amazon's Best Seller list offers a competitive

advantage over those products listed below.  Tr. 184-85.

17

53.     Other components on a product page include the customer reviews section, the
aggregate statistics of all reviews, the most helpful customer reviews, content of reviews, and
comments on reviews.  Tr. 94-99, Ex. 1.3.  In addition, Amazon tracks what customers view in
relation to a product page and uses this information to provide consumers with direct and side-
by-side comparisons to similar items.  Tr. 98-99; Ex. 374.2.

54.     There are two types of reviews on Amazon product pages: verified and unverified
reviews.  Tr. 93-94; Ex. 1.3.  To obtain a verified review, the reviewer must purchase the product
without a discount.  Tr. 93-94; Ex. 1.3.  The verified review badge is automated by Amazon and
determined purely based on whether the non-discounted purchase occurred.  Tr. 93-94; Ex. 1.3.
To leave an unverified review, any Amazon account holder can log in and leave a review.  Tr.
94-95; Ex. 1.3.  The name associated with the Amazon account appears on each review.  Only
one review for each product can be posted from a single Amazon account.  Tr. 96; Ex. 1.3.
Amazon account holders can vote up or down reviews to indicate a review's helpfulness, and
account holders can vote up or down multiple reviews on one product page.  Tr. 102-03.  When
leaving a review, an Amazon account holder selects the number of stars, from 1 to 5 stars, as a
ranking of the product.  Tr. 102-103; Ex. 1.3.  When a new review is posted, the input
immediately changes the product's score rating—adding to the total number of reviews, the total
number of star rankings and the average star ranking.  Tr. 97-98; Ex. 1.3.

55.     Another section on each Amazon product page is titled, "Most Helpful Customer
Reviews."  Tr. 99-100; Ex. 1.5.  In this section, the most helpful reviews are prominently
displayed.  Tr. 99-100; Ex. 1.5.  Such reviews may be positive or negative and are determined by
the number of "helpful" or "up" votes from customers.  Tr. 99-100; Ex. 1.5.  The device by
which a review is voted up or down is a button asking whether the review is helpful or not, and

18

only those with an Amazon account can vote up or down on a review a single time.  Tr. 102-03;

Ex. 1.3.  The reviews with the most helpfulness votes appear at the top of the first page of

reviews.  Tr. 100; Ex. 1.5.  Conversely, the reviews voted least helpful are bumped down to later

pages.  Tr. 101; Ex. 1.5.  Notably, only approximately ten reviews appear on each page, and most

consumers do not read beyond the first set of reviews.  Tr. 101-02; Ex. 1.5.

56.     Reviews are important to consumers. Tr. 483.  In particular, the number of

positive reviews is important to the buying decision of many customers.  Tr. 485; Ex. 669.259.

Customers also generally care about star ratings.  Tr. 488.

57.     Good reviews are a factor in search results, and reviews are a factor in increased

sales.  Tr. 759-760.

58.     In order to monitor reviews and ensure that reviews are legitimate, Amazon has

an anti-manipulation policy for reviews.  Tr. 639-41.  That policy provides that "[a]ny attempt to

manipulate reviews, including by directly or indirectly contributing false, misleading or authentic

content, is strictly prohibited."  Tr. 640; Ex. 416.1; Malley-Naslund Dep. 59-60, Ex. 669.378-

669.379.

**B.      Importance of Amazon Reviews to Consumers**

59.     Vitamins Online presented testimony from a marketing and consumer survey

expert, Michael Belch, Ph.D. ("Dr. Belch"), regarding the importance of online reviews to

consumers.  Tr. 1268-80.  The Court finds that Dr. Belch was qualified and credible.

60.     There is very extensive and consistent literature that online reviews are an

important part of almost all online purchasing decisions.  Tr.  1270, 1310.  The literature

indicates that consumers use, rely upon, and trust online reviews in making purchasing decisions.

Tr. 1270, 1351.

<div align="center">19</div>

61.     More specifically, Amazon customers use and rely upon the website's online reviews when making purchasing decisions.  Tr. 1268-80.  Reviews on Amazon are very important to customers.  Tr. 483; Ex. 235.  The number of positive reviews that any given product has on Amazon is also important to and influential for customers.  Tr. 485-87; Ex. 333.  The number of reviews has an impact on sales.  Tr. 487.  Sellers on Amazon stand to gain financially from each positive review on their product pages.  Tr. 513.

62.     Similarly, customers care about products' star ratings.  Tr. 491; Ex. 334.  Even slight differences in star ratings can lead to much higher sales for higher rated products.  Tr. 491.

C.     **NatureWise's Reviews**

63.     Doyle believed that Amazon reviews were critical to NatureWise's success.  Tr. 475-76.  Doyle also believed that reviews would have a direct effect on NatureWise's sales.  Tr. 586.

64.     Prior to the launch of the First Green Coffee, in May 2012, Doyle knew that customers had the capacity to post dishonest reviews on products that they had never received.  Tr. 577-78.  NatureWise launched the First Green Coffee in mid-to-late July 2012.  Tr. 420, 433.  Nevertheless, the First Green Coffee began receiving product reviews prior to its actual launch.  Tr. 436-37, 504-05; Ex. 571.  For example, the following reviews were posted on the First Green Coffee's Amazon product page prior to its launch:

(a)     A review stating that the customer had been taking the First Green Coffee for a couple of weeks, Tr. 498-99, 501; Exs. 571, 571D.1;

(b)     A review giving the First Green Coffee five stars and claiming that the customer had been taking the product for months, Tr. 504-05; Ex. 571;

(c)     A review explaining that the customer was seeing results of losing one pound every two weeks, Tr. 503-04; Exs. 571, 571D.3;

20

Case 2:20-cv-03333-MWF-RAO  Document 87  Filed 07/01/22  Page 21 of 53
Case 2:13-cv-00982-DAK  Document 585  Filed 11/10/20  PageID.32070  Page 21 of
Main Document  87  Page 104 of 161

(d)      A review stating that the customer had lost eighteen pounds in the prior

eighteen weeks, Tr. 504; Exs. 571, 571D.3;

(e)      A review referring to the specific milligrams being advertised by

NatureWise and claiming to have been taking 800 milligrams as prescribed, twice per

day, Tr. 505-06; Exs. 571, 571D.4;

(f)      A review explaining that the customer had been taking the product for

approximately three weeks, Tr. 509; Exs. 571, 571D.8;

(g)      A review wherein the customer claimed that his spouse had lost eleven

pounds over the prior three months, Tr. 509-10; Exs. 571, 571D.1;

(h)      A review stating that the customer had been taking the product for four

weeks, Tr. 510-11; Exs. 571, 571D.19; and

(i)      A review claiming that the customer had experienced solid weight loss

during the prior month.  Tr. 510-11; Exs. 571, 571D.19.

65.      By July 14, 2012, the First Green Coffee had more than seventeen four- and five-

star reviews.  Tr. 503-04, 510-11; Exs. 571, 571D.3.  Notably, several of these early reviews

came from unverified purchasers and appeared on the First Green Coffee's page all within

fourteen minutes of each other and giving it five-star ratings.  Tr. 498; Exs. 571, 571D.1.

Likewise, fourteen of the five-star unverified reviews appeared on the First Green Coffee's

product page within twenty-five minutes of each other and all ending with a similar pattern of

including an exclamation point in the title of the review.  Tr. 511-12; Exs. 571, 571D.21.

66.      Similar to the First Green Coffee, the Second Green Coffee and the Garcinias also

accumulated a substantial number of overwhelmingly positive reviews soon after their launch.

Tr. 262-63.  For example, by June 2014, the First Garcinia had more than 5,000 reviews filling

21

more than 500 pages. Tr. 287-88; Ex. 322.2. And, notably, may of the positive reviews on the Firs Garcinia received helpfulness votes almost immediately. Tr. 289-90; Ex. 322.4.

67. To analyze the foregoing anomalies of NatureWise's reviews, Vitamins Online presented testimony from a statistics and computer science expert, Julian McAuley, Ph.D. ("Dr. McAuley"). Dr. McAuley was qualified as an expert, Tr. 1394-97, 1401, and his testimony was credible. Dr. McAuley authored a joint report with Vitamins Online's other statistics and review manipulation expert, Thomas "Tommy" Noonan ("Noonan"), Tr. 1401-02. Noonan was qualified as an expert, Tr. 1515-28, 1531-32, and his testimony was credible. Dr. McAuley's testimony related to the Green Coffees and the First Garcinia. Tr. 1403; Ex. 701. He analyzed data from 2012 to 2015 but did not include an analysis of the Second Garcinia. Tr. 1403, 1405, 1407-08, Tr. 1532. Conversely, Noonan's testimony covered all four of the Products, and he analyzed data through 2018. Tr. 1403, 1405, 1407-08, 1532, 1535. Noonan's analysis corroborated Dr. McAuley's analysis. Tr. 1627-28.

68. Based on the credible testimony of Dr. McAuley and Noonan, the court makes the following findings regarding the Products and their corresponding reviews:

(a) NatureWise's unverified reviews had higher ratings than its verified reviews, Tr. 1418-21, 1429;

(b) The Products had higher ratings than other products in the Health & Personal Care category (the "Random Sample"), Tr. 1426-27, 1429-30;

(c) NatureWise's unverified reviews were significantly higher than the Random Sample, Tr. 1428-30;

(d) The Products had an unusually high number of new reviewers compared to the Random Sample, Tr. 1432-34;

22

(e)    NatureWise reviewers had written more prior reviews than the typical reviewers for the Random Sample, Tr. 1433;

(f)    New NatureWise reviewers gave significantly higher ratings than customers who had previously written reviews on Amazon, Tr. 1437;

(g)    Reviewers of the Products had significantly higher similarities compared to other reviewers from the Random Sample, Tr. 1443-44; and

(h)    There were various periods of time in which the Products had an unusually large ratio of unverified reviewers and an unusually large ratio of reviewers that were highly positive, Tr. 1448-49.

69.    This data suggests that NatureWise engaged in review manipulation.  Tr. 1627-28.

### D.    NatureWise's Manipulation of Reviews

70.    NatureWise manipulated the Products' reviews.  It did so by (1) block voting on the helpfulness of reviews and (2) offering free products in exchange for reviews.

### 1.    Helpfulness Block Voting

71.    NatureWise engaged in block voting on the helpfulness of reviews—that is, NatureWise directed its employees, and its employees obliged, to up vote good reviews and down vote bad reviews, which directly affected which reviews appeared at the top of the Products' pages and those that did not.  Tr. 521, 523, 525, 531-534, 543, 545; Exs. 37.5, 279, 283.1, 304, 669.269.

72.    While Doyle testified that the block voting was only in response to attacks on NatureWise reviews by unknown third parties, Tr. 526:16-527:4, that testimony was not credible. For example, Doyle would direct employees to down vote reviews without mentioning purported attacks or distinguishing between "attacking" reviews and legitimate reviews.  Tr. 540-541; Exs.

260.1; 269.1.  Doyle also acknowledged that some of the one-star reviews that NatureWise's

employees down voted may have been from real customers.  Tr. 597.

73.     Doyle further testified that NatureWise employees were allowed to vote their

conscience.  Tr. 522.  That testimony was not credible.  Moreover, NatureWise management

knew that their block voting was interfering with Amazon reviews, and they were worried about

customers finding out.  Ex. 268.1-2.  Similarly, NatureWise management was wary of Amazon

finding out about its block voting.  Tr. 593-594.

74.     NatureWise's conduct in block voting was a violation of Amazon's policies.  Tr.

641-44; Ex. 416; Malley-Naslund Dep. 59-63, 71, 81, Exs. 669.378-669.382, 669.390, 669.400.

Doyle was familiar with Amazon's anti-manipulation policy.  Tr. 614, 616, 639, 640-641; Ex.

70.5.

### 2.     Free Products in Exchange for Reviews

75.     NatureWise offered free products to customers in exchange for reviews.  Tr. 625-

626, 691; Ex. 48.1, 397.2.  Free products were contingent on customers providing a review.  Tr.

626-627; Ex. 34.  On several occasions, NatureWise denied having offered free product in

exchange for a review, even though that was not true.  Tr. 827-828, 831; Exs. 198.1, 280.1.

76.     Doyle also asked customers to review other products so that their reviews of

NatureWise products would have more credibility and so Amazon would not think NatureWise

reviews were fake.  Tr. 659, 663, 677-678; Exs. 210, Ex. 287.1.

77.     The practice of offering free products in exchange for a review was a violation of

Amazon's policies.  Tr. 680; Ex. 43.

78.     These types of review manipulation resulted in the deception of consumers, Tr.

1317-37, because such review manipulation was material to consumers, Tr. 916, 921; Exs. 557-

60.

24

79.     As a result of these types of review manipulation, NatureWise experienced

significant financial success.  Tr. 485-87, 491, 513, 586; Ex. 333.  475-76.

## III.    Effect of NatureWise's Actions on Vitamins Online

80.     The NutriGold Products and the Products were direct competitors on Amazon.

Tr. 179-80, 187, 272, 464-64, 467, 471, 967, 980; Exs. 386.3, 380.2-3, 381.3, 386.3, 638.  In

addition, from at least NatureWise's launch in 2012 through the end of 2013, Vitamins Online

and NatureWise were the major players in the Amazon marketplace for garcinia cambogia and

green coffee products.  And, at that time, the existence and impact of other competitors was

minimal.  Tr. 180, 272, 425-26; Exs. 27, 65, 70.3, 88.1, 1058.

81.     Vitamins Online's NutriGold Garcinia was a "#1 Amazon top seller" prior to

NatureWise's entry into the market.  Tr. 270, 2628-29; Exs. 61.1, 88.1.  Notwithstanding the

existence of a few other garcinia cambogia competitors in the market, sales of NutriGold

Garcinia continually increased following its launch.  Exs. 580, 580.1, 588, Ex. 589.  However,

after NatureWise's emergence on Amazon, it replaced Vitamins Online's NutriGold Garcinia as

the #1 ranked product on the Amazon Best Sellers list for garcinia cambogia products.  Tr. 270;

Ex. 88.1.

82.     Vitamins Online's NutriGold Green Coffee was also a "#1 Amazon top seller"

prior to NatureWise's entry into the market.  Tr. 180, 272; Exs. 27, 61.1.  However, when

NatureWise emerged on Amazon, the Green Coffees replaced NutriGold as the #1 green coffee

product.  Tr. 180, 272; Ex. 27.

83.     Thus, for both garcinia cambogia and green coffee products on Amazon, the

Products replaced NutriGold Products as the #1 best sellers.  Tr. 180, 272, 425-26; Exs. 27, 70.3,

88.1.  Similarly, the Products replaced the NutriGold Products as the top products in Amazon's

25

search results.  Tr. 180, 272, 425-26; Exs. 65, 70.3, 1058.  Consequently, Vitamins Online's

sales of the NutriGold Products dropped once NatureWise began selling the Products on

Amazon.  Tr. 238-40, 267-68, 272, 1954-59, 1977-84; Exs. 578. 579. 580.

84.     Following NatureWise's rise on Amazon, the Products consistently obtained #1

rankings on the Amazon Best Sellers list and effectively replaced the NutriGold Products.  Tr.

283-84; Ex. 322.1.

85.     However, by 2014, the markets for green coffee and garcinia cambogia on

Amazon were inundated with competitors such that Vitamins Online and NatureWise were no

longer the two major players in the relevant marketplace.  Tr. 256, 266; Exs. 5146, 5147.

**IV.     NatureWise's Revenue**

86.     Vitamins Online presented testimony from Dr. Stan Smith ("Smith") to establish

NatureWise's profits from selling the Products.  Tr. 1945-48.  Smith was a credible and well-

qualified witness, Tr. 1940-41, and he used reasonable and appropriate methodologies in

performing his work in this case.  Tr. 1947-50.  Smith determined that, in the years 2012 and

2013, NatureWise made $7,251,118 in revenue from selling the Green Coffees.  Exs. 588, 589.

During that same time period, NatureWise made $2,300,114 in revenue from selling the First

Garcinia.  Exs. 588, 589.  Thus, from 2012 through 2013, NatureWise's revenue from selling the

Green Coffees and the First Garcinia totaled $9,551,232.  Exs. 588, 589.

87.     NatureWise presented testimony from Richard Hoffman ("Hoffman") to rebut

Smith's calculation of NatureWise's profits.  Tr. 2571-74.  In reaching his own calculation of

NatureWise's profits, Hoffman was directed by Doyle to exclude certain profits.  Tr. 2656-62.

Hoffman also relied upon spreadsheets and information provided to him by NatureWise, but he

did not conduct any independent investigation into the accuracy of those spreadsheets or

26

information.  Tr. 2656-62.  In addition, prior to performing his calculation, NatureWise informed

Hoffman that it did not have record of its revenues by each specific product prior to 2014.  Tr.

2674-76.  Thus, Hoffman acknowledged that his calculation of NatureWise's profits for 2012

and 2013 was an estimate based on data from later years.  Tr. 2675-78.

88.    Because (1) Doyle was not a credible witness; (2) Hoffman acknowledged that his

calculation for 2012 and 2013 was a mere estimate; and (3) NatureWise explained to Hoffman

that it did not have record of its revenues by each specific product prior to 2014, Hoffman's

calculations of NatureWise's revenue, costs, and deductions in the years 2012 and 2013 were

unreliable and flawed.  Therefore, the court adopts Smith's calculation of NatureWise's profits

for 2012 and 2013.

## V.    NatureWise's Discovery Improprieties

89.    Doyle understood that he had a duty to preserve information related to this

lawsuit.  Tr. 733; Ex. 1023.2.  Nevertheless, Doyle failed to apprise all of the NatureWise

employees of the obligation to preserve information.  Exs. 640, 1023.  Moreover, Doyle and/or

NatureWise failed to preserve or produce evidence in the following manners:

(a)    Despite being aware of his duty to preserve evidence by early October

2013, on or around October 27, 2013, Doyle cleaned out his email and trash and reported

that he could therefore not find a certain document.  Ex. 5057.

(b)    Although Doyle contends that he sent hundreds of emails to Amazon

regarding fake reviews, NatureWise did not produce them.  Tr. 649.

(c)    Doyle continued deleting emails.  Tr. 519-520.

(d)    Third parties produced multiple emails and documents in response to

subpoenas that NatureWise failed to produce.  Notably, many of these emails contained

27

information detrimental to NatureWise's position.  Exs. 48, 50, 57, 61, 63, 67, 94, 95, 98, 99, 112, 122, 123, 124, 125, 131.

(e)      Doyle deleted videos that he had made and posted online after he was aware of his duty to preserve information.  NatureWise then failed to produce these videos in discovery.  Tr. 228, 445-46, 449-50, 461; Exs. 91, 92, 640.

(f)      In a previous declaration submitted by Doyle in this case, he informed the court that NatureWise used Office AutoPilot only as an autoresponder system, and communicated that the only relevant information that would have been in Office AutoPilot would have been emails.  Ex. 408.3, ¶ 2.  Doyle submitted that none of the remaining information in Office AutoPilot was relevant to this case.  Ex. 408.2.  But at trial, Doyle admitted that Office AutoPilot contained a significant amount of information beyond emails, and that such information and data had been transferred to another system.  Tr. 723; Ex. 408.1.  That additional information and data was essential to this case.  Tr. 455; Ex. 92.5.  Doyle admitted that he did not disclose the extent of the use of Office AutoPilot in his declaration.  Tr. 724-25; 408.2.  NatureWise never produced the Office AutoPilot database in this case.  Tr. 713-721; Exs. 92.5, 408.2.

(g)      NatureWise never produced any product SOPs or specification sheets, and claimed, prior to trial, that such documents did not exist.  Tr. 1131; Ex. 649.1.

(h)      NatureWise never produced the statistical analysis that it presented to Amazon to show that reviews posted to NatureWise's product pages were fake.  Tr. 741-743.

90.      Again, the court finds that Doyle's explanations to the foregoing discovery issues were not credible.

28

# CONCLUSIONS OF LAW

## I.     The Adverse Inference Rule

1.     "The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Wardrip v. Hart*, 949 F. Supp. 801, 804 (D. Kan. 1996) (citing *Gilbert v. Cosco Inc.*, 989 F.2d 399, 406 (10th Cir.1993)).  Because NatureWise failed to preserve and produce relevant evidence in this case, the court will apply the adverse inference rule to each element of Vitamins Online's claims and assume that the evidence NatureWise failed to preserve and produce was unfavorable to it.

2.     In addition, the court notes that it has already imposed spoliation sanctions for Category 1 Products—that is, NatureWise garcinia cambogia and green coffee products for which there were no existing samples for testing.  ECF No. 155.  More specifically, the court determined that Vitamins Online was entitled to an adverse inference instruction that the Category 1 Products bore all of the allegedly false Ingredients Claims alleged in the Complaint and that they failed to meet those label claims.  *Id.*  Because NatureWise has failed to adequately rebut the adverse inference, the court finds and concludes that NatureWise's Category 1 Products did not meet their label claims.

## II.    Lanham Act False Advertising Claim

3.     Vitamins Online's first claim is for false advertising under the Lanham Act.

4.     The Lanham Act provides that:

(1) [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

29

the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

　　　(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2012).

　　5.　　To establish a false advertising claim under the Lanham Act, a plaintiff must show (1) that the defendant used a device or made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that misrepresents or is/are likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.[3]  *See* 15 U.S.C. § 1125(a)(1); *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999); *Vitamins Online, Inc. v. HeartWise, Inc.*, No. 2:13-CV-00982-DAK, 2019 WL 6682313, at *8 (D. Utah Sept. 24, 2019); *Vitamins Online, Inc. v. HeartWise*, Inc., 207 F. Supp. 3d 1233, 1237–44 (D. Utah 2016), *order vacated in part on reconsideration*, No. 2:13-CV-982-DAK, 2017 WL 2733867 (D. Utah May 11, 2017).

　　6.　　In addition to the foregoing elements, some courts also list materiality as another element of a Lanham Act claim, *see Novell, Inc. v. Network Trade Center, Inc.*, 25 F. Supp. 2d 1218, 1227-28 (D. Utah 1997), but the Tenth Circuit has not yet decided "whether the Lanham Act imposes a materiality inquiry," *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 685 (10th Cir. 2015).

---

[3] As the court has done in prior rulings, the court will refer to the foregoing elements as the (1) "falsity"; (2) "commerce"; (3) "deception"; and (4) "injury" elements.

30

## A.    Falsity and Deception

7.    A plaintiff can establish falsity by either showing that the defendant used a device, *Vitamins Online*, 207 F. Supp. 3d at 1242, or made false or misleading representations of fact in connection with the commercial advertising or promotion of its product, *Cottrell*, 191 F.3d at 1252 (10th Cir. 1999). "To constitute commercial advertising or promotion . . . , the statements identified by [the plaintiff] 'must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.'" *Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1267 (10th Cir. 2020).

8.    If proceeding based on a false or misleading representation of fact, a plaintiff "can either show that the representations are literally false or impliedly false." *Vitamins Online*, 2016 WL 538458, at *6.

9.    A representation is literally false when it states that a product "has certain qualities that it in fact does not actually have" and is impliedly false when the "statements . . . , while literally true or ambiguous, convey a false impression or are misleading in context, as demonstrated by actual consumer confusion." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13–14 (7th Cir. 1992).

10.    For literally false statements, "the message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Interlink Products Int'l Inc. v. F & W Trading*, No. 15–1340 (MAS) (DEA), 2016 WL 1260713, at *9 (D.N.J. Mar. 31, 2016) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*,

31

290 F.3d 578, 586–87 (3d Cir. 2002)). "Only an *unambiguous* message can be literally false." *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) (emphasis in original) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)). Importantly, when a statement or advertisement "can reasonably be understood as conveying different messages, [a] literal falsity argument must fail." *Buetow*, 650 F.3d at 1185 (quoting *Scotts Co. v. United Ind. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002)).

11.     For a false statement to be actionable under the Lanham Act, it must be a false statement of fact. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir. 2000); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995). And for a statement of fact to be actionable, it "must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999)).

12.     When a statement or representation is deemed to be literally false, the deception element is presumed. *Procter & Gamble Co. v. Haugen*, 627 F. Supp. 2d 1287, 1290 (D. Utah 2008); *see Zoller Labs., LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004); *see also PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011). Conversely, when the statement at issue is impliedly false, a plaintiff must demonstrate actual consumer deception. *Vincent v. Utah Plastic Surgery Soc.*, 621 Fed. App'x. 546, 550 (10th Cir. 2015). Actual consumer deception must be shown by extrinsic evidence that demonstrates that the challenged statements "tend to mislead or confuse consumers." *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1239 (D. Utah 2018) (quoting *Zoller Labs.*, 111 F. App'x at 982).

13.     Yet, even under a theory of implied falsity, a plaintiff's failure to demonstrate that

32

Case 2:20-cv-13335-MWO3Ge6731 Filed 07/20/2012 DicterMain 848/8237 3637 Page 44 of
Case 2:13-cv-00982-DAK Document 585 Filed 11/10/20 PageID.32062 Page 93 of 93
Main Document 87 Page 116 of 161

consumers were actually deceived is not fatal to his or her claim. Indeed, a plaintiff can still

benefit from a presumption of consumer deception for statements that are impliedly false if the

plaintiff can show that the defendant acted with the intent to deceive consumers. *Cashmere &*

*Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 316 (1st Cir. 2002); *see also Merck*

*Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 256 (2d Cir. 2014); *William H. Morris Co. v. Grp. W,*

*Inc.*, 66 F.3d 255, 258 (9th Cir. 1995), *supplemented sub nom. William H. Morris Co. v. Grp. W.*

*Inc.*, 67 F.3d 310 (9th Cir. 1995).

### 1.    Ingredients Claims

14.    As mentioned above, the court concludes that the Category 1 Products did not

meet their label claims. Consequently, the court finds those claims were literally false, and

Vitamins Online is therefore entitled to a presumption of deception. NatureWise failed to rebut

that presumption. Consequently, with respect to Category 1 Products, the court concludes that

Vitamins Online has established the falsity and deception elements.

15.    As to the Products in general, the court first concludes that NatureWise failed to

keep the necessary documentation to keep track of the Green Coffees and the Garcinias that it

was selling. Indeed, NatureWise represented that it did not and cannot track which labels were

used on which bottles for each lot/batch of the Products that it produced. Likewise, NatureWise

represented that it does not know which labels it used on the Products at different times or on

specific dates, and it does not know during which period it sold certain lots/batches. Therefore,

because of NatureWise's failure to maintain the foregoing information, the court makes the

following legal conclusions with respect to the Products, but does not differentiate between

lots/batches:

(a)     As to certain lots, NatureWise's claim that the First Green Coffee contained 50% chlorogenic acid was literally false;

(b)     As to certain lots, NatureWise's claim that the First Green Coffee contained "Clinically Proven GCA" was literally false;

(c)     NatureWise's claims that the First Green Coffee contained the amount of GCA that corresponded with the GCA study were literally false by necessary implication;

(d)     NatureWise's claim that the First Green Coffee was clinically proven after having knowledge that the GCA study was flawed and retracted was literally false;

(e)     As to certain lots, NatureWise's claims that the Green Coffees were vegetarian were literally false;

(f)     As to certain lots, NatureWise's claims that the Green Coffees contained specific amounts of green coffee extract were literally false;

(g)     As to certain lots, NatureWise's claims that the Green Coffee contained 400 milligrams of chlorogenic acids were literally false;

(h)     As to certain lots, NatureWise's claim that the Green Coffees contained no fillers, binders, or artificial ingredients was literally false.

(i)     NatureWise's representations that the First Garcinia had SuperCitrimax were literally false;

(j)     NatureWise's claims that the First Garcinia contained a clinically proven and patented form of HCA bound to calcium and potassium were literally false;

(k)     As to certain lots, NatureWise's claims that the Garcinias were vegetarian were literally false;

34

(l)     As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(m)     As to certain lots, NatureWise's claim that the Garcinias contained 60% HCA was literally false;

(n)     As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

(o)     As to certain lots, NatureWise's claim that the Garcinias contained 300 milligrams of HCA was literally false;

(p)     As to certain lots, NatureWise's claim regarding the specific amount of garcinia cambogia extract was literally false;

(q)     As to certain lots, NatureWise's claim that the Garcinias contained no fillers, binders, or artificial ingredients was literally false; and

(r)     For much of 2012 and 2013, NatureWise's claims, regarding the Green Coffees and the First Garcinia, that (1) each ingredient it used was verified for purity through in-house testing; (2) it had implemented a strict set of FDA compliant manufacturing procedures; and (3) its facilities were regularly inspected by FDA officials were literally false because NatureWise did not know who was making those products.

16.     The court concludes that NatureWise made the above representations and statements in connection with the commercial advertising and promotion of the Products because (1) NatureWise's representations were commercial speech; (2) NatureWise is in commercial competition with Vitamins Online; (3) the purpose behind the statements was to influence consumers to purchase the Products; and (4) NatureWise disseminated the statements sufficiently to the relevant purchasing public.

17.     Therefore, Vitamins Online has established the falsity element for its Ingredients Claims.  Moreover, because Vitamins Online has demonstrated that NatureWise's foregoing statements were literally false, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived by such statements.  NatureWise failed to rebut that presumption.  Therefore, Vitamins Online has also established the deception element for its Ingredients Claims.

18.     The court also concludes that, even if the foregoing claims were impliedly false, Vitamins Online would nevertheless be entitled to a presumption of deception because the court concludes that NatureWise and Doyle acted with the intent to deceive consumers.  Because NatureWise also failed to rebut that presumption, Vitamins Online has established falsity and deception under either theory of literal or implied falsity.

## 2.     Review Claims

19.     As to the Review Claims, the court reaches the following legal conclusions with respect to falsity and deception:

(a)     NatureWise's practice of block voting on the helpfulness of reviews constitutes the use of a device in connection with the commercial advertising or promotion of its products;

(b)     As a result of NatureWise's practice of block voting, the number of helpfulness votes on certain NatureWise reviews were artificially inflated and literally false; and

(c)     NatureWise's representations that it did not offer free products in exchange for reviews were literally false.

20.     Importantly, the court has already determined that NatureWise's conduct related to the Review Claims constitutes commercial advertising or promotion under the falsity element.

36

*Vitamins Online*, 207 F. Supp. 3d at 1242. Therefore, Vitamins Online has established the falsity element for its Review Claims. Moreover, because Vitamins Online has demonstrated literal falsity, Vitamins Online is entitled to a presumption that consumers were, in fact, deceived. The court concludes that NatureWise failed to rebut that presumption. Therefore, Vitamins Online has established the deception element for its Review Claims.

21.     The court also concludes that, even if the foregoing claims were impliedly false, Vitamins Online would nevertheless be entitled to a presumption of deception because the court concludes that NatureWise and Doyle acted with the intent to deceive consumers. Because NatureWise failed to rebut that presumption, Vitamins Online has established falsity and deception under either theory of use of a device, literal falsity, or implied falsity.

## B.     Commerce

22.     NatureWise has not contested the commerce element of Vitamins Online's Lanham Act claim. *Vitamins Online*, 2019 WL 6682313, at *8. Regardless, the court concludes that NatureWise's actions and statements were made in commerce as required by the Lanham Act. *See* 15 U.S.C. § 1125(a).

## C.     Materiality

23.     As noted above, the Tenth Circuit has not squarely addressed whether materiality is a necessary element of a Lanham Act claim. Nevertheless, the court will address it in this case. As explained by the Tenth Circuit: "Though not explicitly mentioned in the text of the Lanham Act, many courts require plaintiffs to prove that a false or misleading advertisement is 'likely to influence the purchasing decision' before permitting recovery based on it. Circuits that have imposed a materiality requirement are, however, split over who bears the burden of proof: some keep it with the plaintiff while others are willing to presume that at least some

37

misstatements—usually literally false ones—are material." *Gen. Steel*, 627 F. App'x at 685 (citations omitted).  Further, the Second Circuit has articulated that "in many cases the evidence and the findings by [a] court that a plaintiff has been injured or is likely to suffer injury will satisfy the materiality standard—especially where the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 70–71 (2d Cir. 2016).

24.      Based on this standard, the court concludes that Vitamins Online has established that NatureWise's misrepresentations with respect to both the Ingredients Claims and the Review Claims were material to consumers.  Indeed, Vitamins Online has demonstrated that NatureWise's misrepresentations were likely to influence consumers' purchasing decisions.  This is especially true when viewing NatureWise's misrepresentations in the context of Dr. Oz's recommendations to consumers.

25.      Furthermore, given the court's conclusion that NatureWise's statements and representations were literally false, Vitamins Online is entitled to a presumption that those literally false statements and representations were material to consumers. *Pizza Hut*, 227 F.3d at 497.  Because NatureWise has failed to rebut that presumption, the court concludes that NatureWise's literally false statements and representations were material to consumers.

26.      Lastly, as will be explained in detail below, because Vitamins Online and NatureWise were direct competitors in a sparsely populated market, the court presumes that NatureWise's misrepresentations injured Vitamins Online.  Thus, on that additional basis, the court concludes that Vitamins Online has satisfied the materiality element.

38

### D. Injury

27.     To establish the injury element of a Lanham Act false advertising claim, a

plaintiff "must show economic or reputational injury flowing directly from the deception

wrought by the defendant's advertising; and that that occurs when deception of consumers causes

them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components,*

*Inc.*, 572 U.S. 118, 133 (2014).  Put differently, a plaintiff must provide evidence of "an injury to

a commercial interest in sales or business reputation proximately caused by the defendant's

misrepresentations." *Id.* at 140.

28.     The standard for determining whether a plaintiff has provided sufficient evidence

of injury is dependent on the relief that the plaintiff is seeking.  *See Porous Media Corp. v. Pall*

*Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997) ("[C]ases involving injunctive relief and those

seeking monetary damages under the Lanham Act have different standards of proof.").  When a

plaintiff is seeking injunctive relief, the "plaintiff does not need to establish actual damages, and

is instead held to a lesser standard of proving that it is likely that the defendant's advertising has

caused or will cause plaintiff injury."  *Berken v. Jude*, No. 12-CV-02555-RPM, 2013 WL

6152347, at *2 (D. Colo. Nov. 22, 2013).  In other words, when the plaintiff is seeking an

injunction, "[t]he statute demands only proof providing a reasonable basis for the belief that the

plaintiff is likely to be damaged as a result of the false advertising" and not "proof of actual loss

and specific evidence of causation."  *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186,

190 (2d Cir. 1980).

29.     In contrast, a "heightened level of . . . proof of causation and specific injury" is

required when the plaintiff is seeking money damages, *Porous Media Corp.*, 110 F.3d at 1335–

36, in order to "prevent the plaintiffs from receiving a windfall unrelated to their own damages,"

39

*Berken*, 2013 WL 6152347, at *2. And, as this court has previously determined, the standard of proof required when a plaintiff is seeking disgorgement is somewhere between the standards for money damages and injunctive relief. *Vitamins Online*, 2019 WL 6682313, at *15. In this case, Vitamins Online seeks disgorgement and injunctive relief.

30.     There are certain circumstances that allow a plaintiff to benefit from a presumption of injury in Lanham Act false advertising cases. *Id.* at *13. For example, courts will apply a presumption of injury in cases involving (1) comparative advertising, *Munchkin, Inc. v. Playtex Prod., LLC*, 600 F. App'x 537 (9th Cir. 2015), or (2) "direct competitors in a sparsely populated market," *Church & Dwight*, 843 F.3d at 72 n.12.

31.     In this case, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from 2012 through 2013.[4] However, after 2013, there was a flood of competitors into the market such that the market was no longer sparsely populated. Accordingly, for the years 2012 and 2013, Vitamins Online is entitled to a presumption of injury. That presumption, though, applies only to Vitamins Online's economic injury; it does not apply to Vitamins Online's alleged reputational injury. This is so because NatureWise adequately rebutted the presumption as to reputational injury. Indeed, the court concludes that NatureWise established that it did not cause Vitamins Online reputational injury. However, NatureWise failed to rebut the presumption of economic injury for 2012 and 2013. Therefore, for 2012 and 2013, Vitamins Online has established that NatureWise's conduct

---

[4] The court notes that, in its previous decisions on the parties' motions for summary judgment, it concluded that this case did not involve direct competitors in a sparsely populated market. *Vitamins Online*, 2019 WL 6682313, at *13. However, now that the court has been presented with all of the evidence at trial, the court concludes that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from the time that NatureWise launched in 2012 through the end of 2013.

proximately caused it economic injury such that Vitamins Online has established the injury element of its claim.

32.    As to the remaining years, Vitamins Online is not entitled to a presumption of injury.  Thus, Vitamins Online was required to demonstrate that it suffered economic or reputational injury that was proximately caused by NatureWise's misrepresentations.  The court concludes that it failed to do so.  While Vitamins Online did produce some evidence, that evidence was insufficient to establish that NatureWise's actions proximately caused injury to Vitamins Online.  Once the market was flooded with competitors.  Once there were a multitude of competitors for green coffee and garcinia cambogia products on Amazon, one sale for NatureWise was not necessarily a lost sale for Vitamins Online.  Instead, a sale for NatureWise could have meant a lost sale for any of the other Amazon competitors.

33.    Therefore, the court concludes that Vitamins Online has established each of the elements of its Lanham Act false advertising claim for the years 2012 and 2013.  Accordingly, the court finds Vitamins Online's liable for false advertising under the Lanham Act.

### III.    Utah Common Law Unfair Competition Claim

34.    Vitamins Online's second claim is for common law unfair competition.  "Pursuant to Utah common law, unfair competition includes—*but is not limited to*—passing off, palming off, imitating, and causing or *likely causing* confusion or deception."  *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added).

35.    In this case, the court concludes that Vitamins Online has established its unfair competition claim.  The foregoing Findings of Fact and Conclusions of Law demonstrate that NatureWise unfairly competed in the garcinia cambogia and green coffee markets on Amazon.  Indeed, there is ample evidence demonstrating that NatureWise's actions, as detailed above,

41

- 338 -

resulted in a high likelihood of deception in the relevant markets on Amazon. Moreover, the court's analysis with respect to Vitamins Online's Lanham Act claim applies with equal force to its second claim. Therefore, NatureWise is liable for unfair competition under Utah common law.

## IV. Remedies

36.    As previously mentioned, Vitamins Online seeks the recovery of NatureWise's ill-gotten profits through disgorgement in addition to injunctive relief.

### A. Disgorgement

37.    Section 35 of the Lanham Act provides that, when a plaintiff has established a claim for false advertising, the plaintiff is entitled, "subject to the principles of equity, to recover . . . defendant's profits." 15 U.S.C. § 1117.

38.    The Tenth Circuit has held that "[u]nder the Lanham Act, plaintiffs must show either actual damages or willful action on the part of the defendant as a prerequisite to recover disgorgement of profits." *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013). However, the Supreme Court recently clarified that a finding of willfulness can no longer be a mandatory prerequisite to an award of the defendant's profits. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1494–95 (2020). Nevertheless, the Supreme Court noted that willfulness is still "a highly important consideration in determining whether an award of profits is appropriate." *Id.* at 1497. As such, the court will consider willfulness as it "weigh[s] the equities to fashion a remedy that matches the harm." *Klein-Becker*, 711 F.3d at 1162. In addition to willfulness, other equitable considerations may include, among other things, "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the

42

infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands." *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-CV-01398-PAB-KLM, 2013 WL 1900562, at *17 (D. Colo. May 7, 2013), *aff'd*, 627 F. App'x 682 (10th Cir. 2015).

39.     Here, the court concludes that disgorgement of NatureWise's profits from 2012 and 2013 is an appropriate remedy. First, there is little doubt, if any, that NatureWise benefitted from its unlawful actions. NatureWise quickly rose to the top of Amazon sales rankings and made millions of dollars in a matter of months despite having no previous experience in the industry. Second, other remedies would be inadequate. As will be described below, it would be against the public interest to impose a permanent injunction in this case. And, even though Vitamins Online is not seeking actual damages, actual damages are rather difficult to accurately calculate in a false advertising case. Third, Vitamins Online bears no unclean hands with respect to NatureWise's actions. Fourth, Vitamins Online did not delay in seeking relief. Fifth, NatureWise's actions were willful in that NatureWise and Doyle sought to intentionally deceive consumers. Indeed, Doyle willfully made false representations with respect to the Products and artificially altered reviews in order to make NatureWise more profitable. Sixth, as a result of testing, NatureWise had knowledge that certain lots of the Products did not match their label claims. Yet, even with that knowledge, NatureWise continued selling those products and never issued any recalls. And seventh, NatureWise's discovery improprieties, as explained above, favor disgorgement. Therefore, the disgorgement of NatureWise's ill-gotten profits in 2012 and 2013 is a warranted and appropriate remedy.

40.     Now that the court has determined that disgorgement of NatureWise's profits is warranted, the court must determine the amount. Section 35 of the Lanham Act provides that, after a plaintiff has established his or her claim, and the court has determined that disgorgement

is warranted, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117.

41.     Here, as explained in the Findings of Fact, Vitamins Online has demonstrated that, in 2012 and 2013, NatureWise's sales profits from the Green Coffees and the First Garcinia totaled $9,551,232.[5]

42.     Given that Vitamins Online has met its initial burden of proving NatureWise sales, the burden then shifts to NatureWise to prove all elements of cost or deduction. NatureWise, however, failed to carry that burden. As detailed in the Findings of Fact, NatureWise represented that it did not have record of its revenues by each specific product prior to 2014. Thus, Hoffman's calculations of NatureWise's 2012 and 2013 profits, and the costs and deductions associated with those profits, were a mere estimate and therefore unreliable. As such, the court concludes that NatureWise has failed to produce adequate evidence demonstrating any costs or deductions associated with its 2012 and 2013 profits.

43.     The court therefore concludes that the profits attributable to NatureWise's false advertising in violation of the Lanham Act amounts to $9,551,232. As such, the court awards Vitamins Online $9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and $2,300,114 from the First Garcinia. The court orders NatureWise to make payment thereof to Vitamins Online.

44.     In addition, there is a preference in the Tenth Circuit to award prejudgment interest in this type of case. *See, e.g., United Phosphorous Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1236–37 (10th Cir. 2000) ("[T]his Court has adopted a preference, if not a

---

[5] The court notes that NatureWise did not begin selling the Second Garcinia until 2015. Thus, because the court has limited disgorgement to 2012 and 2013, it need not consider the Second Garcinia.

presumption, for prejudgment interest."); *FDIC v. UMIC, Inc.,* 136 F.3d 1375, 1388 (10th Cir.

("[P]rejudgment interest normally should be awarded on successful federal claims.");

*EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, No. 2:09CV523DAK,

2012 WL 2419953, at *2 (D. Utah June 26, 2012).  Accordingly, the court concludes that

prejudgment interest in this case is warranted.

      45.     In determining the appropriate interest rate, federal courts are "free to choose any

interest rate which would 'fairly compensate the plaintiff for the delay in the receipt of

payment.'"  *Towerridge, Inc. v. T.A.O., Inc.,* 111 F.3d 758, 764 (10th Cir. 1997); *EarthGrains*,

2012 WL 2419953, at *2.  Here, in its discretion, the court looks to Utah law for guidance, and

concludes that Utah's post-judgment rate of 2.13% per annum, as of January 1, 2014, is an

appropriate interest rate.  *See* https://www.utcourts.gov/resources/intrates/historic.html.

Accordingly, the court awards Vitamins Online simple prejudgment interest of 2.13% per

annum, with accrual beginning on January 1, 2014.[6]

      46.     As to the Utah common law unfair competition claim, while it appears that Utah

courts have not explicitly addressed the remedies available for unfair competition, the

Restatement (Third) of Unfair Competition permits recovery for actual damages or an award of

the defendant's profits.  Restatement (Third) of Unfair Competition § 37.  A district court will

consider the same or similar factors when considering whether to award a defendant's profits

---

     [6] In Lanham cases, courts generally award simple prejudgment interest instead of
compound prejudgment interest.  *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star
Mark Mgmt., Inc.,* No. 04-CV-2293 SMG, 2009 WL 5185808, at *10 (E.D.N.Y. Dec. 23, 2009),
*aff'd*, 409 F. App'x 389 (2d Cir. 2010); *Sherwood Brands of Rhode Island, Inc. v. Smith
Enterprises, Inc.,* No. CIV.A. 00-287T, 2003 WL 22061871, at *3 (D.R.I. Mar. 31, 2003).
Furthermore, under Utah law, "[c]ompound interest is not favored," and "interest . . . should be
calculated simply unless agreed to otherwise by the parties."  *City of Hildale v. Cooke*, 2001 UT
56, ¶ 36, 28 P.3d 697, 707 (quoting *Watkins & Faber v. Whiteley*, 592 P.2d 613, 616 (Utah
1979)).  Accordingly, the court awards simple prejudgment interest in this case.

under the Lanham Act or Utah common law. *See id.* § 36 cmt. b, § 37. The only possible

distinction is that an award of lost profits under Utah law requires willfulness, whereas an award

under the Lanham Act, does not, in light of the Supreme Court's decision in *Romag*. *See id.* § 37

cmts. c, e. Regardless, the court has found that NatureWise and Doyle acted willfully.

47. The court therefore concludes that disgorgement is also warranted for Vitamins

Online's Utah common law unfair competition claim. Thus, the court awards Vitamins Online

$9,551,232 in disgorged profits from NatureWise—$7,251,118 for the Green Coffees and

$2,300,114 from the First Garcinia. This award of profits is not in addition to the award of

profits for Vitamins Online's Lanham Act claim. The court is merely recognizing that Vitamins

Online is entitled to the same disgorgement damages under both legal avenues. Accordingly,

Vitamins Online is awarded $9,551,232 in disgorged profits from NatureWise for *either* its

Lanham Act claim *or* its Utah common law unfair competition claim—Vitamins Online is not

awarded an independent $9,551,232 for each claim.

48. The court concludes that prejudgment interest is also warranted with respect to

Vitamins Online's common law unfair competition claim. Whether a party is entitled to

prejudgment interest under Utah law turns upon whether the damages are subject to calculation,

as opposed to the types of damages that are not calculated, such as are awarded for personal

injuries. The standard of recovery under Utah law is aptly explained in *Encon Utah, LLC v.*

*Fluor Ames Kraemer, LLC*:

> Prejudgment interest may be recovered where the damage is complete, the
> amount of the loss is fixed as of a particular time, and the loss is measurable by
> facts and figures. Prejudgment interest is appropriate when the loss ha[s] been fixed
> as of a definite time and the amount of the loss can be calculated with mathematical
> accuracy in accordance with well-established rules of damages. The trial court
> adopted a semblance of this language, ruling that prejudgment interest was
> appropriate because Encon's damages were "subject to mathematical calculation.

46

Each of these iterations of the standard for recovering prejudgment interest is correct. None suggests or requires, as the FAK parties claim, that at the time the damages accrued, all of the damage figures must be known and remain static throughout the litigation. Rather, the standard focuses on the measurability and calculability of the damages.

The court of appeals has explained that "losses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact, such as in cases of personal injury, wrongful death, defamation of character, and false imprisonment. Thus, prejudgment interest is inappropriate in cases where the trier of fact is left to assess damages based on "a mere description of the wrongs done or injuries inflicted.

We have held that prejudgment interest is appropriate in cases where the amount due under [a] contract was ascertainable by calculation and it was only the method to be used in making the calculation that was uncertain.

Therefore, where damage figures must be determined by the trier of fact in its exercise of discretion, prejudgment interest is inappropriate. Where damage figures are subject to calculation, however, even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate. The trial court recognized this important distinction and noted that, although various elements of Encon's termination claim may have been disputed as to amount, the claim has been subject to mathematical calculation since the date it was submitted. The trial court was correct.

2009 UT 7, ¶¶ 51–55, 210 P.3d 263, 272–73 (citations and quotations omitted).

49.     Under this standard, the court concludes that Vitamins Online is entitled to simple prejudgment interest on its common law unfair competition claim in the amount of 2.13% per annum, with accrual beginning on January 1, 2014. Again, the court notes that this is the same interest that Vitamins Online is entitled to under its Lanham Act claim, not in addition to that interest.

## B.      Enhanced Damages/Profits

50.     Under the Lanham Act, a court is permitted to enter judgment of up to three times the actual damages or profits awarded. 15 U.S.C. 1117(a); *Earthgrains Baking Companies Inc. v. Sycamore Family Bakery, Inc.*, 573 F. App'x 676, 682 (10th Cir. 2014). The decision to enhance damages lies within the discretion of the district court. *See Earthgrains Baking*, 573 F.

47

App'x at 682.  Importantly, when exercising the court's discretion in deciding whether to enhance damages, the court must keep in mind that the amount of profits awarded "should constitute compensation and not a penalty."  *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1233, 1244 (D. Utah 1998)  (citing *Nintendo of Am. v. Dragon Pac. Int'l,* 40 F.3d 1007, 1009–11 (9th Cir. 1994)).

51.     When assessing the equitable considerations of this case, the court concludes that an enhancement of profits is not warranted.  First, the court believes that the amount of awarded profits adequately compensates Vitamins Online such that an enhanced award of profits is not necessary.  Second, an enhancement of profits would result in a penalty against NatureWise instead of compensation to Vitamins Online.  Third, while the balance of equities in this case supports disgorging the profits that NatureWise earned in 2012 and 2013, that analysis is limited to disgorgement itself; the equitable considerations above do not require the court to also enhance the awarded profits.  Accordingly, the court declines to enhance the amount of disgorged profits awarded.

### C.     Injunctive Relief

52.     Under the Lanham Act, a court has the power to grant an injunction "according to the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116(a).  In order to qualify for injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

48

53.     Based on the foregoing standard, the court concludes that Vitamins Online is not entitled to a permanent injunction.  The court reaches this conclusion based on the second and fourth *eBay* factors.

54.     In this case, a disgorgement of NatureWise's profits adequately compensates Vitamins Online for its injury.  Thus, injunctive relief on top of disgorgement is unwarranted.  Accordingly, the court finds that the second factor weighs against an injunction.

55.     In addition, the fourth factor weighs against an injunction.  For its injunctive relief, Vitamins Online requests that NatureWise be compelled to remove all of the Product reviews on Amazon.  However, the court finds that such a remedy would be against the public interest.  The court reaches this conclusion because, were the court to issue such an order, legitimate reviews of actual consumers would also be removed.  Thus, injunctive relief, in that respect, would not only serve as a remedy for Vitamins Online, but also a remedy against actual consumers on Amazon and the Amazon marketplace itself.  Such a result, the court believes, is not appropriate under the circumstances of this case, and goes strongly against the public interest.  Therefore, the court rejects Vitamins Online's request for injunctive relief.

## D.     Attorney Fees and Costs

56.     Under the Lanham Act, a court may award attorney fees to the prevailing party in "exceptional cases."  15 U.S.C. § 1117(a).  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  When considering whether to award attorney fees under the Lanham Act, a district court should consider the following nonexclusive factors: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in

49

particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554

n.6.

57.     Here, the court concludes that, considering the totality of the circumstances, this

is an exceptional case such that an award of attorney fees and costs is appropriate and warranted.

In particular, the court concludes that this case is exceptional in light of NatureWise's actions in

willfully deceiving consumers, failing to produce pertinent evidence, and abusing the discovery

process.  Furthermore, the court finds that an award of attorney fees and costs is appropriate in

order to deter NatureWise from further engaging in such willful conduct.

58.     Therefore, within thirty days of the date this court enters judgment, the court

directs Vitamins Online to file with the court all of the necessary documentation establishing the

amount of attorney fees and costs that it has incurred in this case.

### NATUREWISE'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS

Lastly, the court will address NatureWise's Rule 52(c) Motion for Judgment on Partial

Findings.  Federal Rule of Civil Procedure 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).  When a defendant files a Rule 52(c) motion, "the trial court is not required

to consider the evidence in the light most favorable to the plaintiff." *Roth v. Am. Hosp. Supply

Corp.*, 965 F.2d 862, 865 (10th Cir. 1992).  Rather, the trial court "must undertake[] the fact

finding process which involves a weighing of the evidence and an assessment of the credibility

of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal

right to relief." *Id.* (alteration in original) (internal quotation marks omitted).

50

In this case, NatureWise moves for judgment on partial findings because it claims that (1) Vitamins Online lacks standing to assert the Ingredients Claims, and (2) Vitamins Online has failed to prove causation and injury as part of its Lanham Act claim. In addition, NatureWise contends that Vitamins Online failed to present any evidence to support a permanent injunction, and that judgment is warranted as to Vitamins Online's common law claim because claims for unfair competition under Utah common law are limited to passing-off/palming-off and misappropriation. The court will address each argument in turn.

First, NatureWise contends that Vitamins Online lacks standing with respect to the Ingredients Claims. In support of its argument, NatureWise avers that Vitamins Online is attempting to enforce the regulations of the Food and Drug Administration ("FDA"), which retains exclusive jurisdiction to enforce its regulations. To that end, NatureWise cites Ninth Circuit caselaw that provides:

> Because the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation.

*PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010).

The court finds NatureWise's standing argument to be without merit for several reasons. First, NatureWise bases much of its argument—if not all of it—on Dr. Howe's testimony regarding Good Manufacturing Practices ("GMP"). The FDA imposes certain GMP manufacturing and labeling requirements, among other things, on product manufacturers. Tr. 1735-36. As demonstrated by the foregoing Findings of Fact and Conclusions of Law, however, the court does not base NatureWise's Lanham Act liability on GMPs or FDA regulations. Rather, NatureWise is liable under the Lanham Act because its advertising claims were literally false—irrespective of the FDA regulations and GMPs. Thus, unlike *PhotoMedex*, there is no

51

need to consider, let alone litigate, any potential underlying FDA violations. Accordingly, the court rejects NatureWise's argument and finds that Vitamins Online has standing to assert its claims.[7]

Second, NatureWise avers that Vitamins Online has failed to establish causation and injury. The court also finds this argument to be without merit based on the court's Findings of Fact and Conclusions of Law. As explained in detail above, the court has concluded that Vitamins Online and NatureWise were direct competitors in a sparsely populated market from 2012 through 2013, and Vitamins Online is therefore entitled to a presumption of injury. Because NatureWise failed to rebut that presumption and for the reasons stated above, the court finds NatureWise's injury and causation arguments to be without merit.

Third, NatureWise contends that Vitamins Online failed to present evidence supporting a permanent injunction. As explained above, the court has concluded that a permanent injunction is not appropriate in this case. That conclusion, however, is based on the entirety of the evidence presented at trial. As such, the court does not grant NatureWise's motion with respect to injunctive relief, but reaches that conclusion, as explained above, based on all of the evidence that the parties presented.

Finally, NatureWise asserts that judgment is warranted on Vitamins Online's Utah common law unfair competition claim. But the court finds this argument to be without merit. As explained above, unfair competition under Utah common law "includes—*but is not limited to*—passing off, palming off, imitating, and causing or likely causing confusion or deception."

---

[7] It also bears mentioning that, notwithstanding the fact that Vitamins Online filed this case in 2013, and the parties have gone through several rounds of motions for summary judgment over the last seven years, this is the very first time that NatureWise argues that Vitamins Online lacks standing to assert the Ingredients Claims.

52

*Overstock.com*, 2008 UT 55, ¶ 13, 192 P.3d 858, 862 (emphasis added).  Thus, while

NatureWise attempts to limit the definition of unfair competition, the Utah Supreme Court

explicitly stated that unfair competition is not limited to passing off/palming off and

misappropriation.  And, because the court has concluded that NatureWise's conduct constitutes

unfair competition, the court rejects NatureWise's request for judgment on Vitamins Online's

common law unfair competition claim.

 Therefore, based on the foregoing reasoning and the Findings of Fact and Conclusions of

Law, the court hereby DENIES NatureWise's Motion for Judgment on Partial Findings pursuant

to Federal Rule of Civil Procedure 52(c).

 DATED this 10th day of November, 2020.

     BY THE COURT:

     DALE A. KIMBALL
     United States District Court Judge

53

**In re: HeartWise, Inc., Debtor**
**United States Bankruptcy Court**
**Central District of California**
**Case No.  8:20-bk-13335-MW**
**Proof of Claim of Magleby Cataxinos & Greenwood, P.C.**

# Exhibit B



**MCG** | Magleby
Cataxinos
Greenwood

T 801.359.9000 : F 801.359.9011 : www.mcgiplaw.com
170 South Main Street, Suite 1100, Salt Lake City, Utah 84101

James E. Magleby
magleby@mcgiplaw.com

September 27, 2018

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

*Via Electronic Mail*

Osman Khan
osman@nutrigold.com
VITAMINS ONLINE, INC.
1467 West 105 North
Orem, UT 84057

Re:     Engagement Letter

*Vitamins Online, Inc. v. HeartWise, Inc., dba NatureWise*
U.S. District Court, District of Utah, Central Division
Case No. 2:13-cv-00982-DAK

Dear Osman:

Thank you for selecting MAGLEBY CATAXINOS & GREENWOOD (the "Firm" or "MCG") to represent Vitamins Online, Inc., Nutrigold, Inc., Osman Khan, and Priya Khan (collectively and individually referred to herein as "Client"), in connection with the above-referenced case (the "Matter"), involving Client's dispute with HeartWise, Inc. ("HeartWise"), DavidPaul Doyle ("Doyle") and possibly related persons and entities. This letter outlines the scopes, terms and conditions of the Firm's representation.

## Scope of Representation

The Firm will represent the Client in all aspects of the Matter. This representation includes, without limitation, providing advice and counsel, reviewing documents, preparing correspondence, filing legal pleadings and papers with the court, appearing in court, trial, appeals, and negotiations.

████████████████████████████████████████████

Page 66

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 2



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 3



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 4



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 5



For the purposes of this letter, timely payment shall be defined as the Firm's
receipt of payment within fifteen (15) days of the date the statement is issues.  A

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 6

statement will be considered issued upon the earlier of (a) its e-mail delivery to the Client at the above e-mail addresses or other e-mail address provided by the Client, or (b) the date of the postmark for statements sent by mail.

**Fees and Costs**

The Firm's representation in this matter will be based upon both an hourly and a contingency component.

Reduced Hourly Portion of the Fee

The hourly portion of the fee will be based on the amount of time spent on behalf of Client. The Firm's hourly fees are based on the amount of time spent on the Client's behalf. Each lawyer and paralegal ("Timekeeper") has an hourly billing rate based generally on experience and special knowledge. The Timekeeper's rate, multiplied by the time expended on the Client's behalf, measured in tenths of an hour, will be the basis for determining the fee. The Firm's statement will detail this information for the Client. If a Timekeeper performs multiple different tasks on your matter in one day, our billing statements may indicate only the total amount of time spent by the attorney for all tasks performed on that date, and not break out the time spent on each individual task.

Because of the contingency portion of this fee agreement, the hourly rate charged to Client will be one-half, or fifty-percent (50%) of the hourly rate assigned to this Matter.

Thus, the Firm's regular rates for purposes of this engagement, are as follows:

| Timekeeper | Regular Rate |
| --- | --- |
| Donald J. Winder | $595.00 |
| Peggy A. Tomsic | $595.00 |
| Edgar R. Cataxinos | $560.00 |
| James E. Magleby | $550.00 |
| Christine T. Greenwood | $475.00 |
| Eric K. Schnibbe | $465.00 |
| David F. Mull | $415.00 |

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 7

| | |
|---|---|
| Jennifer Fraser Parrish | $365.00 |
| Alexander T. Stein | $325.00 |
| Geoffrey K. Biehn | $315.00 |
| Adam Alba | $315.00 |
| Warunee S. Srisiri | $305.00 |
| Mark P. Arrington | $265.00 |
| Matthew B. McCune | $265.00 |
| Yevgen Kovalov | $255.00 |
| Stacia P. Boren (Paralegal) | $210.00 |
| Tiffany L. Sisneros (Paralegal) | $195.00 |
| Greg Wayment (Paralegal) | $190.00 |
| Timothy L. Palfreyman (Paralegal) | $185.00 |
| Law Clerk | $190.00 - $235.00 |
| Legal Assistant | $ 85.00 - $145.00 |

As an example, if David Mull were to work for two hours, the Client would be
charged $415, reflecting a 50% discount. The specific time entries for Timekeepers on
the invoice will reflect their time multiplied by the rate, before the 50% discount. The
discount will then be applied as a "Contingency Discount" at the end of the invoice. This
method is applied both because it accommodates our internal accounting needs,
and also so that if attorney fees are awarded to Client as part of a damages award, or
a calculation needs to be provided for settlement purposes, the invoices will reflect the
higher, non-contingency rates. (This is not to suggest that we will not accurately
represent what has been paid for the services; rather, the higher rates will show the
value, before the discount).

If Client has any questions about or any objections to a monthly statement, our
services, or our charges, such should be raised promptly for discussion. If Client does
not object to our statements, in writing, before payment is due, then the amount due

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 8

shall be an account stated, and Client agrees to have waived any objection to the charges. If Client objects to only a portion of the charges on a statement, then Client agrees to pay the remainder, which partial payment will not constitute a waiver of Client's objection to the remainder.

Our billing rates are adjusted from time to time, and it is anticipated that the next increase in our hourly rates will become effective on January 1, 2019. However, with regard to this engagement, the Firm agrees that it will not increase the pre-discount rate for any Timekeeper more than $10 an hour in any given year.



<u>Contingency Fee Portion of Fee</u>

The second part of the fee paid to the Firm will be a contingency fee. This means that payment to the firm of this portion of the Firm's fee is contingent upon Client, or related persons or entities, recovering some value from one or more of the defendants or adverse parties, or others associated with or related to defendants from which we may be able to recover on the Client's behalf. For example, if Vitamins Online recovers and collects $1,000,000, then the Firm's contingency fee shall be calculated based upon the $1,000,000 figure recovered by Vitamins Online.

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 9

Client agrees that in consideration for the reduced hourly rates reflected above, Client will pay the Firm seventeen and a half percent (17.5%) of any compensatory or other damages that Client may obtain from the defendants in the Matter. The term "compensatory damages" shall include, but not be limited to, any and all monetary recovery of any nature, including not only a recovery of damages, but also any interest, exemplary or punitive damages, attorney or expert fees or costs, sanctions, or other non-monetary things of value obtained from HeartWise.

Client agrees to pay the Firm the contingency fee at the time of recovery. That is, it is the intent of the parties is that both Client and the Firm shall be paid at the same time, as any recovery is obtained. To clarify the obvious, this means that under no circumstances shall Vitamins Online be responsible for the contingency fee portion of the fee, unless and until Vitamins Online recovers monies, i.e., the Firm's contingency fee will come solely from monies recovered from the defendants. All payments from or collected against HeartWise or associated persons or entities shall be directed to the Firm, which will deduct the contingency fee and any outstanding fees and costs, and then pay the balance to Client.

If Vitamins Online wins a verdict that includes money damages at trial, and the defendants, or any of the defendants individually, files a notice of appeal, then this contingent fee will increase to twenty percent (20%).

If Client is successful in recovering more than five million dollars ($5,000,000.00) (the "Extraordinary Result Threshold"), then the Firm's contingency fee shall increase by an additional 5% for all compensatory or other damages recovered above the Extraordinary Result Threshold. So, for example, if the Firm collects $10 million from HeartWise with no appeal, the Firm will be entitled to a 17.5% contingency fee on the first $5 million, and a 22.5% contingency fee on the next $5 million. Assuming the same facts but with an appeal by HeartWise, then the Firm will be entitled to a 20% contingency fee on the first $5 million, and a 25% contingency fee on the next $5 million.

If Vitamins Online loses at trial, then the Firm may withdraw or continue as counsel at its discretion, depending on the Firm's assessment of the likelihood of success on appeal. If Vitamins Online loses at trial and the Firm files the appeal on behalf of Client, then the contingency fee will increase to twenty percent (20%) for damages recovered by way of settlement before a second trial. If an appeals court rules that the case should be remanded for a second trial, then the contingency fee will remain at twenty percent (20%).

It is anticipated the Firm will be lead, or primary counsel in the Matter. If, however, Client determines to hire additional counsel to assist in this matter such as

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 10

collection attorneys or counsel in other locations for purposes of actions such as serving subpoenas or assisting in discovery, Client shall bear these costs exclusively and the Firm's contingency fee shall not be subject to reduction.

Client hereby irrevocably agrees that the Firm will be paid the contingency fee, recognizing that we have agreed to represent Client, and at the risk of spending considerable time and effort on Client's behalf, without any guarantee of recovery or compensation on the contingency fee portion of our representation. Client recognizes that in agreeing to accept a contingency fee, the Firm is foregoing other work and fees, which would likely pay at our higher, standard rates. Client also understands that the firm is entitled to receive its entire Contingency Fee, even if the dispute settles or is resolved quickly and without a substantial investment of time by this firm.



<u>Costs</u>

The Firm typically incurs internal costs in connection with legal representation. Internal costs to the Firm include items such as long-distance telephone charges, postage, facsimile and photocopy charges, and similar expenses. Many firms also bill separately for computerized legal research. These costs can be substantial, and are cumbersome to track on a client-by-client basis. Thus, the Firm charges a flat rate to

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 11


cover all these internal costs, in the amount of four percent (4%) of every hour billed to
the Client's case, in lieu of any other charge for internal costs.

The Firm also typically incurs external, or third-party costs, for items such as
document processing fees, travels costs, filing fees, transcripts, court reporter
appearance and other fees, process server fees, investigator fees, expert witness fees,
and third-party photocopy and/or scanning fees. These charges shall be paid by the
Client at their actual costs (the Firm does not mark-up external charges). At the Firm's
option, it may forward third-party charges in excess of $500.00 directly to the Client for
payment.

<u>Statements and Payments</u>

Statements normally will be issued monthly for costs and expenses recorded on
the Firm's books during the previous month. As noted, payment of our statements is
ordinarily due within fifteen (15) days of the issuance of the statement. However, the
hourly portion of the Firm's compensation will be paid from the retainers, and possibly
additional payments, as described above.



Note that although we do not anticipate that the Client will fail to timely make the
minimum payments described above, if Client fails to do so then the Firm shall have the
right to apply a late-payment (interest) fee equivalent to 12% per annum. If the Client
fails to make the minimum payments or to pay costs, the Firm reserves the right to
terminate its representation of the Client, as set forth below.



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 12

     Client acknowledges the Firm's the right to enforce an attorney's lien in the event there is a balance owning to the Firm. *See* Utah Code Ann. § 38-2-7 (authorizing attorney's liens). In the unlikely event of a dispute, the state and federal courts in Salt Lake County, Utah, shall be the exclusive venue for resolution of any and all claims between Client and the Firm.

     The Client agrees that in the event there is an outstanding amount due to the Firm at the time of settlement, or collection or recovery of monies on the Client's behalf, the Firm is authorized to direct that all such monies be payable and delivered to, and in the name of the Firm. The Client agrees that in the event the Firm receives any settlement proceeds or funds otherwise due to be paid to the Client resulting from the Firm's representation of the clients in the Matter, that prior to delivery to Client, the Firm shall be entitled to first apply such proceeds or funds to any amounts due and owing to the firm, as well as an amount sufficient to cover any fees and costs for work in progress that have not, at that time, been billed. In addition, the Client is advised and agrees that the Firm will not and, pursuant to ethical rules cannot disburse such proceeds or funds if they are received in the form of a check, until such time as the check has cleared the bank on which it is drawn and the check is no longer subject to the possibility of dishonor.

     The costs and expenses relating to a matter are not predictable. Accordingly, the Firm has made no commitment to the Client concerning the maximum costs and expenses that will be necessary to resolve or complete the Matter, or any aspect of the Matter. Any estimate of costs and expenses that the Firm may discuss represents only an estimate of such costs and expenses. The Client understands and agrees that payment of the Firm's costs and expenses is in no way contingent on the ultimate outcome of the Matter or any particular aspect of the Matter.



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 13



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 14



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 15



CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 16



**Signatures**

This letter will constitute the agreement between the Firm and the Client unless amended by a writing signed by an attorney of the Firm. Please have a fully-countersigned copy of this letter delivered to our attention at your convenience.

Thank you for your time and consideration.

Sincerely,

MAGLEBY CATAXINOS & GREENWOOD, PC

James E. Magleby

CONFIDENTIAL ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT PRIVILEGE

Osman Khan
VITAMINS ONLINE, INC.
September 27, 2018
Page 17


**AGREED AND ACCEPTED:**

VITAMINS ONLINE, INC.


_____  DATED this _____ day of September, 2018

By: _____

Its: _____


NUTRIGOLD, INC.


_____  DATED this _____ day of September, 2018

By: _____

Its: _____


_____  DATED this _____ day of September, 2018
Priya Khan


_____  DATED this _____ day of September, 2018
Osman Khan

**James E. Magleby**

| | |
|---|---|
| **From:** | Osman @ NutriGold <osman@nutrigold.com> |
| **Sent:** | Wednesday, October 17, 2018 12:55 PM |
| **To:** | James E. Magleby |
| **Subject:** | Re: 9-27-18 Engagement Letter v2 - Vitamins Online v HeartWise, et al.pdf |

Jim,

Please accept this email as a written confirmation of my acceptance of the engagement letter. I haven't been to the office in a few days and mostly working from home. Please let me know if you need a physically signed copy. If yes, I will print scan and send.

Thanks,

**Osman Khan**
**Co-founder and Chief Business Development Officer @ NutriGold**
1467 West 105 North, Orem, UT 84057, USA
Email: osman@nutrigold.com | Office: (800) 476-3542 | Direct: (801) 885-7761

Privileged Communications: This email (and/or the documents attached to it) may contain confidential information belonging to the sender which is privileged. The information is intended only for the use of the individual or entity named on the distribution. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you received this email in error, please notify us by telephone to arrange for the return of the documents.

On Thu, Sep 27, 2018 at 8:38 PM James E. Magleby <magleby@mcgiplaw.com> wrote:

ATTORNEY-CLIENT / ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL.

Osman:

Engagement letter in .pdf.

Thanks.

James E. Magleby
**MCG** | Magleby Cataxinos Greenwood
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101
Telephone: 801.359.9000
Facsimile: 801.359.9011
magleby@mcgiplaw.com
www.mcgiplaw.com

1

- 369 -

Page 83

PRIVILEGE AND CONFIDENTIALITY NOTICE: This e-mail message, including attachments, is intended exclusively for the individual(s) to whom it is addressed and may contain information that is proprietary, privileged, confidential, or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message. This message may be subject to the attorney-client privilege, work product protection, common-interest rule, or other privileges, protections, or immunities and is strictly confidential.

2

In re: HeartWise, Inc., Debtor
United States Bankruptcy Court
Central District of California
Case No.  8:20-bk-13335-MW
Proof of Claim of Magleby Cataxinos & Greenwood, P.C.

# Exhibit C



**MCG** | Magleby
Cataxinos
Greenwood

170 South Main Street
Suite 1100
Salt Lake City, Utah 84101
Telephone:801 359 9000  Facsimile:801 359 9011

Osman Khan
Nutrigold
1467 West 105 North
Orem, Utah 84057

April  5, 2021

Invoice No:  35900

| Regarding: | Vitamins Online v. HeartWise |
|---|---|
| M&G Matter No | 0902.1 |

Please find below the summary information pertaining to your current bill enclosed

| Previous Balance | $242,613.01 |
|---|---|
| New Charges this Bill | $0.00 |
| Total payments and credits | $-97,864.40 |
| **Balance Due this Bill** | **$144,748.61** |

If you have any questions, please do not hesitate to call us.

**EFT/WIRE INFORMATION:**
**Zions Bank**
**1 South Main Street**
**Salt Lake City, Utah 84133**
**Magleby Cataxinos & Greenwood, P.C.**
**Acct No. 003162682**
**Routing No 124000054**

**MCG** | Magleby
Cataxinos
Greenwood

| Regarding: | Vitamins Online v. HeartWise | Page No.: | 2 |
|---|---|---|---|
| M&G Matter No 0902.1 | | Invoice No: 35900 | |

| | | | |
|---|---|---|---|
| Previous Balance | | | $242,613.01 |
| 3/18/2021 | Payment | EFT | $-97,864.40 |
| | Payment | | |
| | | | |
| Total Payments and Credits | | | $-97,864.40 |
| Balance Due | | | $144,748.61 |

*A/R Aging*

| Current | 30 Days | 60 Days | 90 Days | 120 and Over | -- | Total |
|---|---|---|---|---|---|---|
| $4,222.40 | $0.00 | $12,557.22 | $12,287.60 | $115,681.39 | $0.00 | $144,748.61 |

# EXHIBIT 3

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VITAMINS ONLINE, INC.,** a Delaware corporation,<br><br>        **Plaintiff,**<br><br>v.<br><br>**HEARTWISE, INC.** an Oregon corporation d/b/a **NATUREWISE,**<br><br>        **Defendant.** | **FINAL JUDGMENT**<br><br>**Case No.:  2:13-cv-00982-DAK**<br><br>**Judge Dale A. Kimball** |

This action came before the court for a bench trial.  Pursuant to Federal Rule of Civil Procedure 58 and the court's Findings of Fact and Conclusions of Law entered November 10, 2020 [ECF No. 585], and with there being no other issues before the court, the court enters judgment in favor of Plaintiff and against Defendant in the amount of $9,551,232 in disgorged profits with simple prejudgment interest at the rate of 2.13% per annum, beginning on January 1, 2014.  Plaintiff is further awarded its reasonable attorney fees and costs in this matter, to be determined post judgment.  This action is now closed.

DATED this 10th day of November, 2020.

BY THE COURT:

DALE A. KIMBALL
United States District Court